**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION-CINCINNATI**

NORCAL TEA PARTY PATRIOTS, )
ON BEHALF OF ITSELF, ITS MEMBERS, )
AND THE CLASS IT SEEKS TO REPRESENT, )
                                  )     Case No: 1:13-cv-00341
     Plaintiff, )
                                    )
vs. )
                                    )
THE INTERNAL REVENUE SERVICE, )
THE UNITED STATES DEPARTMENT )
OF THE TREASURY, and CURRENT )
AND FORMER EMPLOYEES OF THE )
INTERNAL REVENUE SERVICE IDENTIFIED )
AS JOHN DOES 1-100, )
                                    )
     Defendants. )

## CLASS ACTION COMPLAINT

COMES NOW NorCal Tea Party Patriots, Plaintiff, on behalf of itself, its members, and the class it seeks to represent, and for its suit against the Internal Revenue Service, the United States Department of the Treasury, and current and former employees of the Internal Revenue Service, identified as John Does 1-100, states as follows:

## SUMMARY OF THE CLAIM

1.    This is a class action against the United States Internal Revenue Service and certain of its officers and agents (John Does 1-100) who are yet to be identified.  The Plaintiff (and putative class representative) is NorCal Tea Party Patriots, an association of individual citizens who came together to exercise their right to free expression.  Their mission was to educate themselves and their fellow Americans and thereby improve social welfare, which they believe is advanced through fiscal responsibility, constitutionally limited government, and free

markets.  To avoid paying a burdensome and duplicative tax on their own post-tax contributions to the group's expressive activities, they sought exemption from the Internal Revenue Service under Section 501(c)(4) of the Internal Revenue Code, which covers social welfare organizations.  However, under pain of denial of tax-exempt status, the IRS and its agents singled out groups like NorCal Tea Party Patriots for intensive and intrusive scrutiny, probing their members' associates, speech, activities, and beliefs.  NorCal and its members suffered years of delay and expense while awaiting the exemption and spending valuable time and money answering the IRS's questions.  The result was a muffling and muzzling of free expression. Hundreds of other citizen groups who met the IRS' criteria—at first, groups with "tea party"-sounding words in their names, but later, groups whose members shared purposes and beliefs similar to NorCal's—suffered the same fate.  Accordingly, NorCal brings this suit on its own behalf, on its members' behalf, and for the putative class.  It asserts two violations: (1) violation of the Privacy Act of 1974; and (2) violation of the First and Fifth Amendments under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) ("*Bivens*").

## JURISDICTION AND VENUE

2.     Jurisdiction is proper in this Court pursuant to 5 U.S.C. § 552a ("the Privacy Act"), and 28 U.S.C. § 1331 ("original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States").  As set forth below, Plaintiff's claim arises under the First and Fifth Amendments of the United States Constitution and is a civil action cognizable in federal courts under *Bivens*.

3.     Venue is proper in this district because it is the district in which the relevant agency records are situated.  5 U.S.C. § 552a(g)(5).  Additionally, venue is proper in this district because "a substantial part of the events or omissions giving rise to the claim occurred" at

the offices of the Internal Revenue Service in Cincinnati, Ohio, and upon information and belief, at least some of John Does 1-100 reside in the vicinity of Cincinnati, Ohio.  28 U.S.C. § 1391(b)(2).

## PARTIES

4.     The NorCal Tea Party Patriots is a non-profit organization located in Colfax, California.  Its purpose is expressive – to support and conduct non-partisan research, education, and informational activities to increase public awareness of legislation and legislators.   Its mission is three-fold:  (1) fiscal responsibility; (2) constitutionally limited government; and (3) free markets.  NorCal has, from time to time, been comprised of a six-member board of directors, including its chairman/secretary, Virginia ("Ginny") Rapini, who associated together in a corporate, tax-exempt form to maximize the effectiveness of their expression.  As discussed below, the Internal Revenue Service exceeded the bounds of the United States Constitution and the Privacy Act of 1974 in deciding to charge a special "price" to Mrs. Rapini and her associates because of their decision to join their voices together.  That price was two-fold:  a lengthy and costly delay in recognition of their tax-exempt status, and the required disclosure of the personal political beliefs, writings, thoughts, and activities of Mrs. Rapini and her associates in Norcal.

5.     The Internal Revenue Service ("IRS") is the chief tax collection agency of the United States and is a division of the United States Department of the Treasury.

6.     The IRS Exempt Organizations Rulings and Agreement Office is located in Washington, D.C., and has final authority as to what organizations are granted 501(c)(3) and 501(c)(4) tax-exempt status.

7.     The Rulings and Agreement Office exercises supervisory authority over the Determinations Unit located in Cincinnati, Ohio.  The Determinations Unit makes the initial

decision as to whether an organization will be granted tax-exempt status. The Determinations Unit also receives guidance and expertise by the Technical Unit of the Rulings and Agreement Office in Washington, D.C.

8.      John Does 1-100 are current and former employees of the Department of the Treasury, the IRS, and specifically, the subdivisions described in ¶¶ 6-7 and above.

## FACTUAL BACKGROUND

9.      Beginning in or about March 2010, the Determinations Unit began singling out for special scrutiny requests for tax exemption for groups identified as "Tea Party," "Patriots," "912 Project," and applications involving political-sounding names that seemed to identify with the Tea Party, such as "We the People" or "Take Back the Country."

10.     These criteria were later expanded to single out groups whose issues included government spending, government debt, or taxes.

11.     Groups dedicated to educating the public by advocacy/lobbying to "make America a better place to live" were also singled out.

12.     Also singled out for special scrutiny were groups who had a statement in the case file criticizing "how the country is being run."

13.     The IRS's knowledge that this discrimination was illegal is evidenced by their scheme to keep the people's duly elected representatives in the dark about it. When members of Congress asked IRS officials whether the IRS was singling out conservative or libertarian groups for different treatment, the IRS officials provided misleading and deceptive responses to conceal the scheme. Further, the White House denied any knowledge of the IRS targeting conservative or libertarian groups until April or May of 2013.

14.     The public was unaware that the IRS was singling out conservative or libertarian groups for special scrutiny until May of 2013.

15.     On May 14, 2013, the Treasury Inspector General for Tax Administration issued a report entitled, "Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review" (hereinafter, "IGR").

16.     The IGR found that tea party and other groups were singled out for special scrutiny based upon their names or policy positions.

17.     There is no evidence that liberal or "progressive" political groups or groups supporting the re-election of President Barack Obama or the election of Democrats were singled out for special scrutiny.  Indeed, a May 15, 2013 Washington Post analysis of the IRS public database of nonprofit organizations showed that groups with the word "progressive" in their names "suffered no similar slowdown pattern," and their number of approvals "increased each year from 17 in 2009 to 20 in 2012."  *See* *http://www.washingtonpost.com/wp-srv/special/politics/irs-targets-conservative-groups/* (visited May 19, 2013).

18.     The IGR identifies 296 applications singled out for review based on the groups' name or conservative or libertarian political views.  Other reports suggest the number may exceed 500.  Only through discovery will the full scope of this discrimination be identifiable.

19.     Once the IRS decided to begin singling out conservative and libertarian groups for special scrutiny it issued the first of several "be on the lookout" or "BOLO" listings.  The initial BOLO simply identified the Tea Party movement.  Further BOLOs included the conservative and libertarian criteria described above.

20.     Once a group like the NorCal Tea Party Patriots was singled out for special review, its file was forwarded to a team of specialists within the Determinations Unit.

5

21.     Once forwarded to the specialist for greater review, the organization was subjected to unreasonable delays and often harassing, illegal, and discriminatory demands for private information.

22.     The intent of the IRS to focus on view point discrimination is further evidenced by the fact that from March 2010 until July 2011 the IRS simply referred to these cases as the "tea party cases."

**Demands for Burdensome Information Disclosure**

23.     One tactic utilized by the IRS to harass, intimidate, and discriminate against conservative and libertarian groups critical of the government was to demand massive disclosure of information not authorized by the Internal Revenue Code or any other federal law.

24.     NorCal Tea Party Patriots, like the vast majority of tea party groups, is a mom and pop operation, run by ordinary citizens, often new to the process of formally organizing for expressive and social welfare purposes.  Like most tea party organizations, NorCal Tea Party Patriots operates on a shoe string budget and relies on its members and volunteers to perform the vast majority of its activities.  NorCal Tea Party Patriots does not have a large corporate structure or in-house legal team to respond to massive and technical requests for information.

25.     Yet as evinced in great detail in ¶¶ 28-29 below, these are exactly the kinds of requests the IRS made of the conservative and libertarian groups who fit its criteria for special scrutiny.

26.     The IRS engaged in a tactic of suffocating NorCal Tea Party Patriots and other similarly situated groups with requests that were so searching and extensive that they would have presented a serious challenge even for sophisticated businesses.

6

27.     The breadth of the requested information has been described by the IGR as inappropriate, unnecessary, and burdensome.

28.     An example of the sort of oppressive and overreaching information sought by the IRS of conservative and libertarian groups is found in the January 27, 2012 demand for information from NorCal Tea Party Patriots.  *See* Exhibit A, attached.  After doing nothing with any conservative or libertarian group's application for thirteen months (as will be discussed below), the IRS sent a demand for information to NorCal Tea Party Patriots.  The information had to be gathered and provided under penalty of perjury by February 17, 2012.  The scope of the information demanded in the January 27, 2012 letter is outrageous, oppressive, and illegal.

29.     For example, the IRS demanded the following information:

a.   a list of all events and activities conducted since July 2010, including the time, location, and content schedule of each event; the names and credentials of any instructors; detailed contents of the speeches or forums, names of the speakers or panels, and their credentials, and the amount paid for each speaker; the names of persons from NorCal Tea Party Patriots and the amount of time they will or had spent spend on the event, as well as the compensation paid to each person, *Id*., ¶ 1;

b.   information about NorCal Tea Party Patriots's website and internet related activities, such as the amounts incurred for these activities for 2010 and 2011, and the amounts to be incurred in 2012 and 2013,  *Id*., ¶ 2;

c.   copies of any newsletters or emails distributed to members or the public, *Id*., ¶ 3;

d.  copies of any new publication and/or advertising materials that were not already provided in the application or response submitted in July 2010, *Id.*, ¶ 4;

e.  whether NorCal Tea Party Patriots had conducted or would conduct rallies or exhibitions for or against any public policies, legislation, public officers, political candidates, and the like, *Id.*, ¶ 5;

f.  the time, location, and content of each scheduled rally or exhibition; copies of handouts that NorCal Tea Party Patriots did or would provide to the public, *Id.*;

g.  the names of NorCal's members and the amount of time each person would spend on the event; and the percentage of time and resources the NorCal Tea Party Patriots planned to spend conducting these activities in relation to its total activities for the year, *Id.*,;

h.  whether NorCal Tea Party Patriots had or would conduct candidate forums or any other events where political candidates were asked to speak, the names of the candidates, time and location of events, number of people in attendance, copies of all handouts distributed at these events, any recordings of the events, and a transcript of speeches given by the political candidates, *Id.*, ¶¶ 6-7;

i.  materials or other communications distributed by NorCal Tea Party Patriots on behalf of another organization or person, including copies of these materials, an indication of when and where the materials were distributed, and the names of the persons distributing the materials, *Id.*, ¶ 8;

j.  whether NorCal Tea Party Patriots had or intended to conduct voter education activities, such as voter registration drives, voting drives, or distribute voter guides; the names of the members who had or would conduct these efforts and copies of all materials distributed to further these efforts, *Id.*, ¶ 9;

k.  whether NorCal Tea Party Patriots had or planned to make any attempts to influence the outcome of specific legislation, *Id.*, ¶ 11;

l.  information about NorCal Tea Party Patriots's direct or indirect communications with members of legislative bodies. The IRS then demanded copies of these written communications, *Id.*, ¶ 12;

m.  the names of other IRC 501(c)(3), 501(c)(4), or 527 organizations, together with the name, employer identification number, and address of each such organization, a detailed description of the nature of the relationship between NorCal Tea Party Patriots and the other organizations, the nature of their contacts, and a list of shared employees, volunteers, and other resources, *Id.*, ¶ 13;

n.  copies of all solicitations made by NorCal Tea Party Patriots and copies of all documents related to fundraising events, *Id.*, ¶ 14;

o.  information about NorCal Tea Party Patriots's board of directors and the board's activities, including all copies of corporate minutes from August 2010 to present, the titles, duties, work hours, and compensation of the board members, officers, and employees, and the names of any board members or officers who has or intends to run for a public office, *Id.*, ¶ 16;

p.  extensive information about NorCal Tea Party Patriots' membership, including the number of members, the nature of its membership (individuals or organizations), copies of member application forms, membership fee schedule, the roles and duties of its members, and copies of NorCal's website's features that are designed to be available exclusively to its members only, *Id.*, ¶ 17;

q.  information on the income NorCal Tea Party Patriots received and raised from its inception to the time the information was requested, and its projected income for 2012 and 2013, *Id.*, ¶ 18;

r.  the names of donors, contributors, and grantors and whether these persons had or intended to run for office and which office, the amounts and dates of the contributions, and a detailed description of how NorCal Tea Party Patriots used these monies; the amount of membership fees NorCal Tea Party Patriots received each year; and the amounts of fundraising received each year, *Id.*; and

s.  detailed information about the expenses NorCal Tea Party Patriots had incurred from its inception to the time the information was requested and all anticipated expenses for 2012 and 2013; the compensation, salary, wage, and reimbursement expenses for each year of NorCal Tea Party Patriots's existence. *Id.*, ¶ 19.

30.  NorCal Tea Party Patriots was given this unreasonable deadline to respond to this onerous request, like so many other similarly situated conservative and libertarian groups, in January 2012. As the IGR points out, conservative groups were given unreasonable periods of

time to respond to these unnecessary and onerous requests even though the IRS had done nothing to process their request for tax exempt status for 13 months.

**Delay**

31.　The NorCal Tea Party Patriots first applied for tax-exempt status in March of 2010. Its approval was not granted until August 2, 2012.

32.　This unjustifiable delay was part of the IRS's pattern of withholding approval from conservative and libertarian groups.

33.　As the IGR points out, inappropriate criteria were in place for at least 18 months which resulted in substantial delays in processing applications of conservative and libertarian groups.

34.　The IGR also found that for the majority of conservative and libertarian organizations who applied for tax exempt status, no work was completed for 13 months.

35.　Many were left open for more than three years and crossed two campaign cycles. Campaign cycles are important not because social welfare groups want to influence candidate elections, but because they are a true "mass event" that focus the American public on the major policy issues of our day. Additionally, at the state level, many initiative petition and referendum campaigns coincide with candidate election cycles. Accordingly, for tax-exempt groups to truly fulfill their expressive and social welfare purposes, it is critical to have an exemption during the windows of heightened public awareness and debate that election cycles bring.

36.　Instead, the IRS saddled conservative and libertarian groups with delays during these crucial windows of opportunity. The delay was especially damaging to groups like the NorCal Tea Party Patriots. As the IGR points out, such groups often withdrew their applications or may not have begun conducting the planned social welfare work they had in mind.

11

37.     As the IGR explains, delays prevented organizations like NorCal Tea Party Patriots from receiving the tax-exempt status, including exemption from certain state taxes and reduced postal rates.

38.     Delays in processing tax-exempt status impaired the ability of NorCal Tea Party Patriots and similar groups to solicit donations and plan and conduct their business activities.

39.     Additionally, according to the IGR, such groups suffered great uncertainty because if their tax-exempt status had been ultimately denied they would have been forced to retroactively file tax returns and pay taxes and penalties for up to two years while their applications were pending.

40.     The IGR noted the extreme delay for these conservative and libertarian groups compared to those not singled out for extra scrutiny.  It took the IRS an average of 238 days to approve the applications of other groups and an average of 574 days to process the conservative and libertarian groups selected for higher scrutiny.  For politically favored groups, the process may have been much faster.  After watchdog groups complained that a foundation named after Barack H. Obama, the father of the President of the United States, was a sham charity and was operating without having received exempt status, the IRS' Cincinnati Determinations Unit processed its application in just 34 days, granting tax-exempt status retroactively to the date it had begun its fundraising in 2009.  *See* http://www.washingtonpost.com/politics/irs-stalled-conservative-groups-but-gave-speedy-approval-to-obama-foundation/2013/05/16/90c53e8a-be57-11e2-89c9-3be8095fe767_story.html (viewed May 19, 2013).  The Obama foundation's tax exemption letter was signed by Lois Lerner.  *Id.*

41.     The IGR points out that potential donors and grantors would be more reluctant to contribute to groups like NorCal Tea Party Patriots when their tax-exempt status is uncertain.

42.     As the IGR points out, when the purpose of a group is to inform and educate the public about the main policy issues of the day these sorts of delays through two election cycles can essentially destroy the group's ability to fully participate in the political process.  Put simply, the IRS used its power to intimidate, coerce, and chill the political activity of conservative and libertarian groups critical of the way the country was being run in the 2010 and 2012 election cycles.

## COUNT ONE:  THE PRIVACY ACT

43.     Plaintiff incorporates the allegations in Paragraphs 1-42 as though fully set forth herein.

44.     5 U.S.C. § 552a, known as the Privacy Act, grants all citizens certain protections regarding private information.  The Defendants violated the Privacy Act in several particulars.

45.     Section 552a(e)(1) requires that the agency "maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by Executive Order of the President".

46.     The Defendants violated this provision by requiring that NorCal produce information about its members' free expression and association that was neither relevant nor necessary to any lawful purpose.  The IRG admits that much of the information sought from Norcal and similarly situated groups was not relevant to any lawful purpose of the IRS.

47.     The IRS's demand for the information described in ¶¶ 28-29 violates § 552a(e)(1) and § 552a(e)(3).

48.     The provisions of § 552a(e)(3)(A) were violated because the IRS's request for information did not specify the authority which authorized the solicitation of the information and did not specify whether disclosure of the information was mandatory or voluntary.  In this case it

could only be voluntary since it was not authorized by law, but the IRS did not so notify the recipients.

49.     The provisions of § 552a(e)(3)(B) were violated because the IRS did not notify the recipients of the principle purpose for which the information was to be used – in this case, intimidation and delay based on a group's viewpoint.

50.     The provisions of § 552a(e)(3)(C) were violated because recipients were not made aware of the routine uses that were to be made of the information.  They were not made aware of it because no lawful routine use was contemplated.

51.     The provisions of § 552a(e)(3)(D) were violated because no notice was provided to recipients of the effects of not providing the information.  The IRS could not tell recipients that it was incapable of imposing any penalty upon them for not responding since the requests themselves were illegal.

52.     The provisions of § 552a(e)(4) were violated in that the IRS did not publish in the Federal Register any of the required information regarding this system of records which it was illegally soliciting and maintaining.

53.     The provisions of § 552a(e)(5) were violated in that the IRS made no effort to maintain these records with "such accuracy, relevance, timeliness, and completeness as is reasonably necessary to ensure fairness to the individual in the determination."   The very purpose for which these records were collected was to ensure unfairness and delay to conservative and libertarian groups.

54.     The provisions of § 552a(e)(7) were violated in that the law requires that the IRS "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is

14

maintained…"  The information demanded regarding the First Amendment activities of NorCal Tea Party Patriots, its associated members like Mrs. Rapini, and similar groups, as outlined in ¶¶ 28-29 above, illustrate a clear and intentional violation of this section.

55.     The provisions of § 552a(e)(10) were violated in that Defendants did not establish safe guards to ensure the security and confidentiality of the records and prevent embarrassment, inconvenience, or unfairness to the targeted groups.  On information and belief, Defendants have improperly disclosed information obtained from conservative and libertarian groups to media sources and groups with a political agenda consistent with Defendants' agenda.

56.     The Privacy Act in § 552a(g)(1) provides civil remedies for individuals who have been injured by activities such as the IRS has undertaken.  Norcal asserts causes of action under subsection (d) because the IRS has failed to comply with several provisions of the Privacy Act in such a way as to have an adverse effect on NorCal Tea Party Patriots and its members.

57.     NorCal's standing is two-pronged.  First, NorCal sues on its own behalf as an expressive association of individuals that has assumed the corporate form to obtain protection from paying taxes on the resources the individuals contribute to the group for its expressive purposes.  Second, NorCal asserts associational standing on behalf of Mrs. Rapini and all other NorCal members.  NorCal has associational standing.  NorCal's members have suffered damages as set forth in ¶ 58, below.  Additionally, the interests NorCal seeks to protect are germane to the organization's purpose (and indeed, its very existence).  Finally, neither the claim NorCal asserts nor the relief it requests requires the participation of the individual NorCal members in the lawsuit.  The demands of the IRS and NorCal's responses pertain to each NorCal member and, at least for purposes of the damages sought here, affect them all equally.

58.     Wherefore, pursuant to § 552a(g)(4) NorCal Tea Party Patriots states that it and its members have been damaged as a direct and proximate cause of Defendants' actions by:

- The collection of irrelevant and unnecessary information on NorCal, its officers, members, donors, speakers, and protected First Amendment activities.

- The invasion of the privacy of NorCal Tea Party Patriots and the above-referenced individuals.

- The harassment, burden, and expense of complying with demands for information that were not lawful.

- The loss of donations, membership fees, and grants due to the Defendants' invasion of the privacy of NorCal Tea Party Patriots and all people associated with it.

- The cost of bringing this action together with reasonable attorney's fees.

### COUNT TWO:  VIOLATIONS OF THE U.S. CONSTITUTION

59.     Plaintiff incorporates the allegations in Paragraphs 1-58 as though fully set forth herein.

60.     The United States Supreme Court ruled in *Bivens* (*see* ¶ 1, *supra*) that federal officers are subject to personal liability for any violation of constitutional rights of which a reasonable officer would be aware.  *Bivens* is available where there is a constitutional violation and the victim has no other remedy.  Other than the damages for the privacy intrusion pled above, NorCal Tea Party Patriots and similarly situated groups and individuals have no statutory remedy for the systematic targeting of conservative and libertarian groups based upon the content of their beliefs and expression.  This is a constitutional tort and a clear violation of several provisions of the United States Constitution.

61.     The First Amendment of the U.S. Constitution prohibits the government from discriminating against groups in any fashion based upon their political viewpoints.  As detailed above, the IRS engaged in systematic discrimination based upon the speech, expressed viewpoints, and association of NorCal Tea Party Patriots, its members, and similarly situated groups.  It subjected them to harassment, unfair delay, denial of governmental benefits, and impaired their ability to participate in the political process.

62.     The actions of IRS officers or agents John Doe 1-100 were intended to chill the political expression of conservative and libertarian associations like NorCal Tea Party Patriots and their individual members.  The IRS agents or officers succeeded in doing so by imposing unreasonable burdens upon the exercise of First Amendment rights and by intimidating through massive government snooping into protected First Amendment activities.

63.     The actions of John Does 1-100 interfered with the freedom of expressive association of NorCal Tea Party Patriots and its members by demanding details of all groups it associated with and details about its speakers, members, and literature it allowed or distributed.

64.     As the IGR report explains, delaying tax-exempt status of NorCal Tea Party Patriots and other similarly situated groups had the effect of impairing their members' expressive associational effectiveness in the 2010 and 2012 election cycles.

65.     Conservative groups like NorCal Tea Party Patriots and its members were denied equal protection of the law.  Upon information and belief, applications from left-leaning groups for tax-exempt status were processed far more swiftly than conservative and libertarian groups. The benefits of tax-exempt status were thus conferred based on political view point, not equally as the law requires.  Likewise, the political expression of conservative and libertarian groups as a class was greatly burdened by IRS agents and officers John Does 1-100, while left-leaning

groups (including those using the title "progressive" in their names) were afforded full privileges of the law.

66.     NorCal Tea Party Patriots, its members, and similarly situated conservative groups were likewise denied Due Process of the law by the IRS agents' actions.   The constitutional protections of conservative groups and the limitations upon the IRS by both the Constitution and statutes were systematically ignored to deprive conservative and libertarian groups and their members of their constitutional rights.

67.     NorCal Tea Party Patriots names John Does 1-100 as defendants because the government has not disclosed the identities of the specific agents or officers in the Determinations Unit or the other subdivisions of the IRS or Department of the Treasury listed in ¶¶ 5-7 of this Complaint.  They are referenced here by their actions and by the unconstitutional intent and effects of their actions, and NorCal will plead the identities of specific agents and officers as it learns them in discovery.  However, although their identities are unknown, NorCal pleads that each agent who authorized, transmitted, accepted, or ratified the requests and responses for information (and the attendant delays) outlined above personally violated the Constitution and committed a constitutional tort.   Additionally, NorCal pleads that each individuals' actions were in violation of clearly established law of which reasonable officials should have known.

68.     In sum, because of their political viewpoints, conservative groups were subjected to harassment, intimidation, delay, discrimination, expense, intrusiveness, and embarrassment all as a part of a scheme by IRS agents and officers John Doe 1-100 to suppress their political activity and punish their political views.

69.     Wherefore, NorCal Tea Party Patriots and its members experienced damages, including loss of constitutional rights, interference with their liberty, delay and denial of government benefits, unequal treatment, loss of donations, increased tax burdens including state and local, loss of postal privileges, the expense of responding to the harassing tactics of the IRS, court costs, and attorneys fees.

70.     The actions of the federal agents of the Defendants were willful, malicious, reckless, and intended to do harm to NorCal Tea Party Patriots, its members, and similar groups.

## COUNT THREE:    CLASS ACTION

71.     Plaintiff incorporates the allegations in Paragraphs 1-70 as though fully set forth herein.

72.     NorCal Tea Party Patriots asks this Court to certify a class action of all conservative and libertarian groups targeted for additional scrutiny by the IRS from March 1, 2010 through May 15, 2012.

73.     The class definition would include all groups who applied for tax-exempt status and were referred to the specialists in the IRS Determinations Unit in Cincinnati, Ohio.  The class would include all members whose applications were delayed and/or additional information sought during this time period, and who meet any of the criteria utilized by the Determinations Unit in what they refer to as "the tea party cases."   This criteria would include any of the following:

- groups identified as "Tea Party," "Patriots," "912 Project";

- applications involving political sounding names, such as "We the People" or "Take Back the Country";

- groups whose issues included government spending, government debt, or taxes;

- groups dedicated to education of the public by advocacy/lobbying to "make America a better place to live" and;

- groups who had a statement in the case file criticizing "how the country is being run."

74. This case meets all of the prerequisites of Rule 23(a).

75. This class is so numerous that joinder of all members is impracticable. The exact number of all class members can only be determined through discovery. The IGR identifies 296 groups singled out for special treatment based on their political views. Media reports suggest the number to be 500 or more.

76. There are questions of law or fact common to the class. All of the members of the class suffered the same sorts of constitutional violations articulated in Count Two. All were subjected to harassment, discrimination, special scrutiny, and interference with their constitutional rights because of their political views. The same constitutional standards apply to each member of the class and common questions of law apply. Many members of the class were subjected to demands of additional information that violate the Privacy Act as articulated in Count One. This class was already defined by the IRS based on commonality of its political views and the decision that the IRS would discriminate in the same manner across the entire class. In other words, the IRS through its own criteria defined the class and chose to discriminate on a class-wide basis against everyone who meets the class definition.

77. The claims of NorCal Tea Party Patriots are typical of the claims of the class. Norcal was singled out and treated to similar discrimination and harassment by the IRS as the other members of the class as articulated above. The claims in this case are particularly typical

because the IRS intentionally chose to treat groups it considered critical of the government, with a conservative or libertarian point of view, in the same or similar discriminatory fashion.

78.    NorCal will fairly and adequately protect the interests of the class.  NorCal's interests are the same as other members of the class in holding the IRS responsible for its illegal activity, ensuring that it never happens again, and being fairly compensated for the results of this illegal activity.

79.    The provisions of Rule 23(b)(2) apply because the IRS has acted on grounds that apply generally to the class such that final injunctive relief would be appropriate for the class as a whole.  The IGR recognizes that more steps need to be taken to ensure that this type of discrimination does not occur again within the IRS.  The class will seek injunctive relief from this Court, including but not limited to:

- A declaration that the IRS may not discriminate in any of its activities based upon the political viewpoint of the applicant or taxpayer;

- That the IRS must destroy all records obtained illegally and in violation of the Privacy Act or any provision of the U.S. Constitution relating to class members or any donors, officers, members, or volunteers of the class members;

- That the IRS establish clear training and guidelines for all employees to prevent this sort of invasion of privacy and discriminatory activity from occurring again in the future.

80.    The provisions of Rule 23(b)(3) are met in that questions of law or fact common to class members predominate over individual questions and class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

81. The common questions of law and fact are overwhelming as described above and incorporated here by reference.

82. Individual questions are minimal. For example, some groups may not have received additional requests for information. Therefore, they may have a reduced or no claim under the Privacy Act. To the extent additional information requests created varying burdens on individuals, that can be resolved through individual damage determinations or creation of subclasses.

83. All groups suffered the same violations of constitutional rights. The IRS selected the class members based on the content of their views and expressive activity regarding the role and scope of government, and then treated them in an illegal fashion. All class members suffered this same harm and were damaged from the same activity.

84. A single action adjudicating the legal rights of conservative and libertarian groups would be more efficient than individual litigation. As noted, class membership will likely run into the hundreds, greatly inconveniencing the court and requiring needless duplication. A single unified discovery process would greatly expedite this litigation and prevent needless, repetitive document productions and depositions from Defendants.

85. Likewise, a single trial court ruling upon the constitutional and Privacy Act issues would greatly improve judicial efficiency. All of these factors illustrate the benefits of concentrated litigation in a single forum.

86. Further, NorCal is unaware of any other pending litigation to date regarding the activities of the IRS. Thus, no other litigants' activities should be impaired.

WHEREFORE, NorCal Tea Party Patriots prays that this Court:

- Enter an Order certifying this case as a class action and appointing its lawyers as class counsel;

- Award NorCal Tea Party Patriots damages for violation of the Privacy Act, including but not limited to, its costs of complying with additional requests for information, loss of donors and membership fees for the delay, uncertainty, and intrusiveness, the cost of litigation, and reasonable attorney's fees.

- Award NorCal Tea Party Patriots damages for violation of its constitutional rights, including damages for loss of benefit of tax exempt status, cost of complying with burdensome requests, loss of donors and membership fees, damages for impairment of constitutionally protected rights, punitive damages, litigation costs, and reasonable attorney's fees.

**A JURY TRIAL IS DEMANDED ON ALL ISSUES SO TRIABLE.**

Respectfully Submitted,

*/s/ David R. Langdon*
David R. Langdon (OH Bar No. 0067046)
   *Trial Attorney*
Joshua B. Bolinger (OH Bar No. 0079594)
Langdon Law LLC
8913 Cincinnati-Dayton Rd.
West Chester, Ohio 45069
Tel: (513) 577-7380
Fax: (513) 577-7383
dlangdon@langdonlaw.com
jbolinger@langdonlaw.com

*and*

Todd P. Graves, Mo. Bar No. 41319
Edward D. Greim, Mo. Bar No. 54034
GRAVES BARTLE MARCUS
& GARRETT, LLC
1100 Main Street, Suite 2700
Kansas City, Missouri  64105
Tel: (816) 256-3181
Fax: (816) 256-5958
tgraves@gbmglaw.com
edgreim@gbmglaw.com
(*pro hac vice* application forthcoming)

24