```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
 2                      WESTERN DIVISION
                           - - -
 3
     NORCAL TEA PARTY PATRIOTS,    : CIVIL NO. 1:13-CV-341
 4   et al.,                       :
                   Plaintiffs,     : Hearing on Motions to Dismiss
 5        -vs-                      :
                                   :
 6   INTERNAL REVENUE SERVICE,     : Monday, June 30, 2014
     et al.,                       : 10:05 a.m.
 7              Defendants.        : Cincinnati, Ohio
                           - - -
 8                  TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE SUSAN J. DLOTT, CHIEF JUDGE
 9                         - - -

10   For the Plaintiffs:  Edward D. Greim, Esq.
                          Todd P. Graves, Esq.
11                        Dane Martin, Esq.
                          Graves Garrett, LLC
12                        1100 Main Street, Suite 2700
                          Kansas City, Missouri  64105
13
                          David R. Langdon, Esq.
14                        Langdon Law, LLC
                          8913 Cincinnati-Dayton Road
15                        West Chester, Ohio  45069

16                        Christopher R. Finney, Esq.
                          Finney Law Firm, LLC
17                        4270 Ivy Pointe Boulevard, Suite 225
                          Cincinnati, Ohio  45245
18
     For the Defendants Internal Revenue Service and Department of
19   the Treasury:
                          Grover Hartt, III, Esq.
20                        U.S. Department of Justice
                          Tax Division
21                        717 North Harwood, Suite 400
                          Dallas, Texas  75201
22
                          Joseph A. Sergi, Esq.
23                        Laura C. Beckerman, Esq.
                          U.S. Department of Justice
24                        Tax Division
                          555 Fourth Street, NW
25                        Washington, D.C. 20001
```

Proceedings recorded in stenotype.
Transcript produced using computer-aided transcription.

```
 1                          Matthew Joseph Horwitz, Esq.
                            Assistant United States Attorney
 2                          221 East Fourth Street, Suite 400
                            Cincinnati, Ohio  45202
 3
      For the Defendants Carter Hall, Joseph Herr, Grant Herring,
 4    Elizabeth Hofacre, Stephen Seok, Mitchel Steele, and Carly
      Young:
 5                          Pierre H. Bergeron, Esq.
                            Thomas E. Zeno, Esq.
 6                          Lauren S. Kuley, Esq.
                            Squire Patton Boggs, LLP
 7                          221 East Fourth Street, Suite 2900
                            Cincinnati, Ohio  45202
 8
                            Jeffrey A. Lamken, Esq.
 9                          Eric R. Nitz, Esq.
                            MoloLamken LLP
10                          The Watergate
                            600 New Hampshire Avenue, NW, Suite 660
11                          Washington, D.C. 20037

12    For the Defendants Douglas Shulman, Steven Miller, William
      Wilkins, Sarah Hall Ingram, Joseph Grant, Lois Lerner, Holly
13    Paz, Cindy Thomas, Bonnie Esrig, Brenda Melahn, and Steven
      Bolling:
14                          Brigida Benitez, Esq.
                            Erica Gerson, Esq.
15                          Steptoe & Johnson, LLP
                            1330 Connecticut Avenue, NW
16                          Washington, D.C.  20036

17                          Mark T. Hayden, Esq.
                            Taft, Stettinius & Hollister, LLP
18                          425 Walnut Street, Suite 1800
                            Cincinnati, Ohio  45202
19


20


21    Courtroom Deputy:    William Miller

22    Law Clerk:           Beth Mandel

23    Court Reporter:      Julie A. Wolfer, RDR, CRR

24                              - - -

25
```

<u>PROCEEDINGS</u>

1

2      (In open court at 10:05 a.m.)

3          COURTROOM DEPUTY:  NorCal Tea Party Patriots versus

4  the Internal Revenue Service, Case Number 1:13CV341.

5          THE COURT:  Good morning to everyone.

6          Let me have just a minute here to get organized.

7          Okay.  I have tried to seat you in an order that I can

8  recall who is who.  Let's go through the first table.  For

9  plaintiffs, would you just state your name for the record.

10          MR. GREIM:  Your Honor, Eddie Greim from Graves

11  Garrett.

12          THE COURT:  All right.  Thank you.

13          MR. LANGDON:  David Langdon, Your Honor.

14          THE COURT:  Mr. Finney.

15          MR. FINNEY:  Christopher Finney.

16          THE COURT:  Okay.

17          MR. GRAVES:  Todd Graves, Graves Garrett.

18          THE COURT:  All right.

19          MR. MARTIN:  Dane Martin of Graves Garrett.

20          THE COURT:  Thank you.  All right.

21          Let's see, DOJ.

22          MR. HARTT:  Good morning, Your Honor.  I'm Grover

23  Hartt.

24          MR. SERGI:  Good morning, Your Honor.  I'm Joe Sergi.

25          MS. BECKERMAN:  Good morning.  I'm Laura Beckerman.

1          MR. HORWITZ:  Good morning, Your Honor.  Matt Horwitz.

2          THE COURT:  Okay.  Thank you, Mr. -- oh, I see where

3    you are, Mr. Horwitz.  You're sort of --

4          MR. HORWITZ:  I'm sort of an extension of the table.

5          THE COURT:  We've just got too many government

6    lawyers.  That's what it is.

7          All right.  For lack of a better word, I've been

8    calling you the government management defendants attorneys.

9          MS. BENITEZ:  Good morning, Your Honor.  I'm Brigida

10   Benitez, Steptoe and Johnson.

11         MS. GERSON:  Good morning, Your Honor.  Erica Gerson

12   with Steptoe and Johnson.

13         MR. HAYDEN:  Mark Hayden with Taft, Stettinius and

14   Hollister.

15         THE COURT:  Thank you.

16         All right.  Then Mr. Bergeron.

17         MR. BERGERON:  Pierre Bergeron, Your Honor, for the

18   line-level employees.

19         MR. LAMKEN:  Jeff Lamken, Your Honor.

20         MR. NITZ:  Eric Nitz, Your Honor.

21         MR. ZENO:  Thomas Zeno.  Good morning, Your Honor.

22         THE COURT:  Good morning, Mr. Zeno.

23         MS. KULEY:  Lauren Kuley.

24         THE COURT:  Thank you.  Good morning.

25         All right.  Let me just go over with you what -- I

1    think you all know my law clerk Peggy Fechtel who has done an

2    incredible job of trying to summarize all this for me in 42

3    pages.

4            Let me tell you about the organization we think we

5    have worked out for this morning.

6            What did I do with my glasses?

7            Bill, somewhere I've lost my glasses.

8            Oh, here they are.  My other ones.  I brought the ones

9    that I can really see with.  Okay.

10           All right.  What we thought we would do, here's how

11   I'd like to organize the arguments.  And I don't want the

12   parties to focus on the personal jurisdiction issues right now.

13   Originally you had told me, I think, that each side wanted

14   about 90 minutes to argue, so using that as our number, and

15   that's not -- I'm not going to time you guys, so, you know, if

16   it goes a little over, fine.  I don't have a problem with that.

17   I'd rather hear what you've got to say.

18           But let's start what I want to start with is the

19   Privacy Act claim, and I thought I'd give 20 minutes to the

20   plaintiffs for that side and 20 minutes to the government

21   defendants and -- for that argument.

22           Then Count 2, the First and Fifth Amendment claims,

23   what I'd like to do, I'm going to give 45 minutes to the

24   plaintiffs for that, and then to all the three other defendant

25   groups, I was thinking of about 15 minutes each for the

1    government defendants, the managerial, and the line-level.

2          Now, if you want among yourselves to rearrange the

3    times, that's fine.  I don't have a problem with that at all.

4    You can use it any way you want.

5          And then finally, on Count 3, the inspection of return

6    information claim, again, 20 minutes for the plaintiffs, and

7    approximately 20 minutes for the government defendants.

8          So if you all want -- if you want to take a few

9    minutes to talk to each other, it's fine with me, to get

10   organized.  Again, I don't have a problem with that.  I would

11   have done this ahead of time but we --

12         MR. BERGERON:  Your Honor, we had a plan on division

13   of labor, but I think it will fit within kind of your

14   parameters so I think we can work it all out.

15         THE COURT:  What was your plan, Mr. Bergeron?  Why

16   don't you tell me your plan.  Maybe it's better than my plan.

17         MR. BERGERON:  Our plan was that the individual

18   defendants would go first and argue Bivens and qualified

19   immunity.  We were planning to stay away from personal

20   jurisdiction unless you had questions.

21         THE COURT:  Good.  All right.

22         MR. BERGERON:  And that the government would go next

23   and then argue all of the issues specific to the government.

24   But I understand what you're saying is you're wanting to get

25   the plaintiffs' response before we go to the entire argument

1    for ourselves, so that's fine.

2              THE COURT:  Yes.  I'd like to do it issue by issue.  I

3    think that's a little easier for me.

4              MR. BERGERON:  That's fine.

5              THE COURT:  Okay.

6              MR. HARTT:  Your Honor, may I clarify?

7              THE COURT:  Yes, Mr. Hartt.

8              MR. HARTT:  We, of course, are the movants.  Do you

9    want the plaintiffs to go first?

10             THE COURT:  No, no, no.  I'm just saying -- I'm just

11   telling you how much time.  No, you're the movants.  Obviously

12   you go first.

13             MR. HARTT:  The second question kind of keys off of

14   that one.  Are we to have some time for rebuttal at some point?

15             THE COURT:  Yes.  Yes.  And, Mr. Hartt, would you -- I

16   assume you -- I'd prefer you do it after each of the three

17   issues.

18             MR. HARTT:  Sure.

19             THE COURT:  That's fine.  You know, not a tremendous

20   amount of time.  I don't want to hear the argument all over

21   again.

22             All right.  Let's start on the Privacy Act claim, and

23   I'll hear from the government defendants.  And if you want, if

24   you want to split your arguments, you know, among lawyers or

25   you want one person, I don't care.  I don't have any problem

1      with you -- with splitting.

2           MR. HARTT:  Shall I proceed?

3           THE COURT:  You drew the short straw, Mr. Hartt.

4           Okay.  You may proceed.

5           MR. HARTT:  Thank you, Your Honor.

6           This morning we're here 13 months after the complaint

7      in this case was originally filed.  As the Court, I'm sure,

8      knows, we moved to dismiss the original complaint.  They

9      amended.  We renewed the motion to dismiss.  They amended

10     again.  The individual defendants moved to dismiss, and so

11     we're now here really on the second amended complaint.

12          THE COURT:  Okay.  Good.  That's what I thought we

13     were here on.  Great.

14          MR. HARTT:  The Court is certainly familiar with the

15     standards for Rule 12, so I'm not going to dive into those.  I

16     do want to comment for just a moment on two important cases,

17     those being the Twombly case and the Iqbal or Iqbal case from

18     the Supreme Court because they relate to the Privacy Act and

19     all we're going to do this morning in very important ways.

20          In Twombly, the Court through Justice Souter said it

21     was time to retire the more relaxed standard for judging

22     motions to dismiss than Conley versus Gibson.  In fact, the

23     Court imposed a more rigorous standard on plaintiffs.  And it's

24     important in looking at those cases to note that in both those

25     cases, the plaintiffs have actually made a series of very

1   detailed allegations.  The Court ultimately held they were not

2   enough, not sufficient.

3          The other point, the Court in both of those cases was

4   very clear that permitting plaintiffs discovery to cure defects

5   in their complaint either under phase discovery or limited

6   discovery was not appropriate.  That, Your Honor, is very

7   important to this case because this case is really all about

8   discovery.  You can see that as a recurring theme in the

9   complaint.  You can see it if you go to their Sue the IRS.com

10  web site.  It's a theme there also.  Basically what they want

11  to do is to come in behind the Congressional committees who are

12  investigating these various allegations of targeting, so forth,

13  and conduct their own sweeping set of discovery as well.  We

14  don't think that's appropriate at all.  The abuses from

15  discovery are chronicled very clearly in both of those Supreme

16  Court decisions.

17         The other point, this is from Iqbal, the second case

18  where the Court reiterated the more rigorous standard, the

19  Court said next we consider the factual allegations in the

20  complaint to determine if they plausibly suggest an entitlement

21  to relief.  And that, Your Honor, is the essential task for the

22  Court in this case.  Over here on one side, we've got a number

23  of allegations.  Over on the other side, we have their various

24  causes of action.  But the pervasive problem in this case is

25  that the allegations they are raising do not fit the causes of

1    action they have pled, even after several amendments.  So the

2    question is then does any combination of these allegations

3    support the causes of action they assert as the grounds for

4    their relief and does the Court have jurisdiction over those

5    causes of action.

6         One more preliminary matter, just so we're starting on

7    the same page.  The Court may recall in one of our telephonic

8    hearings we got into a discussion of the difference between a

9    501(c)(3) organization and a 501(c)(4).  I'm not going back

10   through that.  It's important to understand, though, that a

11   (c)(3), a tax-exempt organization, basically doesn't pay income

12   tax on its income, and people make donations to it, get to

13   deduct what they contribute.  A 501(c)(4), however, a community

14   organization, is permitted certain political activities not

15   allowed to a 501(c)(3) so long as the political activities are

16   not more than half of its operation, commonly understood to be

17   49.9 percent.

18        Let me turn now to the Privacy Act specifically.

19   Somewhat ironically, what these plaintiffs, these plaintiffs,

20   are asking this Court to do is to judicially amend a statute

21   passed by Congress to add language that Congress did not

22   include.  The plain language of the statute explicitly limits

23   the Privacy Act to individuals.  Yet when it serves the

24   plaintiffs' purpose, they ignore the plain meaning rule and

25   here they come asking this Court to expand the statute to

1    include organizations.  Their complaint is very clear in

2    identifying each of these ten plaintiffs as an organization,

3    not an individual.  Accordingly, the plaintiffs lack standing.

4         Plaintiffs first try to finesse this problem by saying

5    they have representative capacity.  That means, I think, a

6    collection of individuals.  But as we point out in our

7    briefing, the Courts have consistently not accepted this theory

8    in a factual setting in anything resembling the one in this

9    case.

10        Then they tried a variation.  They come in and they

11   say, well, we have associational standing.  Associational

12   standing is a judicially created concept.  We believe that it

13   should not trump the statute by which Congress waived in

14   certain circumstances sovereign immunity.  In other words, we

15   think a waiver of sovereign immunity should only come from

16   Congress.  It is elementary as well that when we're dealing

17   with a potential waiver of sovereign immunity, that that waiver

18   is to be narrowly construed in favor of the government and

19   against the finding of a waiver.

20        But even if the Court were amenable here to finding

21   associational standing, there are still absolute barriers in

22   this case that block its application.  The case that everyone

23   looks to when you start talking about associational standing is

24   Washington State Apple Advertising Commission.  But there are

25   problems for these plaintiffs trying to come in with that case

1    or within that case or the cases construing it.  First, the

2    requests for information from the IRS that are talked about

3    quite lengthily in this case were not made to individuals.

4    They were made to the organizations.

5          Second, they can't establish that the individual

6    members who got -- who did not get the request have standing

7    themselves.  Accordingly, if the individuals never had standing

8    since they didn't receive the request, they can't then

9    bootstrap their way into associational standing on behalf of

10   the organization.

11         Next, plaintiffs can't establish that their individual

12   members were damaged.  But even to try to do that, they would

13   then have to have the individual members participate.  And it's

14   very clear that under the concept of associational standing, if

15   the participation of the individuals is required, then you

16   don't get to associational standing.  It voids the concept.

17         Plaintiffs try to get around that problem by telling

18   the Court that each proposed individual member could simply be

19   given a thousand dollars and they can go away.  But as we

20   pointed out, and they admitted in their response, each and

21   every individual must prove some actual damage before it's

22   entitled to even the minimum amount.  To do that, of course,

23   we're back to having the individuals participate, and that in

24   turn is lethal to the concept of associational standing.

25         Last year in another Supreme Court case, Clapper

1  <u>versus Amnesty International</u>, the Court discussed the concept

2  of Article III standing and explained that it is based upon the

3  separation of powers and that it, quote, serves to prevent the

4  judicial process from being used to usurp the political

5  branches.

6      That, Your Honor, goes to the heart of this case.

7  There is no jurisdiction, no standing under the Privacy Act.

8  This Court should not accede to their request, start adding

9  language to the statute that Congress passed, and it should

10  dismiss the Privacy Act count.

11      THE COURT:  Thank you, Mr. Hartt.

12      Who wants to argue on behalf of the plaintiffs?

13  Mr. Greim.

14      MR. GREIM:  Yes.  I want to argue and I will be

15  arguing for the -- for all these different points today.

16      THE COURT:  Oh, aren't you lucky.

17      MR. GREIM:  That's right.

18      THE COURT:  You drew the very short straw.

19      MR. GREIM:  Well, I like the breaks in the scheduling.

20  I can have a drink of water and, you know, reorganize my

21  thoughts.

22      Well, Your Honor, I will keep this, I think, limited

23  in a similar way to what Mr. Hartt did.  I think the briefs do

24  address a lot of this.  But I have a couple of responses that

25  sort of go to the overall case.

1    You know, we're at the motion to dismiss stage, so

2  we're in Twombly and Iqbal territory here, and we have to have

3  stated a plausible claim.  We amended our complaint twice.  We

4  did that because, you know, I'm willing to admit that the

5  information we have is coming from Congress.  It's coming from

6  the documents that are coming out during this investigation

7  process.  Most taxpayers don't have that benefit.  They are

8  dealing with sort of a black box.  They get a letter every six

9  months or nine months, and then they don't know who's dealing

10  with them and they don't know what's happening.  And so one

11  reason we have this case is because of the Congressional

12  investigation.

13    But there's no doctrine in federal law that says that

14  we should not have -- a citizen should not rise up to use the

15  courts.  Article III says that courts are here to, you know,

16  resolve cases or controversies.  And the most fundamental of

17  those are ones arising under the Constitution and federal

18  statutes, and that's what we're here to talk about today.

19    There is a notice of supplemental authority that we

20  filed, Your Honor.  It doesn't deal with the Privacy Act, but

21  it's the Z Street case from the District of Columbia District

22  Court.  And the government filed their response to our notice

23  of supplemental authority.  That is an important case because

24  it deals with a very similar situation.  A group of several

25  pro-Israel Jewish groups alleged that they were targeted in the

1   exemption process, and as a result, they, you know, they dealt

2   with the viewpoint discrimination with the burdensome request

3   and with the delays, the same sorts of issues that we have

4   here.  And once again, in that case the IRS came up and said,

5   you know, there's just no way to recover.  There's no way to

6   get injunctive or declaratory relief.  And the District of D.C.

7   was very, I think, very strong in their rejection of those

8   arguments.  It quoted an important Circuit case from the D.C.

9   Circuit that said, you know, for the IRS, the tax system is a

10  closed loop and everything it does is within its taxing

11  authority.  That's the Cohen case, and we've cited all these in

12  the papers.  But I think that's the way to look at the

13  different arguments we'll be addressing today.

14          Let's talk about the Privacy Act, Your Honor.

15          First of all, this -- I think the thing we're talking

16  about here today is associational standing.  That's always been

17  the plaintiffs' position, that we're here based on

18  associational standing, and it does not require doing any

19  violence to or amending the statute.  In fact, most times that

20  someone brings an associational standing claim, it's because

21  the actual person who initially could have brought the claim is

22  an individual.

23          Associational standing simply means that the

24  association is bringing the rights that belong to the

25  individuals.  You know, its close cousin is a class action.  We

1    don't say that a plaintiff class is sort of like a corporation

2    bringing the class's claims.  We say instead that counsel are

3    in here under Rule 23 bringing a claim on behalf of all the

4    individuals and then you have subclasses and it goes on.

5    Associational standing is sort of the relative of that.  And so

6    it's very true the Privacy Act says that individuals are the

7    ones to bring the claims.  There are other federal statutes

8    that also say, you know, actual, natural people are the ones

9    who have rights and are the ones who are to bring claims.

10          We actually cited one of those cases in our brief, the

11    New Jersey Protection and Advocacy Act.  The statute there was

12    I call it IDEA.  People that practice in this law probably have

13    some other way to call it.  But basically that statute gives

14    children and parents the right to sue under IDEA for problems

15    with remediating issues with disabled education.  And there, a

16    group is able to bring a claim on behalf of all the individuals

17    to remedy problems with New Jersey's system for helping out

18    these kids.

19          That's the same thing we have here.  Individuals have

20    claims under the Privacy Act.  An association can come in and

21    say, look, you have caused us to give you information about

22    individuals that you shouldn't have, and so we're going to come

23    in and we're going to seek damages on their behalf.

24          Now, I just said the word "damages," and I think

25    probably this is the crux of the whole associational standing

1    issue.  Most cases look at this and say, wait a second, if

2    you're asking for damages, you do have to -- you have to bring

3    in these people so that we can see, you know, were they damaged

4    and how much was it.  Now, that's a little bit of an attenuated

5    issue here because as long as you can prove actual damage, the

6    Privacy Act allows for a minimum of $1,000 per plaintiff

7    recovery and it allows for attorneys' fees and things like

8    that.  But plaintiffs recognize that that does not make the

9    damages issue go away because after all, you still need to

10   prove actual damages even before you get to the $1,000.

11            Well, in this case this is how it would work, I mean,

12   it's a very simple process.  We can look and see what the

13   disclosures were that each plaintiff in this class had to make

14   to the government.  We can literally pull those disclosures,

15   which in many cases name and identify the activities, the First

16   Amendment conduct of the individuals.  Now, that's the core of

17   the Privacy Act claim.  The individuals didn't give it to the

18   government.  Their association gave the information to the

19   government in these follow-up requests that came from the IRS.

20            And so what you would do, Your Honor, is you would

21   take every individual whose ident -- whose First Amendment

22   activities were identified in these discloses, so, for example,

23   you might say we had a meeting on June 5th in Fresno and the

24   following individuals were there and they gave out these

25   pamphlets and they discussed, you know, there's a lot of rage

1  about ObamaCare in this meeting; we talked about it a lot.  So

2  now you have disclosed information about the group and about

3  the activities of those people named.

4       The next step, Your Honor, is then to go and see what

5  was the cost.  What was the cost of sending that information in

6  to the government.  There is a cost associated with that, and

7  we pled that in our complaint; that the cost of complying with

8  these requests is X amount.

9       The final step you'd need, and bear in mind none of

10  this requires individual participation, is to simply determine

11  which of the individuals who were named contributed to the

12  group for the cost of that disclosure.  So you don't have to

13  have a plaintiff come in and say, you know, I had emotional

14  distress when my neighbors learned I was at this meeting where

15  we talked about this or that.  You don't have to go into those

16  kind of individualized damages.  The damages, Your Honor, are

17  simply the cost of complying with the unnecessary requests that

18  identified them, and at that point you can simply calculate pro

19  rata what that was.

20       THE COURT:  I was going to say, then how do you put

21  it -- how do you propose putting in the cost if you're saying

22  you're not going to get testimony?

23       MR. GREIM:  Well, you don't -- the group itself has

24  records, just like the group had records of its activity, had

25  to give those to the IRS.  So the last piece is simply the

1    group's own record of its -- of the contributions from the

2    individuals, and you just simply -- you simply need to match

3    that list with the list of people who were disclosed in the

4    materials, and that is an element of damages.  At that level

5    you don't need a plaintiff to come in again and say that they

6    experienced some sort of distress that neighbors found out

7    about it because that's not -- those are not the damages we're

8    seeking.

9            Now, frankly, and it's unlikely, in fact it's probably

10   impossible, that any single plaintiff's damages is over $1,000.

11   But by using those facts, you will have established actual

12   damage for each plaintiff.  The actual damage is the amount

13   they had to pay to their group to respond to these requests for

14   information that disclose their First Amendment activities.

15           THE COURT:  And you're going to pro rata figure out

16   what they had to pay to the group for the group to comply with

17   these requests.

18           MR. GREIM:  That's right, Your Honor.  It doesn't

19   require individual participation.  All it does is it

20   establishes actual damage.  And so by -- and you won't get to a

21   thousand dollars, but you will have established actual damage.

22   You know, we've pled quite a bit in terms of damages that we

23   want for individuals, but limited in this way, it does not

24   require testimony from every individual of every group.

25           And again, this is a class action.  I mean, we're

1    trying to address a wrong that happened nationwide to many

2    people, to many different groups, and to many members of many

3    groups.  And it's not crazy in a class action to eventually

4    when you have to come up with damages for individuals to find

5    some common-sense method that actually does address the harm

6    that individuals suffered and that can be efficiently handled

7    in one court rather than having each individual person who

8    learns that their name was submitted file Privacy Act claims

9    all over the country.  And so that's the benefit of the class

10   action device.  That's the benefit of associational standing

11   using the Privacy Act in that way.  And that's what federal

12   courts are for.

13          There's undertones, I think, in the government's

14   argument that this is just a political fight, people are just

15   treading in the wake of Congress, it's everything we see in the

16   media, and now we just have sort of a case that's trying to say

17   me too, you know, bring us along.  But if this doesn't happen,

18   if this case doesn't go forward, if these remedies are not

19   taken care of in this case, then we have to rely solely on

20   Congress; and what are all these statutes for, what is <u>Bivens</u>

21   for, what are federal courts for if not to remedy

22   constitutional and statutory violations.

23          THE COURT:  Thank you, Mr. Greim.

24          Mr. Hartt, do you wish to rebut?

25          MR. HARTT:  Let me just take this point by point, Your

1  Honor.

2          First of all, whatever happened with the IRS alleged

3  targeting of people of certain political views does not support

4  a claim under the Privacy Act.

5          He talked about Z Street and about Cohen.  We will

6  have plenty to say about those in the context of the cause of

7  action pled today where they relate.  Neither Z Street nor

8  Cohen has anything at all to do with the Privacy Act.  The

9  Privacy Act is not a part of this case at all.

10          He, two points, got into class action analysis, says

11  it's a cousin of associational standing, and then at the end

12  starts talking about need to go forward with the class action.

13  We've been through this already, Your Honor.  The Court's made

14  its decision of not getting to class action unless and until

15  the Court finds some underlying cause of action that should go

16  forward.

17          He then talked about the statute in New Jersey.  Well,

18  the easy answer to that is we're not in New Jersey.  They're

19  suing in United States District Court.  We all know District

20  Courts are courts of limited jurisdiction, and it is the

21  plaintiffs' burden to show some plausible cause of action if

22  they're going to stay in court.

23          Then we got into the discussion about damages and a

24  hypothetical about a group in Fresno, which, of course, is just

25  a hypothetical.  It also assumed that all of the requests made

1    by the IRS were improper.  And that's an assumption that's,

2    well, it's more than a bridge too far, Your Honor.  That's a

3    causeway too far.  It's crucial because it shows that this

4    hypothetical is not going to work out the way they presume in

5    real life.

6            We are going to have to probe the individuals they

7    discussed in their hypothetical to find out how much each and

8    every one of them suffered from whatever group request was made

9    to their particular organization.  It is impossible, he says,

10   that any single individual suffered more than a thousand

11   dollars of damage.  That, Your Honor, is a significant

12   admission.  It illustrates again we made -- the point we made

13   at the beginning.  This is meant to be a ticket to discovery.

14   But the ticket to discovery cannot be used unless and until

15   there's a viable cause of action.

16           It could not be any plainer that the Privacy Act is

17   limited to individuals.  Congress could have included

18   organizations.  It did not.  And we respectfully submit that it

19   is not for this Court to add what Congress left out.

20           THE COURT:  Thank you, Mr. Hartt.

21           Peggy, any questions?

22           MS. FECHTEL:  I would, actually, yes.

23           THE COURT:  Okay.  Go ahead.

24           MS. FECHTEL:  My question for Mr. Greim, I'm not

25   following your damages example.  If, for instance, you've got a

1    group in Tulsa, ten members got together, exercised their First

2    Amendment rights, and they have to disclose about that

3    particular event in response to an IRS question.  I'm trying to

4    figure out whose damage you're talking about because that

5    question from the IRS went to the group.  So the group looks at

6    its records and says persons, you know, A through -- I don't

7    know what the tenth letter of the alphabet is -- A through H

8    were at this meeting.  Are you saying that alone caused a

9    monetary damage, just the fact that the group wrote down their

10   name, and that's why A through H don't have to -- persons A

11   through H don't have to participate?  Would you with a very

12   specific example tell me how you -- what the damage is and how

13   you prove that damage without an individual's participation?

14           MR. GREIM:  Right.  That example is a good starting

15   point.  So let's look at the ten individuals who were

16   disclosed.  Let's cross-reference that -- and, again, this does

17   not require the individuals' participation -- with the people

18   that actually gave money to the group, okay, to pay for the

19   response because that is one pled element of our damages.

20           Now, damages for some individual could be higher than

21   that.  And, by the way, I don't mean to suggest that no -- that

22   using other measures of damages, no individual is over a

23   thousand dollars.  But using that by itself, the cost of

24   compliance of answering -- let's say it was, you know, $275 to

25   answer the part of that request that is unnecessary for tax

1    administration purposes.  We see that ten people's names were

2    disclosed.  We then see that six of those each chipped in $50

3    to pay for this, $50 to the organization.  Then we do a pro

4    rata and we figure out that of that $50, thirty-seven fifty is

5    actual money that the individuals had to pay to fund the

6    unnecessary disclosure about their activity.

7            MS. FECHTEL:  So you're saying who is individually

8    damaged, the person who gave them money to answer the questions

9    or the people who were disclosed as having been at the meeting?

10   Or are you saying they could be in both of those groups?

11           MR. GREIM:  Well, they're both damaged, but I'm saying

12   for purposes of associational standing, to allow -- and this is

13   the third prudential prong of associational standing -- to

14   satisfy that third prong, the people whose claims will be

15   addressed in this case will be those who actually paid money to

16   the group for purposes of responding to it.  I'm not saying the

17   others weren't damaged as well, but I'm saying that for

18   purposes of this claim, for purposes of being able to assert

19   associational standing, that we limit it to those who actually

20   paid in money to the group for that response.

21           MS. FECHTEL:  So the people who paid money possibly

22   months before whose money is now being allocated for the

23   purpose of responding to the IRS instead of to some other

24   protected activity?

25           MR. GREIM:  That's right.  And we don't need the

1  individuals' testimony to be able to determine what that is.

2  Now, we might need testimony from a representative of the group

3  to explain what money came in, who did it come in from, and

4  where was it used.  But that is not individual testimony.

5  That's just testimony of the officer who is able to -- the

6  person with knowledge of the entity.

7       MS. FECHTEL:  Who's going to explain the bookkeeping

8  and who donated money and how that money was spent?

9       MR. GREIM:  They would.  And that would be an issue

10 with any claim, even with an individual who spent a lot of

11 money on a lot of things and had to go out and parse out what

12 parts of their expenses were for these requests.  So, again,

13 this doesn't require the individual participation if we're

14 going to rely heavily on the third prong of associational

15 standing.

16      MS. FECHTEL:  Okay.  Thank you.

17      THE COURT:  Thank you.

18      Mr. Hartt.

19      MR. HARTT:  The problem with the analysis is a series

20 of assumptions.

21      THE COURT:  Wait.

22      MR. HARTT:  A series of assumptions.  I beg your

23 pardon.

24      THE COURT:  Just stay within 12 to 18 inches of the

25 microphone because my court reporter and I aren't going to hear

1   you if you don't.

2          MR. HARTT:  Certainly, Your Honor.

3          THE COURT:  It bends.  You can move it.

4          MR. HARTT:  All right.  I'm trying to.

5          THE COURT:  There.

6          MR. HARTT:  Okay.  What I was saying is that the

7   response assumes several things.  It assumes that Mr. Jones in

8   Tulsa was damaged in the same way that Miss Smith in Tulsa was

9   damaged in the same way that Mr. and Mrs. Brown in Tulsa were

10  damaged.

11          Moreover, to do the pro rata analysis, at least as I

12  understood what he was saying, you're going to have to know how

13  much each of them contributed.  Now, that assumes you're going

14  to have adequate bookkeeping or we don't have to go to each

15  individual and say, you know, did you contribute a hundred

16  dollars in October and then as the election in November got

17  close, you put in 500.  Maybe Mr. Jones didn't put in that 500.

18  I don't know.  It also perhaps would get us into whether there

19  were nonmonetary contributions.

20          There are all kinds of problems here that simply

21  cannot be solved unless you had the participation of each of

22  the members.  And that gets us back to the flaw inherent in

23  trying to do organizations when Congress said individuals.

24          THE COURT:  Thank you.

25          Anything else, Peggy?

1          MS. FECHTEL:  No.

2          THE COURT:  Okay.  Let's move on, then, to the First

3    and Fifth Amendment claims.

4          And, by the way, I never keep people seated for more

5    than an hour-and-a-half, but if anybody needs a break before

6    then, just let me know and we'll -- I'll be glad to take a

7    break.

8          Okay.  Let's see.  Who wants to start, the

9    government -- okay.  All right.  The management employees.  All

10   right.  No, I got it.

11         Ms. Benitez.

12         MS. BENITEZ:  Thank you, Your Honor.

13         Your Honor, the individual defendants move to dismiss

14   on two grounds.  One is that a <u>Bivens</u> claim is not proper

15   against IRS employees; and, two, the individual defendants are

16   entitled to qualified immunity.  And we believe the resolution

17   of our motion to dismiss is very straightforward.

18         THE COURT:  You say -- I'm sorry.  You're saying

19   individual defendants.

20         MS. BENITEZ:  Individual defendants.

21         THE COURT:  Do you mean all of the individual -- do

22   you mean line-level and management?

23         MS. BENITEZ:  I do for purposes of the motion, but I

24   am speaking only on behalf of the management defendants.

25         THE COURT:  All right.

1          MR. BERGERON:  And I'll chime in after she's done.

2          THE COURT:  Okay.  Thank you.

3          MS. BENITEZ:  First, the plaintiffs do not have a

4    proper <u>Bivens</u> claim.  <u>Bivens</u> claims are unavailable against IRS

5    employees because the Internal Revenue Code provides a

6    comprehensive remedial scheme enacted by Congress for aggrieved

7    taxpayers.

8          The Supreme Court has held that <u>Bivens</u> remedies are

9    unavailable where the design of a government program suggests

10   that Congress provided an adequate remedial scheme to address

11   potential violations.  The Internal Revenue Code has been found

12   to be such a remedial scheme.

13         There is controlling Sixth Circuit precedent directly

14   on point.  In <u>Fishburn v. Brown</u>, the Sixth Circuit ruled that a

15   <u>Bivens</u> claim is not available against an IRS agent in that case

16   for violations of due process.  And Circuit Courts throughout

17   the country have also ruled that <u>Bivens</u> does not extend to IRS

18   employees because the Internal Revenue Code is a comprehensive

19   remedial scheme.

20         THE COURT:  Are there any cases to the contrary?

21         MS. BENITEZ:  The only cases to the contrary are ones

22   where there have been some form of law enforcement component.

23   It seems -- and outside the Sixth Circuit.  So there are cases

24   in I think every other Circuit, including those very Circuits,

25   where in the context of tax collection, in the context of tax

1   audits, in the context of sort of other types of assessments

2   there has been found that the Internal Revenue Code is such a

3   comprehensive scheme such that Bivens cannot extend to it.

4           Bivens itself involved a violation of the Fourth

5   Amendment by agents of the Federal Bureau of Narcotics, and in

6   the more than 40 years since Bivens was decided, the Supreme

7   Court has been very reluctant to extend -- to extend Bivens to

8   any new context or any new category of defendants.  And, in

9   fact, the Supreme Court itself has only allowed a Bivens claim

10  in two contexts, neither of which would be applicable here, one

11  being employment discrimination in violation of the Due Process

12  Clause, and the other is violation of the Eighth Amendment by

13  prison officials.  So every Circuit that has considered the

14  appropriateness of a Bivens remedy in the taxation context has

15  uniformly declined to permit one.

16          Plaintiffs here have cited no authority that supports

17  their position to apply Bivens to the context of IRS tax

18  determinations, much less to allege constitutional violations

19  for handling applications for tax-exempt status.  And

20  plaintiffs have dismissed Fishburn in a footnote by saying that

21  its rationale applied only to one section of the Internal

22  Revenue Code.  That would be Section 7433 of the Internal

23  Revenue Code.  And that involves tax collection cases, so they

24  argue the rationale is inapplicable here.  But that doesn't

25  really make sense with Section 7433 is part of the Internal

1   Revenue Code, and that's the -- what is the comprehensive

2   remedial scheme.

3           What the Sixth Circuit referred to in Fishburn was not

4   just 7433 but the Internal Revenue Code as a whole.  And in

5   fact, as the Fourth Circuit stated in the Judicial Watch v.

6   Rossotti case, and I quote, "It would be difficult to conceive

7   of a more comprehensive statutory scheme or one that has

8   received more intense scrutiny from Congress than the Internal

9   Revenue Code."

10          And the Internal Revenue Code contains sections to

11  address potential misconduct by IRS employees.  It includes

12  damages remedies in limited circumstances against IRS employees

13  as well as provisions for Inspector General to investigate

14  claims made for alleged misconduct against IRS employees.

15  Certainly Congress considered a number of different types of

16  remedies.

17          It seems that the plaintiffs' only other argument was

18  that they had no adequate remedy under the Code.  They are, in

19  fact, seeking a remedy under the Code.  But whether they have a

20  remedy is not the question because the Supreme Court has made

21  clear that the rationale applies even if a plaintiff has no

22  remedy.  And so in Bush v. Lucas, for example, the Supreme

23  Court refused to create a Bivens action, even though it assumed

24  in that case that the First Amendment violation had occurred

25  and acknowledged that the plaintiff would not have a remedy,

1   would not get complete relief.  And in that case, the Court

2   said:  The question is not what remedy the Court should provide

3   for a wrong that would otherwise go unredressed.  It is whether

4   an elaborate remedial system that has been construed step by

5   step with careful attention to conflicting policy

6   considerations should be augmented by the creation of a new

7   judicial remedy for the constitutional violation at issue.

8        And Courts have noted that judicial deference is

9   appropriate to indications that Congress's failure to

10  specifically include a remedy has not been inadvertent.  And,

11  in fact, the Sixth Circuit in Fishburn noted that although the

12  damages provision in the Internal Revenue Code does not mention

13  constitutional violations, the Court said, quote, "These

14  carefully crafted legislative remedies confirm that in the

15  politically sensitive realm of taxation, Congress's refusal to

16  permit unrestricted damage actions by taxpayers has not been

17  inadvertent."

18       Secondly, plaintiffs cannot overcome the qualified

19  immunity of the individual defendants.  Qualified immunity

20  protects government officials like the current and former IRS

21  employees from liability.  And the standard is whether a

22  reasonable person in the official's position could have

23  believed his or her conduct to be lawful in light of clearly

24  established law and the information the official possessed.

25  The plaintiffs have to allege every part of that standard, and

1  they don't come close to doing so.  The plaintiffs have to

2  allege the wrongful actions of each individual defendant, not

3  just knowledge, not just that a defendant supervised someone

4  who did something wrong.  They have to allege personal action

5  by each defendant.  The plaintiffs have to allege that each

6  individual defendant acted with the purpose to violate each

7  plaintiff's First Amendment or Fifth Amendment rights.  They

8  have to allege that they had a clearly established

9  constitutional right both under the First Amendment and the

10  Fifth Amendment.  They have to allege that each of the -- that

11  each individual defendant violated that clearly established

12  right.  And they have to allege it under an objective standard

13  each individual defendant should have known that they were

14  violating a clearly established constitutional right.

15          That is deliberately a very heavy burden.  In applying

16  that standard, the Sixth Circuit stated in Ecclesiastical Order

17  of the Ism of Am v. Chasin, a case that is factually similar to

18  this one, the plaintiffs had not met their burden.  And in that

19  case, a religious organization sued individual IRS employees

20  for alleged violations of the plaintiffs' First and Fifth

21  Amendment rights in connection with a denial of tax-exempt

22  status.  In ruling that the individual defendants were entitled

23  to qualified immunity, the Sixth Circuit stated that the IRS

24  and its employees have statutory authority under the Internal

25  Revenue Code to investigate and determine the plaintiffs'

1    claims of tax-exempt status.  The same rationale appears here.

2           Plaintiffs have simply failed to meet their burden.

3    They've failed to allege that there have been violations of

4    clearly established constitutional rights or that any of the

5    individual management defendants personally and purposely

6    violated those rights.  Their amended complaint contains only

7    summary and vague conclusory statements, not the factual

8    allegations that are required.  And as such, they cannot

9    overcome the individual management defendants' qualified

10   immunity.  So for these reasons, the plaintiffs' <u>Bivens</u> claim

11   against the individual defendants should be dismissed.

12          I'd be happy to answer any questions, and I would like

13   to reserve a little time for rebuttal, if needed.

14          THE COURT:  Okay.  If there is no <u>Bivens</u> claim against

15   the individual defendants, does the Court then need to rule on

16   qualified immunity, or does that constitute a ruling on the

17   qualified immunity?

18          MS. BENITEZ:  It could be, and Courts have done it

19   different ways, but if there's no <u>Bivens</u> claim available, then

20   I think that claim would simply be dismissed and need not reach

21   qualified immunity.

22          THE COURT:  All right.  And then the issue of

23   qualified immunity, there is a right to appeal.  What happens

24   if the Court rules on qualified immunity?  Does this case go up

25   or does it go up in part?  What happens?

1          MS. BENITEZ:  I believe it would go up in part because

2     that issue would be immediately appealable.

3          THE COURT:  Okay.  Thank you.

4          MS. BENITEZ:  Thank you, Your Honor.

5          THE COURT:  Peggy, any questions?

6          Wait, I'm sorry.  Ms. Benitez.

7          MS. FECHTEL:  To follow up, but if the Court were to

8     never get past the Bivens issue and say -- is the Court saying

9     we're not addressing qualified immunity, or does the Court also

10    have to address qualified immunity?  You know, I guess we're

11    asking if the Court thinks that Bivens is dispositive, is there

12    an immediate appeal?

13         MS. BENITEZ:  The qualified immunity issue has been

14    sort of designated by Courts as a threshold issue, and so

15    certainly that would be one that the Court could take up even

16    instead of Bivens as a first -- in the first instance.  And

17    that would be immediately appealable.

18         MS. FECHTEL:  I'm trying to just figure out how the

19    interplay of the two.  If there is no cause of action, then it

20    would seem that you never get past that first question, was

21    their right violated?  I mean, is that -- I mean, is that the

22    way you look at it?  Analytically, if there's no cause of

23    action against these individuals because there is no Bivens

24    claim here, what is the analytical framework for addressing

25    qualified immunity?

1      THE COURT:  Thank you.

2      MS. FECHTEL:  It seems strange to get into a question

3 of whether rights were clearly established if you're saying you

4 can't bring the claim anyway.

5      MS. BENITEZ:  Well, and that's why -- I have seen

6 Courts do it both ways.  But the qualified immunity can be the

7 threshold issue that the Court can address in the first

8 instance; and if there is qualified immunity, then the Court

9 need not even reach the Bivens issue.

10      THE COURT:  What if we do Bivens first?

11      MS. BENITEZ:  The question is if you do Bivens first,

12 then presumably you do not reach qualified immunity --

13      THE COURT:  Then there's no appeal.

14      MS. BENITEZ:  -- then there's no appeal.

15      MS. FECHTEL:  Or is it inherently that there is

16 qualified immunity because clearly there could be no clearly

17 established right violated because you can't bring the claim in

18 the first place?  Is it implicitly a ruling on qualified

19 immunity?

20      MS. BENITEZ:  In some ways, yes.  I mean, they're, you

21 know, they're two different arguments, but they are -- in some

22 ways they mesh because there is, you know, the qualified

23 immunity is one that means these individual defendants cannot

24 be sued for these actions.  And so it happens to be that

25 there's a claim under Bivens and sort of they -- the two things

1    sort of mesh analytically, I think.

2         THE COURT:  Peggy and I have gone back and forth about

3    this already, so it's nice to have somebody else to question

4    about it.  Thank you.

5         Mr. Bergeron.

6         MR. BERGERON:  Good morning, Your Honor.

7         Just to pick up on a couple points there.  Our

8    perspective is if you rule on Bivens and say there is no cause

9    of action under Bivens, it obviates the need to go into

10   qualified immunity.  And I think under the Bivens analysis, I

11   don't believe that's going to be immediately appealable unless

12   the Court disposes of the whole case.

13        I'm just going to chime in and pick up on a few points

14   and try not to duplicate everything that was just argued.

15        Obviously, the reason we're here, Ms. Benitez and

16   myself, is because they're suing these individuals for monetary

17   damages, and we're representing them in their individual

18   capacity.  So the question is do you extend Bivens in this type

19   of claim.

20        Your Honor, the Supreme Court has not extended Bivens

21   since I was in kindergarten.  It's been a long time.  And the

22   Court has --

23        THE COURT:  You can't say "since I was in

24   kindergarten."  Mr. Bergeron, you are young.

25        MR. BERGERON:  It was 1980, Your Honor.

1        And the Supreme Court has cautioned and the Sixth

2   Circuit has cautioned and said we shouldn't be extending Bivens

3   into new contexts.

4        So the question is what have the plaintiffs shown you

5   as to the applicability of a Bivens claim here, and the answer

6   is they haven't.  They had 80 pages.  We don't see a single

7   case.

8        And to respond to your question that you asked

9   Miss Benitez, there were two cases that we found, and we

10  disclosed them in a footnote in our brief.  They were both from

11  the Eighth Circuit.  It was footnote five in our brief where

12  the Court seemed to recognize a Bivens claim in the tax

13  collection context.  But subsequent Courts have rejected that

14  analysis, and those Courts that have rejected that analysis are

15  building on Judge Jones' opinion in Fishburn.  When that came

16  down in 1997 and said no Bivens claim against IRS agents,

17  granted, it was due process context, it was not First

18  Amendment, but the subsequent cases that have confronted this

19  very issue against IRS agents in the First Amendment context

20  have relied on Judge Jones' opinion in Fishburn and have

21  refused to recognize a Bivens claim.

22        THE COURT:  That was Judge Jones in Fishburn?

23        MR. BERGERON:  It was.  It was.

24        THE COURT:  Thank you.

25        MR. BERGERON:  And those are the Hudson Valley from

 1   the Second Circuit and the Judicial Watch case from the Fourth

 2   Circuit.  And what's remarkable is these are cases right on

 3   point.  You can't get any more on point than that.  And they

 4   don't even talk about them, Your Honor.  Not a single word.

 5          And the Sixth Circuit continues to rely on the

 6   Fishburn analysis.  The Sachs case that we cited, it was

 7   unpublished.  It was a Judge Cole decision.  But clearly,

 8   Fishburn is good law in the Sixth Circuit and it has been

 9   adopted by other Circuits who are applying it in this very

10   context.

11          Mr. Greim said earlier in his argument, oh, the

12   problem is we'd have to rely solely on Congress.  Well, that's

13   the whole point.  The whole point in Bivens is when you have a

14   comprehensive scheme like this, you have to rely on Congress.

15   And what the Sixth Circuit said just a few months ago, and I'm

16   probably butchering the pronunciation, the Krafsur case,

17   K-R-A-F-S-U-R, says it doesn't really matter whether the

18   Congress provided complete relief, considerable relief, or a

19   little relief.  What matters is they have an entire framework

20   here and you have some remedy.  Now, they say it's not the

21   remedy we want; we want something else; gosh, we'd be

22   litigating with our hand tied behind our back.  You know what,

23   that's Congress's determination.  They have to make the

24   competing policy determinations here.

25          And they have -- you know, I think what's interesting

1    here, and this is what these cases rely on, they have a

2    specific provision about suits based on misconduct by IRS

3    agents.  But you know what, the remedy is against the United

4    States.  The remedy is not against the individual agents.  And

5    there is a reason for that.  And I think the reason here, just

6    to show the practical realities of this, when I was reading

7    their opposition at page 41, there is a heading and it's

8    leading into a description of my clients.  It says, "Cincinnati

9    Managers and Line Workers Who Did the Paperwork."  They're

10   suing our clients for doing paperwork, Your Honor.  And these

11   are -- you see the org. chart.  We're at the very bottom of the

12   org. chart, and yet what you are saying is you are going to be

13   individually liable for sending a letter to these guys, for

14   shuffling some papers around, for following the instructions of

15   your superiors?  I mean, you're never going to get anyone who

16   is going to work at the IRS if that's the result here.  And

17   that's exactly what Bush v. Lucas was talking about in 1983

18   about the inability to hire public servants if they have to

19   operate with the threat of personal liability.

20          And here in particular, and this bleeds over into the

21   qualified immunity context, but it's not like we're talking

22   about a black and white analysis under the actual statutes to

23   determine what level of political activity is sufficient

24   because it -- I mean, and that's what those reports that they

25   attach to their complaint, they chronicle.  They say, well,

1    part of the problem here is that there is no bright line rule

2    and there's ambiguity in the statute as to how much political

3    activity you can engage in and still be tax-exempt or

4    501(c)(4).  Well, that means someone has to analyze that.  And

5    that's what happened here.

6           And they can say all they want it was discriminatory

7    intent.  There's not a single allegation that any of my clients

8    had any animus against them or any other inappropriate intent.

9    And if you look at their own descriptions, Your Honor, of what

10   these organizations do, one of them says it identifies and

11   encourages candidates to run for office.  One says it's going

12   to make donations to influence the selection of individuals to

13   public office.  They're going to host candidate forums.

14   They're going to increase public awareness of legislators.

15   Well, that's all political activity.  And at some point, these

16   organizations, if they're engaged in too much of that, simply

17   don't qualify for nonexempt status.  So someone has to analyze

18   and inquire and say, you know what, are you really a nonprofit

19   or are you just, you know, a super PAC in disguise?

20          And, you know, we want the IRS to be suspicious,

21   right, because if they just roll over and say, oh, well,

22   someone says they're nonexempt -- they're exempt, then -- then

23   they're exempt, then everyone bears the burden of that.  And

24   they can't be walking around looking over their shoulder

25   thinking, my goodness, if I send a request out, am I going to

1    get held personally liable.  And particularly for line-level

2    employees, Your Honor, I mean, even a nominal judgment can be

3    ruinous financially.

4         So the question is would a reasonable officer have

5    understood that doing the paperwork here would clearly violate

6    established First Amendment law, and the answer is no.  And the

7    Supreme -- the Sixth Circuit has made clear -- the Bray case

8    that we cited in our reply brief just came out a couple months

9    ago.  It said they were analyzing a fairly colorful case

10   with -- I won't get into all the background.  But basically the

11   Court said because the legal and factual scenario presented in

12   this action is not identical to any of the Sixth Circuit or the

13   Supreme Court has previously addressed, the rights were not

14   clearly established and a reasonable officer could believe his

15   conduct was lawful.

16        So the way I look at that is, is there anything in

17   their brief, any Supreme Court case, Sixth Circuit case, I

18   mean, even go outside the Sixth Circuit, find something else,

19   in this circumstance, and the answer is no.  So for that

20   reason, even if the Court needs to address qualified immunity,

21   there is -- certainly qualified immunity would justify

22   dismissal here.

23        THE COURT:  Thank you.

24        Peggy, anything?

25        MS. FECHTEL:  No.  Thank you.

1          Mr. Hartt.

2          MR. HARTT:  Your Honor, at the very end of Count 2, we

3    have paragraph 241.  Out of 272 paragraphs in a 74-page

4    complaint, there is one single paragraph of seven lines of type

5    which besides the <u>Bivens</u> action, which is the heart perhaps of

6    Count 2, also requests an injunction, either injunction or

7    declaratory judgment against the United States.  That one

8    little paragraph creates some very big problems.

9          The general rule, as we all know, under the

10   Anti-Injunction Act and the Declaratory Judgment Act which

11   operates in tandem with what we sometimes call the AIA, neither

12   the assessment nor the collection of taxes nor administrative

13   steps upon which they depend are to be enjoined.

14         Now, first, we need to be clear that of the ten

15   plaintiffs in this case, there are really only two who

16   potentially fall within the relief they're seeking here.  And

17   the reason for that is that six of the ten have had their

18   applications granted.  Two of the ten withdrew their

19   applications and are no longer subject to being request --

20   having requests for information.  That leaves us with two

21   plaintiffs that still have pending applications.

22         THE COURT:  Do you by any chance know the specifics,

23   know which ones are --

24         MR. HARTT:  I do, Your Honor.

25         THE COURT:  Okay.

1      MR. HARTT:  It's the Texas Patriots Tea Party.

2      THE COURT:  Is which one?

3      MR. HARTT:  Is one of the two.

4      THE COURT:  Okay.

5      MR. HARTT:  And the other is Americans Against

6  Oppressive Laws, sometimes referred to as AAOL.

7      THE COURT:  Okay.  And who -- which ones withdrew, do

8  you know?

9      MR. HARTT:  Prescott Tea Party -- I can look that up

10  and provide it to the Court, Your Honor.

11      THE COURT:  Okay.  I'm just keeping tab here.

12      MR. HARTT:  Sure.

13      THE COURT:  Anybody else know?

14      MR. HARTT:  We'll provide that.

15      THE COURT:  That's fine.

16      MR. HARTT:  Of the two plaintiffs that still have

17  pending applications, we also want to know that they received

18  the opportunity to participate in the fast-track approval

19  process the Service initiated in summer of last year.

20  Essentially that said if you'll swear that no more than 40

21  percent of your activity -- these are (c)(4) applications, Your

22  Honor -- if no more than 40 percent of your activity is

23  political, you're essentially -- you're going to get your

24  approval by, if not return mail, within a matter of a couple of

25  days.  Both of these plaintiffs declined to participate in that

1    process.

2         We turn then to the standard for enjoining the

3    collection or assessment of taxes.  The first of two important

4    cases there is Enochs versus Williams Packing.  It sets up a

5    two-prong test.  A plaintiff must establish an irreparable

6    injury and that there is no way for the government to prevail

7    in its action.  It is mandatory that any party trying to enjoin

8    tax collection establish both of those points.  Some years

9    after that, the Supreme -- that is a Supreme Court case, of

10   course.  Some years after that --

11        THE COURT:  What case was that again?

12        MR. HARTT:  Enochs versus Williams Packing.  It's

13   cited extensively in our briefing.  I think they have comments

14   on it as well, Your Honor.

15        THE COURT:  Okay.

16        MR. HARTT:  Some years after that, the Supreme Court

17   came back and looked at that issue in the specific context of

18   attacking the revocation of (c)(3) status and found that a case

19   should be dismissed.  That case was, of course, Bob Jones

20   University versus Simon.  The Supreme Court pointed out in that

21   decision that the taxpayer there had the opportunity to either

22   pursue litigation of that issue in the tax court, which, of

23   course, is a prepayment forum, or to pay the tax and then file

24   a refund suit and litigate it either in the District Court or

25   in the Court of Federal Claims.

1          After Bob Jones came down, Congress went back and

2     amended the Internal Revenue Code to add Section 7428.  And

3     that is a remedy only for (c)(3) organizations.  And it says

4     you file your application and the Service hasn't acted upon it

5     within 270 days, then you can go to court and litigate it.

6     Congress did not provide that kind of relief to (c)(4)s, and

7     there is a reason, because a (c)(3) organization essentially

8     has to get approval from the IRS before it can begin its

9     operation.  A (c)(4) organization, however, which is the bulk

10    of the plaintiffs in this case, can simply self-declare and

11    start operating.  For all we know, the two people who withdrew

12    may be self-declaring and operating this day.  We're not to

13    that point yet.  They had that option.

14          The plaintiffs attempt to distinguish Bob Jones

15    because they say it actually involved the assessment or

16    collection of taxes, but they're wrong.  It involved a ruling

17    on the tax-exempt status of an organization which is ultimately

18    what this case comes down to.  The Sixth Circuit follows Bob

19    Jones and it's an application of the Anti-Injunction Act.  That

20    case is the RYO, as in roll your own, RYO Machine versus

21    Department of Treasury decision in our brief, two years ago,

22    August of 2012.  In that case, this Circuit said:  "Regardless

23    of how the claim is labeled, the effect of an injunction here

24    is to interfere with the assessment or collection of tax."

25    It's on page 471 of the opinion.  The Court then continued:

1    "The Supreme Court has found that the AIA" -- Anti-Injunction

2    Act -- "applied where nonprofit organizations complained about

3    a change in their tax-exempt status."  That, of course, is Bob

4    Jones.

5            Now, then, I come to Cohen and Z Street, the two cases

6    they mentioned under the Privacy Act.  Both these cases have

7    highly unique facts.  The Cohen case decided in 2011 by the

8    D.C. Circuit involved a situation involving a telephone excise

9    tax.  It was agreed by all parties that the people who had paid

10   that tax had overpaid it and were entitled to have it refunded.

11   The issue in Cohen was the process of the procedure for making

12   the refunds.  They then generate, of course, quite a bit of

13   litigation.  Obviously, that is not the situation in this case.

14           Now, just this year, we have the Z Street case.  That

15   also involved some peculiar facts.  Z Street began as a case

16   under Section 7428, which I talked about a minute ago, because

17   Z Street was seeking a (c)(3) status, not (c)(4).  Well, the

18   case was filed in Philadelphia in District Court.  The District

19   Judge in Philadelphia decided when he looked at the case this

20   is actually a 7428 action, which is important because for

21   District Courts, the statute provides that those cases may only

22   be brought in the District of Columbia.  So the Philadelphia

23   Court sent it to District of Columbia.  There a new judge

24   picked up the case, looked at it, and said, no, it's not a 7428

25   case, but she kept it, went on to decide it, calling it a

1    process case.  Once again -- and relied very heavily on what

2    that Court understood its Circuit, the D.C. Circuit, had in its

3    controlling authority in the Cohen case.

4         Now, first, we go back to the point that only two

5    plaintiffs in this case arguably even come within what these

6    two cases have to say.  But even as to those two, we

7    respectfully disagree with what the Court in Z Street had to

8    say.  And we note for the Court that case is still in

9    litigation and so we don't know what the final outcome of its

10   decision will be.  In any event, both Cohen and Z Street have

11   highly unusual facts.  We think this Court would want to

12   hesitate before embracing those out-of-Circuit decisions,

13   particularly since this Circuit in the RYO Machine case, one

14   year after Cohen, took the traditional view of the

15   Anti-Injunction Act and the Declaratory Judgment Act and went

16   nowhere nearly as far as the two cases that we've been talking

17   about did.

18        Here's the next thing:  When you start looking at

19   their response, it becomes clear that what they're really

20   seeking at this stage is a pre-enforcement injunction

21   prohibiting the Internal Revenue Service from ever auditing

22   them in the future.  No other exempt organizations receive that

23   kind of special treatment.

24        Now, to a certain extent, we all know that in a

25   response filed in response to a motion to dismiss, plaintiffs

1    are entitled to a certain amount of latitude to flesh out what

2    they alleged in their complaint.  Here, however, this

3    metamorphosis we're seeing goes far beyond anything that really

4    can be found in the complaint.  They start talking in the

5    response darkly about discriminatory audits and other abuses.

6    If you go to page 29, they start making those kinds of

7    statements.  They actually list ten paragraphs in their

8    complaint in support of that inflammatory statement.  And it

9    sounds pretty serious until, until you go back and read the ten

10   paragraphs they cite on page 29.  Because when you do, you'll

11   become clear that you can search this record in vain for a

12   single allegation of a single audit for a single tax year for a

13   single plaintiff in this case.

14            But there's more.  They suggest the IRS could show up

15   sometime on their doorsteps and demand money to pay taxes and

16   it would be a death penalty or some more elaborate rhetoric.

17   What that kind of rhetoric reveals is either a fundamental

18   misunderstanding of how tax administration operates or a

19   deliberate mischaracterization of it because it is elementary

20   that if the IRS begins an audit, it contacts the taxpayer.  As

21   the audit goes forward, the taxpayer may be requested for

22   information.  There's a series of interactions between the

23   taxpayer and the examiner.  Ultimately, there is a conclusion.

24   If the taxpayer is not satisfied with the examiner's

25   conclusion, it then has the first option to go through an

49

1    internal procedure within the IRS called the appellate process,

2    have somebody take a fresh look at it.  If at the end of the

3    appellate process the taxpayer is still not satisfied, then

4    before it pays a dime, it can file a petition in the tax court

5    and have that Court make a decision.  And if it's still not

6    satisfied, then it can go to the appropriate Court of Appeals

7    and litigate it there.  Again, before any money is ever paid.

8         Once again, the elaborate rhetoric we see in the

9    response is not enough for the plaintiffs to stay in court.

10        THE COURT:  Any questions, Peggy?

11        MS. FECHTEL:  Your argument seems to be all --

12   "procedural" is the wrong word, but focused on whether they can

13   bring a claim because of the DJA and the AIA.  If the Court

14   finds that those are not procedural blocks to the claim, are

15   you making an argument at all that the claims still fail under

16   12(b)(6)?  Are you objecting that there is no cause of action

17   stated against the government defendants or do you concede that

18   there is a claim against the government defendants if in fact

19   they can get around the DJA and the AIA?

20        MR. HARTT:  Theoretically there is a claim.  I don't

21   think it's a viable claim.  But I think the important point is

22   when we start looking at the -- it's actually a fairly

23   extensive body of law under the AIA and the DJA, the Courts

24   have been very, very strong that you do not go around enjoining

25   the collection of taxes, and the necessary procedural steps,

1    administrative steps, must be done before taxes can be assessed

2    and collected.  And indeed this Circuit two years ago, a little

3    less than two years ago actually, in the RYO Machine case

4    embraced that very strong view, and we think that this Court

5    would want to look very carefully at that case and adhere to

6    it.

7            MS. FECHTEL:  Thank you.

8            MR. SERGI:  Your Honor, I have that information you

9    needed.

10           THE COURT:  Thanks, Mr. Sergi.  Okay.  Hang on.  Let

11   me find my score sheet here.  Okay.

12           MR. SERGI:  NorCal Tea Party Patriots was granted in

13   2010.  Faith and Freedom Coalition was granted in 2012.  Simi

14   Valley Moorpark Tea Party was granted in November of 2012.

15           I guess that's -- I've been skipping the months.  The

16   months aren't important.

17           The Tampa 9-12 Project was granted in 2011.  The South

18   Dakota Citizens for Liberty, Inc. was granted in 2012.  The

19   Texas Patriots Tea Party, I believe Mr. Hartt mentioned, was

20   still pending.

21           THE COURT:  Right.

22           MR. SERGI:  The Americans Against Oppressive Laws,

23   Inc. is also still pending.  The San Angelo Tea Party was

24   withdrawn, and that's from complaint paragraph 198.

25           THE COURT:  Okay.

1          MR. SERGI:  The Prescott Tea Party was withdrawn from

2   complaint 2 -- paragraph 200.  And this is from my memory, I

3   don't have the date, but I -- the Texas Public Policy

4   Foundation, I couldn't actually find it in our briefs, but I

5   know we have a footnote saying that -- questioning why they

6   were in the class because they were approved so long ago and it

7   was their only claim.  So they were approved as well.

8          MR. HARTT:  The Texas Tea Party Patriot -- or Texas

9   Public Policy Foundation I think is the last one.

10          THE COURT:  Right.

11          MR. HARTT:  And it was approved actually back in the

12   year 1989 during the administration of the first President

13   Bush.

14          THE COURT:  Okay.  Thank you.

15          MR. HARTT:  Thank you, Your Honor.

16          THE COURT:  Do you want to take a break first or would

17   you like to argue first?

18          MR. GREIM:  Well, actually I've got some things I need

19   to organize and bring up there, so we may as well, so you don't

20   have to stand there and watch me anyway.

21          THE COURT:  Let's take a break until -- how long do

22   you want?

23          MR. GREIM:  Five minutes.

24          THE COURT:  Well, let's take a break until 11:30.

25      (Recess in proceedings from 11:20 a.m. to 11:35 a.m.)

1                                  AFTER RECESS

2              THE COURT:  All right.  You may proceed, Mr. Greim.

3              MR. GREIM:  Your Honor, although all three of these go

4    to the First Amendment, really I think the first two arguments

5    of the Bivens defendants kind of fit together, and I'll just --

6    I think I'll address those together.

7              THE COURT:  Okay.

8              MR. GREIM:  And at the very end, I'll get to the

9    Declaratory Judgment Act.

10             You know, I heard an interesting thing from

11   Mr. Bergeron up here.  I think he said something like we

12   want -- we want the IRS, we want these agents to be a little

13   suspicious when people send in their 1023s and 1024s to get

14   tax-exempt status.  And that's right; they should be a little

15   suspicious.  But plaintiffs' view is that they should do that

16   for everybody.  They should not be suspicious just for people

17   that are in the Tea Party movement and pull those out and, you

18   know, be suspicious for 13 months, send the additional

19   requests, and that's really the heart of the First Amendment

20   claim here.

21             THE COURT:  So an overzealous IRS agent.  Are you

22   saying that applies to all overzealous IRS agents?

23             MR. GREIM:  Well, actually, it might be different in

24   different cases, you know, and I'll get to this later.  The

25   King versus Zamaria case from the Sixth Circuit is pretty

1    important.  It's critical for looking at people in a multilevel

2    organization and deciding how do you assign liability to

3    people, you know.  From civil litigation, we have respondeat

4    superior and various doctrines like that.  Well, we don't have

5    that with Bivens claims.  And so one question will be what is

6    the sort of mens rea, so to speak, that the individual agents

7    have to have, the people that push the papers but did other

8    things as well, and so what had to be in their mind; what did

9    they have to know to be held individually liable.  And that's

10   different than people who actually set the policy.  But the

11   doctrine in this area does not say that only one set of people

12   as presumed liable.  They each can play a role in the scheme.

13   And I'll get to that in a second.  I think that's a qualified

14   immunity issue.

15        The first issue is really Bivens and whether there is

16   a scheme.  Although I'm detecting I can do the qualified

17   immunity first, if you --

18        THE COURT:  No, no, no.  I'm just thinking about a

19   local overzealous IRS agent by the name of Rick Currin.

20        MR. GREIM:  Uh-oh.

21        THE COURT:  Go ahead.

22        MR. GREIM:  Your Honor, starting with Bivens, I think

23   really the same bundle of issues apply here in declaratory

24   judgment in a way, and it requires understanding the process

25   and it requires reading carefully what these remedial statutes

 1    actually say and what they actually apply to.

 2         The Fishburn case has been discussed a lot, and we did

 3    address Fishburn and several other cases in our response brief.

 4    But the important thing is those are at a different part in the

 5    process.  Those are -- those cases arise after a taxpayer has

 6    filed returns, after they've either received a notice of

 7    deficiency so that -- and then they would appeal that to the

 8    tax court and you go on through the process of collection and

 9    maybe refund, or they apply to different parts of the scheme.

10         We prepared a sort of a visual aid that we tried out

11    here.

12         THE COURT:  Do you have a copy of this for the record?

13         MR. GREIM:  Your Honor, I do.  I have a couple of

14    copies and I'll -- I can get them now or I can wait.

15         THE COURT:  I just want to make sure that, yes, if

16    you'd give it to Mr. Miller, anything you're going to put up on

17    the screen, so we've got a record of what's up on the screen.

18         MR. GREIM:  Actually, while we're at it, I have a few

19    other copies.  May as well just --

20         (Mr. Greim handed out copies.)

21         THE COURT:  Law students, when you get to the part of

22    the transcript and they say, "Look up on the screen," you know,

23    "I want to show you what we've got on the screen here," and

24    they've got a PowerPoint or something, there's nothing in the

25    record.  So, you know, when you're the lawyer, you want to make

1    sure that the court reporter has and the Court has what they

2    need to be able to review the argument.

3         MR. GREIM:  This is entitled No Remedial Scheme Exists

4    for Plaintiffs' Claims.  And what we have, Your Honor, is over

5    on the left-hand side, this is all the conduct and procedure at

6    issue in the litigation.  Now, you'll recognize some of the

7    statutes that have appeared in the briefs over on the

8    right-hand side, and those apply at different stages in the

9    process.

10        So the first column you'll see right here (indicating)

11   is Audit and Assessment.  And, you know, oftentimes the

12   assessment is simply the IRS receives your returns.  Somewhere

13   they actually note down what your tax liability is, and most

14   people just pay it.  But the IRS may have other sources of

15   information at that stage.  They may actually audit you, and so

16   they may get other information and decide that you owe a little

17   bit more than that and so they'll issue a notice of deficiency.

18   And you'll see that right here.  That's under 6212.  If you

19   receive a notice of deficiency under 6213, you can then go

20   appeal that to the tax court.

21        Now, you have other options.  One thing you can do is

22   you can pay your tax, and then you'll see over here you can

23   apply for a refund and you won't get it, and so then you can

24   bring a suit under Section 7422.  But the question in all of

25   these cases or at least in those cases is how much money do you

1    owe?   What is your tax liability?

2         Now, aside from that question, let's say your tax

3    liability is determined and you're just not paying it; you

4    don't have the money.  Eventually, the IRS can levy on your

5    property and they can show up at your house with a sticker -- I

6    think it might be the facts of Fishburn, actually -- show up at

7    your house with a sticker and they can put it on your vehicle,

8    and then the sheriff will come and take your vehicle away and

9    they'll sell it and they'll try to recover what you owe.  But a

10   lot of times that can go wrong.  The overzealous IRS agents can

11   wrongfully levy and try to collect from you.  And so we have a

12   remedy, Section 7433, for improper collection activities.  It's

13   limited to collection activities.  And that's what we have in

14   the Fishburn case, for example.

15        A few cases have suggested that if there is an

16   improper audit, which I recognize that in a list of things in

17   our complaint we mentioned discriminatory audits, that's,

18   frankly, not part of our case.  We have no factual allegations

19   about that.  No one's reached that stage.  But let's say that

20   there was an improper audit request.  There have been a few

21   cases, and that's the Second Circuit case, which suggests that

22   you can make them issue you a summons.  You can then not comply

23   with the summons.  And then when they -- if they try to get you

24   in federal court, you can defend with whatever defenses you

25   were going to have to their improper request for information.

1    But anyway, that's that side of the ledger.

2          Now, there's one statute that comes kind of close

3    here.  You'll see statute Section 7428.  You've heard that a

4    few times already today.  That is a statute that was enacted

5    because of the Bob Jones case.  In Bob Jones, that university

6    had actually received a letter saying that you are qualified

7    for (c)(3).  It's like in the 1940s.  Then in 1972, the IRS

8    said we're no longer going to say that institutions that

9    racially segregate people, that won't take blacks, are really,

10   you know, have -- are charitable.  That's not a charitable

11   purpose, and so we're going to revoke that letter.  So there

12   was a revocation of the letter.  It then took a long time to

13   litigate that.  And Bob Jones said, you know, it's not enough

14   to be able to litigate your wrongful revocation of our

15   tax-exempt status, and so 7428 was enacted to give somebody a

16   chance to go in and get a declaratory judgment on that.

17         Now, it does also apply for (c)(3) applicants after

18   you apply for exempt status under 501(c)(3).  So if you're

19   actually over in this category but you're just a (c)(3), after

20   you've reasonably responded -- you've responded to all

21   reasonable requests for information, so they've got everything

22   they need, and they still wait 270 days, you can then bring an

23   action for a declaratory judgment.  So that only applies to

24   (c)(3)s.  It doesn't apply to most of the plaintiffs at all in

25   this case.  So this is sort of the statutory background.

1          Some of the cases that we've looked at, especially

2     Fishburn, say things like, well, the Internal Revenue Code,

3     which is massive, it is a comprehensive remedial scheme.  Well,

4     the problem is it's -- it's a framing issue.  It's

5     comprehensive once we're over here, but if you never get to

6     this spot, if you're stuck in this little circle over here

7     where you're applying, getting these threats and targeting and

8     you sit here for several years (indicating), I mean, you're

9     never going to have a chance over here to take advantage of

10    those remedies.

11         So, you know, let's talk about the Bivens cases, the

12    three that are cited the most, the Bush case, the Schweiker

13    case, and the Wilkie case.  Those cases actually demonstrate

14    why Bivens ought to apply here.

15         Bush versus Lucas was a case where a Civil Service

16    employee was wrongfully demoted and so -- or they're either

17    demoted or they were filed.  Well, under the Civil Service

18    Reform Act, there was an actual process for challenging that,

19    getting reinstated, getting your back pay, getting your

20    seniority status back.  And that's actually what the plaintiff

21    did there.  In that case, in fact, the Court said, you know,

22    your constitutional deprivation is the same thing as your

23    statutory deprivation.  So in effect, the plaintiff was saying,

24    well, you violated the statute and you've done that, you know,

25    not only with the statutory bad act but it's also kind of

1   unconstitutional at the same time; so therefore, I should also

2   get all the things I just mentioned but also emotional distress

3   damages and attorneys' fees.  And the Court said no; we have a

4   comprehensive remedial scheme, you took advantage of it.  You

5   got your back pay.  You got all the things you needed.  So

6   therefore, we don't, you know, we have a comprehensive scheme.

7           Schweiker is a similar sort of case.  There the issue

8   was entitlement to disability benefits, and in those cases, you

9   know, there was an avenue to actually litigate whether their

10  disability benefits were wrongfully terminated.  They would

11  then go through the process and they would have them restored.

12  The plaintiff in that case had them restored.  And it would

13  even get the value of the benefits they weren't receiving back

14  during the gap.  And again, the plaintiffs said, well, what

15  about the burden of not having them during that period.  And,

16  you know, that particular category of their damages just

17  couldn't be recovered because, again, Congress set up a

18  comprehensive remedial scheme.

19          Well, in this case there is no comprehensive remedial

20  scheme when you're over on this side.  There's nothing there.

21  There's some little -- people playing a little fast and loose

22  with the complaint when they suggest that defendants simply

23  want a little more.  They want a little more relief.

24  There's -- they're not getting quite enough relief or perhaps

25  they don't want to fight with their arm tied behind their back.

1    Well, they're not even in the arena to fight when they're over

2    on the left-hand side.  So there is no remedy.

3            Now, it's very true that simply not having all the

4    remedies you want, again, doesn't mean you've got to go <u>Bivens</u>.

5    But when there's not even any statutory scheme set up for you

6    and there's no remedy whatsoever, then we're right back into

7    the <u>Bivens</u> area.

8            Now, this argument is more or less developed in the

9    briefs, but I wanted to make sure that our argument was clear

10   that we're not just claiming we need or want an additional

11   category of damages.  But, you know, there's kind of a second

12   argument that I've got to address and it's that, well,

13   Congress, when they enacted especially Section 7433, they

14   thought about this entire problem and they decided we don't

15   want to allow <u>Bivens</u> lawsuits for all the targeting and delays

16   and other things that could happen before anyone ever hits,

17   enters into this system.  But that's not correct, and there is

18   a back and forth about the legislative history in the briefs.

19   I think it's really important to read that history.  Both sides

20   dispute what it really means.  At the risk of --

21           THE COURT:  Would you identify for the record what

22   you're putting on there?

23           MR. GREIM:  Sure.  Your Honor, I'm putting on page 243

24   of the section of the legislative history we've cited in our

25   brief.  I wish I had the full cite to read here, but it's

1    actually -- a part of this, the cite actually is in our

2    response brief.

3          But this is the testimony of Mr. Gibbs who was the IRS

4    Commissioner at this time.  And Mr. Gibbs is commenting on a

5    proposal at that time that you can see right here under A.  The

6    Act would have allowed employees to be held personally liable

7    for the deprivation of any rights, privileges, or immunities

8    secured by the Constitution.  Well, that could be our claim

9    here.  I mean, that's essentially a Bivens claim.  So they

10   would have taken Bivens and they would have basically enacted

11   it in statute for IRS agents.

12         Now, the other thing that this would do is it would

13   get rid of official immunity because now we just have a statute

14   for these agents.  But here's what the Commissioner said.  He

15   said:  "A right of action against Service employees currently

16   exists.  The Supreme Court recognized a cause of action

17   directly under the Constitution in Bivens.  Bivens suits are an

18   available remedy for those whose constitutional rights have

19   been violated by federal employees acting under the color of

20   federal law.  In fact, more than a thousand Bivens suits were

21   filed against Service employees during fiscal years 1980

22   through 1986."  Then he says:  "It should be noted, however,

23   that none of these suits has ultimately been successful."

24         And, of course, one reason for that is the second

25   thing I'm going to get to in a moment which is the issue of

62

 1    official immunity.  But this is important because Congress saw

 2    this, and when they enacted 7433, did they decide that, you

 3    know, we're not going to allow any other remedies; that this

 4    will be the exclusive remedy for deprivations of constitutional

 5    rights by IRS agents?  No, they didn't.  They did say it would

 6    be the exclusive remedy for collection, for issues involving

 7    collection.  But that's not this case.  So Congress was aware

 8    of Bivens.  Congress had it in its power, it knew how to limit

 9    the reach of these statutes, it knew how to limit the causes of

10    action that would be available, and it decided not to reach out

11    and take away what was over here on this side of the ledger.

12         Now, frankly, when you go through the history, you

13    don't see discussion of issues with people who are just

14    applying for tax-exempt status.  People would have been

15    aware -- I mean, the Bob Jones case came later, but, again,

16    that's on the other side of the red line.  Bob Jones had its

17    letter revoked.  So, again, it's a different kind of case.  And

18    then they enacted a statute on that issue.

19         So, you know, it's true there is no case out there

20    that we've been able to find and there's a couple suggestions

21    in dicta from the Ninth and Tenth Circuits and cases that are

22    cited within the authority the parties have cited, but there's

23    no case out there that says people in the same position as

24    plaintiffs are entitled to a Bivens remedy.  I mean, that -- if

25    that case were there, it would have been the very first case we

1    cited in our brief.  But it doesn't -- that doesn't mean we

2    can't cover this area, especially when there's no adequate

3    remedial scheme whatsoever.

4           In fact, let's talk for a moment about the Wilkie case

5    because the Wilkie case answers sort of the second set of

6    issues that especially Mr. Bergeron highlighted.

7           Now, Wilkie sort of made clear that we have a two-step

8    process under Bivens.  The first step looks at whether we have

9    an adequate remedial scheme, whether we have actually a

10   comprehensive remedial scheme, and that's everything we've just

11   talked about to this point; and that's Fishburn and all these

12   other cases.

13          The second part of Wilkie, though, was, all right,

14   well, let's say that we don't have an adequate remedial scheme.

15   Let's move to the second part of this test and let's decide

16   whether special factors would counsel against expanding Bivens

17   liability.  That's an important part of Wilkie, and I think it

18   goes to this concern that we've heard the management -- or the

19   lower-level defendants raise about, gosh, are we going to

20   really make all the poor IRS agents sitting at their office in

21   Cincinnati liable just because they send out a letter or

22   something, you know, and how are we going to -- how are we

23   going to police that.

24          Well, the Wilkie case was a little different scenario.

25   There it was a rancher.  He was in this issue with the Federal

1    Government, Bureau of Land Management, and they couldn't --

2    they wanted him to grant an easement over his property.  He

3    didn't want to do it.  And so the Land Management worker

4    started doing all kinds of things to him.  Some of it was

5    tortious.  But, of course, he had a remedy, a state tort

6    remedy, so there's no Bivens issue there.  And then there were

7    all kinds of administrative proceedings he could have raised

8    and used to challenge different things that the Bureau of Land

9    Management was doing to him, and he used some of them, he

10   didn't use others.  What the Court adopted, I think it was

11   Professor Tribe's argument there, that this is death by a

12   thousand cuts.  And so, yeah, you know, there's no remedy for

13   death by a thousand cuts, but, you know, which cut is the last

14   cut; is it the five hundredth cut, is it the four hundredth

15   cut.  And the problem that the Wilkie case identified and the

16   reason it didn't extend Bivens liability was that what the

17   government was trying to do was not -- it was basically to

18   negotiate with him as a fellow landowner.  It was trying to get

19   him to agree for some, you know, I think it was at issue how

20   much compensation but to somehow grant them an easement.  And

21   it said, we don't -- that's not a cause of action by itself,

22   and so it has to depend on the degree of effort; we're not

23   going to do it.

24        But here's what Wilkie said, it said, you know,

25   there's another kind of case close to this where we can draw

 1   clear lines.  It said a First Amendment retaliation case.

 2   Retaliation cases are all over.  You know, we cite them all the

 3   time.  There's several, by the way, Sixth Circuit retaliation

 4   cases involving prisoners that we've cited in this case.  But

 5   there are tests there; there's a three-part test that we can

 6   administer, and we can figure out whether somebody has the

 7   requisite intent to retaliate against you for violating your

 8   First Amendment rights.  Now, that part of Wilkie is dicta.

 9   That wasn't necessary to the holding.  But it does explain how

10   you can have a clear, you know, test that could apply to the

11   retaliation context.

12        And that's why we have all these Sixth Circuit

13   decisions that actually deal with retaliation against prisoners

14   and they applied Bivens.  We're just applying it against

15   instead of prison officials who sent somebody to a bad jail or

16   something because they're helping people file grievances, we're

17   going to apply it to IRS agents in this case.

18        Now, let's talk a little bit now, shifting from Bivens

19   over to qualified immunity, what has to be shown for the

20   individuals.

21        Well, the King versus Zamaria case is important

22   because what that case establishes is that not every single

23   person within the IRS had to within their own mind conceive of

24   the plan, have this animus against the Tea Party groups who

25   were being targeted, and then be the sort of sufficient cause

1    of the targeting occurring.  That can happen at different

2    levels.  Now, it's not as extreme as saying as long as the

3    subordinate of yours did it, you're liable.  That's not the

4    law.  But if you put in motion the scheme with retaliatory

5    animus and the reasonably foreseeable result is that that

6    scheme is actually going to occur, you're liable even if you

7    weren't the one that actually sent the letters out.

8           THE COURT:  So Mr. Bergeron's example of people just

9    processing paper, you're saying once the scheme is put into

10   effect, they're liable no matter what?

11          MR. GREIM:  No.  No.  In fact, that's the second part.

12   So that what I just mentioned relates to supervisors.  Now

13   let's move down to the lower-level people because that cannot

14   be the law.  It cannot be the law.

15          The lower-level people who actually get the list,

16   okay, these are the people that have been, you know, that are

17   before you; you're specialists, you've been given, you know,

18   Tea Party groups 1 through 15.  Carter Hull says these are the

19   questions that you need to ask, so send out your -- get your

20   letters out to these people and ask them about who their donors

21   are, ask them all these other things; that there's two parts

22   there.  Okay.  First of all, we would say, we would argue, and

23   I think it's got to be correct, that a reasonably -- a

24   reasonable IRS agent would know that for purposes of

25   determining someone's (c)(4) status, you don't ask for all

1    their donors.  I mean, you can't -- those aren't publicly

2    disclosed on people's actual returns once they get status.  You

3    can't ask them to disclose those and put them in the public

4    file because, remember, all this is public, what people send

5    into the IRS.  The identities of their donors have nothing to

6    do with whether they have a social welfare purpose.

7         But we don't even have to debate over that issue right

8    now because the IRS already admitted, and we've alleged this in

9    our complaint, that there are about seven questions that had no

10   tax administration purpose.

11        THE COURT:  Let me go back to you said everything is

12   private that you send to IRS -- I mean, I'm sorry, public?

13        MR. GREIM:  With the return information, yeah, but

14   when you send in an application to the IRS, so your 1023 or

15   1024, if you were to disclose all your donors, then that's

16   public.  The applications are public.  And I don't have a cite

17   on that but I bet Mr. Hartt or Mr. Sergi does.  But anyway,

18   that's public.  But even if it wasn't public, the issue is it

19   wasn't necessary for tax administration.  The IRS already

20   admitted that, and you can get that right from the TIGTA

21   report.  And, again, at the motion to dismiss stage especially,

22   we have to -- that's a factual issue that we have to give

23   plaintiffs the benefit of the doubt, but we actually have the

24   admission already in there.

25        Anyway, that's one thing.  That's knowledge now that

1    the individual agent has.

2            The next thing the agent knows is that we have gone in

3    and we have tried to target not just -- we didn't just run some

4    search terms that sound political.  We went after the, quote,

5    Tea Party movement.  And they actually used other ideas and

6    phrases that would get people who didn't say "Tea Party" but

7    who were allied with them.  And so the agents working on these

8    cases are aware of that.

9            Now, it's a very important distinction.  I would guess

10   when we depose these people, that many of them would say I have

11   nothing against the Tea Party.  I don't subscribe to their

12   ideology, but everybody's got their right to speak.  I have no

13   issue with them whatsoever.  But, Your Honor, that goes to the

14   issue of malice.  Malice is not required for First Amendment

15   retaliation.  What's required is an adverse action against

16   somebody, you know, as a result of their First Amendment --

17   well, first of all, that plaintiffs engaged in protected

18   conduct.  Second is that the defendant took an adverse action

19   to deter somebody from engaging in that conduct.  And third is

20   that the adverse action was motivated, at least in part, by the

21   protected conduct.  And that might mean that simply because you

22   know they're engaging in this conduct or that they have these

23   beliefs, you decide to go after them.

24           Now, you might think you've got other reasons.  You

25   might say, well, people that have those beliefs seem like

1  they're likely to get involved in candidate races.  It seems

2  like a lot of these Tea Party groups, you know, because of what

3  they believe about government, they're likely to also, you

4  know, not agree with the tax laws and violate them.  But that's

5  not permissible, Your Honor, because what you're doing is you

6  are targeting someone because of their political belief.  It

7  doesn't have to be you're targeting them and you disagree with

8  their political belief or that you have malice against them or

9  you have malice against their Tea Party.  And so that's an

10 important point of causation here.  That -- I know we didn't

11 get into it in the opening remarks, but it's important to

12 understand how it is that people with sort of different mental

13 states and different roles in the procedure from the top to the

14 bottom could all be found liable under a <u>Bivens</u> theory.  And,

15 again, you only need to look at the Sixth Circuit cases about,

16 you know, the different levels of prison officials, from the

17 guys working right with the inmates to the ladies who supervise

18 them to the warden, going through people who were transferred

19 because they were filing grievances or getting other, you know,

20 inmates to do it, you know, what was the requisite mental

21 state, what do they have to know.  And so that's why that case

22 is significant.  And we think, as we've argued in the briefs,

23 it supports finding a violation against some of these

24 individuals.

25          And, by the way, you know, I think the statement was

1    made that there's been no showing that anyone, any of the

2    line-level employees had any kind of malice or, you know, had

3    any kind of intent to retaliate, but we pled it in our

4    complaint that one of them, Stephen Seok, said, you know, the

5    Tea Party, these groups are different from regular social

6    welfare groups who want to help the poor because they want to

7    limit the scope of government.  And, you know, you can say that

8    without any malice, but that is an unconstitutional motivation

9    because it's directly tied to their viewpoint.  It's even worse

10   than content-based discrimination.

11           So, Your Honor, I think I won't go through all the

12   different allegations here, but we've laid out in our briefs

13   for each individual person that's in our response brief what

14   the acts were and where they fit into the scheme.

15           One thing I want to point out, it was touched upon, I

16   think, by Mr. Bergeron, the _Bray_ case which is relatively

17   recent from the Sixth Circuit.  That was cited in their reply

18   brief for the proposition that you -- to get around qualified

19   immunity, you have to point to a prior case with identical

20   facts, with the identical legal holding, and that is not

21   correct.  That is not the law.  The law -- in some cases the

22   law requires more specificity.  And the only line of cases I've

23   been able to find that's like that is the excessive force cases

24   where officers are reacting in the spur of the moment to stop

25   somebody from doing something.  There the Court requires a

1    little more specificity about what other conduct and restraints

2    against somebody who's acting out is okay.

3         But otherwise, the background rule as we've cited, the

4    Hope versus Pelzer case, it says that even in novel factual

5    situations, that the agents can have notice that a reasonable

6    agent could know that the violation is unconstitutional.  And,

7    again, there's no question that retaliation against someone for

8    a violation of your First Amendment rights, that is definitely

9    clearly established by law and has been for a very long time.

10   The only question is whether an IRS agent in this position

11   would know that, hey, pulling out everybody who believes like

12   the Tea Party and then holding them for 13 months or two years

13   and asking them all these questions, is there something that's

14   wrong with that.  And we've alleged other facts in the petition

15   about why people did know that was wrong, circumstantial

16   evidence that people tried to cover things up, that they tried

17   to say let's not say we're doing it for political -- for the

18   political reasons; let's come up with other reasons for doing

19   it.  We've alleged circumstantial evidence there that would

20   support that.

21        So with that, Your Honor, let me move on to the

22   Declaratory Judgment Act.

23        Trying to keep an eye on the time here.

24        THE COURT:  No, no, that's all right.

25        Oh, Peggy, I'm sorry.

1     MS. FECHTEL:  Can I ask two questions on that before

2     you move on?

3     You had cited to a King case in the beginning I think

4     regarding levels of liability.  Can you give a cite to that

5     case?

6     MR. GREIM:  Yes.  It's 680 F.3d 686, 2012, from the

7     Sixth Circuit.  And the full citation is in our response brief.

8     MS. FECHTEL:  And secondly, on the clearly

9     established, I think that's the last thing you were addressing.

10    MR. GREIM:  Yes.

11    MS. FECHTEL:  Would you summarize again why you're

12    saying they knew this was clearly established?  Have you

13    conceded that there is no case on point so you're saying it's

14    other circumstantial evidence?

15    MR. GREIM:  Well, I would concede that there is no

16    case involving IRS officials, you know, targeting people who

17    are just applicants for tax-exempt status.

18    What I would say is you look at the right that is

19    clearly established which is the right to be free of

20    retaliation for exercising your First Amendment rights.  It's

21    established in many different contexts.  And then I would say

22    that a reasonable IRS agent, and I would extend that to -- I

23    would extend it to other agencies as well, for people who deal

24    with sensitive information, deal with political activity, would

25    know that, you know, there's nothing wrong with following up

1    with a request from one of the entities about the candidate

2    forum they had, but it is wrong to only go after Tea Party

3    groups and people that have the same ideology, to target that

4    group, pull them out for two years, do nothing with them for 13

5    months, and then to ask a whole bunch of other questions for

6    each one of them.

7            And so it's, you know, under Bivens, the law can't

8    actually develop if you require that specific factual scenario

9    over and over again.

10           MS. FECHTEL:  Thank you.

11           And just to clarify, you said several times it's

12   clearly established no retaliation for First Amendment rights.

13   Do you still have a Fifth Amendment claim?

14           MR. GREIM:  Well, we have a Fifth Amendment equal

15   protection claim.  We're not -- we had raised a Fifth Amendment

16   due process claim, and we are not defending that.  We didn't

17   defend that in our response brief, as I think a few people

18   noted in their reply.  The equal protection claim rises or

19   falls with our First Amendment viewpoint discrimination claim

20   which is technically distinct from the retaliation claim.  And

21   we cited some authorities about why they rise and fall together

22   in our response brief.

23           MS. FECHTEL:  Thank you.

24           MR. GREIM:  Your Honor, I now have a few comments on

25   the Declaratory Judgment Act and Anti-Injunction Act.

1      Interestingly, in that discussion, we didn't talk

2  about the key phrase from 26 U.S.C. 7421, the Anti-Injunction

3  Act, which is that no suit for the purpose of restraining the

4  assessment or collection of any tax shall be maintained in any

5  Court by any person.  Now, the case law interprets the DJA

6  which is 28 U.S.C. 2201 to be co-extensive with the AIA, and so

7  the question then in applying these two statutes is is the

8  lawsuit for the purpose of restraining the assessment or

9  collection of any tax.

10      Now, of course, the IRS wants to argue that that is

11  the purpose of almost any lawsuit involving taxation.  And that

12  is what led to the Cohen decision, although Mr. Hartt is quite

13  correct that the Cohen decision -- maybe returning to our chart

14  up here, if I could.  The Cohen decision dealt with after

15  collection.  We're dealing with a special scheme for refunds.

16  And so the government there said, well, okay, it doesn't

17  actually deal with collection, it definitely doesn't deal with

18  assessment, but it does deal with the amount of money that will

19  be in the U.S. Treasury and so that's the real purpose.  We

20  really don't want -- we really don't want litigation against

21  the IRS that gets in its business, so to speak, about how much

22  money is going to be in the U.S. Treasury.  And so it really

23  extends beyond both ends.  And the D.C. Circuit said absolutely

24  not; that is not what the statute says.  And it said the IRS

25  envisions a world in which no challenge to its actions is ever

1    outside the closed loop of its taxing authority.  It argues

2    assessment and collection are part of the single mechanism that

3    ultimately determines the amount of revenue the Treasury

4    retains.

5           Well, it rejected that argument squarely.  And so

6    Cohen is not limited to a specific program.  It's an en banc

7    decision from the D.C. Circuit Court, and it does not conflict

8    at all with any decision from the Sixth Circuit.  There's some

9    suggestion from the government that somehow it is different --

10   that the RYO case and other Sixth Circuit decisions lean a

11   different direction, but all these cases are ultimately

12   construing what is the collection and the assessment of taxes.

13          Now, if we go back to the chart, the assessment and

14   collection of taxes are over here after somebody has actually

15   filed their return, and now the question is, at most, in some

16   cases it could be are you a (c)(3) or are you a (c)(4).  That's

17   not even the question here.  And this is what really did it for

18   the Z Street Court which is still -- the case is still pending,

19   but what did it for the Z Street Court is your claim,

20   plaintiffs, (c)(3)s, is not that you through this lawsuit need

21   to obtain your tax-exempt status, that's not what you're trying

22   to get.  This is not a declaratory judgment to say recognize me

23   as a (c)(3).  That's why it wasn't a 7428 case, by the way,

24   because that's what a 7428 case would do.  What the Z Street

25   Court said is that, no, your claim is about everything over

1    here (indicating).  It's that pro-Israel Jewish groups were

2    targeted to pull them out of the process and hold them and ask

3    them all these questions because what they're saying might

4    conflict with, you know, U.S. foreign policy goals.  That was

5    the reason there.  And, again, the foreign policy goals do not

6    mean it's okay.  It would still be a viewpoint discrimination

7    even if they had some other reason.  So the Z Street case is

8    directly on point and, you know, basically just construing the

9    plain language of the Anti-Injunction Act.

10       Beyond that, the government makes some other arguments

11   about the Bob Jones case.  There, the Anti-Injunction Act

12   applied.  But, again, we are over here.  They already received

13   a letter and it was revoked.  And anyway, we've gone around

14   that with 7428 now.  Congress passed a law.

15       And then finally, the government says this is actually

16   about much more than the targeting process in the

17   pre-application stage.  And it cites, I think, one point in our

18   complaint in the very beginning we mentioned discriminatory

19   audits.  Well, none of the facts in the complaint are about

20   audits.  This is not an audit case.  There's -- we're not

21   seeking any kind of relief about what the basis for an audit

22   might or might not be because after all, these groups, as far

23   as we know, have not been subjected to any audits.  There's no

24   audit in process.  And so we're not seeking that kind of

25   relief.  We are seeking forward-looking relief, though, for the

1    plaintiffs who have not had their status granted, and so that's

2    why the Declaratory Judgment Act and the Anti-Injunction Act

3    cannot possibly apply here.

4         That's all I have.  And I can answer any questions on

5    that.

6         THE COURT:  I have nothing.  Thank you.

7         MR. GREIM:  All right.

8         THE COURT:  Any rebuttal?

9         MS. BENITEZ:  Yes, Your Honor.

10        Your Honor, just a few quick points.

11        Plaintiffs' counsel says that the Sixth Circuit cases

12   applying Bivens in First Amendment retaliation claims are the

13   ones that they rely on because in those cases, they're just

14   applying it instead to, you know, instead of to prisons, here

15   they would be applying it to IRS agents.  Well, that makes all

16   the difference.  The clearly established analysis is a

17   context-specific analysis, and so the starting point here is

18   what is the context.

19        Also, the principal case that they rely on, the Downie

20   case, is one where the Sixth Circuit denied the extension of

21   Bivens because of the comprehensiveness of the Privacy Act.

22        Plaintiffs also say that malice is not required, but

23   if -- they are required to allege that there was a purposeful

24   infringement of clearly established rights, which they have not

25   alleged.  They have not alleged that any of the individual

1    management defendants have personally and purposely infringed

2    on the clearly established First Amendment rights of each of

3    the plaintiffs.

4            Plaintiffs also say that it's a framing issue, but

5    respectfully, I would say they're framing it the wrong way.

6    You have to look at the entire Internal Revenue Code because

7    it's what Congress considers in terms of what remedies to

8    provide and what remedies not to provide.  The Internal Revenue

9    Code is the same Code that's in all of the cases dealing with

10   Bivens remedies.  I mean, they're every -- the Courts are

11   referring to the Code as a whole.

12           Now, Courts have said that even if the plaintiffs have

13   no remedy, a point that plaintiffs here seem to concede, that

14   there's not a proper extension of Bivens.  And in fact, in Bush

15   v. Lucas, you know, despite the extensive remedial scheme that

16   was available in that case, the Supreme Court said it assumed

17   that, quote, Congress has provided a less than complete remedy

18   for the wrong.  And so the fact that plaintiffs do not have a

19   complete remedy or a remedy at all is not a basis for finding

20   that there should be an extension of Bivens.

21           THE COURT:  What case was that again?

22           MS. BENITEZ:  That's in Bush v. Lucas.

23           THE COURT:  Okay.  Thank you.

24           MS. BENITEZ:  Plaintiffs here have conceded that there

25   are no cases that say that plaintiffs in their position are

1    entitled to Bivens, but there are in fact cases in just about

2    every Circuit considering declining to extend Bivens in not --

3    while not the same context, in the taxation context.  And even

4    looking at plaintiffs' chart, to the extent that assessments

5    and audits are put in the same category, there certainly have

6    been cases from the Second Circuit and the Fourth Circuit where

7    the Courts have denied an extension of Bivens in the context of

8    retaliatory tax audits.

9         Plaintiffs also rely on Wilkie.  Wilkie did nothing to

10   change the law in this area or the Bivens analysis.  In fact,

11   in Wilkie, there was a denial of the extension of Bivens.  And

12   to the extent the Court was talking about special factors

13   counseling hesitation, those special factors have been found

14   not just in Wilkie but in many cases to include the existence

15   of a comprehensive remedial scheme having been enacted by

16   Congress.  So that's certainly a special factor.

17        Finally, I just wanted to make one other point on

18   Wilkie, going back to the question that Your Honor asked, and

19   that was the question of whether or not one gets to -- if you

20   decide Bivens first, whether you get to qualified immunity.

21   And looking back on the cases and conferring with my

22   co-counsel, if one looks at the Wilkie case, footnote four, the

23   Court says:  We recognize just last term that the definition of

24   an element of the asserted cause of action was directly

25   implicated by the defense of qualified immunity and properly

1    before us on interlocutory appeal.  Because the same reasoning

2    applies to the recognition of the entire cause of action, the

3    Court of Appeals had jurisdiction over this issue, as do we.

4            So, in fact, the Supreme Court, even though other

5    appellate courts have treated Bivens and qualified immunity

6    together and have meshed them, the Supreme Court has said that

7    the question of Bivens is part of the qualified immunity

8    analysis.  So both are threshold issues and both would be

9    immediately appealable.  I just wanted to clarify that.

10           THE COURT:  Peggy, anything?

11           MS. FECHTEL:  No.

12           THE COURT:  Thank you.

13           MS. BENITEZ:  Thank you.

14           MR. BERGERON:  Your Honor, just a few points in

15   rebuttal.

16           THE COURT:  Hang on one minute.

17           MR. BERGERON:  Sure.

18           THE COURT:  Okay.

19           MR. BERGERON:  Your Honor, they've conceded that

20   there's not any case out there in the Bivens context that has

21   recognized the cause of action they're asking you to recognize.

22   And when we say, hey, but there's all these IRS cases that have

23   rejected Bivens, they say, well, you can ignore those, you can

24   ignore those and look at cases that deal with prison issues?  I

25   mean, that makes no sense.  You've got cases in the IRS context

 1    refusing to recognize Bivens claims, and they don't have a

 2    response to that.  And I think that's telling at the end of the

 3    day.

 4          In fact, I'm not even sure what this cause of action

 5    is supposed to look like.  He started out talking about the

 6    mens rea aspect, an element of the claim, and then said, well,

 7    maybe you can equate it to a retaliation claim.  But at the end

 8    of the day, my clients, the individuals, the lower-level

 9    employees, how are they supposed to know that, oh, well, I --

10    if I do this, it crosses some threshold either for Bivens or

11    qualified immunity because there's no guidance there.  And when

12    he says, well, you can look at retaliation, that's a good

13    proxy; okay, well, look at the Second and Fourth Circuit that

14    addressed these issues head on and reject a Bivens claim in

15    those contexts.

16          And when he spoke recently about -- or briefly about

17    the legislative history, both the Second and Fourth Circuit

18    walked through exactly that legislative history and say what's

19    clear is Congress considered a lot of different things, a lot

20    of different causes of action, they didn't give everything that

21    this particular plaintiff wanted, but that's okay.  I mean,

22    that's Congress's prerogative.  And neither one of them came to

23    the conclusion that they want you to draw in terms of the

24    legislative history confirms that there is some Bivens cause of

25    action.  In fact, they squarely reject that.  And, obviously,

1    they have no response to those cases.  And I -- just to

2    reiterate, both of those cases rely on the Sixth Circuit's

3    Fishburn case, cited it favorably.

4              Back to my point, Your Honor, about not understanding

5    what the burden is.  I thought, you know, the only individual

6    defendant that Mr. Greim mentioned was Mr. Seok.  And the quote

7    in the complaint is on page -- paragraph 72 and says:  "Normal

8    (c)(4) cases we must develop the concept of social welfare,

9    such as community newspapers, the poor, et cetera.  These Tea

10   Party organizations mostly concentrate their activities on

11   limiting government, limiting government role, or reducing

12   government size.  I think it's different from the other social

13   welfare organizations which are (c)(4)."  It's hard to quibble

14   with that, Your Honor.  They are different.  They're not out

15   there trying to help the poor or make a community newspaper

16   run.  Now, they may still be entitled to (c)(4) relief and that

17   issue is not before you, but in terms of saying ah-ha, this

18   shows First Amendment animus, all he's saying is they're a

19   different category; and that if that's enough to trigger First

20   Amendment Bivens liability, I submit again, consistent with my

21   point earlier, that it's going to be difficult to find anyone

22   to work for the IRS.

23             So the remedies that they have at their disposal, and

24   I kind of like the chart that he put up because I have a hard

25   time seeing how any lawyer with a modicum of creativity could

1    not make all of these claims fall on this side of the line.  If

2    you say, oh, geez, I've got -- I've had delay here, they made

3    improper demands, you know what, you file your action in

4    Federal District Court under 7428 and say I'm entitled to my

5    determination and the IRS has not acted and I've waited the

6    requisite amount of time, I want a ruling, Judge, and then a

7    federal judge would rule on it.  And the issue about

8    threatening taxation, well, if they actually do tax, then

9    you've got your remedies, the collection suit, or you try to

10   get a refund.  So this notion that they have no ability to

11   invoke the administrative remedies they have here, I think is

12   strange credulity.

13           But in any event, even if they're right on that, that

14   gets back to what the Sixth Circuit has said in Krafsur and

15   what the Second and the Fourth Circuit said in the retaliation

16   cases which is you know what, Congress makes policy

17   determinations; and if at the end of the day you don't get

18   exactly what you want, that's Congress's determination.

19           So unless Your Honor has any further questions.

20           THE COURT:  I don't, no.

21           MR. BERGERON:  I respectfully request you dismiss.

22   Thank you.

23           THE COURT:  Thank you, Mr. Bergeron.

24           Mr. Hartt.

25           MR. HARTT:  Several points, Your Honor.

1     First, just so we're all clear, Mr. Greim talked about

2  the notice of deficiency.  The notice of deficiency is not a

3  document the IRS just shows up at your door and says here's

4  your notice of deficiency, you owe tax.  That comes after the

5  audit process with the interaction with the taxpayer, after the

6  opportunity to go to appeals.  Then you get your notice of

7  deficiency.  But you don't have to pay then.  You can go to the

8  tax court and on to the Court of Appeals.  I just want to be

9  very clear about that.

10     Secondly, we had a discussion about the levy process.

11  I'm not sure exactly where that fits into this case, but let's

12  be clear about that.  He acknowledged that there is a specific

13  remedy called a wrongful levy remedy.  If somebody thinks the

14  IRS improperly took their property, they can invoke that.

15  Moreover, we even have now collection due process procedures.

16  We don't need to get into that.  This is just not part of the

17  case.  But for what it's worth, that's where we are.

18     The next point is significant.

19     THE COURT:  Wait.  I'm just curious.  What is

20  collection due process?  What is that?

21     MR. HARTT:  It came in recently, I say "recently,"

22  within the last ten years or so, Your Honor, and it gives

23  someone who is a subject to collection activity the opportunity

24  for an internal procedure within the IRS.  And, again, if

25  they're not happy with the results of that process, then they

1    can go on to the tax court and say the lien you filed was

2    wrong, the levy you filed should not have been made.  It's very

3    complex and it's way beyond anything that's involved in the

4    case today.

5            THE COURT:  Thank you.

6            MR. HARTT:  Next point is important.  That is, they

7    appear now to have withdrawn or backpedaled on the language on

8    page 29 of their response about the discriminatory audits.  It

9    appeared to us that where they were going with that was, again,

10   to kind of metamorphose beyond what was said in the complaint,

11   beyond what the Inspector General of the Treasury said, beyond

12   what the taxpayer advocate said, beyond what everyone who's

13   dealt with this issue has said, and that is that this issue has

14   to do with the alleged improper targeting of certain groups who

15   applied for tax-exempt process, period, full stop, end of

16   story.  And we're there on the same page.  That's good.

17           Next, 7428.  It's very clear that 7428 came into the

18   law after Bob Jones versus Simon.  Congress created a

19   particular remedy for organizations under 501(c)(3).  They did

20   not include organizations pursuing status under 501(c)(4).

21   Congress obviously knew how to add (c)(4)s in there if it

22   wanted to.  It did not.  Why?  Because as we pointed out to

23   begin with, the (c)(4)s can simply self-declare.  They can just

24   start operating and say we're a (c)(4), file the return that

25   becomes due saying we're a (c)(4).  Then if the IRS wants to

1    come along and audit them and say, well, we think you are or we

2    think you're not, okay, fine.  Then you can go through the

3    audit process and that long series of steps that I've already

4    described twice now.

5            We get, then, to the AIA/DJA.  They point out that the

6    statutory language says assessment or collection.  But we

7    pointed out in our briefing, pointed out again this morning,

8    that the Courts had uniformly said those two statutes work in

9    tandem with each other and crucially for our analysis today,

10   that they include administrative steps necessary to assess or

11   collect a tax; i.e., the (c)(4) gets audited, the IRS says you

12   owe tax, they say no, we don't; you go forward, you have your

13   remedies, it gets resolved.  So they've got a remedy without

14   the necessity of 7428.

15           Cohen and Z Street, as we pointed out, both involve

16   highly unique facts that are clearly different from the facts

17   in this case.  More importantly, I think, for the analysis

18   today, the decision of the Sixth Circuit a year after Cohen

19   adheres to this traditional approach to the AIA/DJA which is a

20   very rigorous standard that says there's not going to be --

21           THE COURT:  I'm sorry, what case are you quoting?

22           MR. HARTT:  I beg your pardon.  It's RYO, which I

23   think is an acronym for roll your own cigarettes or whatever,

24   RYO Machine versus the Department of the Treasury decided in

25   August of 2012, and it's cited in our briefing.

 1          THE COURT:  Thank you.

 2          MR. HARTT:  That gets us down there to my last point,

 3   Your Honor, and that is, that by taking out the potential

 4   argument that we're talking about discriminatory audits, these

 5   other future evils, what we're down to really are just the two

 6   defendants that I mentioned.  He had no response to that.  So

 7   as to eight defendants, their injunction argument doesn't even

 8   apply.  As to the two that potentially could come within it,

 9   the law from the Supreme Court, the law from the Circuit is

10   very clear that the Anti-Injunction Act and the Declaratory

11   Judgment Act soundly and clearly prohibit the relief they're

12   seeking.

13          THE COURT:  Anything else?

14          Mr. Greim?

15          MR. GREIM:  Your Honor, I did have.  I don't want to

16   abuse this.

17          THE COURT:  That's all right.

18          MR. GREIM:  But there was a point made about (c)(4)s

19   being able to self-declare.  I think that's important.  We

20   recognized that in drafting the complaint, and the problem is

21   once a (c)(4) has applied and they're sending things back and

22   forth to the IRS, if they want to withdraw, they are now

23   determined to be not a tax-exempt entity.  So they lose that

24   right once they're caught in the trap of having made their

25   initial application without knowing what's going to happen to

1    them.

2              And the second point is that there's a whole reason

3    for the letter program.  It's that it's a valuable --

4              THE COURT:  Reason for the?

5              MR. GREIM:  For the letter program.  That's the

6    program where you can get a (c)(4) letter and not wait to see

7    whether an audit happens at some point.  When you get that

8    (c)(4) letter, you know, okay, if I keep doing the things that

9    I told them about to get the (c)(4) letter, I'm going to be

10   okay.  We can be pretty sure we're going to be a (c)(4).  And

11   that's why the IRS even has the program.  People pay several

12   hundred dollars just to participate.  So it's not really an

13   answer to say, well, just self-declare.  I mean, the whole

14   point of this is that there is a valuable government benefit

15   that you can't in a discriminatory way take away from people

16   that is the program.

17             THE COURT:  Thank you.

18             Mr. Hartt.

19             MR. HARTT:  Your Honor, somebody files an application.

20   It's not dangling out there in the wind, I guess is the way he

21   means to describe it.  If they don't like it, they can do what

22   two plaintiffs in this case did.  They can withdraw their

23   application.  They can start operating.  And they've now

24   self-declared.  They can proceed along the path that I have

25   just described.

1          What Mr. Greim is really suggesting to the Court is

2     that while there are remedies there, wouldn't it be better if

3     they could have something like the (c)(3) remedy under 7428,

4     wouldn't it be nice if they could compel through the Court the

5     IRS to grant their application.  Well, that doesn't go to

6     whether there's a remedy at all.  What he's saying is they'd

7     just like a better remedy than they think they've got now.

8     That, Your Honor, is a question for Congress to decide and not

9     for the Courts.

10          THE COURT:  Thank you.

11          Anything, Peggy?

12          MS. FECHTEL:  No.

13          THE COURT:  All right.  Let's move on, then, to Count

14    3, the inspection of return information claim.

15          Let me just get it together.

16          Okay.

17          MR. HARTT:  Count 3, Your Honor, was not in the

18    original complaint.  It was added when they began their

19    amending of the complaint.  And basically it seeks relief under

20    Sections, I believe, 6103 and 7431.  6103 is the statute which

21    defines "taxpayer information."  7431 is the part of the Code

22    that kind of crystallizes how you go to court and act upon any

23    abuse of 6103.

24          We ought to begin by noting that there are really two

25    different types of activity under Count 3.  One is the

1    disclosure of taxpayer information, and the second is the

2    inspection of taxpayer information.  This brings me back to one

3    of these plaintiffs and that is this Texas Public Policy

4    Foundation, the one that's been operating for 25 years now.

5    Frankly, Your Honor, there's no reason for this plaintiff to be

6    involved in this case.  Obviously, there's no targeting of the

7    application that's been the subject of our discussion today and

8    recently the news media.  This group has been functioning for a

9    quarter of a century now.  Their complaint was what looked

10   like, we thought, described in the plaintiffs' complaint really

11   a garden variety wrongful disclosure case.  And it seemed to us

12   that was basically a bilateral dispute between Texas Public

13   Policy Foundation and the government which should have been

14   litigated in a bilateral case back in Texas.

15        In any event, we challenged the allegations in the

16   complaint as being deficient.  We said you have no allegations

17   as to how this information was purportedly released, no

18   allegations about to whom it was released, and you don't allege

19   anything about whether the IRS is the source of what you

20   described as media reports.  We were very up front with these

21   deficiencies in our motion to dismiss.  But when they filed

22   their 80-page response, when it came time to respond to those

23   challenges to what they said in their complaint, basically it

24   was a case of answer came there none.  They had nothing to say.

25   We believe they have dropped the point and this should be

1    dismissed.

2         Now, for the sake of completeness, they may, unclear,

3    may be trying to also argue that there was a wrongful

4    disclosure of information within the IRS.  Courts really have

5    never been called upon to deal with this, but it theoretically

6    could be an argument.  The distinction being the disclosure law

7    we're all familiar with involves a disclosure of information

8    held by the IRS outside of the IRS.  In any event, if there is

9    some notion that's included in this complaint, then, once

10   again, they've never provided anything approaching the level of

11   specificity and detail required under Rule 8; and if that is an

12   argument, then it should be dismissed also.

13        That gets me, then, to what really is, I think, the

14   heart of Count 3, and that's their claims of wrongful

15   inspection.

16        In 1998, Section 6103 was amended.  The statute that

17   amended it was entitled the Taxpayer Browsing Protection Act,

18   and it was meant, as everyone who was associated with the

19   passage of the legislation to President Clinton when he signed

20   the legislation, to provide protection against a curious IRS

21   agent browsing, looking at a return or return information that

22   is a case not assigned to him or her.  The examples that are

23   typically given were some curious agent pulling up the return

24   of a celebrity or public figure.  The Taxpayer Browsing Act is

25   meant to prevent that.  Obviously, that has nothing whatever to

1    do with this case.

2         Agents who are assigned to a particular taxpayer

3    obviously have the right, the duty really, to examine the

4    return and the tax return information of that taxpayer.

5    Accordingly, it seems to us that the rationale as there

6    emerges, I guess, the response in the complaint, is that the

7    IRS has asked for too much information, it took too long to ask

8    these questions.  Well, that may or may not be, but it's not

9    really critical to deciding the case today because there is no

10   allegation that the IRS personnel who examined the information

11   which they submitted to the IRS with the expectation that it be

12   examined was not examined by the people who were responsible

13   for making decisions on their applications.

14        There are multiple flaws with their theory.  Their

15   real complaint, and we're assuming today for the purposes of

16   the hearing that the IRS shouldn't have asked for all the

17   information it did ask for; if we ever have to, we'll come back

18   and show you, yeah, we actually did need this information, but

19   we're not here today to do that.  We will assume that the IRS

20   asked for too much information.  That all has to do -- and the

21   length of time it took, the questions that are asked, all of

22   that has to do with the gathering of information.  It has

23   nothing whatever to do with the handling of the information

24   once it was obtained by the IRS.  Even when it comes to the

25   inspection theory, they don't give us allegations of which

1    agents supposedly wrongfully inspected which documents.  They

2    must concede that at least some of the documents they submitted

3    were proper ones for the IRS to look at.  Crucially, they

4    cannot get past the statutory exception in 6103 that when a

5    taxpayer submits information to the IRS with the request that

6    it be examined, that when the IRS does so, that's not wrongful

7    inspection.  It stands to reason, I mean, that is really -- it

8    gets to the heart of what we're talking about.

9           Let us consider the cause of action they're really

10   asking for this Court to create for them.  In the future in any

11   audit, if a taxpayer supplies information requested by the IRS

12   and then once the agent has received it and looked at it, the

13   disgruntled taxpayer can now turn around under 7431 as expanded

14   and bring suits saying that was a wrongful inspection, I want

15   some damages.  Your Honor, that is not the law and it should

16   not be the law.

17          In addition, there is a substantial body of case law,

18   most recently in the Wilkerson case in the Fifth Circuit and

19   the Dean case out of the Third Circuit cited in our briefing,

20   which holds that even if the underlying activity by the IRS is

21   later found by a Court to have been inappropriate, that does

22   not taint the information that was received by the IRS as part

23   of that process.  Those two Circuits in their opinions say they

24   are aligning themselves with what they consider to be the

25   majority view on that subject.  There's not controlling

1   authority that we're aware of for this Court, but we think this

2   Court, if it has to go that far in the process, ought to align

3   itself with that very sensible majority view.

4           Finally, they have some allegations about duress and

5   no real choice.  In a way, this gets back to what we were

6   talking about at the end of the discussion of Count 2.  They

7   said once we filed our application, we had to provide this

8   information or suffer consequences.  Well, certainly in the

9   context of Count 3, there is nothing in 7421 that talks about

10  either of those two issues.  And what the plaintiffs are doing,

11  once again, is asking this Court to step beyond the statutory

12  language and create some new remedy that was not provided by

13  Congress.

14          All the allegations in this complaint, Your Honor,

15  really center on the question of alleged wrongful targeting of

16  certain groups by the IRS.  Whether there was or whether there

17  wasn't is not an issue this Court has to decide today.  What

18  the Court has to decide after we're through today is whether

19  that activity, taken as true for these limited purposes,

20  actually provides them with a cause of action under the Privacy

21  Act, a way to get around the Anti-Injunction or the Declaratory

22  Judgment Act, or a way to somehow expand 7431 to create a new

23  remedy that is not there now.  None of those things exist, and

24  the portions of this case relevant to what we're calling the

25  federal defendants should be dismissed.

1          THE COURT:  Thank you, Mr. Hartt.

2          Mr. Greim.

3          MR. GREIM:  Your Honor, first I want to address the

4   Texas Public Policy Foundation argument.  There was a claim I

5   noted in the reply brief that they had not got a response --

6   not received a response to their footnote in which they

7   suggested we did not have enough specificity alleged on the

8   Texas Public Policy Foundation.  In an 80-page brief, it's a

9   little bit difficult to respond to every footnote, but actually

10  on page 73 without naming Texas Public Policy Foundation, we

11  argue about the level of evidentiary detail that is necessary

12  to state a 6103 claim.  We cite case law, and then we actually

13  cite the parts of our complaint, the paragraphs where we did

14  talk about the Texas Public Policy Foundation disclosures, and

15  there, certainly there was enough alleged.  We alleged when it

16  happened.  We allege what the return information was that was

17  disclosed.  It was donor names.  We alleged that they were

18  disclosed from a Form 990.  And, you know, short of knowing the

19  name of the agent who disclosed it, which we can't know yet,

20  that is enough.  I mean, that certainly provides the government

21  notice of what we're claiming happened to the Texas Public

22  Policy Foundation.  And so, you know, the allegations are in

23  there.

24          Let's turn to the rest of 6103.  The government

25  repeats a few arguments it makes in its brief and its reply

1   brief, but I want to make sure that the Court has the full

2   picture on the law.

3           The first point that is very important is that

4   inspection is definitely a separate part of the statute.  It's

5   a separate violation.  Now, the government very cleverly relies

6   upon a line of cases where people have tried to piggyback 6103

7   claims on top of other wrongful conduct.  And so, well,

8   remember we talked about the wrongful levy statute.  You can

9   actually sue somebody for wrongful levy.  And what often

10  happens is somebody will -- somebody's bank or their credit

11  union will get a notice from the government saying here's the

12  taxpayer, here's the money we think they have, and here's how

13  much they owe.  Well, that's return information.  And the

14  problem is there is a bunch of administrative exhaustion

15  required before you get to sue under that statute, so people

16  try to skip that.  And they just said, well, you did disclose

17  return information on the wrongful notice of levy, so we'll

18  just call this a wrongful disclosure because the underlying

19  notice of levy was wrongful.  And the Court said no, no, no,

20  no.  This information is always disclosed on a notice of levy,

21  and so there's nothing independently wrongful about putting it

22  on here.  The problem was that you sent out the notice of levy

23  in the first place.  That was wrongful.  There's a separate

24  remedy.  Go pursue them there.

25          But the government goes way beyond those cases and it

1   says, well, actually, if the -- if there was some wrongful

2   conduct that led to the wrongful inspection, you know, you

3   can't go forward on wrongful inspection.  But remember what

4   happened in this case.  The allegation is that there was a

5   wrongful gathering.  We say that, and there was, but it could

6   have stopped there.  It did not stop there.  And so a separate

7   independent decision had to be made to wrongfully inspect the

8   information it had gathered.  Frankly, it doesn't matter in

9   some ways, at least on this particular statutory claim, exactly

10  where they got it from.  What matters is that they had it and

11  that they wrongfully inspected it.

12         And there actually are allegations about this.  The

13  government says, well, there's no allegations at all about, you

14  know, any other people other than the people working on the

15  application who looked at this.  Well, maybe we're looking at a

16  different complaint, but the complaint does allege this in

17  several instances.  First of all, it talks about Carter Hull

18  supervising the cases at each step.  He reviewed information

19  from the taxpayers.  No decisions were to go out of Cincinnati

20  until the applications went all the way through the process in

21  Washington, D.C.  Those are not the line workers at that point

22  reviewing the responses from the taxpayers.

23         THE COURT:  But don't they have a right to inspect?  I

24  mean, I'm losing you here.  If they have -- whether they

25  rightfully or wrongfully get the information, once they get it,

1    they have a right to inspect it; right?

2             MR. GREIM:  No, they don't, if it's information that

3    they're not supposed to have in the first place.  You know,

4    it's sort of like -- I'm trying to think of an analogy to

5    another part of law.

6             I mean, they could have wrongfully requested it.  It

7    comes in, and somebody says, what did you send out, let me look

8    at that.  Oh, okay.  So you sent out these requests; they sent

9    all this stuff back.  No, you know, we're done.  We are not

10   going to forward it up to Washington, D.C. for them to review

11   it, come up with new questions off of it; but that's what

12   happened in this case.  So --

13            THE COURT:  So it's the forwarding of it for people in

14   Washington to inspect that's --

15            MR. GREIM:  At a, yeah, at a minimum it is.  It's for

16   Carter Hull to inspect.  Another part of our, and I'm quoting

17   from paragraph 110 of our complaint, this is -- there was a

18   reference that the -- they redacted parts of this,

19   unfortunately, but the information "will be ready to go to Judy

20   soon."  That's Judith Kindell, Lerner's chief technical

21   assistant.  So it's several spots we alleged inspection by

22   higher-up D.C. workers after the initial agent received it and

23   it came in the door.

24            And then finally, Lois Lerner saying to Holly Paz:

25   "Cincinnati should probably not have these cases.  Holly,

1  please see what they have, please."  I guess there's two

2  "pleases" there.

3          But at any point, we've adequately alleged that the

4  materials came in, let's say they came across the agent's desk,

5  it said, "Send your stuff back to Stephen Seok," then they were

6  pulled up to Washington, D.C.

7          THE COURT:  And that's the violation, once it went to

8  Washington.

9          MR. GREIM:  It's a wrongful inspection, yes.

10         Now, we don't have the facts on this.

11         THE COURT:  The IRS agent here could look at it.

12         MR. GREIM:  Well, let's say -- I would say this:  I

13  don't think I have a position on whether the wrongful

14  inspection might simply be the IRS agent who wrongfully

15  gathered it, saw what it was, and then sent it back.  Has

16  opening the envelope crossed the line?  I don't think we have

17  to answer that question.  I think we could say if it sits

18  around for 13 months and then you go back and review through

19  all of the First Amendment protected items, that's a violation.

20  And I think we can definitely say that sending it up to people,

21  to a lawyer in Washington, D.C., Carter Hull, to look through

22  that information and then give you advice about what follow-up

23  questions to ask, they're still inspecting that information.

24         Now, one of the issues is was it really wrong to even

25  have this.  And we heard some skepticism that, you know, we'll

1    show that they needed all this information.  But, again, the

2    IRS has already admitted that seven of these questions, and I

3    keep coming back to number one which is the request for donors,

4    that all that was unnecessary for tax administration purposes.

5    And I suppose we might get into a debate later in this case

6    about whether maybe the IRS wrongfully admitted that.  Maybe

7    the Inspector General was wrong and the government in this case

8    will prove that it really needed all the information in these

9    disclosures.  We don't think -- we think that that issue is

10   foreclosed.  But the point is it's a motion to dismiss.  We

11   have alleged it.  We have alleged the Inspector General's

12   statement of those seven things they didn't need to ask about,

13   and that is what our return information claim is keyed to.

14   It's they shouldn't have asked for it, but in particular, they

15   should not have inspected it.  They should not have inspected

16   it, and we, again, we have allegations that they did so.

17         Your Honor, at the end of the day, this case, it's

18   interesting because we've gone through a wide range of

19   statutes, only two of which we're trying to go under here.

20   We've got the Bivens claim, but the real question in this case

21   is can it be that 6103 and the Privacy Act and Bivens, that

22   none of them apply.  You know, given the facts that are pled

23   here, the actual delay that definitely happened, the viewpoint

24   based pulling people out that actually happened, whether you

25   want to call it targeting or not, that's objectively what we

1    believe it is, but taking those facts as they've been alleged

2    and then people actually being burdened by all that, is it

3    really, really true that federal courts have nothing to say

4    about this.  Is it really true that the Constitution and these

5    other statutes have nothing to say about this.  And the answer

6    from the defense today seems to be yes, there is nothing we can

7    say about it; it's all just a political matter; it's just a

8    media -- a media storm.  Is that really what we expect from the

9    IRS, is that what we really expect as citizens that go into

10    federal court.  We believe the answer to that is no, Your

11    Honor.

12           The claims should not be dismissed.

13           THE COURT:  Thank you, Mr. Greim.

14           Mr. Hartt.  You may proceed.

15           MR. HARTT:  Thank you, Your Honor.

16           Mr. Greim admits that in their 80-page response, they

17    didn't have any room to provide the specifics we asked for

18    about the Texas Public Policy Foundation.  He says if you look

19    at page 73, that's where you'll find it.  I went back and

20    looked at it.  I sure don't see it.  I'm sure the Court at a

21    convenient time can look at 73, 72, 74, or wherever else and

22    make its own decision on whether they provided the specifics

23    about Texas Public Policy Foundation and the alleged wrongful

24    disclosure.

25           But to be clear, what we said in our briefing was you

1    have no allegations about how this information was released, no

2    allegations about to whom it was released, and you don't allege

3    anything about whether the IRS is the source of what you called

4    media reports.  I don't see it.  Maybe somebody else does.  But

5    look at it and let the Court -- the Court can make its own

6    decision.

7           There's nothing involving that plaintiff, however,

8    about targeting, about any of the other issues we've been

9    talking about.  And even if, even if the Court should decide as

10   to that one plaintiff and that one issue there's something left

11   over to litigate, that really is a bilateral case between the

12   Internal Revenue Service and TPPF, and they ought to be

13   litigated back in Texas because there's certainly no connection

14   whatever to -- even if it happened here in Cincinnati.

15          The other point, and this is really huge, we've said

16   you didn't give us any details about wrongful inspection.  They

17   came back and they've said, I guess admitted now, that as at

18   least to the line employees, I understand what they've said,

19   there's not any wrongful inspection.  That's a step in the

20   right direction.

21          But then they say, wait a minute, how about the people

22   up the line.  Carter Hull is mentioned specifically.  The

23   people up the line should not have inspected this when it was

24   sent to them by the people down below them.  That is a

25   staggering argument, Your Honor, breathtaking really.  No one

1   has ever suggested that a supervisory employee has to be on

2   guard about looking at something that a person below him or her

3   sent up.  That has certainly never been the law as far as I'm

4   aware.  And once again, we don't think the Court ought to go

5   out and create that kind of a brand new remedy because that

6   is -- that would turn administration of the Internal Revenue

7   Service and perhaps other parts of the government really on its

8   head.  Supervisors have to be able to review and look at what

9   the people down below them are doing or they can't supervise.

10  In fact, I kind of think that goes to the heart of what they're

11  saying because they're complaining about the supervisors.

12  Well, if the supervisors don't have any interaction with the

13  people down below them, how are they supposed to have committed

14  the wrongful acts they complain about other parts of this

15  complaint?  This is just beyond the pale.

16          Mr. Greim said we can have debates on this later in

17  this case.  No, Your Honor, I don't think we should because

18  this case should be over now.

19          THE COURT:  Thank you, Mr. Hartt.

20          Anything else, Mr. Greim?

21          Peggy, anything?

22          MR. GREIM:  I did have one, one thing.

23          THE COURT:  Okay.  Go ahead.

24          MR. GREIM:  On the -- Your Honor, I'm just afraid that

25  we got away from the actual allegations in the complaint with

1   Mr. Hull.  This was not a situation where Mr. Hull was actually

2   the supervisor and one day a bunch of information came into his

3   office that he was curious to look at and see what it was.  We

4   have alleged that he directed the lower-level agents to go get

5   that information, and then they having got it, he reviewed it,

6   which is very different from a supervisor accidentally opening

7   a manila envelope from Cincinnati and find themselves liable

8   under 6103.

9             THE COURT:  Anything?

10            MS. FECHTEL:  I want to ask a question back --

11            THE COURT:  Go ahead.  Okay.  Of which lawyer?

12            MS. FECHTEL:  I think both.

13            Going back to Count 2 and the allegation that there's

14   only two of the groups have applications pending.  First,

15   Mr. Hartt, is it your position that those are the only two

16   plaintiffs that can be stating a claim under Count 2?

17            And then, Mr. Greim, is it your position that all ten

18   plaintiffs in fact are stating a claim under Count 2, which

19   looks iffy at least as to Texas Public Policy Foundation if

20   they weren't actually a part of this targeting scheme?

21            MR. HARTT:  To answer your question, yes, only those

22   two plaintiffs plausibly come within the cause of action

23   they're trying to advance under Count 2 with respect to

24   enjoining the Federal Government.

25            And so we're clear, we think there are other reasons

1    why even as to those two they don't get anywhere, but these

2    people who have -- the eight other plaintiffs, the six who have

3    been granted, the eight -- the two, I'm sorry, who withdrew,

4    they got their applications through the process.  But if

5    targeting happened, may have happened, but there's nothing to

6    enjoin at this point.

7         MS. FECHTEL:  Is there a claim for declaratory relief

8    and is there a claim for damages?

9         MR. HARTT:  I didn't understand them to be seeking

10   damages against the government in Count 2.  Under the Privacy

11   Act in Count 1 and under the 6103, 7431, they're seeking

12   damages against the government, but not in Count 2.

13        MS. FECHTEL:  Thank you.

14        THE COURT:  Mr. Greim?

15        MR. GREIM:  The plaintiffs who have already moved

16   through the process have no claim about what already happened

17   to them.  They can't seek injunctive relief about what already

18   happened.  So it would be the two groups, and AAOL, I always

19   remember that one, I'm forgetting the other one right offhand,

20   but those are the two groups that still would have a claim for

21   declaratory and injunctive relief.  And we've pled them as the

22   representatives of the class of the many other groups who are

23   also still waiting.

24        MS. FECHTEL:  Thank you.

25        MR. HARTT:  For clarity, the other one, I believe, is

1    Texas Patriots Tea Party.

2              THE COURT:  Anything?

3              All right.  Anything else from counsel?

4              Well, thank you very much for the arguments.  The

5    Court will take this entire matter under submission and rule as

6    soon as possible.

7              Mr. Greim, I marked your overhead as Plaintiffs'

8    Exhibit 1 to this hearing.  Is that --

9              MR. GREIM:  You know, we should probably mark the

10   other one too, the legislative history.

11             THE COURT:  Okay.  Then we need -- then you need to

12   give us --

13             MR. GREIM:  I'll do that.

14             THE COURT:  -- copies.  So that's clear.

15             MS. FECHTEL:  And that will get put into CM/ECF?

16             THE COURT:  Yes.

17      (Proceedings concluded at 1:03 p.m.)

18                              - - -

19                   C E R T I F I C A T E

20             I, Julie A. Wolfer, the undersigned, do hereby

21   certify that the foregoing is a correct transcript from the

22   record of the proceedings in the above-entitled matter.

23                           s/Julie A. Wolfer
                             Julie A. Wolfer, RDR, CRR
24                           Official Reporter

25