```
                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
                          WESTERN DIVISION
                              - - -

NORCAL TEA PARTY PATRIOTS,      : CIVIL NO. 1:13-CV-341
et al.,                         :
              Plaintiffs,       : Discovery Dispute Conference
     -vs-                       : by Telephone
                                :
INTERNAL REVENUE SERVICE,       : Tuesday, December 9, 2014
et al.,                         : 10:04 a.m.
              Defendants.       : Cincinnati, Ohio


                          - - -
                  TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE SUSAN J. DLOTT, CHIEF JUDGE
                          - - -


For the Plaintiffs:  Edward D. Greim, Esq.
                     Dane Martin, Esq.
                     Graves Garrett, LLC
                     1100 Main Street, Suite 2700
                     Kansas City, Missouri  64105


                     Christopher R. Finney, Esq.
                     Finney Law Firm, LLC
                     4270 Ivy Pointe Boulevard, Suite 225
                     Cincinnati, Ohio  45245


                     David R. Langdon, Esq.
                     Langdon Law, LLC
                     8913 Cincinnati-Dayton Road
                     West Chester, Ohio  45069


                     Bill Randles, Esq.
                     Bill & Bev Randles Law Group, LLP
                     5823 North Cypress Avenue
                     Kansas City, Missouri  64119

For the Defendants Internal Revenue Service and Department of
the Treasury:
                     Joseph A. Sergi, Esq.
                     Laura Beckerman, Esq.
                     Marissa Miller, Esq.
                     U.S. Department of Justice
                     Tax Division
                     555 Fourth Street, NW
                     Washington, D.C. 20001
```

Proceedings recorded in stenotype.
Transcript produced using computer-aided transcription.

```
1                          Matthew J. Horwitz, Esq.
                           Assistant United States Attorney
2                          221 East Fourth Street, Suite 400
                           Cincinnati, Ohio  45202
3

4

5
      Courtroom Deputy:    William Miller
6
      Law Clerk:           Margaret Fechtel
7
      Court Reporter:      Julie A. Wolfer, RDR, CRR
8
                                 - - -
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        <u>PROCEEDINGS</u>

2        (10:04 a.m.)

3        COURTROOM DEPUTY:  Okay.  Counsel, good morning.

4        We're here for a discovery conference in Case Number

5   1:13CV341, <u>NorCal Tea Party Patriots versus the Internal</u>

6   <u>Revenue Service</u>.

7        And on the phone representing the plaintiffs, I

8   believe I have David Langdon, Bill Randles, Chris Finney, Dane

9   Martin, and Edward Greim.  Is there anyone that I left off that

10  list?

11       MR. GREIM:  No.  That's everybody.

12       COURTROOM DEPUTY:  Thank you.

13       And on the phone representing the defendant, I believe

14  I have Joe Sergi, Laura Beckerman, Marissa Miller, and Matt

15  Horwitz.  Is that correct?

16       MR. SERGI:  That's correct.

17       COURTROOM DEPUTY:  Okay.  Here in chambers, I have

18  Chief Judge Dlott, Peggy Fechtel is the law clerk, Julie Wolfer

19  is the court reporter.

20       And if you could please just identify yourselves

21  before you speak.  Thank you.

22       THE COURT:  Good morning, counsel.

23       It looks like everything in this case seems to be

24  turning into an argument on discovery.  I think we've already

25  had more discovery conferences in this case than I've had in

1    any other case this whole year.  I don't enjoy this, and I

2    would appreciate it if counsel would try a little harder to

3    compromise on things.  But let's go through what we've got, and

4    perhaps the rulings on these matters will take care of future

5    objections.

6         Why don't we start with the first -- the first issue.

7    I guess we might as well start with the first interrogatory.

8         Who wants to be heard first?  I guess it's the

9    government's objection.

10        MR. SERGI:  I'm sorry, Your Honor, you want us -- you

11   want the government to go first?  This is Mr. Sergi.

12        THE COURT:  Yes.  I would assume.  That seems -- I

13   guess that makes the most sense.  It's your objection.

14        MR. SERGI:  Okay.  Yes, Your Honor.  First, let me say

15   up front -- you say it's our objection.  Let me say up front,

16   we've given plaintiffs everything that we're allowed to release

17   under the law and have accommodated them by providing

18   additional ways they could get the 6103 prohibited information,

19   Your Honor.

20        As you're aware, 6103 prohibits the unauthorized

21   disclosure or inspection of third-party taxpayer return

22   information.  Here, Your Honor, if you look at Plaintiffs'

23   Interrogatory 1, it requests the names of IRS employees who

24   worked on any of the number of taxpayers that it defines in one

25   of five different categories.  This request would have required

1    first the IRS to go into its files to determine whether the

2    taxpayer meets the definition and then requires the IRS to

3    inspect the third-party information to find the employees and

4    then disclose that to the plaintiffs.  As such, we objected

5    under 6103 grounds from producing the information of

6    non-related taxpayers.

7          But, Your Honor, the fight -- despite the fact that

8    plaintiff keeps complaining and we're here because plaintiff

9    has -- doesn't like our response, but we haven't just told them

10   to go pound sand.  We've attempted to accommodate plaintiffs

11   and get them the information they requested.  First, there were

12   exceptions, there are exceptions to 6103 that would allow

13   disclosure of responsive information.  Because we're in

14   litigation, the important exception here is 6103(h)(4) which

15   relates to information that the Department of Justice can

16   release in a court proceeding if it's -- and (h)(4) allows

17   disclosure only in one of four circumstances:  A, if the

18   taxpayer is a party and determination of their liabilities is

19   at stake; B, if the treatment on the disclosed return is

20   directly related -- Your Honor, not indirectly related as

21   plaintiff is arguing -- to resolving an issue in the

22   proceeding; C, if the information directly relates to a

23   transaction or relationship between the taxpayer and a third

24   party; or a Court order arising out of a specified criminal

25   statute or a rule of proceeding.

1          So the United States, what we did was we reviewed the

2    files of the plaintiffs in this case because, you know, we

3    could release that under (h)(4), and produced the names of all

4    the IRS personnel that worked on the case.  This resulted in

5    the production of about 34 employees.

6          In addition, although not required, the government

7    took the added step of providing plaintiff with other

8    complaints and Congressional documents that purported to

9    contain the names of other taxpayers that could fit in their

10   definition.  But because of 6103, we couldn't admit or deny

11   whether the information was correct without violating 6103, so

12   we did the next best thing.  We provided plaintiffs with access

13   to public databases which they could search for approved

14   entities by name, and we also gave them access to a public

15   database where they could see entities approved by month.  We

16   agreed to provide the applications under 6104 which is another

17   exception for approved tax-exempt entities.  We agreed to

18   provide their tax-exempt files for any taxpayer they could

19   determine was approved.

20         So you may ask, well, why didn't we just look at those

21   lists and see who was approved.  Well, Your Honor, one, we

22   couldn't because the original source of information, some of it

23   was maybe coming through Congress and they were saying the

24   IRS -- it was IRS information, so we couldn't actually confirm

25   those names without admitting the underlying document and would

1    be the release of 6103.  But more practical than that, Your

2    Honor, it's plaintiffs' definitions, so they're in a much

3    better position to do the search.  So in essence, we shifted

4    the burden to them to do their own search; and then when they

5    came back to us, we could get them the information they needed.

6            In addition, 6103 permits taxpayers to waive

7    protections under 6103.  And, again, not required under the law

8    but because we knew plaintiff claimed in the early conferences

9    with this Court that they represent other parties -- other

10   taxpayers who are not parties to the suit, we accommodated

11   plaintiffs and provided sample waiver language and we said,

12   hey, for the ten plaintiffs, we gave you all the information;

13   if you give us a waiver, we will give you that information.

14   But rather than avail themselves of these procedures,

15   plaintiffs simply said that this request is not covered by

16   6103.

17           Specifically, if you look at their papers, they're

18   going to argue that (h)(2) allows for the release of taxpayer

19   information to the Department of Justice.  Without getting into

20   it, Your Honor, we strongly disagree with their overly broad

21   interpretation of (h)(2), and it's kind of amazing given the

22   fact that plaintiffs' argument in this lawsuit is that IRS

23   employees violated 6103 in the course of doing their regular

24   job.  But even if you accept their argument as to the broadness

25   of (h)(2), at the end of the day, (h)(2) only allows the DOJ to

1    see the information, not the plaintiffs and not the Court.  If

2    this Court were to accept plaintiffs' argument that DOJ could

3    somehow take this (h)(2) information and then send it to

4    plaintiffs, then that would -- that would be the exception that

5    exceeds the rule.  (h)(4) wouldn't matter anymore.  There would

6    be no need for this anymore because (h)(2) -- the government

7    could get everything in (h)(2).

8         And to take it as an example, let's say a refund suit

9    is filed on a -- on, say, a home interest deduction.  Well,

10   that, under their theory, the Department of Justice would have

11   access to this, any taxpayer in the history of taxes that ever

12   claimed a home interest deduction.  Your Honor, it's an absurd

13   result to take it that far.

14        And even take it even another step.  Make it a class

15   action on anyone that's ever claimed a home interest deduction.

16   Well, that class would probably never be approved, but during

17   class discovery they would argue that we could see every bit of

18   information.

19        Basically, Your Honor, to sum it up a little more

20   colloquially, plaintiff would have you believe based on their

21   filing that we're just doing two different interpretations of

22   the statute; essentially we're ships in the night.

23   Respectfully, Your Honor, this is black letter law.  We aren't

24   ships in the night.  The government is the lighthouse in this

25   case and 6103 is the island.  Plaintiff is asking and demanding

1    the lighthouse to yield, and we can't, Your Honor.  We've

2    offered alternative routes.  We've bent over backwards and gone

3    beyond the discovery requirements in an effort to resolve this,

4    but it's not a choice of interpretation.  And that, I mean, I

5    think that pretty much sums up our argument.

6              THE COURT:  Okay.  Thank you, Mr. Sergi.

7              Who wants to be heard on behalf of the plaintiffs?

8              MR. GREIM:  Your Honor, this will be Mr. Greim.

9              And it's interesting, some of the issues that

10   Mr. Sergi went into on Interrogatory 1 actually slip into

11   Interrogatory 2, and I think some of them don't even apply to

12   Interrogatory 1, but I'll do my best to pick through this.

13             Two initial observations.  I mean, this is absolutely,

14   we agree, it's black letter law, and we also agree that it's

15   time to resolve the 6103 issue now because that is what the

16   government is using to support some of the positions it's

17   taking here.  And if we don't resolve this the right way now,

18   we're going to continue to get this sort of information that

19   doesn't -- I mean that basically sheds no light on the class.

20             So let's start with one, I think.  This is going to be

21   what I would call an (h)(2) issue.  It's not an (h)(4) issue.

22   Those are two exceptions under 6103.  And while, though,

23   Mr. Sergi talked a lot about (h)(4) first as the one that

24   really applies here, under Interrogatory 1, it doesn't apply

25   here.  The one that we are relying upon actually throughout

1    this is (h)(2).  And I'll get into two in a second why that's

2    kind of important.

3          Interrogatory 1 asks the names of the employees who

4    actually handled the applications of the plaintiff class.  So

5    we're not asking for the release of return information.  We're

6    asking for information about who at the IRS handled these

7    things.  Now, the government --

8          THE COURT:  Now, wait, wait, wait.  When you say

9    "plaintiff class," what do you mean?

10         MR. GREIM:  We've got five categories, Your Honor.

11   And you'll often -- you'll hear the government say these are

12   subjective categories; that only we really know what they mean.

13   But in fact, if you look at our request, we came up with five

14   categories based on the TIGTA report itself.  And so, you know,

15   they're in our instructions, the interrogatories.

16         Number 1 is the people whose application for tax

17   exemption was identified and referred to by the IRS Rulings and

18   Agreements office or EO function as tea party cases or the,

19   quote, advocacy cases, referred to a specific part of the TIGTA

20   report where it says the IRS actually used those terms and did

21   in -- and I won't go through all the rest.

22         But another example of one is everybody's application

23   was inspected, reviewed, processed, or investigated by Carter

24   Hull.

25         So these are things that the IRS can determine by

1     looking at its own records.  They are not things we can

2     determine by just looking at the application files of people

3     whose applications have been granted.  We can't go -- we can't

4     go through and determine these things.

5          You know, another one is people whose applications for

6     tax exemption was flagged by the IRS for special screening

7     based on the BOLO criteria, the terms and phrases listed in the

8     TIGTA report.  And then again in that search, we point to the

9     spot in the TIGTA report where we say this happened.  We can't

10    look at the application file for just the approved entities and

11    find out what that is.  I'll come back to that issue in a

12    second.

13         The point is we've got five items.  It's in the

14    materials, Your Honor, where we list the five sections of

15    people that we think are relevant under 6103.  So anyway, what

16    the IRS is saying is they were prohibited from even looking at

17    the files so that they can then determine, you know, who

18    processed the files and then give us the names.  That has been

19    the hang-up under Interrogatory 1.

20         So the IRS, as they went through all these workarounds

21    that they tried, and, I mean, they're good so far as they go, I

22    mean, they're trying to establish a class, and they gave us the

23    names of people that looked at ten of the applications.  I

24    mean, if this were just not a class action, if it was only

25    about the ten parties, we'd be getting somewhere.  But that's,

1    I mean, this is sort of like merits discovery if the class

2    wasn't certified and it was going forward on the ten

3    plaintiffs.  That's what they're trying to do is to work around

4    now.  That doesn't work.  And so we've got to go back and look

5    at what does 6103 mean here.

6          Your Honor, (h)(2), this is the first -- this is the

7    first exception, provides that -- the IRS first claimed that

8    those parties, that the class members had to actually all be

9    named in the class, they actually had to be parties to this

10   case before they could turn it over.  Then I think they've

11   conceded that actually, it just needs to be related to this

12   case, the information needs to be related to this case.  Well,

13   clearly, Your Honor, we're trying to establish a class.  We're

14   trying to show that the same people reviewed all of these

15   applications; that a special group within the IRS had access to

16   the application and then reviewed this in the process they set

17   up.  And so definitely the names of the people who looked at

18   the people who aren't the ten named class members are relevant

19   for this inquiry.  We have to know that answer.  So it

20   satisfies the (h)(2) exception.  And we don't have -- we don't

21   have to move to (h)(4) because disclosing the names of the IRS

22   agents who worked on this, to us, is not the disclosure of

23   return information.  We're not down into (h)(4).

24          Now, I believe that later in the case, and maybe even

25   quite soon, we can be in (h)(4), and we can show you why the

1    direct relationship requirement under (h)(4) is met.  Now, the

2    reason why it's a little bit of a higher test for (h)(4) is

3    that under that exception, they are actually giving us return

4    information.  They are not just looking at return information

5    so that they can give us other information that's not return

6    information which would be under (h)(2).  So (h)(2) applies to

7    Interrogatory 1, not (h)(4), and you have to focus on the

8    relevant provision.

9            A couple other things that I have to address.  We

10   heard that we were given access to these public databases and

11   that the burden was shifted to plaintiffs because we have these

12   subjective criteria and that as long as we're given a link to

13   the GuideStar Web site, where you can get on and you can kind

14   of research a (c)(3) or a (c)(4) that you want to get to, we

15   could actually go onto that Web site and a couple other Web

16   sites and see every (c)(3), (c)(4) -- (c)(3) or (c)(4) that was

17   granted exempt status in a given year and that we could then

18   work backwards and just tell the government who the class

19   members were using the Web site.  But, Your Honor, that -- the

20   person with the information about who was targeted is the

21   government, not us.  We cannot look at just the people who were

22   approved over that time, look at their application filed and

23   see, okay, well, clearly, the BOLO was used here.  The IRS can

24   do that.  In fact, it already has done that and that's why the

25   TIGTA report was even possible.

1          So that's what our class discovery is targeted to is

2     let's identify and learn about the characteristics of the

3     groups from the TIGTA report.

4          You know, the IRS's very first response was to give us

5     the total number of everybody who applied and I think was

6     accepted for (c)(3) or (4) -- (c)(4) status over a several-year

7     period.  I mean, that -- there were several weeks of this when

8     the IRS said there you go, that's enough.  That's not even --

9     that's not even close to what we're asking for.  Now, I agree

10    that somewhere in those thousands of numbers the plaintiff

11    class resides, but it's sort of the needle in the haystack

12    problem.  I mean, from that information alone, we can't tell

13    anything.

14          So, Your Honor, what we're asking for, then, under 1

15    and what we think has to be provided, and I think the Court has

16    to address the 6103 issue, we need the names of the people who

17    actually reviewed or accessed, worked on the plaintiff class

18    member applications.  To do that, it is very true the IRS is

19    going to have to go in and they're going to have to look at the

20    people that they themselves pulled to give to TIGTA for the

21    TIGTA report.  They're going to have to know who these looks to

22    be probably 298 groups are.  The IRS can do that, and it

23    doesn't violate 6103 just by looking at the files themselves so

24    that they can give us the agent names.

25          THE COURT:  Okay.  Thank you, Mr. Greim.

1          Anything further, Mr. Sergi?

2          MR. SERGI:  Yes, Your Honor.  I feel the need to -- I

3     actually wasn't planning on saying anything, but I feel the

4     need to correct some gross inaccuracies.

5          (h)(2) only gets the information to the Department of

6     Justice.  It doesn't get the information to the public.  If I

7     understand what Mr. Greim is saying, he's saying, well, then

8     the government can then redact and sanitize the information and

9     give him what would be otherwise taxpayer information and then

10    produce it.  Well, Your Honor, that's not allowed.  That's a

11    clear violation of 6103 according to the Supreme Court.

12          The Supreme Court held in -- sorry, I dropped my

13    notes.

14          Redacting information is not the same as excluding

15    information, Your Honor, under 6103.  The Supreme Court clearly

16    stated that mere redaction of identifying data or even

17    segregating non-6103 data will not take the material out of the

18    definition of return information.  As such, it's prohibited

19    from disclosure.  That case is Church of Scientology versus

20    Internal Revenue Service, and it's a Supreme Court case at 484

21    U.S. 9.  So as such, even if Mr. Greim is correct, which he's

22    not, that we can get any information on any taxpayer relayed to

23    this -- related to this, we can't just pick and choose and hand

24    out stuff.

25          The other thing that I feel -- I mean, I hate to tell

1  plaintiffs how to do their job, but we sent them complaints and

2  lists of names, and the TIGTA report says identities --

3  entities were determined by having the word "tea party,"

4  "patriot" or "9/12" in their name.  I would suggest maybe

5  rather than argue against the law of 6103, perhaps they search

6  for entities with those names, "9/12," "patriot," "tea party"

7  as a starting point.

8         I mean, it -- what's crazy about this, Your Honor, is

9  that it's very frustrating to the government because we have

10 these restrictions, but we are bending over backwards to allow

11 ways to get the information without us violating the law.  6103

12 is a very serious statute.  But plaintiff says, hey, thanks,

13 but, no, if you're not going to give us a hundred percent of

14 what we asked for, we're not going to work with you, and that's

15 our dilemma, Your Honor.

16        THE COURT:  Well, Mr. Sergi, what I don't understand,

17 what Mr. Greim says is they're not asking -- in Interrogatory

18 Number 1, they're not asking for any return information.  It's

19 information -- it's the name, job title, address, dates of

20 employment for every person who worked for IRS.  It's not

21 asking about any returns.  It's asking for information about

22 IRS employees.

23        MR. SERGI:  Right, Your Honor.  Maybe to answer that

24 question, let me explain how we gave them the names of the ten

25 entities.  The way we figured out who worked on the cases was

1  we took the application files of the ten entities and then we

2  looked through the ten entities and saw who sent the letters,

3  who made the agency notes.  So that was all information

4  contained in the files.  We then took those names and we took

5  them to the IRS personnel office and we had them confirm that

6  they were on the case.  And then we also found out based on

7  that a linkage to see who else worked on the case, support

8  staff and things like that.

9       But we needed to start in the file, and in every case,

10  and I won't repeat it because it's in our filings and in our

11  letters to them, "tax return information" is a very broad

12  definition and it includes anything in a taxpayer's file.  So

13  in order for us to go into these files in the first place and

14  get this information, we needed to access the taxpayer's return

15  information.

16       Does that make sense, Your Honor?

17       THE COURT:  No.

18       MS. FECHTEL:  This is Peggy Fechtel.  Can I ask one

19  question?

20       MR. SERGI:  Sure.

21       MS. FECHTEL:  If (h)(2) -- if the (h)(2) exception

22  applies, then the DOJ has the right to look at that taxpayer's

23  file to get the name of the IRS agent; correct?

24       MR. SERGI:  Correct.

25       MS. FECHTEL:  And so then when you produce the name of

1    that agent, why do we need to go beyond (h)(2) for

2    Interrogatory 1?

3         MR. SERGI:  Because it came out of the taxpayer's file

4    that is not directly related or a party to the litigation.  So

5    in essence, it would be doing what the Supreme Court said.  You

6    would be sanitizing the non-61 -- you'd be essentially

7    redacting everything except the name and giving it to

8    plaintiffs.

9         I admit, Your Honor, 6103 is very esoteric, to be

10   polite.

11        MS. FECHTEL:  I'm not sure I agree with you on the

12   directly related, but the Judge will make that decision.  But

13   I'm still -- but you agree that (h)(2) would allow the DOJ to

14   get the information; correct?

15        MR. SERGI:  No, I actually don't agree with that, Your

16   Honor, because I don't think the nonparty plaintiffs reach the

17   standard of (h)(2).

18        One second.

19        If you look at the legislative history of (h)(2), it's

20   a very narrow scope for (h)(2).  I'm trying to see if I have it

21   in my notes here.  Basically what plaintiffs' interpretation

22   is, reading out of their -- of (h)(2), and they're saying

23   related is it has to be related to an item reflected on such

24   return.  And an organization's tax-exempt status is not an item

25   reflected on the return.  So there is no real relation here

1   which is why we wanted to put off class discovery because we

2   wanted to -- I'm sorry, you're right, we did class discovery --

3   we wanted to put off merits discovery is because we wanted to

4   try to avoid this fight with regard to the non -- non --

5   non-plaintiff taxpayers.

6          I will say we got this request actually before the

7   case was bifurcated, so we actually assumed by working with

8   them in other ways around the information, the waivers and the

9   public information and even, I mean, Your Honor, we've given

10  there are filings and documents released by court that purport

11  to name all entities that are these taxpayers.  If plaintiff

12  were to just contact them, they could find out whether or not

13  they're entities in this.  We, however, because of 6103, cannot

14  admit or deny whether that list is correct because it's a very,

15  very strict standard and it's the very, very fine line that we

16  have to walk here because 6103 has some pretty heavy

17  prohibitions in it.

18         THE COURT:  All right.  Counsel, I'm going to put you

19  on hold for a minute.

20     (Off-the-record discussion.)

21         THE COURT:  Counsel, let me ask you this:  Mr. Greim,

22  are the names of these groups already in the TIGTA report?

23         MR. GREIM:  Your Honor, they're not.  Just there are

24  numbers in the TIGTA report, and so that -- this is now

25  Interrogatory 2.  We are trying to get them to confirm that

1    those numbers are correct, but that's a whole nother thing.

2         There's also a document floating around that was

3    released -- I shouldn't say it that way, that sounds

4    horrible -- but it was released, I think, by the Senate and

5    it -- it's a spreadsheet that was produced by the IRS that

6    contains, like, over a hundred of names of people that were --

7    that were kept by the IRS, but the IRS said it cannot

8    authenticate that because, again, they're claiming 6103

9    information.  But that's an (h) -- we believe that's an (h)(4)

10   issue, not an (h)(2) issue.

11        THE COURT:  All right.  Let me put you on hold again.

12     (Off-the-record discussion.)

13        THE COURT:  Counsel, another question for you.

14        MS. FECHTEL:  Again, this is Peggy Fechtel.  This is

15   to the government.  I am not clear on your position of why

16   these -- why the exceptions in (h)(2) and (h)(4) don't apply.

17   You keep saying it as if it just is, and I don't understand

18   that.

19        The (h)(2) exception seems fairly broad when it talks

20   about information that is or may be related to the resolution

21   of an issue in this proceeding or investigation.  The (h)(4)

22   exception is, I know, narrower where it says, "directly related

23   to the resolution of an issue in the proceeding."  If these

24   covered groups are in fact the putative class members, if

25   they're going to be a member of the class, how is this not

1  related to a resolution of issue in this lawsuit?

2          And also have you -- secondarily, I was not familiar

3  with your reference to this Church of Scientology case.  Was

4  that in your brief?  And I'm not clear what you're saying that

5  case says.  So if you'd answer both of those, what does that

6  case say as to 6103 because, frankly, your main citation seemed

7  to be to this Lehrfeld versus Richardson case, 954 F.Supp 9,

8  and I didn't think that case was directly on point in my

9  reading it.  So I'm not familiar with that Church of

10  Scientology case.

11          MR. SERGI:  What we did was we cited general cases to

12  show the broad nature of 6103 in our letters, and I thought we

13  cited a case that had to do with third-party tax -- it was a

14  FOIA suit.

15      (Interruption by court reporter.)

16          THE COURT:  It was a FOIA suit.

17          MR. SERGI:  That was the one that was the FOIA suit.

18  That's the one you were referring to.  But the principles are

19  the same as to the reading of 6103 for discovery and for FOIA

20  purposes.

21          But the Church of Scientology was -- there was a

22  series of Church of Scientology cases.  What Church of

23  Scientology cases stands for -- there's also the aggregation

24  principle that also comes from that case which is if there's

25  more than three taxpayers, the Service can aggregate

1   information to release it.  But what Church of Scientology

2   stands for is the fact that you -- basically Scientology was

3   arguing, hey, we don't want all the information in the file; we

4   just want non-taxpayer information, so just redact out -- pull

5   the document from the file of a taxpayer and redact out the

6   non -- the non-6103 -- I'm sorry, redact out the 6103

7   information and that way it won't be return information.  And

8   what the Supreme Court held was that redactions alone are --

9   cannot fix 6103.  It still would be return information.  The

10  non-identifying information would still be 6103 protected

11  because it originated in the taxpayer's file.

12          MS. FECHTEL:  Okay.  If I can then -- accepting that,

13  that doesn't address the interpretation of (h)(2) and (h)(4).

14  And if you could please restate succinctly why you're saying

15  this information isn't related to issues before the Court

16  because if this is in fact a class action, it would seem that

17  these identities are directly related to issues in this court.

18          MR. SERGI:  But this is not a class action.  If this

19  was a class action, the analysis might be different.

20          One of the grounds we're going to argue against class

21  action is because of the prohibitions of 6103.  But as of now,

22  this is not a class action, and they are attempting to get

23  information on third-party members that are not plaintiffs in

24  this case.  So there is not a direct relation.

25          MS. FECHTEL:  So --

1          MR. SERGI:  I'm sorry.  Go ahead.

2          MS. FECHTEL:  So the government's position is because

3     they don't already know everyone who is in the putative class,

4     they can't do discovery on the putative class?

5          MR. SERGI:  No, that is not our position.  Our

6     position is that you can't just ask for taxpayer information

7     about anybody in the world and have the IRS give it.  You're

8     violating the privacy of these other entities.

9          Even if this was a class action, we would posit that

10    it needs to be an opt-in class because people have to exempt

11    their access of their 6103 information.  These people are not

12    parties.  They're not consenting whatsoever to this information

13    being released.  This is to protect the third-party taxpayer

14    information.  If a class is never certified, then this -- then

15    this information was wrongfully disclosed if we'd give it out.

16         MS. FECHTEL:  And as to Interrogatory 1, the

17    taxpayer-protected return information is the name of the agent

18    who looked at it?

19         MR. SERGI:  The name of the agent who looked at it

20    would be obtained by reviewing the taxpayer information.

21         MS. FECHTEL:  I guess I'm still not hearing you

22    address the issue of you're saying it's not related because

23    they're not named plaintiffs.

24         MR. SERGI:  I'm saying they're not parties to this

25    suit.  So as a result, we cannot give out the information.  And

1    there is -- there is not a direct relationship.

2            Who is one of the plaintiffs?

3            NorCal's application approval does not have a direct

4    relationship to the approval of Taxpayer X because they're

5    different -- they're different facts, there's different

6    circumstances.  So there -- their argument, of course, is that

7    there is a -- this broad blanket conspiracy against these

8    entities.  You don't need to go into the files of the taxpayers

9    to get that type of information.  They have 34 names.  They can

10   take the depositions of those people.  They have asked for us

11   to give aggregate broad numbers, which you'll see when we get

12   to Interrogatory 2, which we haven't just answered that in the

13   ambit of 6103.  We've answered that one completely.  But we're

14   restricted by 6103, and we have attempted to do our best to

15   provide the necessary -- what I'm saying is they can get the

16   information they need without having to violate 610 -- having

17   to make us violate 6103.

18           THE COURT:  And I don't understand your answer.  And

19   the way I understand what you're saying is that class discovery

20   is not relevant unless you already know who the class is.  And

21   that's what class discovery is for.

22           I think plaintiffs are right on this issue.  I think

23   they're entitled to the names of all of the IRS employees and

24   everything else they ask for in Number 1.

25           MR. SERGI:  Your Honor, would it help if we briefed it

1    because 6103 is complicated?

2         THE COURT:  You did brief it.  You know --

3         MR. SERGI:  That's we viewed that as an agenda.  But

4    okay.  We --

5         THE COURT:  You know, I don't think it's going to --

6    you wanted this limited to class discovery and not merits too.

7    So this is class discovery, but you're not willing to give any

8    discovery on the putative class.  You know, it's I feel like

9    you're a rat chasing its tail; you're just running around in

10   circles and not answering the questions.

11        Let's go on to Number 2.

12        MR. SERGI:  May I proceed?

13        THE COURT:  Yes.

14        MR. SERGI:  As I said, with regard to Interrogatory 2,

15   this is a case of us giving what we're able to give.  This

16   was -- we've actually given them everything they've asked for.

17   Once again, this request was based on the same document

18   category of documents as Mr. Greim mentioned.  They produced a

19   very complicated -- they contained a chart that, quite frankly,

20   confused everyone in my office that looked at it; but after we

21   had a few phone calls with counsel, we discovered that what

22   that interrogatory was actually seeking was the number of

23   entities in each of the five categories and a listing of

24   whether their application was approved, denied, or withdrawn.

25   We determined based on the discussion with the IRS and TIGTA

1   that three of the categories were synonyms of each other.  They

2   were returns used by the TIGTA report, and they just ended up

3   being other ways to describe the same information.

4          This left three basic categories:  First, applicants

5   identified in the TIGTA report; second, applicants handled by

6   Carter Hull; and, third, applicants who received a so-called

7   unnecessary request from the IRS that was -- and that term --

8   as that term was defined in the TIGTA report.

9          Generally, Your Honor, the IRS does not keep that

10  information by category, and it would have been highly

11  burdensome to give it in those categories.  However, we did

12  discover that because Congress had actually asked them for very

13  similar categories, one of the -- the first category, they did

14  prepare such a list for Congress in July in response to a

15  request for the 298 entities listed in the TIGTA report, and

16  then they prepared a response in April that gave a response for

17  395 entities that would have been included in the TIGTA report

18  for the same time frame if you had, like, a hundred percent

19  hindsight because they didn't know about these other entities

20  at the time when the TIGTA report was filed.

21         Because this list was provided to Congress, it

22  included additional terms like "progressive" which is one of

23  the terms plaintiffs complain about that we listed in the

24  status report.  To be clear, Your Honor, we didn't put that

25  term in there to be argumentative or to cluster in any way.  We

1    put it in there so the responsive data was the way that it was

2    produced to Congress and it kept the numbers intact.  For

3    example, the other and the duplicate numbers.  We then asked

4    the IRS to update this information to the date of our response

5    and provided that information to plaintiff.  So that covered

6    the first category, the applicants identified in the TIGTA

7    report, and we went even beyond and we gave them people who

8    would have been identified in the TIGTA report, absent with the

9    benefit of hindsight.

10           Second, they asked for the cases done by Carter Hull.

11   And so what we did was we pulled his time sheets and we saw the

12   cases that he was assigned to, and we provided again the

13   information approved, denied, or withdrawn.  And I should add

14   we added a different category because we gave approved, denied,

15   withdrawn; and "denied" is a funny word for the Service.  There

16   is two kinds of denials.  There is a denial on the merits, and

17   then there's a denial because they didn't respond to

18   information.  So we added that category.  So we broke it out

19   even further.

20           The third category was a little trickier, and I

21   hesitate to say this given the last ruling, but it was the

22   position of our -- us and the Service that in order for us to

23   determine who got a, quote, unquote, unnecessary request, we

24   would have had to go through the files of all the taxpayers to

25   see what requests were actually sent to them.  So instead, we

 1   talked to opposing counsel about it and we got agreement that

 2   the TIGTA report identified 98 entities who they were

 3   referenced but they weren't identified, and so what we did was

 4   we contacted TIGTA directly and obtained the same information.

 5   We got the -- we had the Service and TIGTA work together and

 6   they gave us the withdrawns, the denied, denied for failure to

 7   respond --

 8           THE COURT:  Why don't you -- I'm sorry, Mr. -- I've

 9   got to be somewhere at 11:15.  Why don't you tell me -- maybe I

10   should start with Mr. Greim.  Where is the dispute with regard

11   to Number 2 right now?  I don't need to go through every step

12   that was gone through.

13           MR. SERGI:  That was the point, Your Honor.  We don't

14   see a dispute.

15           THE COURT:  Thank you.

16           Mr. Greim, where is the dispute?

17           MR. GREIM:  I think the issue, Your Honor, and we

18   obviously made more progress here than on the others, but our

19   requests are tied to what was identified in the TIGTA report

20   and what the IRS gave to TIGTA before, and, you know, it seems

21   like in a few of these categories, that's exactly where the IRS

22   stayed with its responses.  So like with Carter Hull, it sounds

23   like they did that.  I'm looking over at Mr. Martin just to

24   make sure I'm right about this.  Because the details got tricky

25   even for us.  But anyway, I think we're okay with the other

1    things.

2         The problem is, though, where the IRS swapped in the

3    Mr. Sergi kind of called the benefit of hindsight analysis and

4    decided to answer questions based on this benefit of hindsight

5    analysis instead of based on the actual categories we'd asked

6    for.  And, you know, I mean, at one level, you could -- the IRS

7    can kind of spin this as saying, hey, you know, we kind of --

8    we thought these categories; we kind of rethought how we

9    treated people, and we actually feel like other groups were --

10   should be included here because we treated them in kind of a

11   similar way.  And so from their perspective, they're giving us

12   even more information than we asked for, but from our

13   perspective, that's not right.

14        I mean, if you look closely at the letter that they

15   sent to Congress, and this is -- this is like a year after

16   everything broke, this was in response to a Congressional

17   investigation.  And what the IRS did is I think it re-reviewed

18   its files to determine cases that it viewed a year later after

19   the scandal has broken as potential political cases.  So now we

20   have put aside the TIGTA report and the TIGTA categories.  IRS

21   is coming up with its own list of potential political cases.

22   That number yielded, like, 390-something; 398 or something

23   like -- 395.  Then the IRS did word searches within the 395 to

24   say how many were progressive, how many had "progress" in the

25   name.

```
 1              THE COURT:  Mr. Greim, let me ask you this:  What
 2    didn't you get that you contend you're allowed to have, you're
 3    supposed to have?
 4              MR. GREIM:  Okay.  Sure.
 5              THE COURT:  Make this simple.
 6              MR. GREIM:  That's a fair question, Your Honor.  We
 7    basically want the exact numbers for the categories that we
 8    have defined, and that would be for category one, two, I think
 9    we -- I do think we have three, four, and it sounds like we
10    have five.  So one, two, and four are really at issue.  We
11    actually want the numbers that correspond to one, two, and
12    four, not the numbers that the IRS later reviews could have
13    been part of that category but the actual number of cases that
14    were -- that were disclosed --
15              THE COURT:  Wait.  You're breaking up, yes.  We missed
16    part of that.
17              MR. GREIM:  And if it's all the same, then that can be
18    their answer, the number's exactly the same for those
19    categories.  But we do want the actual number based on what the
20    IRS pulled at the time and gave to TIGTA, not its follow-up
21    analysis that it did later on for Congress.
22              And I guess we just want to be sure that the answer to
23    numbers three and five which -- where we had way more progress
24    actually reflects what TIGTA asked for, what they gave to
25    TIGTA, and what was in the TIGTA report.
```

1          So I would -- that's how I would summarize what we

2     want on Interrogatory 2 that I don't think we quite have yet.

3          THE COURT:  Okay.  Mr. Sergi.

4          MR. SERGI:  Your Honor, there are 298 entities in the

5     TIGTA report.  The first letter from Congress gives them the

6     numbers they want for those 298 entities.  I apologize for then

7     going beyond our scope and giving more information than was

8     required by that, but Mr. Greim has the answers to the

9     interrogatories.  It is the first letter to Congress dated July

10    31st.  I'm looking at -- July 31st.  So it sounds like there's

11    not an issue here, Your Honor.

12         THE COURT:  Do you agree, Mr. Greim?

13         MR. GREIM:  I'm checking with Mr. Martin to make sure

14    I got -- I have this.

15         THE COURT:  Ms. Fechtel and I don't -- we do not

16    understand at this point what anybody is talking about.

17         MR. GREIM:  Your Honor, I may be -- I may have a

18    letter not in mind here that I'm missing, but I believe the

19    letter that we have actually has these additional groups.  And

20    I don't want to seem like some kind of curmudgeon here, but we

21    really want the numbers that were initially given to TIGTA and

22    we want those -- you know, we don't need documents.  We just

23    want a number and a signed and sworn interrogatory response

24    that answers it, and I don't think we have that.

25         MR. FINNEY:  Eddie, let me interrupt.

1          Your Honor, maybe we could just leave on this issue

2     that if we -- if we can't get the IRS --

3          THE COURT:  Is this Mr. Finney?

4          Wait, wait.  Who is speaking?

5          MR. FINNEY:  I'm sorry.  If we don't have them, that

6     they will provide them.  Does that sound simple enough since

7     they don't seem willing enough to provide them?

8          MR. SERGI:  Your Honor, if they don't think they have

9     them, then the interrogatory is more vague and ambiguous than I

10    first thought because we have given them the numbers from the

11    TIGTA report, approved, denied, and withdrawn, and then, of

12    course, we updated it to the current because given the Court's

13    order on Count 2 only being for cases that haven't been

14    approved or denied, we thought that we should bring it current.

15    But they also have the date -- I mean, if they just need it of

16    the 298, the approved, denied, withdrawn, those numbers are

17    actually in the TIGTA report, so I'm not sure why there is an

18    interrogatory at all.  But we've updated it.

19         What Mr. Greim may be talking about is the terms

20    "9/12," "patriot," "progressive," "tea party" --

21         THE COURT:  Who is talking?

22         Wait a minute.  This is impossible.  I'm going to make

23    you guys show up in person if you don't tell me who is talking

24    because I don't have a clue.

25         MR. SERGI:  I'm sorry, Your Honor, that was Mr. Sergi.

1    I thought my accent was apparent.

2              COURT REPORTER:  Was the person that spoke before that

3    Mr. Finney?

4              MR. FINNEY:  It was.  I'm sorry I did not introduce

5    myself.  Yes, it was.

6              MR. GREIM:  Your Honor, this is Mr. Greim.

7              I see exactly what the issue is.  I'm, just to make an

8    effort to pin it down, we -- the follow-up letter with -- the

9    thing that Mr. Sergi is mentioning, okay, that is not the same

10   as the numbers given in the TIGTA report.  That is the result

11   of a different process the IRS did.

12             THE COURT:  Okay.  But wait a minute, Mr. Greim.

13   You're asking for the what's in the TIGTA report.  Mr. Sergi

14   says they have given you what you've asked for in the TIGTA

15   report.

16             MR. GREIM:  Right.  Well, that's only -- I mean, I

17   guess that's true if what's in the TIGTA report is some subset

18   of this other number 395.  But if you give us the bigger

19   number, we can't actually tell how much of those are the TIGTA

20   report numbers.  We just want the TIGTA report numbers.  We

21   don't -- while it's, I suppose, it's interesting to know these

22   higher numbers, you can see where you lose the ability to

23   define your class if the IRS kind of recast what the body is

24   and gives you sort of a slightly increased number, we don't

25   know how many --

```
 1              THE COURT:  All right.  So you want what's in the

 2    TIGTA report.

 3              MR. GREIM:  Yes.

 4              THE COURT:  Mr. Sergi, can you give them what's in the

 5    TIGTA report?

 6              MR. SERGI:  Yes, Your Honor, and we have given them

 7    what's in the TIGTA report.  There are 298 entities in the

 8    TIGTA report.  The first letter we sent them was for 298

 9    entities.

10              THE COURT:  Okay.  All right.

11              MR. SERGI:  The second letter was the bigger subset.

12              THE COURT:  Mr. Greim, it sounds like they've

13    complied.

14              MR. GREIM:  Your Honor, I don't think they have.  I

15    don't think we have an answer that category one, for example,

16    totals 298, the category two totals 298, the category four

17    totals 298, and then it breaks those down between the, you

18    know, application granted, denied, withdrawn, or still pending.

19    I mean, if we had those, we definitely wouldn't be here, and

20    I'm telling you we don't have those, Your Honor.

21              It sounds like we don't have a disagreement.  We

22    just -- I think I go with Mr. Finney.  I think an order just

23    saying that should be answered, and if they have answered it,

24    we'll quickly figure it out off the call.

25              THE COURT:  Okay.  That's fine.  All right.  Let's go
```

1    to the last, the document request.  Well, I guess that's not

2    the last thing.  I guess there is an additional thing on the

3    agenda.

4            MR. SERGI:  Your Honor, this is Mr. Sergi.  Do you

5    want me to proceed on this?

6            THE COURT:  No.  Why don't we start with Mr. Greim.

7    That seemed to be a little more successful.  Just tell me,

8    Mr. Greim, what don't you have that you want.

9            MR. GREIM:  Okay.  The Document Request 1, Your Honor,

10   asked for everything that they -- that the IRS produced to

11   Congress and, you know, as part of the investigation into the

12   scandal.  And we did that, you know, we did that, first of all,

13   because there has been a search and a production made.  We can

14   get them all at once.  We actually recognize that there will be

15   documents in there that go to the merits and not to class

16   discovery.  We get that.  We understand it.  And we've been

17   open about that from the very outset.  But we -- our thought

18   was rather than give them lots of categories that we think up

19   and make them go back and search those same documents, let's

20   just ask for the whole thing.

21           There shouldn't be a 6103 issue because they had to

22   scrub it for 6103 information before they produced it.  That

23   takes care of that issue.  They've had a clawback period that

24   has gone on for well over a year, probably not two years yet,

25   but, you know, a year-and-a-half where if there were issues

1   with it, they've presumably by now fixed it.  And so we'd be

2   willing to do some sort of a similar thing here.  I don't think

3   anyone has gone to jail for any 6103 mistakes in the production

4   to Congress.  I think the same thing could be done here.

5        That's basically our -- you know, in a nutshell,

6   that's our argument.  That's what we're asking for.  We think

7   that's actually easiest.

8        The IRS did raise a deliberative process privilege

9   and, you know, they basically say this is about our internal

10  operations and that's a deliberative process; you can't see any

11  of these records.  I mean, if that privilege were to be

12  strongly applied, we really wouldn't have very much to litigate

13  about in this case other than the waivers of the privilege that

14  have already occurred that have already been released, you

15  know, like in the TIGTA report.

16       So we have two arguments.  I'll just outline them.

17  They're already in our agenda.  Number one --

18       THE COURT:  No, I know the arguments.  Okay.

19       MR. GREIM:  So I'll just leave it at that.  There's

20  been a privilege argument raised, and we object to it.  That's

21  it.

22       THE COURT:  All right.  You're talking about the

23  deliberative process privilege, and I assume you're saying that

24  whenever there's government misconduct, that that's an

25  exception to the deliberative process privilege; correct?

1    MR. GREIM:  That's right.  And, number two, that there

2  has been a waiver at least when they disclose everything to the

3  Senate Committee which was not under a subpoena and with the

4  understanding that the Senate would just be releasing various

5  items of those as the Senate saw fit and which the Senate

6  actually did, which distinguishes this from other cases where

7  they produce everything to Congress with the promise that

8  Congress will not make it public.  In fact, Congress did.  And

9  the reason we can even file the case is that Congress made, you

10  know, a decent amount of this public.

11    THE COURT:  All right.  Mr. Sergi.

12    MR. SERGI:  Your Honor, first of all, I don't know

13  where Mr. Greim is getting the understanding that Congress

14  would release the documents.  We cite in our papers the fact

15  that when Congress makes a request of an agency, it's not very

16  voluntary and as a result, there is no waiver of the

17  deliberative process.

18    But I do want to just point out, though, again, we've

19  been working with them.  We objected to this request.  We

20  didn't produce anything, and we didn't produce anything because

21  it would be too burdensome for, first of all, it's of limited

22  relevance because there are -- the Congressional report -- the

23  Congressional investigation is much, much broader.  For

24  example --

25    THE COURT:  No, I understand that.  I would assume

1   that there's a whole bunch of things that aren't relevant here.

2   That's obvious to me.

3       MR. SERGI:  I mean, there's personnel complaints and

4   health and medical issues of employees because they've asked

5   for all the e-mails of Holly Paz and Lois Lerner as well.

6       But what we did is we said to them -- this request

7   almost was let me say before class discovery was bifurcated,

8   and we said to them, hey, we'll work with you and so if you

9   send us specific requests, we'll answer them.  Since then,

10  we've received five separate document requests and we've either

11  answered or are in the process of answering 72 different

12  document requests.  Many of these requests was not about class

13  discovery and we objected but we still responded.  What we're

14  hoping to do is avoid again the burden of this and having us to

15  review it.

16      With regard to the deliberative process, well, the

17  factors Mr. Greim is talking about are tests.  They're not

18  blanket waivers.  What they are are they're fact and -- they

19  have to be weighed and a fact and circumstances test and as to

20  a specific document, and as of now, in all of these document

21  requests we have not claimed deliberative process on a specific

22  document as of yet, so there are no facts and no circumstances.

23      And, Your Honor, that's as succinct as I think I can

24  make it.

25      THE COURT:  Okay.  Thank you.

1    MR. GREIM:  Your Honor, this is Mr. Greim.  I have one

2    quick response.

3    THE COURT:  Okay.

4    MR. GREIM:  I have one point.  The only thing I'd say

5    is, you know, we did try to work with them.  We tried to name

6    specific documents we already knew about, like we knew the

7    title of it from a report or something, but, you know, you

8    quickly run out of things like that that you can think of.  And

9    so we instead just asked for -- (phone connection

10   interruption) -- and the IRS said -- either because we thought

11   if we get an index and we would go through and ask for parts of

12   the index and that would resolve a lot of this.  IRS has said

13   they don't have any kind of index of these.  And we take them

14   at their word that there is no index of this production to the

15   government and if it doesn't exist in paper format already,

16   they can't make a report off their document system.  Their

17   answer was that they couldn't do that; that that was not

18   possible.  And we take them at their word that there is no

19   index and it's not possible to create one.  But that would

20   actually fix this issue as well.

21   THE COURT:  Go ahead, Peggy.

22   MS. FECHTEL:  You know, from the Court's perspective,

23   with a discovery dispute, you're usually trying to find a

24   resolution and order one party to produce or group A documents

25   to be produced, group B documents not to be produced.  I'm not

1    clear and I'm not sure the Judge is clear what it is you are

2    asking for.

3         I believe the Judge already stated she thought the

4    request was too broad as written.  Asking for everything simply

5    because the document's turned over to Congress would appear to

6    be more broad than issues relevant to this lawsuit,

7    particularly class certification issues.  Mr. Sergi has said

8    that a lot has been produced.

9         I don't think the Court has an understanding,

10   Mr. Greim, of what it is you are asking --

11        THE COURT:  Yes.

12        MS. FECHTEL:  -- the Court to order to produce,

13   specifically what it is you're asking to have produced.

14        THE COURT:  That you haven't already received.

15        MR. GREIM:  Okay.  I'd answer that two ways.  Number

16   one -- and we've been open about this too.  I mean, we know

17   that there's things in there that go beyond what is relevant

18   here.  Our thought is that -- and normally that's the end of it

19   because why would you make someone go out and locate things

20   that you don't need.

21        Our thought is that these exist in a body, so they

22   don't have to actually incur the expense of going and finding

23   things that aren't relevant.  Just give it to us, and if they

24   want to on the interrogatories shift the burden to us to search

25   through and find things that are relevant; and if we need a

1    protective order because there's, you know, medical information

2    in there or something --

3            THE COURT:  No.

4            MR. GREIM:  -- we can do that.

5            THE COURT:  No.

6            MR. GREIM:  So that's idea one.  And that would be one

7    answer is to order that they be produced and order the parties

8    to agree on a protective order.  And then we would be -- it

9    would be up to us to find things relevant in there.

10           THE COURT:  No.  The answer to that is no.

11           MR. GREIM:  Okay.  And so then, Your Honor, all that

12   leaves at this point, then, is just Number 2 which is -- I

13   mean, I want to be very clear that there is no index that they

14   already have or that could be produced.  We actually did a

15   document request for that index because if they can produce

16   that, then we'll just use that to formulate requests and we'll

17   probably be able to tie it to some sort of a Bates number or

18   something and make it easier.  But if that's -- if it's truly

19   not there and if Mr. Sergi is willing to state that there is no

20   index at all, that nobody can create one, then we'll just

21   have -- I mean, I think at that point given what you've said on

22   the first point, we'll just have to go about it the normal way.

23           THE COURT:  Okay.  Mr. Sergi, is there an index?

24           MR. SERGI:  Your Honor, this was the subject of both

25   an interrogatory that asked us to create an index as well as a

1    document request for any existing index.  The interrogatory is

2    signed by a representative from the Service saying that it

3    would -- well, we said it was too burdensome to create an

4    index.  Obviously, if it's too burdensome for us to review them

5    all, it would be too burdensome for us to index them all and

6    review them all and just re --

7            THE COURT:  Mr. Sergi, when I was a trial lawyer, I

8    would say:  Would you just give me a yes or no answer.  Is

9    there an index?

10           MR. SERGI:  I'm sorry, Your Honor.  The answer is no,

11   there is no index.  The documents are contained in Clearwell

12   and we could have printed out the Clearwell index, but it has

13   no identifiers in it.  There was no rhyme or reason because

14   different people input it different ways.  So there is no

15   working index.  The way they're working is they're searching

16   databases using OCR technology.

17           THE COURT:  All right.  Does that satisfy you,

18   Mr. Greim?

19           MR. GREIM:  Actually, that's a new -- we had not heard

20   that before.  We knew they had Clearwell and we've used

21   Clearwell before, so that's why we were surprised.

22           MR. SERGI:  Your Honor, we sent them a letter on this.

23           MR. GREIM:  Yeah, they did.  Look, we -- if they can

24   print off an index from Clearwell, we'd like to have it and we

25   can figure out, you know, whether it's useful or not, frankly.

1    Unless somehow printing is going to be expensive or time

2    consuming.  That's new information that they could do that and

3    that's -- we've got a request for that.  We'd like it.  Maybe

4    it's a, you know, hopefully it would save us all a lot of time

5    and money because we can use that to make good requests.  If it

6    doesn't work, at least we tried.

7         MR. SERGI:  Your Honor, may I address that very

8    quickly?

9         THE COURT:  Yes.  Okay.

10        MR. SERGI:  It's not an index.  It's just gobbledygook

11   in a spreadsheet.  It's not -- people put their own notations

12   in it.  It has nothing to do -- an index -- the request asked

13   for an identification of the documents.  You can't look at it

14   and say "Bob reviewed" and determine what the document is.  I

15   mean, we checked with the Service on this.  This is not -- we

16   said do you have an index of these documents.  There are no

17   indexes.  So that is the answer.

18        I'm sorry.  I apologize.  I sound like I'm losing my

19   temper.  I'm not.  I'm losing my voice.

20        MR. GREIM:  Your Honor, this is Mr. Greim.  I mean, we

21   tried to find something that would save time.  Instead, it's

22   created a secondary dispute.  I think it's time just to move

23   on.

24        THE COURT:  All right.  That's fine with me.

25        Okay.  The 30(b)(6) depo.  I guess that's the last

1    issue.  What's the problem?  Is that what it is, the 30(b)(6)?

2            MR. SERGI:  Your Honor, this is Mr. Sergi.  I believe

3    I can be succinct on this one.

4            THE COURT:  All right.

5            MR. SERGI:  The issue here is this is a 30(b)(6)

6    deposition of an IRS employee --

7            THE COURT:  Right.

8            MR. SERGI:  -- where they want to ask about general --

9    general information related to how the IRS basically keeps its

10   documents and its procedures.  We didn't think it was related

11   to class discovery.  We asked them.  They didn't tell us.  We

12   asked them again.  They didn't tell us again.  And then they

13   put in their report for the first time how it possibly could be

14   related, but the explanation they gave actually isn't covered

15   by the request because they're not asking for the general

16   policies of the IRS but rather how one specific employee would

17   have implemented his own interpretation of them.

18            So while we are not opposed to a 30(b)(6), we just

19   think this 30(b)(6) is premature.  And we have no problem with

20   a 30(b)(6) or even individual IRS depositions that are on class

21   discovery.  And that's my succinct explanation.

22            THE COURT:  All right.  Mr. Greim?

23            MR. GREIM:  Your Honor, I'll just very succinctly, I

24   disagree with most of what Mr. Sergi said.  We did explain in

25   our -- that's the reason we had several letters.  We explained

1   why it was relevant.  Looking at the five topics there at the

2   very front of the supplemental joint agenda, we're not just

3   asking for them to list what their procedures are.  We're not

4   asking for legal issues which is what the IRS --

5           THE COURT:  No.  You're asking how they keep their

6   records, correct.

7           MR. GREIM:  And this is a case about how the

8   information was kept and who viewed it and who saw it, and, to

9   us, this is sort of a bare-bones beginning of the discovery

10  30(b)(6) so that we can know what we're asking for from here on

11  out.

12          THE COURT:  All right.  Mr. Greim, that makes sense to

13  the Court.  You know, I think a 30(b)(6) request is

14  appropriate.  And maybe the parties will have a better

15  understanding, then, of what exists if you do that.

16          I would order a 30(b)(6) go forward.

17          I would ask that before -- before you call the Court

18  again on disputes, that I don't want your letters back and

19  forth to each other.  I'm not going to sit here and read them.

20  You know, I will read filings that you make, but I'm not going

21  to read your e-mails.  If you have disputes with each other,

22  please call each other and talk to each other.  That might help

23  to narrow the issues.  That would be of great assistance to the

24  Court.

25          Is there anything further, counsel?

1          MR. GREIM:  Your Honor, from Mr. Greim for the

2     plaintiffs, we have nothing more.  Thank you for your time

3     today.  I know no one likes a call like this, but I think we

4     really advanced discovery.

5          THE COURT:  All right.  Anything else, Mr. Sergi?

6          MR. SERGI:  The government has nothing, Your Honor.

7          THE COURT:  Okay.  Thank you, everyone.

8        (Proceedings concluded at 11:09 a.m.)

9                              - - -

10

11

12                  C E R T I F I C A T E

13          I, Julie A. Wolfer, the undersigned, do hereby

14     certify that the foregoing is a correct transcript from the

15     record of the proceedings in the above-entitled matter.

16                         s/Julie A. Wolfer
                            Julie A. Wolfer, RDR, CRR
17                          Official Reporter

18

19

20

21

22

23

24

25