## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION

| | | |
|---|---|---|
| NORCAL TEA PARTY PATRIOTS, et al., | ) | |
| ON BEHALF OF THEMSELVES, | ) | |
| THEIR MEMBERS, and THE CLASS | ) | |
| THEY SEEK TO REPRESENT, | ) | |
| | ) | Case No. 1:13-cv-00341 |
| Plaintiffs, | ) | |
| | ) | Judge Susan J. Dlott |
| v. | ) | |
| | ) | |
| THE INTERNAL REVENUE SERVICE, et al., | ) | **REDACTED** |
| | ) | |
| Defendants. | ) | **ORAL ARGUMENT REQUESTED** |
| _____ | ) | |

## PLAINTIFFS' MEMORANDUM
## <u>IN SUPPORT OF MOTION FOR CLASS CERTIFICATION</u>

Plaintiffs NorCal Tea Party Patriots, South Dakota Citizens for Liberty, Inc., Americans Against Oppressive Laws, Inc., Texas Patriots Tea Party, and San Angelo Tea Party (collectively, "Plaintiffs") hereby submit their Memorandum in Support of their Motion for Class Certification (Doc. # 193).

## Combined Table of Contents and Summary

Table of Authorities ................................................................................................................ vi

Introduction ............................................................................................................................ 1

This case satisfies the standards for class certification under Fed. R. Civ. P. 23. Starting in February of 2010, the IRS began to systematically identify, segregate, and disparately scrutinize hundreds of "Tea Party" groups and "Tea Party-type" groups that were applying for tax exemption under 26 U.S.C. §§ 501(c)(3) or (c)(4). These groups were segregated based on their viewpoint and, after being segregated, had their return information repeatedly inspected in violation of 26 U.S.C. § 6103. Plaintiffs seek certification of a "Principal Class" of more than 200 Targeted Groups and an "Unnecessary Questions" Subclass of at least 37 of the Targeted Groups who responded to intrusive demands for information that the IRS has admitted were unnecessary.

Factual and Procedural Background ....................................................................................... 4

I.      The Determination Letter Program is Designed to Promote Uniform Treatment ......... 4

The IRS's systems and policies are designed to promote uniform and consistent treatment. Applicants are treated – or mistreated – consistently. This extends to the "Determination Letter Program," which establishes strict guidelines and timelines for processing applications for tax exemption. Many applicants are approved immediately on "merit" or receive expedited processing. A designated subset of complex cases, however, are subject to "centralization" and sent to a specialty group for secondary screening and development. The centralization of complex cases ensures uniformity and consistency, but should only be undertaken "in appropriate situations" and "in an equitable manner."

II.     The IRS's Scrutiny of the Targeted Groups was Pervasive and Uniform ...................... 6

        A.      The Initial Cases, Centralization, and the Targeting Criteria ............................... 8

IRS Exempt Organizations Unit became increasingly politicized in the wake of the *Citizens United* decision. Fearing that a Tea Party group would make a consitutional challenge to the tax-exempt rules, the Director of EO deemed the Tea Party movement "very dangerous." Although three Tea Party groups had been recognized as tax-exempt, a Tea Party group was flagged in February 2010 as "high profile." Screeners were directed to flag and hold all other "Tea Party-like" cases, and did so using four criteria based on viewpoint. The Targeted Groups were centralized with a "Tea Party Coordinator" and began to have their information repeatedly inspected.

        B.      The Holding Pattern from October 2010 to November 2011 ............................... 11

The Targeted Groups were assigned to Ronald Bell, the second "Tea Party Coordinator" in November 2010. Bell already had a full workload of cases and, for twelve months, simply held the 50 to 100 Targeted Groups without further development. EO Technical searched for arguments to deny tax-exempt status to the Targeted Groups, but recognized that they would have to approve the

majority of the applicants. Bell believes that the Targeted Groups were segregated and more scrutinized than other cases.

**C. November 2011 to May 2012: The Semblance of Activity and the Demand for Irrelevant and Confidential Information** ......................................................... 14

The third Coordinator was Stephen Seok. Over the next seven months, Seok used a guidesheet provided by EO Technical to create template questions and, through an "Advocacy Team," issued development letters to the Targeted Groups. At least seven of the questions were unnecessary for determining tax-exempt status. These questions were known to be unnecessary, but were sought to be publicly disclosed in the application process. In November of 2011, EO Technical conducted a "triage" of the Targeted Groups that the identified as pointless. IRS agents were prohibited from recognizing the Targeted Groups as tax-exempt.

**D. The TIGTA Audit and Issuance of Determination Letters**................................... 17

The IRS began issuing Determination Letters after learning of an audit by TIGTA, nearly 27 months of scrutiny and delay. A "bucketing" process was developed and took just weeks to complete. Targeted Groups to be recognized as exempt were informed that their applications were sufficient and did not need to respond to any requests for information. At least 108 of the Targeted Groups were referred to "Quality Assurance" and at least 45 were referred for a "Review of Operations."

**III. Fallout from the Targeting: The TIGTA Report, Congressional Investigations, the IRS's Admissions, and Plaintiffs' Lawsuit**................................................................18

TIGTA issued its report on May 14, 2013, concluding that the IRS imroperly targeted "Tea Party" and other groups based on their viewpoint. Four days prior, on May 10, 2013, the IRS tried to minimize the report by blaming the issue on line-level workers in response to a planned question. Plaintiffs filed their lawsuit on May 20, 2013. On June 24, 2013, the IRS issued an Initial Assessment and Plan of Action admitting that its conduct as to the Targeted Groups was improper. The IRS leadership now asserts that no wrong occurred.

**Arguments and Authorities**.........................................................................................................20

**I. The Proposed Classes** ........................................................................................................21

The Principal Class and the Unnecessary Questions subclass definitions satisfy Rule 23(c) because they are capable of ascertainment by objective standards. The IRS has records which identify the class membership, including spreadsheets of the Targeted Groups and detailed records of when the cases were flagged, why they were flagged, and which groups received demands for unnecessary information.

*Ebin v. Kangadis Food, Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014).
*Walls v. Sagamore Ins. Co.*, 274 F.R.D. 243 (W.D. Ark. 2011).
Fed. R. Civ. P. 23(c).

**A. The Principal Class** ................................................................................................ 21

The "Principal" Class consists of more than 200 groups that were targeted using the four improper criteria, all of whom were centralized and had their return information subject to "secondary screening."

**B. The "Unnecessary Questions" Subclass** ........................................................ 22

The "Unnecessary Questions" Subclass consists of at least 37 of the Targeted Groups who responded to intrusive demands for information that the IRS has admitted were unnecessary.

**II. Plaintiffs' Wrongful Inspection Claim Should be Certified as a Class Action Because Each of the Prerequisites of Rule 23(a) Are Satisfied** ................................. 23

**A. Numerosity is Satisfied Because There Are Hundreds of Members in the Principal Class and At Least 37 in the Unnecessary Questions Subclass** ........... 23

The numerosity requirement is satisfied for the Principal Class because there are more than 200 groups flagged and subject to secondary screening using the four improper criteria. Numerosity is satisfied for the Unnecessary Questions Subclass because there are at least 37 members.

> *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838 (6th Cir. 2013).
> *Mann v. Acclaim Fin. Servs., Inc.*, 232 F.R.D. 278 (S.D. Ohio 2003).

**B. Commonality is Satisfied Because the Primary Legal and Factual Issues in this Case Are Amenable to Class-Wide Resolution** ........................................ 24

Commonality requires a common contention that is capable of classwide resolution. There are a number of common issues of law and fact that are subject to common proof in this case. Common questions include whether the Targeted Groups were chosen for heightened scrutiny and delay using a four-criterion test; whether the test was based on factors not germane to tax administration; whether the Targeted Groups were in fact chosen for repeated and uniform inspections based on factors not germane to tax administration rendered those inspections unlawful under § 6103.

> *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).
> *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838 (6th Cir. 2013).
> *Hendricks v. Total Quality Logistics*, 292 F.R.D. 529, 540 (S.D. Ohio 2013).

**C. Typicality is Satisfied Because Plaintiffs' Return Information Claims Are Similar (If Not Identical) to the Class and Subclass Members' Claims** ............... 25

Typicality is met if Plaintiffs' claims arise from the same course of conduct that give srise to the claims of other class members, and if his or her claims are based on the same legal theory. The typicality requirement is satisfied for the Principal Class because the claims of Plaintiffs and putative members of the Principal Class arise from the same course of conduct by the IRS (being

segregated improperly and being subject to secondary screening to ensure that improper segregation), affect Plaintiffs and members of the Putative Class in the same manner (uniform and unnecessary inspection of their return information) and arise from the same legal theory (violation of § 6103). Plaintiff NorCal is also typical of the putative members of the Unnecessary Questions Subclass because it responded to the IRS's demands for unnecessary information.

> *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838 (6th Cir. 2013).
> *In re Am. Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996).
> *Hendricks v. Total Quality Logistics*, 292 F.R.D. 529, 540 (S.D. Ohio 2013).

**D.  Adequacy is Satisfied Because Plaintiffs and Their Attorneys have No Conflicts of Interest and Will Vigorously Prosecute this Lawsuit** ...................... 27

The adequacy requirement tests whether there is any conflicts between Plaintiffs and the putative classes and ensures the experience and ability of counsel for Plaintiffs. Adequacy is satisfied in this case because Plaintiffs are part of the classes they seek to represent and have suffered the same injuries. Plaintiffs' interest in obtaining relief for the IRS's conduct is co-extensive with the interests of the putative classes. Plaintiffs have no conflicts of interest and are committed to vigorously prosecuting this lawsuit. Similarly, Plaintiffs' counsel have no conflicts and are committed to the vigorous prosecution of this lawsuit. Plaintiffs' counsel are qualified, experienced, and fully capable of handling this litigation to conclusion.

> *In re Am. Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996).

**III.  The Case is Properly Maintained as a Class Action under Rule 23(b)(3)** ....................28

**A.  The Common Legal and Factual Issues Predominate Over Any Individual Issues That Might Exist** .......................................................................................... 28

Predominance requires that the issues in the class action that are subject to generalized proof, thus appliable to the class as a whole, predominate over issues that are subject only to individualized proof. The issues that are subject to generalized proof predominate over any individual issues because the unlawfuness of the IRS's repeated inspection of the Targeted Groups' return information depends on whether the inspections were without a valid tax administration purpose and, for the Unnecessary Questions subclass, whether the questions were irrelevant. The predominance of general issues is strengthened by the fact that § 6103 provides statutory damages of $1,000 per unlawful inspection, allowing damages to be calculated with common proof for each uniform inspection that occurred.

> *Amgen Inc. v. Conn Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013).
> *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838 (6th Cir. 2013).
> *Beattie v. CenturyTel, Inc.*, 511 F.3d 554 (6th Cir. 2007).

Fed. R. Civ. P. 23(b)(3).

**B.** **The Class Action Mechanism is the Superior Method for Adjudication**............. 30

A class action is a superior method of adjudication when class members are unlikely to file individual actions because the cost of litigation would dwarf any potential recovery. The proposed classes satisfy the superiority requirement because they provide a mechanism for efficiently adjudicating hundreds of claims in a single proceeding that would either go unlitigated or would cause an unnecessary burden on the judicial system. Although some of the Targeted Groups have initiated litigation, hundreds of groups have claims and injuries that should be efficiently and effectively adjudicated.

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838 (6th Cir. 2013).
Fed. R. Civ. P. 23(b)(3).

**Conclusion** ........................................................................................................................30

## <u>Table of Authorities</u>

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
   133 S. Ct. 1184, 1194-95 (2013) ....................................................................... iv, 21, 28

*Beattie v. CenturyTel, Inc.*,
   511 F.3d 554 (6th Cir. 2007) ..................................................................................... iv, 28

*Citizens United v. FEC*,
   558 U.S. 310 (2010)................................................................................................... i, 2, 7

*Ebin v. Kangadis Food, Inc.*,
   297 F.R.D. 561, 567 (S.D.N.Y. 2014)............................................................................ 21

*Hendricks v. Total Quality Logistics*,
   292 F.R.D. 529 (S.D. Ohio 2013) ...................................................................... iii, iv, 24

*In re Am. Med. Sys., Inc.*,
   75 F.3d 1069 (6th Cir.1996) ............................................................................... iv, 25, 27

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
   722 F.3d 838 (6th Cir. 2013) .................................. iii, iv, v, 20, 21, 23, 24, 26, 28, 29, 30

*Mann v. Acclaim Fin. Servs., Inc.*,
   232 F.R.D. 278 (S.D. Ohio 2003) .......................................................................... iii, 23

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010) ........................................................................................................ 20

*Walls v. Sagamore Ins. Co.*,
   274 F.R.D. 243 (W.D. Ark. 2011) ............................................................................... ii, 21

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011)................................................................................. iii, 21, 24, 28

*Z Street v. Koskinen*,
   --- F.3d ----, 2015 WL 3797974, at *6 (D.C. Cir. June 19, 2015) ............................. 20

**Statutes**

26 U.S.C. § 501(c)(3).............................................................................................. i, 3, 4, 6, 21

26 U.S.C. § 501(c)(4)................................................................................................ 3, 4, 13, 21

26 U.S.C. § 6103.........................................................................i, iii, iv, 2, 3, 24, 25, 26, 27, 29

26 U.S.C. § 7431 ....................................................................................................................... 2, 29

vi

**Other Authorities**

Fed. R. Civ. P. 23(a) ....................................................................................... iii, 20, 23, 24, 25, 28

Fed. R. Civ. P. 23(b) ........................................................................................ iv, 20, 28, 30

Fed. R. Civ. P. 23(c) ........................................................................................ ii, 21, 22

Internal Revenue Manual § 7.15.1 ................................................................... 4

Internal Revenue Manual § 7.20.1 ................................................................... 5, 6

Internal Revenue Manual § 7.20.2 ................................................................... 5, 6

William B. Rubenstein, *Newberg on Class Actions* .................................................. 20, 23, 24, 25

## Introduction

> They used names like *Tea Party*, or *Patriots*. They selected cases simply because the application had those names in the title. That was wrong, that was absolutely incorrect, it was insensitive, and it was inappropriate.
>
> – Lois Lerner, Director of IRS Exempt Organizations, ABA Tax Section's Exempt Organizations Committee Meeting (May 10, 2013)

This statement, a seemingly impromptu response to a question about the tax-exempt status of Tea Party groups, had been carefully vetted by top IRS officials, including the Acting Commissioner of the IRS. The question was planted by the IRS, and it came mere days before the expected release of a report by the Treasury Inspector General for Tax Administration ("TIGTA") concerning its audit of the IRS's tax-exempt determinations process. TIGTA released its findings four days later, and its conclusions were alarming: "The IRS used inappropriate criteria that identified for review Tea Party and other organizations applying for tax-exempt status based upon their names or policy positions instead of indications of potential political campaign intervention." A once-benign process had turned discriminatory.

The IRS did not accidentally target Tea Party and "Tea Party-type" groups. It was orchestrated. Starting in February 2010, the IRS began to systematically identify, segregate, and disparately scrutinize applications for tax-exempt status by "Tea Party" groups and other groups it deemed similar. These groups were lumped together and harassed for years-on-end not because of their activities, but because of their viewpoints and the names they used to symbolize their beliefs (such as "Tea Party," "9/12," and "Patriots"). All the while, the IRS processed other applicants in the ordinary course, some receiving recognition in as little as 30 days.

In this lawsuit, Plaintiffs assert that the IRS violated their First and Fifth Amendment rights by discriminating and retaliating against them based on their viewpoint. Furthermore, because the IRS repeatedly inspected and scrutinized their return information without a valid tax

1

administration purpose,[1] Plaintiffs assert claims under 26 U.S.C. § 7431 for the improper inspections of their return information in violation of 26 U.S.C. § 6103. *See* Count III, Second Am. Class Action Compl. at ¶¶ 242-253 (Doc. #114). Plaintiffs seek to represent a "Principal Class" of similarly situated Tea Party and "Tea Party-type" groups (the "Targeted Groups") that, from February 1, 2010 to June 31, 2013 (the "Class Period"), were subjected to the same unlawful multi-tier inspection of their return information in violation of § 6103. Plaintiff NorCal also seeks to represent an "Unnecessary Questions" Subclass of entities who responded to IRS demands for information that were unnecessary for determining their tax-exempt status.

The IRS's unlawful inspection of the Targeted Groups' return information was uniform and pervasive. The allegations in the Complaint and other record evidence demonstrate that:

- In the wake of the January 2010 *Citizens United* decision, the IRS's Exempt Organizations Unit ("EO") became increasingly politicized. Officials began crafting strategies to "fix" the issue of money in politics. (App. Ex. A.) The Targeted Groups were considered "very dangerous" because they "could be the vehicle to go to court on the issue of whether Citizen's United [sic] overturning the ban on corporate spending applies to tax exempt rules." (Ex. B, at 1-2.)

- In February 2010, the EO Determinations Unit ("EOD") in Cincinnati, Ohio flagged a "Tea Party" applicant as a "high profile" case. (Ex. C at 3-4.) EOD referred the case to EO Technical ("EOT") in Washington, D.C. and began to screen for other Tea Party cases. (*Id.*) By March 2010, EOD had identified ten Tea Party cases, three of which it had already recognized as tax exempt. (*Id.* at 2.) EOT instructed EOD to send two more cases to D.C. and hold all other Tea Party cases in Cincinnati. (*Id.* at 1-2.)

- The EOD Screening Group reviewed all applications for tax exemption and "flagged" the Targeted Groups *(*IRS Dep. 94:4-96:4 (June 24, 2015).) EOD managers held "Screening Workshops" to train the Screening Group on how "Tea Parties and the like" should be flagged based on "Key Names and/or Subjects. . . ." (Ex. D; Ex. E.) A cumulative spreadsheet was developed to track the Targeted Groups. (Ex. F.)

- The Screening Group flagged the Targeted Groups based on four criteria:

---

[1] Although Plaintiffs need only show that the inspections were unnecessary to prove a violation under § 6103, the evidence will show that the inspections were worse than simply unnecessary. The inspections were part and parcel of the IRS's unconstitutional scheme of viewpoint discrimination and retaliation.

- o A reference in the case file to "Tea Party," "Patriots," or "9/12 Project";
- o A reference in the case file to government spending, government debt, or taxes;
- o A reference in the case file to education of the public by advocacy or lobbying to "make America a better place to live"; or
- o A statement in the case file criticizing how the country is being run.

These criteria are recognized as inappropriate. (IRS Dep. at 189:3-191:18.)

- ▪ From February 2010 to June 2012, the IRS had flagged at least 200 groups for increased scrutiny using the above-listed criteria. (Admis. No. 43.) These criteria continued to be used to flag and segregate "Tea Party" and "Tea Party-type" cases until June 2013. (Ex. G; ███████████████████.)

- ▪ The Targeted Groups were centralized with a "Tea Party Coordinator" in April 2010, which allowed for consistency and uniform treatment of the Targeted Groups. (Ex. H, at 43.) The IRS centralized the Targeted Groups with a Coordinator throughout the Class Period. (Interrog. 17 & 19; Ex. I, at 2.)

- ▪ Once segregated, the Targeted Groups had their return information repeatedly inspected. All of the Targeted Groups had their return information inspected during "secondary screening" to ensure that they met the improper criteria. (Interrog. 17; IRS Dep. at 67:9-19; 68:16-20.) Their return information was again inspected during a "triage" process identified as pointless. (Interrog. 18.) Their return information then underwent re-screening in January 2012. (Interrog. 19.) And shortly afterward, their return information was inspected by an "Advocacy Team" before they demanded information known to be unnecessary. (*Id.*) Many more unnecessary inspections occurred during the Class Period.

- ▪ The IRS did not begin issuing Determination Letters to the Targeted Groups until May 2012, after learning of TIGTA's audit and after investigations were opened by U.S. Congressional committees. (Ex. J.) Of the 298 groups referenced in the TIGTA report, only eight (8) were denied tax-exempt status under 501(c)(3) or 501(c)(4). (Interrog. 2.) Hundreds of the Targeted Groups were wrongfully scrutinized.

This case meets all the requirements for class certification. As further detailed below, the IRS segregated and repeatedly and unnecessarily inspected the application files of more than 200 Targeted Groups. At least 37 of the Targeted Groups responded to "development letters" demanding sensitive information that IRS officials knew to be unnecessary. To give the appearance of activity, IRS employees churned their applications for more than two years, but were explicitly prohibited by upper management from recognizing their tax-exempt status. These inspections were improper under § 6103. Plaintiffs' claims are representative of those held by the Targeted Groups, and certification of the proposed classes will promote economies of time and

expense and will allow for the possibility of relief to groups who might otherwise be incapable of seeking it independently. Accordingly, the Court should certify a Principal Class and Unnecessary Questions Subclass under Count III, as defined below.[2]

**Factual and Procedural Background**

The IRS's Mission is to "enforce the law with integrity and fairness to all." (Ex. K, at 4.) For IRS Exempt Organizations ("EO"), this stated goal is accomplished by ensuring "uniformity and consistency" in handling applications for tax-exemption. This concept is engrained into EO's information management systems, which were designed not to "allow [the] IRS to treat taxpayers, employees, or others, differently," and to ensure "uniformity and consistency in processing cases." (Ex. L, at 9; Ex. M, at § 7.15.1.) It is also engrained in the procedure used by EO Determinations ("EOD") to process applications, called the "Determination Letter Program." (Interrog. 7; ███████████████; █████████████████.) For better or for worse, taxpayers are treated – or mistreated – consistently.

## I.     The Determination Letter Program is Designed to Promote Uniform Treatment

The Determination Letter Program begins with a group requesting recognition of tax-exempt status under IRC §§ 501(c)(3) or 501(c)(4) (the "Application"). The Application is scanned by the Submission Processing Center in Covington, Kentucky and sent to EOD in Cincinnati, Ohio. (IRS Dep. at 139:21-140:13 (O'Reilly).) The case sits in "unassigned inventory" until pulled by an EOD Screener for Technical Screening. (*Id.*) The Screener – selected from the most experienced EOD specialists – conducts a review of the Application to

---

[2]     Plaintiffs were informed by the IRS on June 29, 2015, that it had issued Determination Letters to all but eight of the approximate 298 groups analyzed by TIGTA. Given the reduced number of applicants still pending, Plaintiffs do not seek certification of a class under Count II for declaratory and injunctive relief.

make one of five decisions: (1) forward the case for "full development" by an EOD specialist; (2) return the Application because it is incomplete; (3) immediately approve it on merit (███████ █████████████████████); (4) apply expedited processing to correct minor errors before approving on merit; or (5) require secondary screening. (Ex. N, at § 7.20.2.3; IRS Dep. at 63:10-66:1; ███████████████.) The decision is based on the activities of the entity or, if there are not yet any activities, the representations of planned activities made by the entity. (IRS Dep. at 53:8-17; 54:20-55:7.) EOD is not supposed to predict what an organization might do. (IRS Dep. at 53:9-58:11; ██████████████████████.)

Among the cases requiring development, certain types of cases presenting complex issues may be designated for "reserve inventory" and sent to a specialty group for secondary screening after managerial approval. (IRS Dep. at 28:4-29:22; 37:17-38:12; 90:14-92:6; Ex. N, at § 7.20.2.3.2.7.) The particular activities warranting transfer to a specialty group are provided to Screeners in "Screening Workshops" and in other materials, such as Internal Revenue Manual ("IRM") § 7.20.1.3, the Determinations Screening Checksheet, or starting in August 2010, the "BOLO" spreadsheet. (Ex. O, at § 7.20.1.3; Ex. N, at § 7.20.2.3.2; IRS Dep. at 73:19-74:6.) The Screener must indicate the reason for his or her decision on the Screening Checksheet and also record it on a "Case Chronology Report." (Ex. N, at § 7.20.2.3.2.4.5; IRS Dep. at 76:4-19.)

The process for transferring certain types of cases to specialty groups is referred to as "centralization" and is designed to handle complex cases "in a uniform way to promote consistency and quality." (Ex. H, at 43; ███████████████████.) After a case is transferred to a specialty group, a specialist within that group conducts a "secondary screening" of the Application to ensure it fits the applicable criteria. (IRS Dep. at 93:5-96:4; ████████ ██████████.) The specialist either approves the case on merit or develops the case on a first-in,

first-out basis. (IRS Dep. at 28:20-30:4; 67:20-68:7.) As recognized by Joseph H. Grant, then Acting Commissioner of TE/GE, "centralization does slow the progress of some applications (at least initially)," making it "important to take this action only in appropriate situations and to designate cases for centralization in an equitable manner." (Ex. H, at 43)

The process for developing a case is straightforward. If additional information is required, the EOD specialist is to send a "development letter" requesting additional information within five days of case assignment, with a response required in twenty-one days. (Ex. N, at § 7.20.2.4.1-.2.) Once the additional information is received, the specialist will review the response and, if sufficient, close the case within five days. (*Id.*; IRS Dep. at 103:16-104:14.) This timeframe is the same for cases developed by a specialty group. If the facts and circumstances of the Application do not qualify for tax-exemption, a denial letter is sent.

In rare circumstances, the facts of a case may warrant referral to EOT in Washington, D.C. EOT is staffed with Tax Law Specialists that provide guidance to EOD on complex issues. (IRS Dep. at 40:11-41:2, 42:4-22.) The standard for a referral is outlined in IRM 7.20.1.4, which provides that EOT may process "cases where issues cannot be resolved by established precedent" or where cases "may have significant regional or national impact." (*Id.* at 40:6-42:22.) New issues may be "elevated" to managers for referral to EOT based on the standards in IRM 1.54.1.4, such as "sensitive" issues. (*Id.* at 46:12-48:19; Ex. O, at § 7.20.1.4.1; Ex. P, at § 1.54.1.)

## II.    The IRS's Scrutiny of the Targeted Groups was Pervasive and Uniform

For decades, the IRS has processed applications for tax-exemption under 501(c)(3) and (c)(4) by entities that engage in political activities. By 2010, the IRS had issued multiple revenue rulings on the subject, including two authored by Judith Kindell, the Senior Technical Advisor to

the Lois Lerner, the Director of EO, using examples to explain which (and to what extent) political activities are allowable. (Ex. Q.) Indeed, Lerner recognized in a 2010 speech that "(c)(4)s can do straight political activity." (Ex. A.)

In late 2009 and early 2010, EOD recognized three Tea Party cases as qualifying for tax-exemption under 501(c)(3). (Ex. D, at 2.) The processing of Tea Party groups would soon change. On January 21, 2010, the U.S. Supreme Court issued its decision in *Citizens United v. FEC*, 558 U.S. 310 (2010). The decision sparked an immediate uproar; President Obama openly criticized it in his 2010 State of the Union Address just six days later.

IRS officials saw the decision as a serious threat to their efforts to limit nonprofits' political activities. On January 22, 2010, the day after the *Citizens United* decision, Lerner emailed her superior, Sarah Ingram, the Commissioner of TE/GE, to discuss EO's position on the decision. (Ex. R, at 2.) Ingram responded by identifying the elephant in the room: whether the IRS should cooperate with groups wanting to take "the test of the tax-exemption issue to the courts." (*Id.* at 1.) The plan that emerged was the opposite of what Ingram suggested. According to Lerner, the IRS "buil[t] a cathedral to avoid getting to [court] on the c3 issue," which she separately referred to as "the big *Citizens United* issue." (Ex. S, at 108.)

The "cathedral" came in the form of unending delay through an unprecedented multi-tier review process. To Lerner and her staff, Tea Party and "Tea Party-like" groups, as opposed to other groups, were perceived as likely to mount a constitutional challenge under *Citizens United*:

> Tea Party Matter very dangerous. This could be the vehicle to go to court on the issue of whether Citizen's United [sic] overturning the ban on corporate spending applies to tax exempt rules. Counsel and Judy Kindell need to be in on this one please . . . Cincy should probably NOT have these cases—Holly please see what exactly they have please.

(Ex. B, at 1-2.) Lerner's fear was unfounded, but it resulted in discrimination against the Targeted Groups based on their viewpoint.

### A.    The Initial Cases, Centralization, and the Targeting Criteria

In February 2010, EOD flagged a "Tea Party" applicant on the ground that it was a "high profile" case. (Ex. C, at 4.) The case was elevated to an EOD Area Manager, who forwarded the "potentially politically embarrassing case" to Cindy Thomas, the Program Manager for EOD, and asked that it be sent to EOT in Washington, D.C. (*Id.* at 3-4). This case, along with two other "Tea Party" cases – were referred to EOT and described as "test cases." (*Id.* at 1-2.) Steven Grodnitzky, the Acting Manager of EOT, asked "what are the specific activities of these organizations?" Donna Elliot-Moore, an IRS Tax Law Specialist, replied that "it looks more educational but with a [R]epublican slant obviously. Since they are applying under (c)(4) they may qualify." (Ex. T, at 3.) Grodnitzky instructed that a "Sensitive Case Report" ("SCR") be prepared for all Tea Party groups. (*Id.*) Shortly afterward, a manager in EOT circulated an email stating "Be on the lookout for a tea party case." (Ex. U.)

The EOD Screening Group began to screen for other Tea Party cases. (Ex. C, at 2.) By April 5, 2010, the Screening Group had collected eighteen cases and began to track them in a spreadsheet. (Ex. T.) Furthermore, in a group-wide meeting on April 14, 2010, Gary Muthert gave a presentation on the "Tea Party Cases," instructing Screeners to send such cases to their manager, John Shafer. (Ex. D, at 2.) ██████████████████████████████
████████████████████████████████████████████████. (████████████████.)

The EOD Screening Group developed four sets of criteria for identifying and flagging the Targeted Groups (the "Targeting Criteria"):

- A reference in the case file to "Tea Party," "Patriots," or "9/12 Project";
- A reference in the case file to government spending, government debt, or taxes;
- A reference in the case file to education of the public by advocacy or lobbying to "make America a better place to live"; or
- A statement in the case file criticizing how the country is being run.

(Ex. V, at 2; IRS Dep. at 190:9-191:18.) When the Targeting Criteria were circulated to Tax Law Specialist Carter Hull, he questioned the criteria, remarking that "[w]e noted that the list contained organizations that appeared to be a particular political ideology" and asking whether another political ideology was included. (Ex. V.) No other ideology was included, and no one responded to Hull's question. The Targeting Criteria are irrelevant to determining tax-exempt status and were identified as inappropriate in Figure 3 of the TIGTA Report. (IRS Dep. at 189:3-191:9; Ex. H, at 6; ███████████████████.)

The cases meeting the Targeting Criteria were eventually centralized and assigned to EOD Specialist Elizabeth Hofacre in Group 7822, who was designated the "Tea Party Coordinator." (Interrog. 7; Ex. W, at 2.) As Tea Party cases were sent to her, Hofacre would conduct a secondary screening of the Application to ensure it met the criteria developed by Management and the EOD Screeners. (*Id.*; ███████████████.) If the case did not satisfy the criteria, Hofacre would return the case to the general inventory. (███████████; Ex. X, at 9.) ████████████████████████████████████████████████ ███████████████. (███████████████████.) She also coordinated with Hull to review the applications and receive approval of information requests to the groups, a review process she considered highly unusual. (███████████████████; Ex. X, at 9-10.)

On July 28, 2010, the Screening Group held a Screening Workshop concerning "Tea Parties and th[e] like – regardless of the type of application." (Ex. W, at 2.) Hofacre presented at the workshop and stated that "applications with Key Names and/or Subjects [*i.e.,* those satisfying

the Targeting Criteria] should be transferred to [Group] 7822 for Secondary Screening." (*Id.*) ██████████████████████████████████████████████████████████. (██████████ ████████.) Although EOD Screener Gary Muthert expressed interest in "Emerge" and "Progressive" cases, Hofacre emphasized that "Progressive" applications were not considered "Tea Parties" and would not accept any "Progressive" or "Emerge" cases. (Ex. W, at 2; Interrog. 7; ████████████████████.)

In August 2010, Hofacre sent an email to all of TE/GE circulating the first "BOLO" spreadsheet. (Ex. Y; ████████████████.) The BOLO sanctioned the segregation of the Targeted Groups, requiring IRS Agents to watch for the "Tea Party" issue and including a generalized issue description about the 'various local organizations" in the "Tea Party movement." (Ex. Y, at 5.) The BOLO instructed IRS agents that "[a]ny cases should be sent to Group 7822" where "Liz Hofacre is coordinating." The issue was designated as "open," meaning that it was an active issue being watched. (*Id.* at 6.)

Hofacre served as the designated "Tea Party Coordinator" from April 2010 until November 2010. (Interrog. 7; ████████████████.) Hofacre testified that the ████ ██████████████████████████████████████████████████████ ████████████████████ (████████████.) Hofacre eventually requested to transfer from Group 7822 because of her frustration with being unable to proceed with the cases and ████████████████. (Ex. X, at 10; ████████████.) ████████████ ██████████████████████████████████████████████████████ ██████████████████████████. (████████████████.) At the time of her transfer, there were approximately 40 to 60 groups that had been targeted. (████████; Ex. X, at 10.)

From the outset, the scrutiny of the Targeted Groups was known and approved by high-level IRS officials in Washington, D.C. The initial "Tea Party" case flagged by EOD was approved as a "test case" by Holly Paz, the Manager of EOT. (Ex. C, at 3.) In May 2010, Lerner inquired with EOT Manager Grodnitzky about the development of the Tea Party cases, and in a follow-up email thanked him for his response, which indicated that they were on hold by EOD. (Ex. Z.) Executive-level IRS officials, including attorneys' from the Chief Counsel's office, continued to be involved in the targeting throughout the Class Period.

### B. The Holding Pattern from October 2010 to November 2011

Ronald Bell became the next "Tea Party Coordinator" in November 2010. Bell was assigned the Targeted Cases even though ███████████████████████████████████ ███████████████████████████████████████████████████. (███████████ ██████.) His existing caseload was not a problem, however, because he was told by his manager to simply hold the 50 to 100 "Tea Party" and "Tea Party-type" cases without further development. (Interrog. 7; ████████████████████████.) When a Targeted Group would call to check on the status of it Application, Bell would say that it was "under review." (Interrog. 7; ██████████████████.) During his time as Coordinator, ██████████████████████ ███████████████████████████████████████████████████████. (████████████████████.) ███████████████████████████████████ ██████████████████████████████████████. (███████████ ██.) He also testified that the "Tea Party Coordinator" position was ████████████ ██████████████████ and that any applications evidencing other ideologies were either approved or returned to general inventory. (Interrog. No. 7; ███████████████████.)

In June 2011, an "Advocacy Orgs Briefing Paper" was given to Lerner. (Ex. AA.) The Briefing Paper identified the Targeting Criteria and stated,"[o]ver 100 cases have been identified so far, a mix of (c)(3)s and (c)(4)s. (*Id.* at 2.) In addition, the Briefing Paper noted that EOD was seeking to "promote uniform handling and resolution of issues." (*Id.*) The Briefing Paper cautioned, however, that the "determinations process is representational, therefore it is extremely difficult to establish that an organization will intervene in political campaigns at that stage." (*Id.*)

Bell was responsible for updating the BOLO and came to be known as the ██████████ ██████ (████████████████.) The BOLO did not contain the list of actual criteria being applied by the Screening Group to flag the Targeted Groups. (Ex. V, at 2; IRS Dep. at 194:2-196:18; 199:8-16; 202:21-204:2; ████████████████.) Instead, the BOLO consisted of generalized entries for "issue" and "issue description." (Ex. Y, at 5.) On June 29, 2011, Lerner instructed that the issue and issue description for the "Tea Party" be revised to replace the words "Tea Party" with "Advocacy Orgs." (IRS Dep. at 199:17-201:8; Ex. BB.) Eventually, the term "Advocacy Orgs" was replaced with "Current Political Issues." (Ex. BB.) These changes to the BOLO were intended to make it more generic; changing the labels did not change the actions to be taken with the cases, and did not change the underlying Targeting Criteria, which continued to be used to segregate the Targeted Groups until June 2013. (IRS Dep. at 204:3-206:18; Ex. G; ██████████████.)

As the Targeted Groups were being held by EOD, EOT was actively searching for the best "argument" to deny their tax-exempt status. In February 2011, Lerner remarked that "even if we go with a [c]4 on the Tea Party cases, they may want to argue that should be [c]3s, so it would be great if we can get there without saying the only reason they don't get a [c]3 is political activity." (Ex. CC, at 1). Lerner assigned Kindell to review the Applications in July 2011, after

which Kindell "recommended that they develop the private benefit[3] argument further and that they coordinate with Counsel." (Ex. DD, at 2.) Lerner responded that the cases should be "assigned to one or two folks who don't make a move without Counsel/[Kindell] involvement," prompting Paz to reassure her that "[t]hey have been told not to issue determs until we work through the test cases we have here." (*Id.* at 1.) Despite their efforts to identify grounds for a denial, Lerner and Paz admitted in July 2011 that "[w]e suspect we will have to approve the majority of the c4 applications." (Ex. EE, at 2.) They recognized that "this is not a new issue (just an increase in frequency of the issue)," so they wanted to "discuss our planned approach for dealing with these cases." (*Id.*) Proposed tactics for the cases included obtaining more sworn representations about the groups' activities, checking FEC registrations, and referring the organizations for a subsequent "Review of Operations" ("ROO"). (*Id.*)

Bell served as the Coordinator from November 2010 to November 2011. (Interrog. 7; ███████████████.) Like ███████ before him, Bell agreed that the Targeted Groups, as a whole, were treated differently than other applicants:

> Q.   In your experience, was there anything different about the way that the Tea Party 501(c)(4) cases were treated that was as opposed to the previous 501(c)(4) applications that had some level of political engagement?
> A.   Yes.
> Q.   And what was different?
> A.   Well, they were segregated. They seemed to have been more scrutinized. I hadn't interacted with EO technical in Washington on cases really before. . . . not as a whole group of cases.

(Ex. FF, at 3.) Bell elaborated further in his deposition:

███   ████████████████████████

---

[3]   "Private benefit" means a benefit for the entity's insiders rather than for the public or society. If an applicant is organized primarily for a private benefit, it provides an independent basis for denying an application.



(⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛.) Bell testified that he ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ when informed of his re-assignment. (⬛⬛ ⬛⬛⬛⬛⬛⬛⬛; Interrog. 7, at 11.) One year and nine months after the first "Tea Party" case was flagged, the Targeted Groups were no closer to receiving a determination of their tax-exempt status. But plans for developing the cases were in the works, requiring an EOD agent less encumbered by a full plate of auto-revocation cases.

### C. November 2011 to May 2012: The Semblance of Activity and the Demand for Irrelevant and Confidential Information

The baton was handed to Stephen Seok, who became the third Coordinator in November 2011. (Interrog. 7.) Seok became the leader of an "Advocacy Team," which consisted of EOD Specialists from every group, including Group 7822. (*Id.*; ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛.) In "Advocacy Team Meeting Minutes" dated December 16, 2011, Seok noted that there were "[a]bout 172 cases so far and counting" that consisted of "37 c3 125 c4 [and] no other sections." (Ex. GG.) Seok emphasized "consistent development" and, reflecting the IRS's viewpoint-based assumptions about the Targeted Groups, stated that the cases were "[m]ostly Advocacy with strong or some political activities, *at least implied*." (*Id.* (emphasis added.))

On or around November 2011, EOT performed a "triage" of the Targeted Cases for the ostensible purpose of determining which cases could be closed. (IRS Dep. at 215:2-15.) The

triage was performed by Hilary Goehausen, a Tax Law Specialist ███████████████ ███████████████. (Interrog. 4; ███████████████.) The results of Goehausen's triage were eventually leaked to USA Today[4] and contained her comments on 161 groups, which included characterizations of the groups' applications as containing "inflammatory" or "emotional" language. (Ex. HH, at 1, 5.) EOD Program Manager Cindy Thomas admitted that the triage process was pointless: the comments provided no recommendations. (Ex. II, at 4; ███████████████.) The Targeted Groups continued to be held in EOD.

In December 2011, EOT provided Seok with an "Advocacy Org Guide Sheet" that he and the Advocacy Team used to issue development letters to the Targeted Groups. (Interrog. 7; Ex. JJ; ███████████████.) The development letters were approved by Lerner, Paz, and the Commissioner's office. (Ex. J, at 2; ███████████████.) Shortly after the letters were sent, groups began to report about abusive questions they received from the IRS. (███████████████.)

The IRS sent the Targeted Groups the following questions that the IRS found to be unnecessary for determining tax-exempt status:

(a)   The names of any donors;
(b)   A list of all issues that are important to the entity and an indication of its position regarding such issues;
(c)   Information about the roles of non-member participants in activities by the entity and the types of conversations and discussions had by members and participants during the activity;
(d)   Whether any officer, director, or member of the entity has run or will run for public office;
(e)   The political affiliation of any officer, director, member, speaker, or candidates supported or other questions regarding any relationship with identified political parties;

---

[4]       The IRS has refused to authenticate the USA Today document, but it is substantially identical to redacted lists it has produced in discovery with the same title, date, columns and rows, and number of entities. (Ex. HH.)

      (f)      Information regarding the employment of any officer, director, or members other than by the entity, including but not limited to the number of hours worked; or

      (g)      Information regarding the activities of other entities beyond solely the relationship between the applicant and such other entities.

(Ex. KK, at 2; IRS Dep. 281:1-5.) Seok was instructed by his manager to stop sending development letters in February 2012 and was eventually removed from the position in May 2012, after which Bell resumed the secondary screening of the Targeted Groups. (Interrog. 7, at 12; Interrog. 19; ██████████████; █████████████.) ████████████████ ███████████████████████████████████████. (████████████.)[5] He admitted that the Targeted Groups received different treatment because of their conservative ideology or perspective. (Ex. LL, at 2-3; ██████████████████████████.)

      The IRS knew that these demands for information were unnecessary. For example, in creating the template questions, Paz informed Thomas that "[i]f TPs call and say I don't want to give you a list of my donors, we should allow them to instead provide information about the size and categories of their support instead of donor names." (Ex. J; IRS Dep. 277:1-279:13.) Donor identities, which are ordinarily submitted in annual Form 990 tax return filings that the IRS must keep confidential, would have been made public by the IRS if submitted as part of the application process. (Ex. H, at 18.) Paz, apparently wanting this information public, ensured that this step would be completed before favorable determination letters were issued, stating that "[w]e should not be sending out favorable yet," although "[w]e can identify them . . . ." (Ex. J.) At least 37 groups responded to one or more of the seven requests for information that were unnecessary. (Interrog. 15.)

--------

[5]      The record reflects that, at some point prior to May 2012, six of the Targeted Groups were approved. (Ex. H, at 14-15.) Other evidence indicates that no approvals occurred prior to this time. This discrepancy, however, does not affect the propriety of class certification here.

### D.     The TIGTA Audit and Issuance of Determination Letters

In March 2012, the IRS learned that TIGTA, an independent body responsible for overseeing the IRS's activities, planned to audit its Determination Letter Program. With this, the gridlock showed its first signs of loosening. In May 2012, Paz, Kindell, and other EOD agents in met in Cincinnati to develop a "bucketing" process. (Ex. MM, at 2.) "Bucketing" involved a team of EOD and EOT agents reviewing the Applications and placing them in four different buckets based on the "facts and circumstances." (IRS Dep. at 171:12-172:1.) Applications in Bucket 1 could be immediately approved; Bucket 2 required limited development; Bucket 3 required full development; and Bucket 4 applications were likely to be denied. (*Id.* at 172:2-6.)

After years of delay, it only ████████████████ to complete the bucketing process for the accumulated mass of groups, and the results were listed in a bucketing spreadsheet. (████████ ███████; Ex. NN.) A total of 282 groups were bucketed by June 8, 2012; by December 2012, 102 groups had received favorable determination letters. (Ex. H, at 15.) For groups that had not responded to development letters, the IRS sent a template letter in which it conceded that their Application was sufficient (and should have been approved) all along:

> Please note that we have just completed another review of your request to be recognized as tax exempt . . . Based on that review, we concluded that we do not need the additional materials previously requested because your application and materials provide sufficient information.

(Ex. OO, at 4; IRS Dep. at 284:9-285:21.)

Although the pressure from TIGTA jump-started the determinations process, the IRS continued its disparate treatment of the Targeted Groups in other areas, including:

- Nearly every case, regardless of bucket placement, was to be referred for "mandatory review" by Quality Assurance before being approved (IRS Dep. at 254:2-8; 265:2-266:18.) A total of 108 groups were actually reviewed by QA. (Ex. PP.)

- After approval, EOD agents were encouraged to refer the Targeted Groups for a "Review of Operations," which is an informal audit of operations and the Application that occurs

17

at a specified time in the future. (IRS Dep. at 51:1:52:13.) 45 of the Targeted Groups were referred for a ROO. (Ex. PP.)

### III. Fallout from the Targeting: The TIGTA Report, Congressional Investigations, the IRS's Admissions, and Plaintiffs' Lawsuit

The TIGTA report was released on May 14, 2013. (Ex. H.) TIGTA conducted its review based on a list of 298 "Tea Party" or "Advocacy Groups" provided by the IRS, as well as statistical samples from thousands of applicants. (*Id.* at 9.) TIGTA concluded that the "IRS used inappropriate criteria that identified for review Tea Party and other organizations applying for tax-exempt status based upon their names or policy positions instead of indications of potential political campaign intervention." (*Id.* at 2.) The Targeting Criteria were listed in Figure 3 of the Report, and the unnecessary questions were listed in Figure 8. (*Id.* at 6, 20.)

The IRS's conduct was also the subject of congressional investigations. In advance of these investigations, the number of organizations considered to be "Advocacy Organizations" inexplicably increased from 298 (as provided to TIGTA) to 395. (Interrog. 2.) An email from Paz sheds light on this disparity, indicating that the Targeted Groups were an identified subset of organizations engaged in advocacy:

> The advocacy org discussion tomorrow is focused on a very specific bucket of orgs (not advocacy orgs in general). The goal is to walk through the history of this particular bunch of applications since the first ones were received to the present in order to prepare for the coming Congressional hearing on the allegations that we are unfairly treating Tea Party organizations.

(Ex. QQ.) Later versions of the "Emerging Issues" BOLO made a similar distinction for these cases, stating that "typical advocacy type issues that are currently listed on the Case Assignment Guide (CAG) do not meet these criteria unless they are also involved in activities described above." (Ex. BB.)

Knowing that the release of TIGTA's report was imminent, the IRS attempted to minimize and spin the issue. Acting Commissioner Steve Miller, Lerner, and other high-level

IRS and Treasury officials devised a plan: Lerner would give a speech and "use it to burst a bubble" by identifying the issue, apologizing for it, and doing it so as to "minimiz[e] follow-up questions." (Ex. RR, at 1-3.) They selected the venue – an ABA tax-law panel event on May 10, 2013 – and worked on the script. The day before the event, on May 19, 2013, Lerner called a Washington, D.C. tax lawyer, Celia Roady, and arranged for her to pose a question to Lerner during the ABA event. (Ex. SS.) Lerner provided the question to Roady that day, and Lerner issued a response that blamed the targeting and delay on line-level agents in Cincinnati:

> [I]n this case the way they did the centralization was not so fine. Instead of referring to the cases as advocacy cases, they actually used case names on this list. They used names like Tea Party, or Patriots. They selected cases simply because the application had those names in the title.

(Ex. TT, at 8.) Lerner concluded that the process "was wrong, that was absolutely incorrect, it was insensitive, and it was inappropriate." (*Id.*)

Additionally, nearly a month later on June 24, 2013, Daniel Werfel, who replaced Miller as the Acting Commissioner of the IRS, issued a document titled "Charting a Path Forward at the IRS: Initial Assessment and Plan of Action." In the "Assessment," the IRS admitted that, with respect to the Targeted Groups: (1) EO applied "inappropriate screening criteria" to them; and (2) they "were subjected to overly burdensome and intrusive questionnaires and data requests that went beyond an acceptable level of fact finding." (Ex. K, at 9-10; IRS Dep. at 190:9-191:9.)

What began as an apologetic and transparent path forward, however, later turned to obfuscation. New leadership was installed at the IRS – Acting Commissioner Werfel was replaced by Commissioner Koskinen – and secrecy, redaction, and non-disclosure became the norm. Indeed, the IRS and its leadership now assert that no wrong occurred.

On May 20, 2013, Plaintiffs filed their Class Action Complaint ("Complaint") against the IRS. (Doc. #1). On July 17, 2014, the Court issued its Order on several Motions to Dismiss filed

by Defendants (Doc. # 102.) In pertinent part, the Court ruled that Plaintiffs could proceed on their constitutional claims for retaliation and discrimination under Count II,[6] as well as their wrongful inspection claim under Count III, stating that "Plaintiff Groups will be given the opportunity to establish with evidence that IRS officials inspected or disclosed the Plaintiff Groups' return information for improper purposes." (*Id.* at PageID #1677.) The Court subsequently ordered that class discovery proceed before merits discovery. Plaintiffs now seek certification of a Principal Class and an Unnecessary Questions Subclass under Count III of their Complaint on behalf of the Targeted Groups.

## Arguments and Authorities

Class actions in federal court are governed by Federal Rule of Civil Procedure 23, which is "designed to further procedural fairness and efficiency." *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 402 (2010). "Class actions promote administrative efficiency in at least three ways: by avoiding a multiplicity of actions, by enabling claim processing through representatives, and by preventing inconsistent adjudications." 1 William B. Rubenstein, Newberg on Class Actions § 1:9 (5th ed. 2011).

Rule 23 prescribes a two-step analysis: First, under Rule 23(a), the proposed class must satisfy the requirements of numerosity, commonality, typicality, and adequacy. *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013). Second, it must satisfy at least one of the three requirements of Rule 23(b). *Id.* "Class certification is

---

[6] The Court's reasoning was recently affirmed by the D.C. Circuit in the *Z Street* case. *See Z Street v. Koskinen*, --- F.3d ----, 2015 WL 3797974, at *6 (D.C. Cir. June 19, 2015) ("Under these circumstances, the Anti-Injunction Act does not bar this suit. Were it otherwise, the IRS would be free for at least 270 days – the period of time taxpayer must wait to invoke section 7428 – to process exemption applications pursuant to different standards and at different rates depending upon the viewpoint of the applicants – a blatant violation of the First Amendment.").

appropriate if the court finds, after conducting a 'rigorous analysis,' that the requirements of Rule 23 have been met." *Id.* at 851 (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)). "A district court has broad discretion to decide whether to certify a class." *Id.* at 850.

The U.S. Supreme Court recently emphasized that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013). "'Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *In re Whirlpool.*, 722 F.3d at 851 (quoting *Amgen*, 133 S. Ct. at 1194-95).

## I.  The Proposed Classes

Rule 23(c)(1)(B) provides that an order certifying a class action "must define the class." A class definition is proper for certification if it is "drafted in such a way to ensure that membership is ascertainable by some objective standard." *Walls v. Sagamore Ins. Co.*, 274 F.R.D. 243, 250 (W.D. Ark. 2011). "The standard for ascertainability is not demanding and is designed only to prevent the certification of a class whose membership is truly indeterminable." *Ebin v. Kangadis Food, Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014). Plaintiffs propose a "Principal" Class and an "Unnecessary Questions" subclass defined as:

### A.  The Principal Class

All entities that, at any time from February 1, 2010 to June 31, 2013, filed an Application for Recognition of Tax Exemption with the IRS under 26 U.S.C. §§ 501(c)(3) or 501(c)(4) and had their application flagged by the IRS as an "Advocacy" case using the criteria:

(a)  A reference in the case file to "Tea Party," "Patriots," or "9/12 Project";
(b)  A reference in the case file to government spending, government debt, or taxes;
(c)  A reference in the case file to education of the public by advocacy or lobbying to "make America a better place to live"; or

(d)     A statement in the case file criticizing how the country is being run.

Excluded from the Principal Class are any entities that properly execute and file a request for exclusion from the Principal Class.

**B.     The "Unnecessary Questions" Subclass**

All entities included in the Principal Class that, at any time from January 1, 2010 to June 31, 2013, provided information in response to one or more of the following requests for information by the IRS:

(a)     The names of any donors;

(b)     A list of all issues that are important to the entity and an indication of its position regarding such issues;

(c)     Information about the roles of non-member participants in activities by the entity and the types of conversations and discussions had by members and participants during the activity;

(d)     Whether any officer, director, or member of the entity has run or will run for public office;

(e)     The political affiliation of any officer, director, member, speaker, or candidates supported or other questions regarding any relationship with identified political parties;

(f)     Information regarding the employment of any officer, director, or members other than by the entity, including but not limited to the number of hours worked; or

(g)     Information regarding the activities of other entities beyond solely the relationship between the applicant and such other entities.

Excluded from the Unnecessary Questions Subclass are any entities that properly execute and file a request for exclusion from the Unnecessary Questions Subclass.

The Principal Class and the Unnecessary Questions Subclass satisfy Rule 23(c) because they are capable of ascertainment by objective standards. Indeed, Plaintiffs and the Court need only look to the IRS's own records to determine membership of the classes. The IRS maintained spreadsheets of the Targeted Groups and has detailed records of when the cases were selected, why they were selected, and which groups received the unnecessary requests for information.

(USA Today; Spreadsheets; Colored Case Listing.)[7] Accordingly, the Court should certify the Principal Class and the Unnecessary Questions Subclass under the proposed definitions.

## II. Plaintiffs' Wrongful Inspection Claim Should be Certified as a Class Action Because Each of the Prerequisites of Rule 23(a) Are Satisfied

Rule 23(a) establishes the four prerequisites for class certification. Each of these four prerequisites of Rule 23(a) – known as numerosity, commonality, typicality, and adequacy – are satisfied here.

### A. Numerosity is Satisfied Because There Are Hundreds of Members in the Principal Class and At Least 37 in the Unnecessary Questions Subclass

There is "no strict numerical test" to satisfy numerosity, but "'substantial' numbers of affected [members] are sufficient to satisfy this requirement." *In re Whirlpool*, 722 F.3d at 852. "Satisfaction of the numerosity requirement does not require that joinder is impossible, but only that plaintiff will suffer a strong litigational hardship or inconvenience if joinder is required." *Mann v. Acclaim Fin. Servs., Inc.*, 232 F.R.D. 278, 283 (S.D. Ohio 2003).

The numerosity requirement is satisfied. For the Principal Class, Defendants have admitted that there are more than 200 groups that were flagged and subjected to heightened scrutiny using the Targeting Criteria. (Admis. 43.) And for the Unnecessary Questions Subclass, at least 37 groups provided information in response to one or more of the seven requests for information that were unnecessary. (Interrog. 15.) This is more than sufficient for a subclass, to which courts often apply a "relaxed numerosity approach" to help "enable subclassing where it is needed." *See* Rubenstein, *supra*, § 3:16.

---

[7] These spreadsheets were heavily redacted by the IRS to cover the names of the Targeted Groups and other pertinent information. The information in these spreadsheets is directly relevant to the issue of class certification, but it is not *necessary* for certification under Fed. R. Civ. P. 23. *See Johnson v. Midland Credit Mngmt, Inc.*, No. 1:05-cv-1094, 2012 WL 5996391, at *11 (N.D. Ohio Nov. 29, 2012). ("[O]n certification, only the *ability* to identify class members is necessary; the actual names and addresses of class members are not necessary at this time.").

**B.      Commonality is Satisfied Because the Primary Legal and Factual Issues in this Case Are Amenable to Class-Wide Resolution**

To satisfy commonality, "plaintiffs must show that class members have suffered the same injury." *In re Whirlpool*, 722 F.3d at 852 (citing *Dukes*, 131 S. Ct. at 2551). This showing, which "is easily met in most cases," Rubenstein, *supra*, § 3:20, requires that the claims in a case "depend upon a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *In re Whirlpool*, 722 F.3d at 852 (quotations omitted). "[F]or purposes of Rule 23(a)(2) even a single common question will do." *Dukes*, 131 S. Ct. at 2556 (internal citation, quotations and brackets omitted); *see also In re Whirlpool*, 722 F.3d at 853 ("[T]here need be only one common question to certify a class."). "What matters to class certification . . . is not the raising of common 'questions' – even in droves – but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 131 S. Ct. at 2556 (citation omitted). Notably, "factual differences do not necessarily defeat commonality." *Hendricks v. Total Quality Logistics*, 292 F.R.D. 529, 540 (S.D. Ohio 2013) (the ability "to submit common proof on the issues" supports commonality).

There are a number of common issues of law and fact in this case that are subject to common proof. The overarching issue to be resolved is whether the IRS's multi-tier scrutiny of the Targeted Groups was unauthorized (*i.e.*, unnecessary for tax administration purposes) such that the inspections were unlawful under § 6103. Common questions include: (a) whether the Targeted Groups were chosen for heightened scrutiny and delay using a four-criterion test; (b) whether that test was based on factors not germane to tax administration, such as the groups' names, their perceived identity with the Tea Party Movement, or their viewpoint; and (c) whether

24

the fact that they were scrutinized unnecessarily based on these factors rendered the repeated inspections of their Applications unlawful under § 6103.

Significantly, the IRS's scrutiny of the Targeted Groups was uniform and pervasive: The Targeted Groups were flagged and segregated using criteria based on their viewpoint or at the very least irrelevant to tax administration purposes. Their return information was then subjected to secondary screening to ensure that they met these impermissible criteria; tracked on a cumulative excel spreadsheet; and subject to repeated inspections by IRS officials who were prohibited by upper management from using those inspections to recognizing their exempt status. Each member of the Principal Class received almost identical treatment, which can be shown through common proof. Similarly, with respect to the Unnecessary Questions Subclass, a common legal issue is whether the seven demands for information were unnecessary and resulted in unlawful inspections. Any one of these common questions will produce one-stroke answers that are central to the validity of the § 6103 claims and, therefore, satisfies the commonality requirement under Rule 23(a).

### C.    Typicality is Satisfied Because Plaintiffs' Return Information Claims Are Similar (If Not Identical) to the Class and Subclass Members' Claims

The Sixth Circuit has described the typicality prerequisite as follows:

> Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct. In other words, when such a relationship is shown, a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff. Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.

*In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1082 (6th Cir.1996) (quotations omitted). "[T]he test for typicality is not demanding." Rubenstein, *supra,* § 3:29. It is recognized that the "two concepts

of commonality and typicality 'tend to merge' in practice because both of them 'serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *In re Whirlpool*, 722 F.3d at 853.

Here, the typicality requirement is satisfied because the claims of Plaintiffs and the Principal Class members arise from the same course of conduct by the IRS (targeting and segregating over 200 Tea Party and Tea Party-like groups), affect Plaintiffs and Principal Class Members in the same manner (uniform and unnecessary inspection of their return information), and arise from the same legal theory (violation of § 6103). Specifically, the putative class representatives – NorCal, AAOL, San Angelo, SD Citizens for Liberty, and Texas Patriots Tea Party – were screened using the four criteria and, therefore, were listed as an Advocacy Case in the tracking spreadsheets. (Ex. F; Ex. G; Ex. HH.) The underlying facts supporting Plaintiffs' claims are not different from the class claims: Plaintiffs' applications were selected and repeatedly inspected for improper purposes.

The same is true for the putative representative for the Unnecessary Questions Subclass, Plaintiff NorCal. The IRS demanded that NorCal provide donor information and state whether its officer would run for public office or it would be deemed a taxable entity. (Ex. UU, at 14, 26.) Faced with the treat of being taxed as a for-profit corporation, NorCal provided the information that the IRS demanded of it under penalty of perjury. (*Id.*) NorCal's claim is representative of the claims of the putative subclass, all of whom received the unnecessary questions, furnished the information demanded, and had those responses wrongfully inspected.

**D. Adequacy is Satisfied Because Plaintiffs and Their Attorneys have No Conflicts of Interest and Will Vigorously Prosecute this Lawsuit**

The adequacy requirement tests whether the class representative and class counsel will sufficiently protect the interests of the absent class members. Courts examine two criteria to determine adequacy: "1) the representative must have common interests with unnamed members of the class; and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel. *In re Am. Med. Sys., Inc.*, 75 F.3d at 1083. The purpose of the adequacy requirement is to ensure "the experience and ability of counsel for the plaintiffs" and to test whether there is any antagonism or conflicts between the interests of the plaintiffs and other members of the class they seek to represent. *Id.*

In this case, Plaintiffs are each part of the Principal Class they seek to represent and have suffered the same injuries as the other class members when they endured the IRS's unlawful multi-tier inspections. Plaintiffs' interest in procuring relief for the IRS's violation of § 6103 is coextensive with the interests of the class. Plaintiffs have no conflicts of interest with the class and they are committed to the vigorous prosecution of this lawsuit. (NorCal Dep. at 40:11-41:16; AAOL Dep. at 33:5-35:2; TPTP Dep. at 102:20-105:10; SD Citizens Dep. at 25:22-26:8; San Angelo Dep. at 82:21-83:25.) The Court should find that Plaintiffs are adequate class representatives for the Principal Class. For these reasons, Plaintiff NorCal is also an adequate class representative for the Unnecessary Questions Subclass.

Plaintiffs' counsel are similarly committed to the vigorous prosecution of this lawsuit. (Ex. VV, Greim Aff. at ¶ 1-5.) Plaintiffs' counsel are qualified, experienced, and fully capable of handling this litigation to conclusion. (*Id.*) Graves Garrett, LLC is a firm experienced in complex commercial and class action litigation and is willing to devote the time and resources necessary to prosecute this action zealously. Similarly, Plaintiffs' counsel David Langdon, Christopher

Finney, and Bill Randles have substantial experience litigating complex cases, including matters involving constitutional and statutory law. (*Id.*) Plaintiffs' counsel are paid on an hourly basis by a third-party funder. Because Plaintiffs and their counsel have no conflicts and are prepared to vigorously prosecute this lawsuit, the Court should find that adequacy is satisfied.

## III. The Case is Properly Maintained as a Class Action under Rule 23(b)(3)

In addition to satisfying the four prerequisites of Rule 23(a), certification of a class action requires that one of the elements of Rule 23(b) also is satisfied. *Dukes*, 131 S. Ct. at 2548. At issue in this case is the predominance-superiority element outlined in Rule 23(b)(3). This Rule "allows class certification in a much wider set of circumstances" than other provisions of Rule 23(b). *Id.* at 2558. In this case, class certification is appropriate under Rule 23(b)(3) because both the predominance and superiority requirements are satisfied.

### A. The Common Legal and Factual Issues Predominate Over Any Individual Issues That Might Exist

In *Amgen*, the Supreme Court recently observed that the predominance element merely "requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*, at 133 S. Ct. at 1191. "When adjudication of questions of liability common to the class will achieve economies of time and expense, the predominance standard is generally satisfied even if damages are not provable in the aggregate." *In re Whirlpool*, 722 F.3d. at 859 (quotations omitted). A plaintiff class need not "prove that each element of a claim can be established by classwide proof." *Id.* at 858. Instead, it requires that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007). Ultimately,

predominance generally exists if the class "will prevail or fail in unison." *In re Whirlpool*, 722 F.3d at 858.

The issues in this case that are subject to generalized proof predominate over any issues subject to individualized proof. The IRS engaged in a uniform scheme to segregate and scrutinize the Targeted Groups, and the unlawfulness of that scheme will be shown through common proof. Because the unlawfulness of the IRS's repeated inspection of the Targeted Groups' return information depends on whether the inspections were unauthorized or unjustified (*i.e.*, without a valid tax administration purpose), the § 6103 claims are subject to generalized proof and will prevail or fail in unison. Likewise, the Unnecessary Questions Subclass involves common issues that predominate, including the irrelevance of the questions asked.

Although a need for individualized proof on damages rarely defeats certification, *In re Whirlpool*, 722 F.3d at 861, this case does not even require individualized proof of damages. Under § 7431(c)(1), a violation of § 6103 entitles the taxpayer to a statutory minimum of "$1,000 for each act of unauthorized inspection or disclosure of a return or return information . . . ." Because the IRS subjected the Targeted Groups, as a whole, to multiple stages of unlawful inspections – including secondary screening, EOT agent review, the "triage" process, and re-screening by the "Advocacy Team" – damages may be calculated with common proof at each step found unlawful. And while it may be necessary to determine where a group fell on the timeline of unnecessary inspections (thus affecting the number of unlawful inspections it received), such calculations can be made through case listings and other generalized evidence that does not result in the predominance of individual issues. *See id.* at 860 (damages are a common issue if "susceptible of measurement across the entire class[.]" (quotation omitted)). Common issues predominate.

**B.     The Class Action Mechanism is the Superior Method for Adjudication**

A class action is a superior method of adjudication when "class members are not likely to file individual actions" because "the cost of litigation would dwarf any potential recovery." *In re Whirlpool*, 722 F.3d at 861 (class actions promote "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." (quotations omitted)). Rule 23(b)(3) outlines four factors for the Court's consideration in addressing the superiority requirement.[8] These factors favor the class certification in this case.

Here, the proposed class action easily meets the superiority requirement because it provides a mechanism for the efficient adjudication of hundreds of claims in a single proceeding; without a class action, the claims of the absent members either would go unlitigated (because individually the claims are too small) or would create an enormous, unnecessary burden on the judicial system (if prosecuted individually). Although certain members of the Targeted Groups have initiated litigation in the D.C. District and in Texas, hundreds of groups have claims and injuries that should be efficiently and effectively adjudicated in this action. The class action method is the superior method for adjudicating the claims under Count III.

## Conclusion

Plaintiffs respectfully submit that the Court should certify the Principal Class and the Unnecessary Questions Subclass and appoint Graves Garrett, LLC, Finney Law Firm LLC, Langdon Law, LLC, and Bill & Bev Randles Law Group, LLP as Class Counsel.

---

[8]     These factors include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against members of the class; (C) the desirability or undesirability of concentrating litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

Dated: August 3, 2015

Respectfully submitted,

**GRAVES GARRETT, LLC**

*/s/ Edward D. Greim*

Edward D. Greim (*pro hac vice*)
Todd P. Graves (*pro hac vice*)
Dane C. Martin (*pro hac vice*)
1100 Main Street, Suite 2700
Kansas City, MO 64105
Telephone: (816) 256-3181
Fax: (816) 256-5958
edgreim@gravesgarrett.com
tgraves@gravesgarrett.com
dmartin@gravesgarrett.com

Christopher P. Finney (OH Bar No. 0038998)
FINNEY LAW FIRM LLC
2623 Erie Avenue
Cincinnati, OH 45208
Telephone: (513) 533-2980
Fax: (513) 533-2990
Chris@finneylawfirm.com

David R. Langdon (OH Bar No. 0067046)
 *Trial Attorney*
Joshua B. Bolinger (OH Bar No. 0079594)
LANGDON LAW, LLC
8913 Cincinnati-Dayton Road
West Chester, OH 45069
Telephone: (513) 577-7380
Fax: (513) 577-7383
dlangdon@langdonlaw.com
jbolinger@langdonlaw.com

Bill Randles (*pro hac vice*)
Bev Randles (*pro hac vice*)
RANDLES & SPLITTGERBER, LLP
N. Cypress Avenue
Kansas City, MO 64119
Telephone: (816) 820-1973
bill@billrandles.com
bev@billrandles.com

*Counsel for Plaintiffs*

31

## **Certificate of Service**

The undersigned attorney hereby certifies that, on August 3, 2015, the foregoing document was served the Court's CM/ECF electronic notification system to all counsel of record.

_/s/ Edward D. Greim_____
Attorney for Plaintiffs
