# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| NORCAL TEA PARTY PATRIOTS, et al., | ) | |
| ON BEHALF OF THEMSELVES, | ) | Case No. 1:13-cv-00341 |
| THEIR MEMBERS, and THE CLASS | ) | |
| THEY SEEK TO REPRESENT, | ) | Judge Susan J. Dlott |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE INTERNAL REVENUE SERVICE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |

### United States' Memorandum in
### Opposition to Plaintiffs' Motion for Class Certification

The United States submits this memorandum in opposition to Plaintiffs' Motion for Class

Certification. Dkt. 193.

## COMBINED TABLE OF CONTENTS AND SUMMARY

**Introduction**.................................................................................................................1

Plaintiffs seek certification of a Principal Class and Subclass only with respect to a single cause of action: their claim that IRS employees improperly inspected information submitted by Plaintiffs to the IRS in connection with their applications for tax-exempt status. To determine whether to certify this class, the Court must examine (1) the elements of the § 7431 claim (what information was inspected, who inspected the information, and whether the inspection related to the employee's official duties); (2) whether proof of those elements requires common or individual evidence; and (3) whether the requirements of ascertainability, adequacy, and superiority are met. Plaintiffs fail to meet the requirements of Rule 23, as their claims are not appropriate for a class action.

**Statutory Background**...................................................................................................2

Congress enacted the Taxpayer Browsing Protection Act to address reports of renegade IRS employees browsing taxpayer information out of sheer curiosity. This legislation added the word "inspection" to 26 U.S.C. § 7431 to create a new cause of action against the United States for violations of 26 U.S.C. § 6103 by federal employees. Under § 6103(h)(1), IRS employees are authorized to inspect taxpayer information in the course of their official tax administration responsibilities.

26 U.S.C. §§ 6103, 7431

H. Rep. No. 105-51, 1997 WL 183944 (1997)

**Statement of Facts** .......................................................................................................3

Following the Supreme Court's decision in *Citizens United*, the IRS was inundated with applications for tax-exempt status from organizations that were openly engaged in political advocacy. Consistent with its requirements and past practice, the employees in the Exempt Organizations Determinations Unit flagged these applications and requested guidance from the Exempt Organizations Technical Unit. Requesting guidance from EO Technical is common and is often used for "new" issues seen by EO Determinations. Given the uncertainty about how to apply the law to the advocacy cases before it, the IRS designated a "specialty group" to handle these cases. But despite their efforts, EO Technical struggled to reach a consensus about how EO Determinations should screen, develop, and evaluate these applications, and a backlog of applications quickly developed. The IRS took several steps to reduce this backlog, but met little success. During this period, TIGTA was asked to investigate whether the IRS had improperly targeted conservative organizations. Although TIGTA found that inappropriate criteria were used to select some applicants for review, it concluded that management failures, and not political discrimination, was to blame. As of March 2015, nearly all of these applications have been processed and closed.

**Argument**.....................................................................................................................9

**I.**   **A Rule 23 analysis is inherently and inextricably linked to the elements of the underlying claim, and the harm that Plaintiffs allege bears no relation to the harm § 7431 is meant to address**.......................................................................10

Plaintiffs' motion seeks class certification only for their claims of unauthorized inspection under § 7431. Both the commonality and predominance inquiries require a precise understanding of the elements of the underlying cause of action. An analysis of the legislative history and case law demonstrates that the harm § 7431 is meant to address bears no relation to the harm Plaintiffs allege here. Instead of simply asking whether IRS employees were authorized to inspect tax return information — i.e., whether they were acting within the scope of their official duties — Plaintiffs ask whether the inspection was

necessary to further tax administration.  Nevertheless, Plaintiffs thus argue for a novel interpretation of § 7431 that would make "unnecessary" synonymous with "unauthorized." In addition to misreading § 6103(h)(1), Plaintiffs' theory would encourage courts to second-guess the IRS's decisions about how to manage its workload effectively. Section 7431, however, is not a mechanism by which individuals can challenge the manner in which the IRS carries out the tasks which have been delegated to it by Congress.

> *United States v. Czubinski*, 106 F.3d 1069 (1st Cir. 1997)
> *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)
> *Wewee v. United States*, 2001 WL 429823 (D. Ariz. Mar. 29, 2001), *aff'd* 72 F. App'x 731 (9th Cir. 2003)

**II.** **The Principal Class fails to meet Rule 23's commonality and predominance requirements.** ...................................................................................................................14

The Principal Class cannot be certified for two reasons. First, Plaintiffs fail to identify common questions of law or fact that will drive the resolution of Plaintiffs' claims for unauthorized inspection under § 7431. Second, issues requiring individual evidence necessarily predominate over any issues susceptible to common proof.

**A.** **The Principal Class lacks common questions that drive resolution of their claims**. . 15

The "common questions" identified by Plaintiffs do not relate to the elements of their claims under § 7431. As a result, contentions common to the Principal Class do not drive resolution of the claims and therefore do not satisfy Rule 23(a)'s commonality requirement.

> *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)

**1.** ***Wal-Mart*** **requires Plaintiffs to identify common questions that are central to the validity of their claims**. ................................................................................................ 15

Common contentions whose answers will have no impact on the outcome of the case do not satisfy commonality. Accordingly, to determine whether the proposed class action meets this requirement of Rule 23(a), the Court must examine the elements of Plaintiffs' claims under § 7431.

> *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)

**2.** **The Principal Class's "common questions" cannot drive resolution of this litigation, because they are irrelevant to the merits of their unauthorized inspection claims**. .... 16

To prevail on an improper inspection claim under § 7431, a plaintiff must demonstrate that an inspection occurred and that it was unauthorized. Liability under this provision requires the Court to determine: (1) what information was inspected; (2) who in the IRS inspected the information and what were their job duties; and (3) whether the inspection of information was performed as part of the employee's official duties. However, answering the "what, who, and whether" will require the Court to examine the facts and circumstances surrounding each purported class member and with respect to each IRS employee who reviewed their application.

> *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)

**B.** **The Principal Class fails to meet Rule 23(b)(3)'s predominance requirement because establishing liability requires a case-by-case analysis with evidence unique to each entity.** ................................................................................................................................ 19

The predominance inquiry focuses on whether the defendant's liability can be proven through evidence common to the class. Like Rule 23(a)'s commonality inquiry, the predominance analysis requires examination of the underlying legal claim, but it focuses on whether proof of the elements of the claim necessitates evidence individual to each class

member. However, the elements necessary to show liability under § 7431 require evidence unique to the facts and circumstances of each plaintiff, as do the United States' defenses. Where proof of liability requires individual evidence, individual issues predominate.

> *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013)
> *In re Whirlpool Corp.*, 722 F.3d 838 (6th Cir. 2013)
> *Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347 (6th Cir. 2011)

**1. Evidence to establish the "what, who, and whether" of Plaintiffs' § 7431 claim requires a case-by-case inquiry incompatible with predominance.** ............................ 20

Evidence necessary to prove a § 7431 claim requires a case-by-case, file-by-file inquiry. In this case, answering the relevant common contentions (the "what, who, and whether" of a § 7431 claim) will require individual evidence. Plaintiffs each submitted different information that was reviewed by different IRS employees with different job duties. Thus, resolution of Plaintiffs' § 7431 claim will require the presentation of evidence unique to each Plaintiff or purported class member. This is fatal to predominance.

> *Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347 (6th Cir. 2011)

**2. The defenses available to the United States require individual evidence.** ................. 21

In response to Plaintiffs' claim, the United States may assert several defenses: statute of limitations, good faith, and that the inspection was performed at the taxpayer's request. Each of these defenses require the type of individualized inquiry that is incompatible with the predominance requirement.

> *Myers v. Hertz Corp.*, 624 F.3d 537, 551 (2d Cir. 2010);
> *Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347 (6th Cir. 2011)
> *Gandy v. United States*, 234 F.3d 281, 286 (5th Cir. 2000)

**III. Plaintiffs cannot establish liability for the Subclass without individual questions and evidence.**...............................................................................................................23

Because Plaintiffs' proposed Subclass suffers from the same defects as the Principal Class, the Court should refuse to certify the Subclass. The Subclass is based on a series of allegedly "unnecessary" requests for information sent by the IRS. Despite Plaintiffs' assertions, the Subclass does not satisfy Rule 23(a)'s commonality requirement, as the "common question" Plaintiffs identify is irrelevant to their claims under § 7431. Moreover, the inquiry is simply not common to all the Subclass's members because each member of the proposed Subclass responded to a different set of these requests. Even if this question were relevant, however, the Subclass is incompatible with the predominance requirement, because determination of liability would require the Court to perform an individualized inquiry for each member of the Subclass. The case law and past practice clearly demonstrate that there are at least some instances in which these requests would be relevant. As a result, even under Plaintiffs' theory, the Court would need to examine the specifics of each class member's application to determine whether the information requested and produced was relevant in light of the issues that application raised. As a result, resolution of these claims will necessitate the type of individual inquiry that is incompatible with the predominance requirement.

> *American Campaign Academy v. Comm'r*, 92 T.C. 1053 (Tax Ct. 1989)
> *Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347 (6th Cir. 2011)

**IV. Plaintiffs fail to meet Rule 23's remaining requirements.** ..................................................26

Plaintiffs fail to meet their burden under Rule 23's remaining requirements: neither the Principal Class nor the Subclass is ascertainable, the Plaintiffs may not adequately represent the Principal Class and Subclass, Plaintiffs failed to demonstrate typicality for the Subclass, and the class action mechanism does not provide a superior forum for adjudication.

**A.** **Plaintiffs' proposed class is not readily ascertainable.** ..................................................... 26

Plaintiffs have failed to propose an ascertainable class because it is not administratively possible to determine whether a particular individual is a member of the proposed class. Plaintiffs have asked this Court to certify a class composed of all entities "flagged by the IRS as an 'Advocacy' case using" the Four Criteria. Although the IRS's records show which cases were identified as political advocacy cases, these records do not indicate how that determination was made, at least in the vast majority of cases. Because there is simply no way to determine who is a member of Plaintiffs' class, the Court should refuse to certify the class on the basis of this implicit requirement.

*Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537-38 (6th Cir. 2012)

**B.** **Plaintiffs failed to affirmatively demonstrate adequacy.** ............................................... 27

Although Plaintiffs insist they will adequately represent the Principal Class, they have repeatedly shown themselves to be disinterested in the particulars of the lawsuit, ignorant of basic information about their claims, and ill-equipped to protect the interests of absent class members. These matters are the subject of an ongoing discovery dispute. Additionally, NorCal, the sole representative of the Subclass, cannot adequately represent the Subclass. It never provided information in response to any of the Seven Requests, and thus is not a member of the Subclass.

**C.** **Because the Subclass concerns responses to seven unique information requests, it fails to satisfy typicality.** ................................................................................................. 28

Each of the 37 members of the Subclass responded to a different collection of requests for supplemental information from the IRS. Because of this, their experiences are atypical of each other, and they are better viewed as seven distinct sub-groups. Plaintiffs have not alleged any information regarding whether these sub-groups would satisfy the numerosity requirement.

**D.** **Privacy considerations and the existence of multiple other suits show that a class action is inferior to other methods of resolving the controversy.** ................................. 28

42 other entities have filed suit against the United States alleging similar claims to the one at issue here. The large number of organizations that have brought these claims on their own shows that a class action is not needed. At the same time, there are privacy interests that mediate in favor of allowing organizations to control their individual actions.

*Linchpins of Liberty v. United States*, 71 F. Supp. 3d 236 (D.D.C. 2014)
*True the Vote, Inc. v. IRS*, 71 F. Supp. 3d 219 (D.D.C. 2014)
6A Fed. Proc., L. Ed. § 12:226

**Conclusion** .................................................................................................................................... 30

iv

## INTRODUCTION

In their Second Amended Class Action Complaint (SACAC), filed in October 2014, ten organizations[1] alleged claims against the United States under the First and Fifth Amendments and claims under 26 U.S.C. § 7431 that IRS employees had improperly inspected and disclosed Plaintiffs' tax return information in violation of 26 U.S.C. § 6103. Plaintiffs have abandoned their claim that the IRS disclosed their tax return information in violation of § 6103,[2] and their motion seeks class certification only with respect to their claim that IRS employees, while processing Plaintiffs' applications for tax-exempt status, improperly inspected the applications and information submitted by Plaintiffs in support of their applications.[3]

In their motion, Plaintiffs describe in great detail their allegations that the IRS improperly targeted conservative organizations that sought tax-exempt status under 26 U.S.C. § 501(c)(3) and (4). While those allegations may relate to Plaintiffs' constitutional claims, Plaintiffs are not seeking class certification with respect to those claims, and the story Plaintiffs tell is not relevant to a determination of whether IRS employees violated the law when, while performing their official duties, they inspected Plaintiffs' applications and supporting material.[4]

As explained below, § 6103 authorizes IRS employees to inspect tax return information in connection with the performance of their official duties. Plaintiffs each submitted applications for tax-exempt status which required processing by IRS employees. Whether the IRS was too

---

[1] These organizations are NorCal Tea Party Patriots (NorCal), Americans Against Oppressive Laws (AAOL), San Angelo Tea Party (San Angelo), South Dakota Citizens for Liberty (SD Citizens), Texas Patriots Tea Party (TPTP), Texas Public Policy Foundation (TPPF), Prescott Tea Party (dismissed), Faith and Freedom Coalition of Ohio (FFCO) (dismissed), Simi Valley Moorpark Tea Party (Simi Valley) (dismissed), and Tampa 912 Project (Tampa 912) (dismissed).

[2] Plaintiff TPPF, the only entity with a disclosure claim, has withdrawn as a class representative and member of the putative class, because it received tax-exempt status from the IRS in 1989. Despite this, Plaintiffs have refused to sever that entity from this class action.

[3] Plaintiffs concede that they cannot meet Rule 23 requirements to certify a class for Count II, the constitutional claims. Dkt. 193-1, fn. 2, PageID 4683.

[4] Plaintiffs misstate and overstate several key facts and testimony in support of their story. As these facts do not directly affect class determination, they will not be specifically addressed.

demanding in requiring that the applicants submit detailed information to support their applications or too earnest in ensuring that applicants would not be engaged in excessive political activity could arguably be relevant to a claim of viewpoint discrimination. And indeed, Plaintiffs' motion for class certification focuses solely on the so-called targeting issue. But Plaintiffs seek class certification only on their claim under § 7431, and whether IRS employees asked Plaintiffs to produce too much information does not mean that the inspection of the information submitted was outside their official duties. In deciding whether to certify a class with respect to Plaintiffs' improper inspection claim, the Court must focus on (1) the elements of the § 7431 claim (what information was inspected, who inspected the information, and whether the inspection related to the employee's official duties); (2) whether the claim requires common or individual evidence; and (3) whether the requirements of ascertainability, adequacy, typicality, and superiority are met. For the reasons detailed below, Plaintiffs' claims are not appropriate for a class action.

## STATUTORY BACKGROUND

Section 7431 of the Internal Revenue Code establishes a private cause of action against the government "[i]f any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to [the] taxpayer in violation of any provision of section 6103." 26 U.S.C. § 7431(a)(1). Under § 6103(a), returns and return information must be kept confidential; inspection and disclosure are prohibited except where authorized by the statute. To that end — and so that IRS employees may do their jobs — § 6103(h)(1) provides that "[r]eturns and return information shall, without written request, be open to inspection by or disclosure to officers and employees of the Department of the Treasury whose official duties require such inspection or disclosure for tax administration purposes." 26 U.S.C. § 6103(h)(1). Tax administration is defined extremely broadly. It includes "the administration, management, conduct, direction, and supervision of the execution and application of the internal revenue laws," as well as "the development and formulation of Federal tax policy relating to existing

2

or proposed internal revenue laws." § 6103(b)(4).

Before 1997, § 7431 allowed claims only for the improper disclosure of return information, but not for the improper inspection of return information. Spurred by reports that IRS employees had examined taxpayers' records out of sheer curiosity, Congress enacted the Taxpayer Browsing Protection Act, which added the word "inspection" to § 7431. *See, e.g.*, 143 Cong. Rec. H1464 (statement of Rep. Camp, referring to reports of "IRS employees even browsing the records of celebrities like Tom Cruise"). This legislation was exclusively aimed at preventing IRS employees and contractors from looking at tax records that had no possible connection to their work. *See* H. Rep. No. 105-51, 1997 WL 183944, at *3 (1997) (listing the reason for legislation as "[w]idespread indications of browsing"); *see also* 143 Cong. Rec. H1461-08, 1997 WL 179139 (Apr. 15, 1997) (statement of lead sponsor, Rep. Archer, that purpose was to deter those who "browse and snoop" in personal taxpayer records maintained by the IRS); Statement by President William J. Clinton Upon Signing H.R. 1226 (Taxpayer Browsing Protection Act), 33 Weekly Comp. Pres. Doc. 1226 (Aug. 11, 1997), 1997 WL 806823 ("Maintaining the confidentiality of the information submitted by taxpayers is critical to the operation of this system [of taxation]. . . . This is a bipartisan issue on which everyone can agree: 'browsing' taxpayer information is wrong and we all condemn it.").

## STATEMENT OF FACTS

Headquartered in Cincinnati, Ohio, the Exempt Organizations Determinations Unit ("EO Determinations") of the IRS is responsible for processing and reviewing applications for tax-exempt status. Section 501(c) of the Internal Revenue Code sets forth many of the types of organizations that receive this exemption from federal income tax. Under § 501(c)(3), tax-exempt status is provided to religious, charitable, or educational organizations. Under § 501(c)(4), tax-exempt status is given to groups that are "operated exclusively for the promotion of social welfare." 26 U.S.C. § 501(c)(4). Entities that claim tax-exempt status under § 501(c)(3) are prohibited from participating, either directly or indirectly, in any political campaign on behalf of, or against, any candidate for

public office. 26 C.F.R. § 1.501(c)(3)-1(c)(3)(iii). Groups claiming tax-exempt status under § 501(c)(4) may engage in limited political activity, but it cannot constitute the group's primary activity. *See* 26 C.F.R. § 1.501(c)(4)-1(a)(2); Rev. Rul. 81-95. While groups seeking tax-exempt status under § 501(c)(3) generally must apply with the IRS, those who seek tax-exempt status under § 501(c)(4) may apply with the IRS or simply self-declare. IRS Pub. 557, 2015 WL 887401, at *5, 118. The employees in EO Determinations are tasked with applying this law to decide whether to grant or deny the applications the IRS receives. Gov't Ex. 1, Permanent Subcommittee on Investigations, U.S. Senate, *IRS and TIGTA Management Failures Related to 501(c)(4) Applicants Engaged in Campaign Activity*, (Sept. 5, 2014) ("PSI Report") at 12; "2012 Annual Report & 2013 Work Plan," IRS (2013), http://www.irs.gov/pub/irs-tege/FY2012_EO_AnnualRpt_2013_Work_Plan.pdf.

When a number of applications raise the same difficult or novel legal issue, the Internal Revenue Manual (IRM) instructs EO Determinations to flag these applications and request guidance from the Exempt Organizations Technical Unit ("EO Technical"). *See* IRM 7.20.1.4 (12-20-2012).[5] Staffed with tax law specialists, EO Technical is a Washington-based IRS office that works with the agency's Office of Chief Counsel to interpret and provide guidance on complex issues regarding tax-exempt entities. IRM § 7.29.1.2 (02-01-2008). Employees in EO Technical are explicitly authorized to review applications and seek information from applicants in the course of their work. *See* IRM § 7.29.3.2 (07-14-2008). Requesting guidance from EO Technical is common and is often used for "new" issues seen by EO Determinations. EO Determinations also uses specialty groups to review applications that raise similar issues or involve similarly situated entities. *See* PSI Report at 35-36. The IRS has taken this same approach on a wide variety of cases, including those involving credit-counseling organizations, down-payment-assistance groups, organizations relating to Hurricane Katrina, charter school management companies, mortgage foreclosure cases, and groups whose

---

[5] As Plaintiffs concede, this process "is designed to handle complex cases 'in a uniform way to promote consistency and quality.'" Dkt. 193-1, PageID 4684 (quoting Gov't Ex. 5, Hofacre Tr. 175:24-176:2).

status was automatically revoked and were seeking retroactive reinstatement. Dkt. 193-13, PageID 4941, 4943-44; *see also* PSI Report at 35; Gov't Ex. 5, Hofacre Tr. 64:2-13. EO Determinations employee Ronald Bell recalls credit counseling cases being designated as high profile and sent to EO Technical for guidance in the mid-2000s. Gov't Ex. 6, Bell Tr. 45:2-12.[6]

Following the Supreme Court's decision in *Citizens United*, the issue of political campaign activity by § 501(c)(4) groups increasingly came to the IRS's attention.[7] *See generally* Gov't Ex. 3, Senate Finance Committee, Bipartisan Investigative Report, *The Internal Revenue Service's Processing of 501(c)(3) and 501(c)(4) Applications for Tax-Exempt Status Submitted By "Political Advocacy" Organizations from 2010-2013* (Aug. 5, 2015) ("SFC Report") at 66-73. Over the next two years, the number of such applications doubled. Gov't Ex. 2, Treasury Inspector General for Tax Administration, *Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review* (May 14, 2013) ("TIGTA") at 3. At the same time, a substantial number of these applications contained indications that the applicant-entity was engaged in political advocacy. PSI Report at 27-29; SFC Report at 73.[8] The IRS also came under external pressure — in the media, and by the public and Congress — to pay particular attention to the level of political spending and campaign involvement of tax-exempt entities. *See* SFC Report at 66-73.

Determining whether an organization engages in too much political activity to qualify for tax-exempt status is a difficult task. *See* PSI Report at 14-20; 90-94. Treasury regulations provide that an organization must be "primarily engaged in promoting in some way the common good and

---

[6] While "Tea Party Coordinator" is not, as Plaintiffs imply, an official IRS title or designation, Mr. Bell, Mr. Seok and Ms. Hofacre were tasked with coordinating these cases at various periods of time as part of their work in EO Determinations. Dkt. 193-13, Page ID 4948-59.

[7] Since § 501(c)(4) organizations are not required to disclose their donors, after *Citizens United* eased restrictions on corporate spending in political campaigns, the use of 501(c)(4)s became an attractive way for corporations to donate money, while remaining anonymous. *See* SFC Report at 72.

[8] One of the first applications submitted by a group identifying itself as part of the Tea Party movement was flagged as a "high profile" case because of media interest in the Tea Party. SFC Report at 37. The SFC Report states that the application indicated that the group "was seeking to engage in political discourse, an issue that could affect its status as a tax-exempt entity." *Id.*

general welfare of the people of the community." 26 C.F.R. § 1.501(c)(4)-1(a)(2)(i). However, the same regulations state that "[t]he promotion of social welfare does not include direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office." *Id.* § 1.501(c)(4)-1(a)(2)(ii). As a result, the IRS must review the political activities of every applicant-entity and determine (a) whether those activities represent "campaign intervention" and (b) whether, taken together, they are substantial enough to prevent the group from receiving tax-exempt status under § 501(c)(4).

To determine whether an organization is "primarily" engaged in social welfare activities, the IRS may consider a broad range of information. All aspects of a group's personnel, relationships, activities and management are relevant to determining whether a group operates primarily for the public benefit. *See American Campaign Academy v. Comm'r*, 92 T.C. 1053, 1060, 1069-71 (Tax Ct. 1989); *see also U.S. v. Dykema*, 666 F.2d 1096, 1101 (7th Cir. 1981); Rev. Ruling 68-45, 1968-1 C.B. 259, *available at* 1968 WL 15264. Because no one factor is determinative, agents must make case-by-case determinations without the assistance of bright-line rules. *See* PSI Report at 19-20.

As was its practice, and given the uncertainty about how to apply the applicable law correctly and consistently to the applications before it, EO Determinations sought assistance from EO Technical. While EO Determinations was awaiting guidance from EO Technical, both groups agreed that all work on applications raising these issues should be stayed pending EO Technical's advice. PSI Report at 60. For consistent treatment, EO Determinations designated a "specialty group" to handle these cases. As described above, the use of specialty groups is not uncommon.

There was no uniform procedure by which agents in the Screening Group identified cases involving potentially excessive political activity, referred to as "advocacy cases."[9] Although the

---

[9] Plaintiffs allege that the IRS used a "Four Criterion test" to identify advocacy cases. But in fact, these four criteria are a compilation of the "uncoordinated and divergent approaches" that the screeners took to identifying advocacy cases, rather than a defined test. PSI Report at 63-64; *see also* TIGTA at 6, n.17.

screening agents did receive guidance on how to identify political-advocacy-type cases, that advice varied among managers and over time. *See* PSI Report at 54-56. While one manager told screeners to be on the lookout for Tea Party-type groups only, another urged them to flag advocacy cases from conservative and liberal groups alike. *Id.* Many case files do not explain the specific reason or reasons the applications were selected for coordination. For example, while Plaintiff AAOL's file indicates that it was identified as an "advocacy" case, there is no explanation as to the specific criteria applied except a note in the case file that states: "case meets criteria for Current Political Issues in Emerging Issues tab of BOLO spreadsheet." Gov't Ex. 7, IRS_AAOL000090, 105.

After guidance was requested from EO Technical, employees in that division were assigned to review the sorted applications as part of their efforts to create guidance for EO Determinations. PSI Report at 67. But despite their efforts, EO Technical struggled to reach a consensus about how EO Determinations should screen, develop, and evaluate these applications. *See* TIGTA at 37; PSI Report at 5, 95-101. A draft guidesheet was circulated in September 2011, but multiple rounds of comments and suggested edits from the Chief Counsel's office slowed work on the draft. *See* PSI Report at 95-99; *see also* SFC Report at 45-47. And while EO Determinations awaited guidance, the IRS continued to receive an onslaught of these applications, creating a backlog of unreviewed applications.

During this time, both EO Technical and EO Determinations took steps to reduce this backlog. In November 2011, Hilary Goehausen — a new tax law specialist in EO Technical — was assigned to weed out cases that did not involve lobbying or campaign activities. PSI Report at 67-68. This review did not result in a reduction of the backlog. In January 2012, employees in EO Determinations used draft guidance from EO Technical to create letters to some of the applicants asking for supplemental information. PSI Report at 102. These letters, called "development letters," are not unusual. Rather, they are the primary mechanism by which EO Determinations agents

obtain additional information about applicants and were sent in approximately 30% of all cases during fiscal year 2012. TIGTA at 1.[10]

By May 2012, the backlog had grown to approximately 320 cases. PSI Report at 116. In the hopes of expediting resolution of these cases, EO Technical sent eight employees to Cincinnati to provide training to EO Determinations and work with them on these cases. *Id.* at 117. Employees worked in pairs of two to "bucket," or sort, the advocacy applications into four groups: likely approvals, likely denials, cases where minor information was needed, and cases requiring more development. *Id.*; *see also* SFC Report at 48. Seventy of the cases were resolved through this process, but a year later, 259 applications still remained. PSI Report at 119.

In March 2012, the Treasury Inspector General for Tax Administration (TIGTA) initiated an audit of the IRS's Exempt Organizations office. PSI Report at 130. The audit investigated allegations that the IRS had targeted conservative groups applying for tax-exempt status. TIGTA at 3-4; PSI Report at 130. After TIGTA searched over 2,200 IRS emails and other documents, it found "no indication" that the pulling of applications for additional scrutiny was "politically motivated." PSI Report at 130.[11] In May 2013, TIGTA released the results of its audit in a report. Although TIGTA faulted the IRS for using applicant-entities' names and policy positions to identify advocacy cases — as opposed to more concrete evidence of political campaign intervention — the report concluded that this was caused by "insufficient oversight provided by management" (TIGTA at 7; *see also* TIGTA at 5-6; SFC Report at 40-41), not any political bias on the part of IRS employees.[12] In March

---

[10] Development letters were sent to both conservative and liberal groups during this time period. PSI Report at 105; SFC Report at 125.

[11] In addition, the bipartisan investigation conducted by the Senate Finance Committee found that left-leaning and progressive groups also experienced the same type of identification by names, delays in processing their applications, and requests for additional information. *See* SFC Report at 118-25.

[12] Contrary to Plaintiffs' assertions, the TIGTA report did not conclude "the IRS improperly targeted 'Tea Party' and other groups based on their viewpoint." Instead the report stated, "the criteria developed by the Determinations Unit *gives the appearance* that the IRS is not impartial in conducting its mission." TIGTA at 6 (emphasis added). In fact, TIGTA's Chief Counsel Michael McCarthy specifically expressed concern over the (continued...)

2015, TIGTA reported that almost all of these applications had been processed and closed. Gov't Ex. 4, Treasury Inspector General for Tax Administration, *Status of Actions Taken to Improve the Processing of Tax-Exempt Applications Involving Political Campaign Intervention* (March 27, 2015) at 16-19. Of the eleven cases that remain, six are involved in ongoing litigation and five have received notice of a proposed adverse determination. *Id.* at 18-19.

## ARGUMENT

The Court should decline to certify Plaintiffs' proposed class because it fails to satisfy the requirements of Rule 23(a) and 23(b)(3). As the Supreme Court has explained, these requirements are not easily met: "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule — that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). To that end, "certification is proper *only* if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (emphasis added).

Plaintiffs' proposed class cannot be certified for several reasons. First, neither the Principal Class nor the Subclass satisfies Rule 23(a)(2)'s commonality requirement. Plaintiffs identify contentions common to the class, but none of these contentions relate to their claim for unauthorized inspection under § 7431. Because deciding Plaintiffs' contentions will not "resolve an issue that is central to the validity of each one of the claims in one stroke," they do not justify certification of Plaintiffs' class. Second, proof of liability under § 7431 will require a case-by-case, individualized inquiry into the facts and circumstances presented by each applicant, which is incompatible with Rule 23(b)(3)'s predominance requirement. Third, and even before getting to

---

(… continued)

use of the word "targeting" because, "[T]argeted has a connotation of improper motivation that does not seem to be supported by the information presented in the audit report." PSI Report at 164.

commonality and predominance, Plaintiffs have failed to define an ascertainable class: contrary to Plaintiffs' assertions, there is no way to determine which entities were flagged on the basis of the Plaintiffs' "Four Criterion Test." Finally, Plaintiffs' purported class fails Rule 23's adequacy, typicality, and superiority requirements.

I.      **A Rule 23 analysis is inherently and inextricably linked to the elements of the underlying claim, and the harm that Plaintiffs allege bears no relation to the harm § 7431 is meant to address.**

Plaintiffs' motion seeks class certification for Count III, their claim for unauthorized inspection under 26 U.S.C. § 7431. As detailed below, both the commonality and predominance inquiries require a precise understanding of the underlying claims. *See Wal-Mart*, 131 S. Ct. at 2551; *Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir. 2014). Thus, the Rule 23 analysis must be firmly tethered to the elements of the underlying claim. But what does an unlawful inspection claim under § 7431 look like?

As discussed earlier, a taxpayer has a cause of action under § 7431 if a Federal employee knowingly or negligently inspects the taxpayer's return or return information in violation of § 6103. *See* discussion pp. 3-4, *supra*. Although returns and return information are confidential, § 6103(h)(1) provides that returns and return information may be inspected by or disclosed to Treasury Department officers and employees whose official duties require access to that information for purposes of "tax administration," a term broadly defined in § 6103(b)(4). Section 7431 originally addressed only unauthorized disclosures; the statute was amended in 1997 to include unauthorized inspections to address the narrow problem of IRS employees browsing taxpayer information unrelated to their duties.

Case law both before and after the amendment illustrates the harm § 7431 is meant to address, which bears no relation to the harm Plaintiffs allege. The committee report on the Taxpayer Browsing Protection Act cites — as the paradigmatic example of an unauthorized inspection — the facts underlying *United States v. Czubinski*, 106 F.3d 1069 (1st Cir. 1997). See H.R. Rep. 105-51, 1997

WL 183944, at *3-4. Czubinski was an IRS employee who conducted numerous unauthorized

searches of IRS files, which were clearly outside the scope of his official duties (e.g., political

candidates, a local district attorney, and a woman he had once dated). *Czubinski*, 106 F.3d at 1071. At

the time, improper inspection was not proscribed by the Internal Revenue Code. As the committee

report explains, Congress crafted a new criminal penalty for wrongful inspection. H.R. Rep. 105-51,

1997 WL 183944, at *3-4. At the same time, Congress added the word "inspection" to § 7431 to

provide a civil remedy for the same type of behavior. *Id.* Thus, as this legislative history shows,

plaintiffs who bring claims for unauthorized inspection by IRS employees must prove that the

inspection at issue fell outside the scope of their official duties.

The handful of courts that have addressed such claims agree: IRS employees who inspect (or

disclose to other IRS employees) taxpayer information do not violate § 6103 when that inspection or

disclosure occurred while the employee was performing his or her official IRS duties. *Wewee v. United*

*States*, 2001 WL 429823 (D. Ariz. Mar. 29, 2001), *aff'd* 72 F. App'x 731 (9th Cir. 2003) (rejecting

plaintiff's argument that IRS employees had improperly browsed, inspected, and disclosed his return

information after an IRS agent placed that information in a "Return Preparer Penalty File" and

finding that § 6103(h)(1) applied because any inspection would have been for a tax administration

purpose); *see generally Barnard v. United States*, 1981 WL 1754, at *2 (S.D. Fla. Mar. 5, 1981) (stating

that § 6103(h)(1) allows inspections or disclosures "for the purpose of facilitating a current

employee's official duties"). Courts have found that, at the bare minimum, § 6103(h)(1) authorizes

inspection by, or disclosure to, all IRS employees who are engaged in processing a taxpayer's case.

*See Gardner v. United States*, 213 F.3d 735, 738 (D.C. Cir. 2000) (§ 6103 "guarantees that sometimes

sensitive or otherwise personal information in a return will be guarded from persons not directly

engaged in processing or inspecting the return for tax administration purposes."); *McGinley v. U.S.*

*Dep't of Treasury*, 2002 WL 1058115, at *4 (C.D. Cal. Apr. 15, 2002) (finding that, because an IRS

employee was "no longer working on the case relating to the documents at issue," and because "he

provide[d] no other basis for finding that his official duties as a staff economist require him to review the requested materials," § 6103(h)(1) did not apply).

In this Circuit, the Court of Appeals stated that § 6103(h)(1) is "an explicit exception to the confidentiality requirements" that allows IRS employees who are involved in one investigation to share taxpayer information from that investigation with IRS employees on another, related investigation. *United States v. Monumental Life Ins. Co.*, 440 F.3d 729, 734 (6th Cir. 2006).

Plaintiffs wrongly allege two stages of wrongful inspection. First, they suggest that the IRS employees who screened and sorted applications when those applications were first submitted did so using criteria that were irrelevant to tax administration. But Plaintiffs do not contend that these employees, who were charged with processing the tax-exempt status applications that the IRS received, had no right to inspect them as part of their intake. Instead, Plaintiffs insist that the key issue here is whether the applications of the putative class members were sorted using the Four Criteria,[13] and whether these criteria were relevant to tax administration. Rather than asking whether the IRS employee had the authority to examine and sort applications as they arrived – the keystone for liability under § 7431—Plaintiffs' theory instead focuses on the propriety of IRS screening procedures and sorting mechanisms — an issue which § 7431 quite plainly does not address.

Plaintiffs also misapprehend the law when they contend that a second wrongful inspection occurred when the sorted applications were reviewed by more IRS employees as part of the effort to coordinate the handling of cases with common issues. According to Plaintiffs, the relevant question is whether the applications of class members were reviewed by IRS employees because they were identified as meeting the Four Criteria. But again, an answer to this question would not get the Court any closer to resolving the Plaintiffs' inspection claims, because the Court would still need to determine whether the employees who reviewed those applications were acting outside the scope of

---

[13] The four criteria are discussed in Section II, *infra*.

their official tax administration duties. In addition, Plaintiffs admit that referral of an application to EO Technical is warranted in "rare circumstance." Dkt. 193-1, PageID 4685. Thus, even under Plaintiffs' theory of liability, a sub-set of the purported Principal Class's applications may have warranted referral to EO Technical, making the resulting inspection proper. Only with the benefit of hindsight and a case-by-case review of the files could the Court determine which referrals would be deemed "warranted" in Plaintiffs' paradigm.

Plaintiffs' theory, that they "need only show that the inspections were unnecessary to prove a violation under § 6103" (Dkt. 193-1, fn. 1, PageID 4681), is predicated on a misreading of § 6103(h)(1), centering on the word "require." Plaintiffs contend that inspections are permissible only when they are required, or strictly necessary, for tax administration — i.e., could the nation's tax laws have been administered without that inspection? Read in full, however, this provision states that "[r]eturns and return information shall, without written request, be open to inspection by or disclosure to officers and employees of the Department of the Treasury whose official duties require such inspection or disclosure for tax administration purposes." 26 U.S.C. § 6103(h)(1). The plain language of the statute mandates that the employee's *official* duties require inspection, not that the inspection be required for tax administration purposes. Or, put another way, the question is not, "Was this inspection required for tax administration?" but rather, "In the course of tax administration, did the employee's official duties require the inspection?" In short, Plaintiffs are attempting to create liability by claiming that "unnecessary" is synonymous with "unauthorized." This is not provided for by the statute.

As the legislative history clearly shows, § 7431 is designed to hold the United States accountable — and § 7213A holds the employee criminally accountable — when individual IRS employees look at taxpayer information that bears no relationship to their official responsibilities. Section 7431 is not a mechanism by which individuals can challenge the manner in which the IRS carries out the tasks which have been delegated to it by Congress. In asking the Court to determine

13

whether the procedures implemented for these applications were "strictly necessary," Plaintiffs

invite this Court to endorse an interpretation of § 7431 that encourages courts to second-guess the

IRS's decisions about how to manage its workload effectively. No court has ever taken such a

bloated view of this statute, likely because waivers of sovereign immunity are to be strictly construed

in favor of the sovereign, *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33-34 (1992); *United States v.*

*Mitchell*, 445 U.S. 535, 538 (1980); *United States v. Sherwood*, 312 U.S. 584, 586 (1941). Plaintiffs should

not be permitted to conflate their constitutional claims, for which they lack a certifiable class, with

their § 7431 claims.

Even if all of Plaintiffs' facts were accepted as true, those facts would not give rise to a cause

of action under 26 U.S.C. § 7431. As a result, they have no common claim.

## II.     The Principal Class fails to meet Rule 23's commonality and predominance requirements.

Plaintiffs define the Principal Class as an opt-out class that comprises:

> All entities that, at any time from February 1, 2010 to June 31, 2013 [sic], filed an
> Application for Recognition of Tax Exemption with the IRS under 26 U.S.C. §§
> 501(c)(3) or 501(c)(4) and had their application flagged by the IRS as an "advocacy"
> case using the criteria:
> (a) A reference in the case file to "Tea Party, "Patriots, "or 9/12 Protect";
> (b) A reference in the case file to government spending, government debt, or taxes;
> (c) A reference in the case file to education of the public by advocacy or lobbying to
> "make America a better place to live"; or
> (d) A statement in the case file criticizing how the country is being run.

Dkt. 193-1, PageID 4701 ((a)-(d) collectively referred to as the "Four Criteria")[14]. The proposed

Principal Class cannot be certified because it fails to raise common issues of law or fact that relate to

the merits of Plaintiffs' claims for unauthorized inspection and because issues requiring individual

evidence necessarily predominate over any issues susceptible to common proof.

---

[14] Plaintiffs' Principal Class definition points to a "Four Criterion Test" over the time period February 1, 2010
to June 31, 2013 [sic]. Not only was this test never actually in effect, but over the February 2010 to June 2013
time period, the criteria used by IRS employees to select cases for coordination changed repeatedly. TIGTA
at 7, 10. The PSI report states that, "[f]rom 2010 to 2012, the primary BOLO entry for advocacy cases was
changed four times in three years without producing consensus support for the screening criteria." PSI
Report at 109.

A.    **The Principal Class lacks common questions that drive resolution of their claims.**

As the Supreme Court has explained, "What matters to class certification is not the raising of common 'questions' — even in droves — but, rather the capacity of a class wide proceeding to generate common answers *apt to drive the resolution of the litigation*." *Wal-Mart*, 131 S. Ct. at 2551 (emphasis added). Plaintiffs must "affirmatively demonstrate" compliance with Rule 23. *Id.* The Supreme Court has recognized that courts may need to "probe behind the pleadings," and that this "rigorous analysis will entail some overlap with the merits of plaintiff's underlying claim." *Id.* Here, Plaintiffs' asserted "common questions" do not relate to the elements of a claim under § 7431, and will not drive resolution of the claims, and accordingly, do not satisfy Rule 23.

1.    *Wal-Mart* requires Plaintiffs to identify common questions that are central to the validity of their claims.

The Supreme Court's decision in *Wal-Mart* makes clear that plaintiffs cannot satisfy the commonality requirement merely by identifying questions of law or fact that are common to the proposed class. As the Court emphasized, "Any competently crafted complaint literally raises common questions." *Wal-Mart*, 131 S. Ct. at 2551. Rather, the plaintiffs' claims "must depend upon a common contention . . . which means that determination of its truth or falsity will resolve an issue that is *central to the validity of each one of the claims*." *Id.* (emphasis added). Common contentions whose answers will have no impact on the outcome of the case do not satisfy commonality. *See id.*

This inquiry requires "identify[ing] the elements of the class members' case-in-chief" and asking whether the common contentions address those elements. *Id.* Applying the *Wal-Mart* analysis, in *Stukenberg*, the Fifth Circuit vacated and remanded a class certification order because the district court failed to determine whether the common questions were relevant to the plaintiffs' cause of action. *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012). The court concluded that the district court's discussion did not "look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination." *Id.* at

15

841. And, the district court failed to consider or explain how answering class members' questions would "resolve an issue that is central to the validity of each one of the [individual class member's] claims in one stroke." *Id.*

> 2. The Principal Class's "common questions" cannot drive resolution of this litigation, because they are irrelevant to the merits of their unauthorized inspection claims.

In their motion for class certification, Plaintiffs point to the following contentions that, they claim, satisfy commonality: (1) whether the IRS's multi-tier scrutiny of putative class members was unnecessary for tax administration purposes; (2) whether the putative class members were chosen for additional scrutiny and delay using four criteria;[15] and (3) whether those criteria were based on factors relevant to tax administration. Dkt. 193-1, PageID 4703-4. But, these inquiries are irrelevant to the merits of Plaintiffs' § 7431 claim and, thus, will not "resolve an issue that is central to the validity of each one of the claims in one stroke." *See Wal-Mart*, 131 S. Ct. at 2551.

To prevail on an improper inspection claim under § 7431, a plaintiff must demonstrate that an inspection occurred and that it was unauthorized. Inspection by an IRS employee is only unauthorized if it does not fall within the exception for Treasury employees under § 6103(h)(1). Thus, the only issues that are relevant to liability under § 7431 are:[16]

> (1) *What* information was inspected?
>
> (2) *Who* in the IRS inspected the information and what were their job duties?
>
> (3) *Whether* the inspection of information was performed as part of the employee's official duties?

Plaintiffs' brief, however, is devoid of the necessary "what, who, and whether" of a § 7431 claim. Plaintiffs have not identified any of these questions as common to the proposed class, and for obvious reasons: answering "what, who, and whether" requires the Court to engage in an inquiry

---

[15] Neither §§ 6103 nor 7431 provide a cause of action for a "delay" in processing applications.
[16] In addition, the government may raise several defenses, discussed in Section II.B.2, *infra*.

into the facts and circumstances surrounding each purported class member, and with respect to each IRS employee. In fact, Plaintiffs have not alleged a single specific inspection by a specific IRS employee in their Motion, let alone a common inspection that would affect "entities that, at any time between February 1, 2010 to June 31, 2013, [sic] filed an application." Dkt. 193-1, PageID 4700.

Plaintiffs' attempt to gloss over these differences — emphasizing that IRS scrutiny was "uniform and pervasive" and that the applications of all putative class members were "flagged and segregated using criteria based on their viewpoint or at the very least irrelevant to tax administration purposes" (Dkt. 193-1, PageID 4704) — fundamentally misunderstands the substantive law that governs causes of action under § 7431. Instead, the five representative Plaintiffs, themselves, demonstrate that the elemental questions presented by a § 7431 claim do not yield common answers.[17]

First, what information was inspected? The amount, extent, and type of information submitted vary significantly from plaintiff to plaintiff. For example, Plaintiff San Angelo submitted only a Form 1024 Application for Tax-Exempt Status and the required supporting documentation (copy of its organizing instrument, EIN, and Articles of Incorporation). Gov't Ex. 7, IRS_SanAngelo000019-49. AAOL submitted less than a dozen pages of information in addition to its application material, consisting of a written response to a letter from the IRS, a website print-out,

---

[17] Plaintiffs' SACAC, filed in October 2014, alleged that ten plaintiff entities would represent members of the putative class. Now, only five of the original ten plaintiffs remain as class representatives. *See* Dkt. 188, Order dismissing Simi Valley, Prescott Tea Party, FFCO, and Tamp 912. (Additionally, Plaintiffs admit that TPPF does not represent the class. *See* note 2, *supra*.) These former representative plaintiffs each presented unique facts that made them unsuitable class representatives. For example, Plaintiffs' counsel described Prescott Tea Party as an "outlier," "unique even among the 3 test cases, which does not make them a good representative or typical of the others." Gov't Ex. 8, Email from Plaintiffs' Counsel Edward Greim, dated April 8, 2015. Likewise, the other former plaintiffs have unique facts. (Simi Valley—dissolved four months prior to filing of the SACAC) (Tampa 912—received tax-exempt status in December 2010, following February 2010 application, processed in Maryland, not Cincinnati) (FFCO—local counsel, David R. Langdon, signed Articles of Incorporation as incorporator and authorized representative). While these entities have been dismissed as plaintiffs, Plaintiffs' counsel still maintains that they may be members of the putative class. However, if these entities present facts and circumstances so unique that they cannot be representative plaintiffs, how can the remaining plaintiffs present claims typical of such "outliers" or adequately represent class members with a variety of unique facts and circumstances? Plaintiffs have not answered this question.

and a two page brochure. Gov't Ex. 7, IRS_AAOL000076-88. By contrast, NorCal submitted over three thousand pages of information. Gov't Ex. 9, NorCal Tr. 69:13-16.

Second, who inspected the information and what were their job duties? Each member of the putative class had its application examined by a different set of EO employees. These employees' jobs varied. For example, an Exempt Organizations Agent's major duties include "[r]eview[ing] applications for exempt status" to determine whether tax-exempt status is warranted. Gov't Ex. 14, IRS EO, Revenue Agent Position Description, p. 3. When an EO Agent is assigned to act as a screener, their duties include "review[ing] the application package to determine, based on the facts in the case and clearly established legal precedent . . . whether the case should be" (1) sent for full development, (2) returned as incomplete, (3) approved on merit with no contact, (4) identified as needing only minor additional information, or (5) sent for secondary screening. IRM 7.20.2.3.3 (8-24-2012). An EO Tax Law Specialist's duties include "[r]eview[ing] and analyz[ing] applications, organization's charter, by-laws, planned activities and other pertinent documents to determine the nature and purpose of the organization." Gov't Ex. 15, IRS EO, Tax Law Specialist Position Description, p. 2.

A review of just the Plaintiffs' files shows that each was assigned to different IRS employees across different job functions. For example, SD Citizens was screened by EO Screener Renee Norton, and reviewed by EO Agent Daniel Dragoo, EO Agent Specialists Joseph R. Herr and Janice Estes, and Tax Law Specialists Hilary Goehausen and Sharon Light, while AAOL was screened by EO Screeners Roger Vance and Ronald Bell, reviewed by EO Agents Andrew Megosh, Janice Estes, and Faye Ng, and examined by EO Technical Tax Law Specialist Justin Lowe. *See* Gov't Ex. 7, IRS_SDCitizens000039-40, 280-299, 320; IRS_AAOL000038-39, 76-78, 90-95, 108-110.

As *Wal-Mart* made clear, Rule 23(a) requires plaintiffs to identify common questions whose answers will drive the resolution of the litigation. But answering the questions put forth by Plaintiffs,

regarding IRS scrutiny and coordination criteria, would do precious little to resolve their claims. Even if the Court were to find that the criteria these employees used to sort applications was improper, it would not follow that the official duties of those employees did not require them to inspect those applications. These questions are therefore irrelevant to the "what, who, and whether" of a § 7431 claim and cannot be used to justify class certification.

### B. The Principal Class fails to meet Rule 23(b)(3)'s predominance requirement because establishing liability requires a case-by-case analysis with evidence unique to each entity.

Plaintiffs seek to have the Principal Class certified under Rule 23(b)(3), which requires Plaintiffs to establish that "questions of law or fact common to class members predominate over any question affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance inquiry focuses on whether the class will "prevail or fail in unison" — that is, whether the defendant's liability can be proven through evidence common to the class. *In re Whirlpool Corp.*, 722 F.3d 838, 858 (6th Cir. 2013). As the Supreme Court has explained, "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 133 S. Ct. at 1432. Like Rule 23(a)'s commonality inquiry, the predominance analysis requires examination of the underlying legal claim, but it focuses on whether proof of the elements of the claim necessitates evidence individual to each class member. *See Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347, 354 (6th Cir. 2011). If a plaintiff's claims "necessitate substantial, individual inquiries to determine liability" they are "incompatible with the predominance requirement." *Randleman*, 646 F.3d at 354; *see also In re Whirlpool*, 722 F.3d 838 (finding predominance requirement met where determination of liability requires only common evidence); *Schumacher v. State Auto. Mut. Ins. Co.*, No. 1:13-CV-00232, 2015 WL 421688, at *6 (S.D. Ohio Feb. 2, 2015) (finding individual issues predominate where "Defendants' liability and Plaintiffs' damages will hinge on a case-by-case analysis").[18]

---

[18] Plaintiffs cite, without analysis or application, *Beattie v. CenturyTel, Inc.*, 511 F.3d 554 (6th Cir. 2007), a case in which the central issue (whether the defendant's billing practices were deceptive) was common to all class (continued...)

19

While Plaintiffs seek certification of a class action solely on their § 7431 claim for wrongful inspection, the elements necessary to show *liability* under § 7431 require evidence unique to the facts and circumstances of each plaintiff. So do the United States' defenses. Where proof of liability requires individual evidence, individual issues predominate:

  1.  Evidence to establish the "what, who, and whether" of Plaintiffs' § 7431 claim requires a case-by-case inquiry incompatible with predominance.

The evidence necessary to prove a § 7431 claim is not "applicable to the class as a whole"; rather it requires a case-by-case, file-by-file inquiry. *Cf. Randleman*, 646 F.3d at 352-53 ("To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof."). As described above, answering the relevant common contentions (the "what, who, and whether" of a § 7431 claim) requires individual evidence. This is fatal to predominance. *See id.*; *Corder v. Ford Motor Co.*, 297 F.R.D. 572, 579 (W.D. Ky. 2014) (collecting cases in which courts have "declined to certify class actions" where "there was a concern regarding proof of a certain element of the action").

As detailed in section II.A.2, above, Plaintiffs each submitted different information that was reviewed by different IRS employees with different job duties. Thus, resolution of Plaintiffs' § 7431 claims will require the presentation of evidence unique to each Plaintiff or purported class member. Regardless of whether Plaintiffs clarify their position to allege that the wrongful inspection occurred during screening, triage, or at some other point, the evidence necessary to prove liability is individual, not common.[19] Even if the Court found that a particular employee lacked a tax

---

(… continued)

members, although establishing damages would require individual proof. *Id.* at 565-66. That case is distinguishable, because Plaintiffs' § 7431 claim requires individual evidence to establish liability, in addition to damages.

[19] Even if Plaintiffs claim that Ms. Goehausen's work on the coordination list was the instance of wrongful inspection, the analysis still does not rest on common proof: EO Technical Employee Hilary Goehausen was assigned to review 161 applications for tax-exempt status to compile information identifying which

(continued…)

administration purpose to inspect an applicant's information (an unlikely proposition), that finding would not resolve the question of whether another applicant, who most likely submitted different information that was reviewed by a different group of employees, suffered an improper inspection. The elements, necessary for a determination of liability, can only be established through evidence unique to each individual plaintiff or class member, and Plaintiffs make no attempt to show otherwise. This is incompatible with the predominance requirement. *Randleman*, 646 F.3d at 354.

2. The defenses available to the United States require individual evidence.

In response to Plaintiffs' claim, the United States may assert several defenses: statute of limitations, good faith, and that the inspection was done at the taxpayer's request. It is "well established that courts must consider potential defenses in assessing the predominance requirement." *Myers v. Hertz Corp.*, 624 F.3d 537, 551 (2d Cir. 2010). Each of these defenses requires individual determinations with evidence specific to each claimant.

Where application of a statute of limitations defense turns on the plaintiff's knowledge, that "typically requires individual evidence, which will frequently defeat Rule 23's requirements." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 370 (4th Cir. 2014) (internal citations omitted); *see also Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) (finding that, while not dispositive, "a necessity for individualized statute-of-limitations determinations invariably weighs against class certification"). Section 7431(d) is such a statute: it requires that suit be brought within two years of

---

(… continued)

applications needed additional development, which could be closed, and which had indications of political activity. The amount, extent, and type of information submitted varied significantly from plaintiff to plaintiff. (*See* discussion of information submitted by San Angelo, AAOL, and NorCal, Section II.A.2., *supra*.) Section 7431 requires an examination of the tax administration purpose behind each inspection of information, and the wide variety of information present in the entity files precludes uniform evidence or a uniform finding. In addition, several of the Plaintiffs do not appear on the list of 161 entities reviewed by Ms. Goehausen. *See* Gov't Ex. 16, Spreadsheet of Cases Screened by Goehausen with Original 10 Plaintiffs' Information Unredacted, dated November 16, 2011, produced as USA_NorCAL_RFP_0009463-475 (NorCal, FFCO, SD Citizens, and San Angelo appear on list, but the other six original plaintiffs — AAOL, Simi Valley, TPTP, Tampa 912, Prescott Tea Party, and TPPF — are not on list). Nor did Ms. Goehausen's review of 161 entities encompass all members of the purposed Principal Class, which Plaintiffs allege totals more than 200 entities.

the date of each Plaintiffs' discovery of the inspection. The Principal Class definition does not

address this threshold liability requirement, and as the testimony of NorCal and SD Citizens reveals,

the answers to this question are not uniform. *Compare* NorCal, Tr. 62:12-63:24 (testified she became

aware of inspections after receiving second IRS letter requesting additional information), *with* SD

Citizens, Tr. 28:17-29:9 (testified that he "did not know" whether their information had been

improperly inspected, suggesting that its claim may not have yet accrued.) Like the notice

requirement in *Randleman*, the question of when each plaintiff or purported class member discovered

the alleged unlawful inspection will require precisely the type of individual inquiry that leads to the

predominance of individual issues over common issues. *See Randelman*, 646 F.3d at 352-53; *Thorn v.

Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 320 (4th Cir. 2006).

Similarly, the good faith of the numerous IRS employees engaged in processing applications

for tax-exempt status cannot be determined through common proof. The good faith defense,

contained in § 7431(b), requires inquiry into whether a reasonable IRS employee would understand

that the act of inspection violated § 6103. *See Ingham v. United States*, 167 F.3d 1240, 1245 (9th Cir.

1999).[20] The analysis applies an objective test. For each instance involving each individual employee,

the court must consider whether, under the circumstances specific to that inspection, a reasonable

employee would have known the inspection violated § 6103. *See generally Gandy v. United States*, 234

F.3d 281, 286 (5th Cir. 2000) (contrasting inquiry of circumstances surrounding oral disclosure by

IRS agent with those surrounding mass mailing disclosure). This would require an analysis of the

actions of the employee as it relates to the specific facts of the entity and thus is individualized.

Additionally, § 7431(b)(2) provides an exception from liability where the inspection is

---

[20] In analyzing good faith in the context of a § 7431 claim, courts look at the resources available to the IRS
employee (such as IRS handbooks and IRM provisions) and the circumstances of the individual inspection or
disclosure. *Ingham*, 167 F.3d at 1245 (finding good faith where IRM instructs agents that limited disclosures
are permitted in "whipsaw" cases [involving an abusive trust situation] and disclosure was made in context of
a whipsaw case, finding reliance on IRM to be objectively reasonable).

"requested by the taxpayer." This analysis also requires a case-by-case examination of what information was submitted and why to determine whether the taxpayer requested the inspection. Where, for example, a purported class member submitted no material besides an application for tax-exempt status, the analysis of whether any inspection was requested will be different than for taxpayers who submitted copious information in response to IRS requests. As with the other defenses, this defense requires the type of individualized inquiry incompatible with the predominance requirement.

III.     **Plaintiffs cannot establish liability for the Subclass without individual questions and evidence.**

Plaintiffs' proposed Subclass suffers from the same defects as the Principal Class, and the Court should refuse to certify the Subclass as well. Plaintiffs define the "Unnecessary Questions" Subclass as "[a]ll entities included in the Principal Class that, at any time from January 1, 2010 to June 31, 2013 [sic], provided information in response to one of more of the following requests for information by the IRS." Dkt. 193-1, PageID 4701. Plaintiffs then list seven information requests (the "Seven Requests")[21] and state that 37 members of the Principal Class provided information in response to one or more of the Seven Requests. Dkt. 193-1, PageID 4702.

Despite Plaintiffs' assertions, the Subclass does not satisfy Rule 23(a)'s commonality requirement, as the "common question" Plaintiffs identify is irrelevant to their claims under § 7431. Even if this question were relevant, however, the Subclass is incompatible with the predominance requirement, because determination of liability would require the Court to perform an individualized

---

[21] These Seven Requests are: (a) The names of donors; (b) A list of all issues that are important to the entity and an indication of its position regarding such issues; (c) Information about the roles of non-member participants in activities by the entity and the types of conversations and discussions had by members and participants during the activity; (d) Whether any officer, director, or member of the entity has run or will run for public office; (e) The political affiliation of any officer, director, member speaker, or candidates supported or other requests regarding any relationship with identified political parties; (f) Information regarding the employment of any officer, director of members other than by the entity, including but not limited to the number of hours worked; and (g) Information regarding the activities of other entities beyond solely the relationship between the applicant and such other entities.

inquiry for each member of the Subclass.

Plaintiffs assert that the questions common to this group are whether each of the Seven Requests was "unnecessary," but they fail to establish how answering this question will drive the resolution of this litigation. As detailed above, it is only the answers to "what, who, and whether" that are relevant to Plaintiffs' claims under § 7431. Thus, even if the Court concluded that these requests were "unnecessary," that does not mean an unauthorized inspection actually occurred. For purposes of § 6103, what matters is whether the inspection took place because the employee was performing his or her official duties. The necessity of the request that generated the inspected information is not an element of a wrongful inspection claim.

Even if the inquiry into whether the Seven Requests were "necessary" was relevant, the inquiry is simply not common to all members of the Subclass. An IRS review conducted in April 2012 found that no organization received all of the Seven Requests and no single request was received by all entities. Gov't Ex. 18, Email dated April 25, 2012 and attached Spreadsheet, produced as USA_NorCAL_RFP_0011234-243. In fact, the review found that the vast majority of the entities received only one or two of the Seven Requests. *Id.* Accordingly, even if the Subclass members answered every request they received, most of the Subclass members would only have provided answers to one or two of the Seven Requests. Thus, even under Plaintiffs' theory, the Court cannot resolve the claims of the Subclass without an individual review of each Request. NorCal's own circumstances illustrate that the claims of the Subclass cannot be resolved absent individual inquiry. NorCal asserts that it answered only two of the Seven Requests — (a) donor names and (d) whether persons are running for public office. Dkt. 193-1, PageID 4705.[22] Thus, even under Plaintiffs' theory of liability, if the Court found that Request B (list of issues and entity's

---

[22] NorCal's deposition testimony reveals that it did not, in fact, provide donor names to the IRS. Gov't Ex. 9, NorCal Tr. 36:16-37:4. Rather, in response to Request A, it submitted a printout of donation amounts without any names or other identifying information. *Id.*

position) was "unnecessary," this would not resolve the § 7431 claims of NorCal. Accordingly, the Subclass lacks common contentions that, when answered, are "apt to drive the resolution of the litigation." *Wal-Mart*, 131 S. Ct. at 2551.

Ultimately, however, the Subclass must fail on predominance grounds. As Plaintiffs portray it, the Court would only need to decide whether each of the Seven Requests were improper to resolve all of the claims of the Subclass. But this is not true. Case law and past practice clearly demonstrate that there are instances in which these requests would be relevant. Indeed, the IRS has repeatedly denied tax-exempt status to organizations that are dedicated to training candidates from a specific party to run for public office. In these cases, the IRS has relied on information about whether members have run, or will run, for public office (Request D); the outside employment of members (Request F); and the political affiliation of the organization's directors (Request E). *See, e.g., American Campaign Academy*, 92 T.C. at 1060, 1069, 1070, 1071, 1079 (finding an examination of all aspects of the American Campaign Academy's operations relevant to its determination of tax-exempt status, including political affiliation of academy graduates, content of teaching aids and curriculum used by the academy, political affiliation of the donors, and identity and political affiliation of the organization's directors); *see also* PSI report at 19 (describing denial of tax-exempt status to an organization devoted to encouraging and training Democrat women to run for public office).

As these examples show, the Court cannot determine the necessity of the information requested (or of the requests themselves) in a vacuum. Even under Plaintiffs' theory, the Court will still be forced to examine the specifics of each class member's application to determine whether the information requested — and produced — was relevant in light of the issues that application raised. Because these claims will "necessitate substantial, individual inquiries to determine liability," they are "incompatible with the predominance requirement." *Randleman*, 646 F.3d at 354.

IV.     **Plaintiffs fail to meet Rule 23's remaining requirements.**

Plaintiffs fail to meet their burden under Rule 23, because neither the Principal Class nor the Subclass is ascertainable, the Plaintiffs may not adequately represent the Principal Class and Subclass, Plaintiffs failed to demonstrate typicality for the Subclass, and the class action mechanism does not provide a superior forum for adjudication.

     **A.     Plaintiffs' proposed class is not readily ascertainable.**

Plaintiffs have not proposed an ascertainable class. In the Sixth Circuit, a class action cannot be certified under Rule 23 unless the class definition is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537-38 (6th Cir. 2012). Because there is simply no way to determine who is a member of Plaintiffs' class, the Court should refuse to certify the class on the basis of this implicit requirement.

Plaintiffs have asked this Court to certify a class composed of all entities "flagged by the IRS as an 'Advocacy' case using" the Four Criteria. According to Plaintiffs, it will be easy to determine which organizations were flagged on these bases because the IRS maintains "detailed records of . . . why [these organizations] were selected." Dkt. 193-1, Page ID 4701. But this is incorrect. While the IRS's records do show *which* cases were identified as political advocacy cases, these records do not indicate *how* that determination was made, at least in the vast majority of cases.[23]

Plaintiffs' own files illustrate this problem. The screening sheet for Plaintiff AAOL indicates that this group was identified as a political advocacy case, but there is no explanation why. Gov't Ex. 5, IRS_AAOL000090. The file simply states that the case "meets criteria for Current Political Issues in Emerging Issues tab of BOLO spreadsheet." *Id.* at IRS_AAOL000105. At the time this notation

---

[23] Plaintiffs do not, and cannot, contend that the Four Criteria were the only criteria by which all political advocacy groups were identified. Employees were left to use their individual, subjective judgment to sort the applications they were assigned, and the vast majority of flagged applications contained indications of significant political campaign intervention. TIGTA at 10.

was made, the criteria listed on the BOLO spreadsheet were "[o]rganizations involved with political, lobbying, or advocacy for exemption under § 501(c)(3) or 501(c)(4)." Gov't Ex. 17, BOLO Iteration History. Thus, the only way to determine whether AAOL belongs in the class — i.e., whether it was actually flagged using one of the Four Criteria — would be to ask the screening agent who reviewed their application if he relied on any of the Four Criteria. This problem is not unique to AAOL — it is present for every member of the class. As a result, the Court would have to perform highly individualized assessments to determine the membership of the Proposed Class. *See Schumacher v. State Auto. Mut. Ins. Co.*, No. 1:13-CV-00232, 2015 WL 421688, at *4 (S.D. Ohio Feb. 2, 2015); *see also Crosby v. Soc. Sec. Admin.*, 796 F.2d 576, 579–80 (1st Cir.1986) (holding that class failed to satisfy Rule 23 because class members were impossible to identify without "individualized fact-finding and litigation").[24] Accordingly, the class is not ascertainable, and the Court should refuse to grant Plaintiffs' motion.

### B. Plaintiffs failed to affirmatively demonstrate adequacy.

Plaintiffs conclusively state that their interests are "coextensive with the class," that they "have no conflicts of interest," and that they are "committed to the vigorous prosecution of this lawsuit." Dkt. 193-1, Page ID 4706. However, as shown by the quotes from Plaintiffs' depositions compiled in the Appendix, these issues are far from resolved. Several Plaintiffs lack basic knowledge of their claims and a basic understanding of the duties of a class representative. In addition, Plaintiffs have ceded control over the litigation to counsel to a degree that may impair the due process rights of absent class members.[25] These examples reveal a group of class representatives disinterested in the particulars of the lawsuit, ignorant of basic information, and ill-equipped to

---

[24] The same concern would apply to notice. In the words of Opposing Counsel Finney, "a lot of these tea parties sprung up overnight and disappeared overnight." Transcript of Hearing, March 24, 2015, at 30-31, above-captioned case. Thus, an individual inquiry may be necessary to determine which entities still exist and who, if anyone, is the proper person to receive notice on their behalf.

[25] There is also a question as to the the role of Citizens for Self Governance, who Plaintiffs describe as a mere funder, given that it has publically claimed is it responsible for and is directing this class action.

protect the interests of absent class members. The United States has moved to compel discovery that will directly relate to these adequacy issues, as well as to several other requirements under Rule 23. If granted, the government will be better able to address the adequacy prong.

Additionally, NorCal cannot adequately represent the Subclass, because it never provided *information* in response to any of the alleged unnecessary requests. Although asked for donor names and whether officers or members are running for public office, NorCal refused to provide the names of its donors and simply wrote "none" in response to the other request. Gov't Ex. 9, NorCal Tr. 36:16-37:4; Gov't Ex. 5, IRS_NorCalTeaPrty000169. As NorCal is not even a member of the Subclass, it follows that it cannot adequately represent the Subclass, no matter how "committed to the vigorous prosecuting of this lawsuit" it may be.

### C. Because the Subclass concerns responses to seven unique information requests, it fails to satisfy typicality.

Plaintiffs define the Subclass as the 37 entities who submitted information in response to one or more of the Seven Requests. However, each of these entities responded to a different request or set of requests, with no request common to all 37 entities. *See* Section III, *supra*. Thus, the Subclass is better viewed as seven distinct groups. However, as Plaintiffs have not alleged the number of organizations that provided information in response to each request, Plaintiffs seem to be attempting to aggregate the responses to the Seven Requests in order to avoid application of the numerosity requirement.

### D. Privacy considerations and the existence of multiple other suits show that a class action is inferior to other methods of resolving the controversy.

There are at least two reasons that a class action is not the superior form of adjudication for this dispute. First, a number of other groups have already brought their own unlawful inspection claims based on the same events alleged here. Second, the privacy interests of each class member strongly counsel against class certification.

To determine whether a class action is superior to a series of individual lawsuits, courts must consider "the extent and nature of any litigation concerning the controversy already begun by or against the class members." Fed. R. Civ. P. 23(b)(3)(B). Here, at least 42 other groups have already brought their own individual claims alleging a violation of § 6103. *See Linchpins of Liberty v. United States*, 71 F.Supp.3d 236 (D.D.C. 2014); *True the Vote, Inc. v. IRS*, 71 F.Supp.3d 219 (D.D.C. 2014). Given the existence of these lawsuits, there can be no argument that a class action is necessary because the costs of litigation will deter other groups from bringing their own individual suits. If anything, the presence of these individual suits — brought by a significant segment of the putative class — demonstrates that there is no need for the Court to expend "the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court." 6A Fed. Proc., L. Ed. § 12:226.

The large number of individual suits also underscores an important point about "the class members' interests in individually controlling the prosecution . . . of separate actions." Fed. R. Civ. P. 23(b)(3)(A). In this case, that control extends to who will have access to their return information. If the Court certifies this class action, Plaintiffs' attorneys will likely request private taxpayer information under the exception set forth in § 6103(h)(4)(A), which permits the disclosure of this information when the taxpayer is a party. Thus, even if these groups do not consent to participate in this lawsuit, their very private information may be subject to disclosure.[26] And while the opt-out mechanism for class actions under Rule 23(b)(3) might allow some of those groups to protect their information, this mechanism is hardly foolproof, and there is a high likelihood that some groups will have private information disclosed against their will. To allay these concerns, the Court should take the safer course of action and decline to certify this class action; to the extent there are other groups

---

[26] It is a question of first impression whether § 6103(h)(4)(A) would permit the disclosure of taxpayer information from absent class members in a class action lawsuit. The United States' position is that it does not.

that wish to participate, they may simply opt *in* to the lawsuit via the federal rule for permissive joinder. *See* Fed. R. Civ. P. 20 (permissive joinder).

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny Plaintiffs' Motion for Class Certification.

DATED: August 31, 2015            Respectfully submitted,
CAROLINE D. CIRAOLO
Acting Assistant Attorney General
Tax Division

s/ Joseph A. Sergi
JOSEPH A. SERGI (DC 480837)
Senior Litigation Counsel
U.S. Department of Justice, Tax Division
555 4th Street, N.W., JCB 7207
Washington, D.C. 20001
(202) 305-0868; (202) 307-2504 (FAX)
Joseph.A.Sergi@usdoj.gov

JENNIFER D. AUCHTERLONIE (WA 29481)
LAURA C. BECKERMAN (CA 278490)
LAURA M. CONNER (VA 40388)
JEREMY N. HENDON (OR 982490)
MARISSA R. MILLER (CO 47214)
GERALD A. ROLE (IL 6198922)
Trial Attorneys
U.S. Department of Justice, Tax Division
555 4th Street, N.W.
Washington, D.C. 20001
(202) 514-2000

Of Counsel:

CARTER M. STEWART
United States Attorney
MATTHEW J. HORWITZ (OH 0082381)
Assistant United States Attorney
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
(513) 684-3711
Matthew.Horwitz@usdoj.gov

ATTORNEYS FOR THE UNITED STATES

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 31, 2015, I caused the UNITED STATES'

MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS

CERTIFICATION and attachments in the above-captioned matter to be served by filing the same

with the United States District Court for the Southern District of Ohio via the Court's CM/ECF

system, which will electronically transmit true and correct copies to all counsel of record.

/s/ Laura C. Beckerman
LAURA C. BECKERMAN

**Appendix**

Chart: Plaintiffs' Deposition Testimony Calls into Question Ability to Adequately Represent Class

**Index of Exhibits**

1. Excerpts, Permanent Subcommittee on Investigation, *IRS and TIGTA Management Failure Related to 501(c)(4) Applicants Engaged in Campaign Activity*, U.S. Senate (Sept. 5, 2014) ("PSI Report")

2. Excerpts, Treasury Inspector General for Tax Administration, *Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review*, (May 14, 2013) ("TIGTA")

3. Excerpts, Senate Finance Committee, Bipartisan Investigative Report, *The Internal Revenue Service's Processing of 501(c)(3) and 501(c)(4) Applications for Tax-Exempt Status Submitted By "Political Advocacy" Organizations from 2010-2013* (Aug. 5, 2015) ("SFC Report")

4. Excerpts, Treasury Inspector General for Tax Administration, *Status of Actions Taken to Improve the Processing of Tax-Exempt Applications Involving Political Campaign Intervention* (March 27, 2015)

5. Transcript, Deposition of IRS Employee Elizabeth Hofacre with Errata Sheets, March 2, 2015, (filed under seal)

6. Transcript, Deposition of IRS Employee Ronald Bell with Errata Sheet, March 3, 2015, (filed under seal)

7. Excerpts, Plaintiffs AAOL, San Angelo, and SD Citizens IRS Application Files

8. Email from Plaintiffs' Counsel Edward Greim, dated April 8, 2015

9. Transcript, 30(b)(6) Deposition of NorCal Tea Party Patriots, April 7, 2015

10. Transcript, 30(b)(6) Deposition of San Angelo Tea Party, May 1, 2015

11. Transcript, 30(b)(6) Deposition of Americans Against Oppressive Laws, April 23, 2015

12. Transcript, 30(b)(6) Deposition of South Dakota Citizens for Liberty, April 28, 2015

13. Transcript, 30(b)(6) Deposition of Texas Patriots Tea Party (aka We the People of Texas), April 15, 2015

14. IRS EO, Revenue Agent Position Description, GS-0512-09

15. IRS EO, Tax Law Specialist Position Description, GS-0987-11

16. Spreadsheet of Cases Screened by Goehausen with Original 10 Plaintiffs' Information Unredacted, dated November 16, 2011, produced as USA_NorCAL_RFP_0009463-475

17. BOLO Iteration History, dated April 30, 2012, produced as USA_NorCAL_RFP_0011683-684

18. Email dated April 25, 2012 and Attached Spreadsheet, produced as USA_NorCAL_RFP_0011234-243