# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

NorCal Tea Party Patriots, *et al.*,

        Plaintiffs,                               Case No.  1:13cv341

        v.                                     Judge Michael R. Barrett

Internal Revenue Service, *et al.*,

        Defendants.

## OPINION & ORDER

This matter is before the Court on the Government's Motion for Partial Summary Judgment (Doc. 212) and Plaintiff Texas Patriots Tea Party's Motion for Preliminary Injunction (Doc. 237).  After these motions were fully briefed, Plaintiff filed Notices of Supplemental Authority (Docs. 267, 288), to which the Government responded (Doc. 290).

Also before the Court is Plaintiff's Notice of Intention to Supplement Motion for Preliminary Injunction (Doc. 292); the Government's Motion to Strike, or in the Alternative Response to, Plaintiff's Notice of Intention to Supplement Motion for Preliminary Injunction (Doc. 293); Plaintiff's Response to the Government's Motion to Strike (Doc. 294); and the Government's Reply (Doc. 295).

Plaintiff Texas Patriots Tea Party ("TPTP") joined with nine other self-described "dissenting groups"—groups that oppose the policies of the current presidential administration—to file suit against the Government for violating their statutory and constitutional rights in the processing of their applications for tax exemption.  Plaintiffs

allege that the Internal Revenue Service ("IRS") subjected their applications to heightened scrutiny and unnecessary delays because of the groups' political viewpoints, specifically because their group names included terms such as "Tea Party," "Patriots," or "9/12 Project" or because their group focuses included issues such as government spending.

The pending motions are addressed solely to Count II of the Second Amended Complaint. In Count II, TPTP seeks declaratory and injunctive relief against the Government for violating its First and Fifth Amendment rights in the processing of its application for tax exemption. (Doc. 71 at PageID 1038, 1044–45.) TPTP is the only Plaintiff with a Count II claim remaining because it is the only named Plaintiff whose application for tax exemption still is pending before the IRS.[1] Initially, the IRS placed TPTP's application on a "litigation hold" during the pendency of the lawsuit. However, by letter dated August 16, 2016, the Government informed TPTP that the IRS has decided it will process TPTP's application. (Doc. 288-2.) The Government seeks summary judgment on Count II on the grounds that TPTP lacks standing and that its constitutional claim is moot. The Government asserts that the IRS has stopped using the application review procedures that gave rise to the allegations that it discriminated against the dissenting groups based on their political viewpoints. In its supplemental brief, the Government maintains that the request for injunctive relief is now moot for an additional reason. The Government explains that the relief sought by TPTP is now occurring because the IRS has decided to begin processing TPTP's application. (Doc. 293-1 at PageID 9817.) The Government argues that there is no further controversy for

---

[1]As explained in Section I(B) *infra*, Plaintiffs did not seek to certify a class in regards to Count II.

the Court to resolve. TPTP, for its part, opposes summary judgment and explains that even if the IRS has begun to process TPTP's application, injunctive relief is necessary to protect TPTP's rights during the application process.

For the reasons that follow, the Court will **GRANT** the Government's Motion to Strike, or in the Alternative Response to, Plaintiff's Notice of Intention to Supplement Motion for Preliminary Injunction (Doc. 293) to the extent that it seeks to respond to Plaintiff's Notice of Intention to Supplement Motion for Preliminary Injunction; **DENY** the Government's Motion for Partial Summary Judgment and **GRANT** TPTP's Motion for Preliminary Injunction.

## I.     PROCEDURAL HISTORY

## A.     Governmental Investigations

The allegations that underlie this lawsuit—allegations that the IRS discriminated against dissenting groups when processing their application for tax-exempt status based on the groups' political viewpoints—were the subject of investigations by the Treasury Inspector General for Tax Administration ("TIGTA"), the Senate Finance Committee, and the Senate Permanent Subcommittee on Investigations for the Committee on Homeland Security and Governmental Affairs ("Senate PSI"). TIGTA issued its initial report on May 14, 2013 and a supplemental report on March 27, 2015. (Docs. 71-1, 244-7.) The Senate Finance Committee issued its report on August 5, 2015. (Doc. 197-5.) The Senate PSI issued its report on September 5, 2014. (Doc. 197-3.)

## B.    Current Litigation

Plaintiffs initiated this suit on May 20, 2013 and filed their Second Amended Class Action Complaint on January 23, 2014.  (Docs. 1, 71.)[2]  Plaintiffs sued four sets of defendants: (1) the Government, consisting of the United States of America, the IRS, and IRS employees sued in their official capacities; (2) Management Defendants of the IRS sued in their individual capacities; (3) Line-Level Employees of the IRS sued in their individual capacities; and (4) Carter Hull, an IRS attorney sued in his individual capacity. The Management Defendants, the Line-Level Employee Defendants, and Hull are collectively referred to as the Individual Defendants.  Plaintiffs asserted three causes of action in the Second Amended Complaint:

(Count I) Violation of the Privacy Act, 5 U.S.C. § 552;
(Count II) Violations of the First and Fifth Amendments to the United States Constitution; and
(Count III) Violation of 26 U.S.C. § 6103, a statute which protects the confidentiality of tax return information.

(Doc. 71 at PageID 1032–46.)

Defendants moved to dismiss all three claims.  (Docs. 73, 77, 78, and 79.)  In its July 17, 2014 Order, the Court dismissed all claims against the Individual Defendants and dismissed Count I against the Government.  (Doc. 102 at PageID 1678.)  Counts II and III against the Government remain.  The parties then proceeded with discovery on

---

[2]The named Plaintiffs in the Second Amended Class Action Complaint included NorCal Tea Party Patriots, South Dakota Citizens for Liberty, Inc., Texas Patriots Tea Party, Americans against Oppressive Laws, Inc., San Angelo Tea Party, Texas Public Policy Foundation, Simi Valley Moorpark Tea Party, Prescott Tea Party, Tampa 912 Project, and Faith and Freedom Coalition of Ohio.

class certification. Four Plaintiffs were dismissed from this lawsuit by agreement of the parties on July 7, 2015. (Doc. 184.)[3]

On July 31, 2015, Plaintiffs moved for class certification as to Count III only. (Doc. 191.) While the class certification motion was still pending, the Government filed the pending Motion for Partial Summary Judgment as to Counts II and III. (Doc. 212.) Plaintiffs responded that summary judgment was premature as to Count III because merits discovery had not been completed, but they agreed that the Court could adjudicate whether the Government was entitled to summary judgment on Count II without further discovery. (Doc. 214 at PageID 8226–29.) On January 12, 2016, the Court issued an Order certifying a Principal Class and an Unnecessary Requests Subclass as to Count III. (Doc. 223/228.) That same day, the Court issued an Order striking the Motion for Partial Summary Judgment as to Count III as premature, but allowing full briefing on the Motion for Partial Summary Judgment on Count II. (Doc. 225 at PageID 8440.)

On February 16, 2016, TPTP filed its brief in opposition to the Motion for Partial Summary Judgment as to Count II. (Doc. 230.) Four days later, TPTP filed its Motion for Preliminary Injunction. (Doc. 237.) Both motions were fully briefed and ripe for adjudication when the D.C. Circuit Court of Appeals issued its decision in *True the Vote, Inc. v. Internal Revenue Serv.*, 831 F.3d 551 (D.C. Cir. 2016). This decision, which presented issues similar to those addressed in the Motion for Partial Summary Judgment and Motion for Preliminary Injunction, spurred a round of supplemental briefing, including Plaintiff's Notice of Intention to Supplement Motion for Preliminary

---

[3]The voluntarily dismissed Plaintiffs were Simi Valley Moorpark Tea Party, Prescott Tea Party, Tampa 912 Project, and Faith and Freedom Coalition of Ohio.

Injunction (Doc. 292) and the Government's Motion to Strike, or in the Alternative Response to, Plaintiffs' Notice of Intention to Supplement Motion for Preliminary Injunction (Doc. 293).[4]

## II.   FACTUAL HISTORY

### A.   Section 501(c)(4) Tax Exemption Applications

The Internal Revenue Code allows tax-exempt status to be provided to "[c]ivic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare."   26 U.S.C. § 501(c)(4)(A).   An organization is operated exclusively for the promotion of social welfare if it is "primarily engaged in promoting in some way the common good and general welfare of the people of the community."   26 C.F.R. § 1.501(c)(4)-1(a)(2)(i).   "The promotion of social welfare does not include direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office."   26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii). Section 501(c)(4) organizations can engage in limited political activity, but political activity cannot be the primary activity of the organization.

The Exempt Organizations Determinations Unit ("EO Determinations") within the IRS is the unit responsible for processing and reviewing applications for tax-exempt status.   (Doc. 233-1 at PageID 8585.)   The Exempt Organizations Technical Unit ("EO Technical") provides assistance to other IRS offices, including EO Determinations, on issues involving exempt organizations.   (*Id.*)

Applications for tax exemption are reviewed initially by an EO agent in the role of a screener.   (Cooper Decl., Doc. 212-4 at PageID 7868; Doc. 193-13 at PageID 4941.)

---

[4]While Plaintiffs notified the Court that they intended to supplement their Motion for Preliminary Injunction, the Court finds that such a supplemental filing is unnecessary due to the extensive briefing of the parties.

The Government states that the screener can make three initial decisions: (1) approve the application; (2) determine that the application requires minor additional information; or (3) determine that the application requires more development. (*Id.*) However, the IRS Rule 30(b)(6) deponent stated that the screener can make one of five different initial decisions: (1) approve the application; (2) determine that the application is incomplete; (3) determine that minor additional information is needed; (4) determine that the application requires full development; or (5) assign the application for a secondary screening. (IRS Dep., Doc. 194-4 at PageID 5630–31.) In January 2013, the IRS stated on its website that approvals or requests for additional information from the first three categories ordinarily would be sent out within 90 days of the receipt of the application. (Doc. 248-1 at PageID 9135.) The IRS stated that at that time there was an approximately nine-month wait to hear a response from the IRS for applications that needed full development. (*Id.*)

Applications that involve certain technical or complex topics can receive secondary screenings. (IRS Dep., Doc. 194-4 at PageID 5621.) Such cases are "centralized" in specialty groups to "approach cases in a uniform way to promote consistency and quality." (2013 TIGTA Report Appendix, Doc. 71-1 at PageID 1103; Senate PSI Report, Doc. 197-3 at PageID 7004.) The specialty groups ordinarily make determinations on applications on a first-in, first-out basis. (IRS Dep., Doc. 194-4 at PageID 5621–22.)

**B.     IRS Segregation of Certain Applications Based of Political Advocacy**

After the Supreme Court issued the decision of *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), the IRS became concerned about the

potential for increased political spending and activity by § 501(c)(4) organizations. (Senate Finance Report, 197-5 at PageID 7098–99; Senate PSI Report, Doc. 197-3 at PageID 6996–97.)  The Senate PSI Report explained as follows:

> **Increased 501(c)(4) Campaign Involvement.** Since the 2010 <u>Citizens United</u> decision, it has become common for a Super PAC to have an affiliated 501(c)(4) organization which, under the tax code, can accept unlimited contributions from all types of donors, including businesses, unions, and individuals, and can engage in campaign activity as long as it is not the organization's primary activity.  In addition, unlike Super PACs, 501(c)(4) organizations are not legally obligated to publicly disclose the names of their donors or the amounts of the donations, although all donations over $5,000 must be reported confidentially to the IRS on Schedule B of their annual 990 tax returns.  The ability of 501(c)(4) groups to keep donor information confidential has, in some cases, made those groups attractive to donors interested in financing campaign activities without publicly disclosing their identities.  Some 501(c)(4) organizations have used confidential donations to directly fund campaign activities.  Others have contributed donated funds to other 501(c)(4) organizations, Super PACS, or other political organizations involved with campaign activities, without disclosing the names of the donors who originated the funds.
>
> * * *
>
> According to the IRS, from 2010 to 2012, the number of applications filed to obtain 501(c)(4) status nearly doubled, from about 1,700 in 2010, to more than 3,300 in 2012.  In addition, from 2008 to 2010, the same year the <u>Citizens United</u> decision was issued, the number of 501(c)(4) groups reporting campaign activities to the IRS doubled, while the amount of campaign-related expenditures during that period almost tripled.  The IRS also reported that while all 990 tax returns for 2012 were not yet in, "large 501(c)(4)s with political campaign activities expenditures in TY 2010 reported a large increase in spending to the FEC between 2010 and 2012."  At the same time, the IRS reported receiving "numerous referrals from the public, media, watchdog groups, and members of Congress alleging that specific section 501(c)(4) organizations were engaged in political campaign activity to an impermissible extent."

(Doc. 197-3 at PageID 6997–98 (citations and footnotes omitted).)

In 2010, EO Determinations flagged a "Tea Party" group application for the first time on the grounds that it was a "high profile" case.  (Doc. 244-1 at PageID 8815.)  The

application was elevated to the EO Determinations program manager and then sent to EO Technical in Washington D.C. as a "test case." (*Id.* at PageID 8815–16). Thereafter, the EO Determinations screening group began to screen for other Tea Party cases. By April 5, 2010, the screening group had collected eighteen cases and began tracking them in a spreadsheet. (*Id.* at PageID 8816.)

The EO Determinations screening group developed sets of criteria for identifying and flagging applications raising political advocacy concerns. The criteria changed over time. (Doc. 244-1 at PageID at PageID 8817; 2013 TIGTA Report, Doc. 71-1 at PageID 1090.)[5] EO Determinations developed listings known as the "Be on the Look Out" listings, or "BOLO" listings, which included the emerging issue of the Tea Party cases.

---

[5]The 2013 TIGTA Report identified the following criteria changes:

March–April 2010: The EO Determinations Unit began searching for other requests for tax exemption involving the Tea Party, Patriots, 9/12, and I.R.C. § 501(c)(4) applications involving political sounding names, *e.g.*, "We the People" or "Take Back the Country."

July 2010: Determinations Unit management requested its specialists to be on the lookout for Tea Party applications.

August 2010: First BOLO ["be on the lookout"] listing issued with criteria listed as "…various local organizations in the Tea Party movement…applying for exemption under 501(c)(3) or 501(c)(4)."

July 2011: Criteria changed to "Organizations involved with political, lobbying, or advocacy for exemption under 501(c)(3) or 501(c)(4)" based on the concerns the Director, EO, raised in June 2011.

January 2012: Criteria changed to "Political action type organizations involved in limiting/expanding government, educating on the constitution and bill of rights, social economic reform/movement" based on Determinations Unit concerns that the July 2011 criteria was too generic.

May 2012: Criteria changed to "501(c)(3), 501(c)(4), 501(c)(5), and 501(c)(6) organizations with indicators of significant amounts of political campaign intervention (raising questions as to exempt purpose and/or excess private benefit)."

(2013 TIGTA Report, Doc. 71-1 at PageID 1090.)

(2013 TIGTA Report, Doc. 71-1 at PageID 1066.)  The BOLO listings were used to identify relevant issues, but screeners used their own judgment to apply the BOLO listings to the applications.  (Doc. 244-1 at PageID 8823–24.)

Beginning in June 2010, the cases meeting the political advocacy criteria were centralized and assigned to Elizabeth Hofacre, an EO Determinations specialist in Group 7822, who was sometimes referred to as the Tea Party Coordinator.  (Doc. 244-1 at PageID 8819.)  Hofacre conducted secondary screenings of the segregated applications to ensure that they met the criteria.  (*Id.*)  At least one IRS employee has testified that applications that met the definition for a Tea Party case were segregated for centralized coordination even if the applications otherwise warranted approval for tax exemption status after the initial screening.  (Thomas Dep., Doc. 194-8 at PageID 6002.)  On July 28, 2010 the screening group held a screening workshop.  (Doc. 244-1 at PageID 8820.)  Notes from the workshop indicate that different EO Determinations members did not agree as to whether both liberal and conservative groups' applications were segregated using the political advocacy criteria.  (Doc. 194-44 at PageID 6691–93.)

Ronald Bell became the new Tea Party Coordinator replacing Hofacre in November 2010.  Bell was told by his manager to hold the cases meeting the political advocacy criteria.  (Doc. 244-1 at PageID 8822.)  He also performed secondary screenings of segregated applications.  (*Id.* at PageID 8823.)  Stephen Seok took over the Tea Party Coordinator role in November 2011.  (*Id.* at PageID 8828.)  Seok noted that there were 172 cases meeting the political advocacy criteria, including 125 cases for § 501(c)(4) applications, on December 16, 2011.  (Doc. 244-1 at PageID 8828.)

Beginning in November 2011, Hilary Goehausen, a tax law specialist with EO Technical, began a "triage" of the Tea Party cases to determine which cases could be closed. (Doc. 244-1 at PageID 8829.) At least 160 applications received a third screening by Goehausen. (2013 TIGTA Report, Doc. 71-1 at PageID 1096–97; IRS Dep., Doc. 194-4 at PageID 5668; Doc. 197-18 at PageID 7424–36.)

In May 2012, the IRS changed the political advocacy criteria on the BOLO listings to "501(c)(3), 501(c)(4), 501(c)(5), and 501(c)(6) organizations with indicators of significant amounts of political campaign intervention (raising questions as to exempt purpose and/or excess private benefit)." (2013 TIGTA Report, Doc. 71-1 at PageID 1101.)

Also in May 2012, EO Determination agents met in Cincinnati and developed a "bucketing" process to address the backlog of tax exemption applications from groups that had been segregated for special review using the political advocacy criteria. (Doc. 244-1 at PageID 8838; Senate PSI Report, Doc. 197-3 at PageID 6978, 7036–37; Doc. 233-1 at PageID 8593 n.2.) Bucketing involved dividing the cases into categories for more efficient processing: "Bucket 1 – favorable decision on the application likely; Bucket 2 – minor information needed; Bucket 3 – more development needed; and Bucket 4 – denial of application likely." (Senate PSI Report, Doc. 197-3 at PageID 7037–38.) IRS employees had identified 298 applications for special processing by May 2012. (2013 TIGTA Report, Doc. 71-1 at PageID 1070, 1084.) A total of 282 groups were bucketed by June 8, 2012. (Doc. 244-1 at PageID 8838.) By December 2012, 102 groups had been granted tax-exempt status. (*Id.*)

TIGTA issued its initial report on May 14, 2013. (TIGTA Report, Doc. 71-1.) TIGTA found that the IRS had used "inappropriate criteria that identified for review Tea Party and other organizations applying for tax-exempt status based upon their names or policy positions instead of [upon] indications of potential political campaign intervention." (*Id.* at PageID 1056, 1066–67.) TIGTA noted that the May 2012 criteria wording-change to "organizations with indicators of significant amounts of political campaign intervention" had "more clearly focus[ed] on activities permitted under the Treasury Regulation." (*Id.* at PageID 1067.) TIGTA included nine specific recommendations for improving the IRS's application-review processes. (*Id.* at PageID 1070–71, 1076–77, 1081.)

The IRS took steps to implement the 2013 TIGTA Report recommendations. Significantly, in June 2013, the IRS suspended "the use of the BOLO listings and other listing used to identify cases or issues (including emerging issues) for further review." (2015 TIGTA Report, Doc. 244-7 at PageID 8860; Doc. 233-1 at PageID 8605.) TIGTA issued a follow-up report in March 2015. TIGTA concluded that the IRS had "substantially changed its procedures for processing applications for tax-exempt status" and had addressed TIGTA's concern that "only applications with indications of significant political campaign intervention should be worked as potential political cases and the basis for selection should be clearly documented in the file." (2015 TIGTA Report, Doc. 244-7 at PageID 8862.) TIGTA also found that the IRS had "developed and provided extensive political campaign intervention training" which addressed the following topics:

> 1) the use of activities, instead of names and policy positions, to identify applications for further review, 2) what constitutes political campaign

> intervention versus general advocacy, [and] 3) the type of additional information that should be requested and the appropriate wording of questions in additional information request letters . . . .

(*Id.* at PageID 8865.)  However, TIGTA also found that the IRS still needed to improve the timeliness of the training and the monitoring of attendance at the training.  (*Id.* at PageID 8865–66.)  As of June 25, 2015, eight of the original 298 groups analyzed in the 2013 TIGTA Report had applications for tax exemption pending before the IRS.  (Doc. 244-1 at PageID 8810.)

The Senate Finance Committee and the Senate PSI also issued reports on the alleged IRS targeting of Tea Party groups.  The Senate PSI, like TIGTA, concluded that the IRS had used inappropriate screening criteria "based on the applicants' names or political views[,]" but found the criteria were the result of "poor judgment" and not "political bias."  (Senate PSI Report, Doc. 197-3 at PageID 6976.)  The Senate PSI found that both conservative groups and liberal groups had been subjected to heightened scrutiny using the political advocacy criteria, but that "from 2010 to mid-2013, more conservative groups than liberal groups applied for tax exempt status, underwent IRS scrutiny, and ultimately won tax exempt status."  (Senate PSI Report, Doc. 197-3 at PageID 6978.)  However, the Minority Staff Dissenting Views in the Senate PSI Report stated that political advocacy criteria "were designed to scrutinize conservative applicants" more than liberal groups.  (Senate PSI Report, Minority Staff, https://www.gpo.gov/fdsys/granule/CPRT-113SPRT89800/CPRT-113SPRT89800/content-detail.html, at 233.)  Likewise, the bipartisan Senate Finance Committee Report issued on August 5, 2015 concluded that during the 2010–2011 time period, "every incoming application from a Tea Party or related conservative

organization was sent to Group 7822 for further review—whether or not it reflected potential political campaign intervention—which ultimately resulted in heightened scrutiny and extended delays." (Senate Finance Report, Doc. 197-5 at PageID 7087.) The Senate Finance Committee blamed the procedure on mismanagement by IRS management officials. (*Id.* at PageID 7084.)

## C. TPTP's Application

TPTP submitted an application for tax-exempt status under 26 U.S.C. § 501(c)(4) in June 2012, and it was received by the IRS on June 18, 2012. (Doc. 233-1 at PageID 8601.)[6] Cara D. Franczak, an EO agent, screened the application on September 14, 2012. (*Id.*) Franczak indicated on a draft screening checklist dated September 14, 2012 that the application fell within screening categories of "Political Issues—Sensitive Issues" and "Other Issues discussed w/Manager [*sic*]—Specify issue: TEA PARTY." (Doc. 212-11 at PageID 8137.) The IRS has admitted in discovery that it segregated TPTP's application because the IRS classified it as a Tea Party case. (IRS Dep., Doc. 194-4 at PageID 5666.)

EO Agents Joseph Herr and Mitch Steel reviewed TPTP's application as part of the "bucketing" process in October 2012. (Doc. 233-1 at PageID 8602.) They completed three separate bucketing worksheets noting on two worksheets that it was not clear if TPTP was involved in political campaign intervention activities. (Doc. 212-11 at PageID 8141, 8144.) Steele noted on one worksheet that TPTP's website had a link to a political action committee formed by TPTP. (*Id.* at 8141.) Herr's and Steele's final recommendation was for "General Development." (*Id.* at PageID 8138.)

---

[6]TPTP listed its name on the application as "We the People of Texas, Inc. d.b.a. Texas Patriots Tea Party." (Doc. 212-11 at PageID 8129.)

EO Specialist Janine L. Estes sent letters to TPTP in or about January 2013 and February 2013 requesting further information. (Doc. 233-1 at PageID 8602; Doc. 212-11 at PageID 8116, 8119.)[7] Estes asked TPTP, in part, for information concerning TPTP's relationship with "We the People of Texas PAC" discussed on TPTP's website. (*Id.*) TPTP responded to the two requests for information on January 24, 2013 and March 8, 2013, respectively. (Doc. 233-1 at PageID 8602.)

On June 26, 2013, TPTP received notice from the IRS that it was eligible to participate in an optional expedited review program. (Doc. 233-1 at PageID 8602–603.) The letter stated in part as follows:

> The IRS is instituting an optional expedited process for certain organizations applying for recognition of exemption under Section 501(c)(4) whose applications have been pending with the IRS for more than 120 days as of May 28, 2013. Organizations can make representations to the IRS under penalties of perjury regarding their past, current, and future activities and receive a determination letter based on those representations.
>
> If you choose to apply for this expedited process, complete and return pages 5-7, *Representations and Specific Instructions.* We will send you a favorable determination letter within 2 weeks of receipt of the signed representations.

(Doc. 212-11 at PageID 8120.) To receive approval for tax-exempt status under the expedited review program, TPTP was required to swear under penalty of perjury that it has spent and anticipates that it will spend less than 40% of "*both* the organization's total expenditures *and* its total time (measured by employee and volunteer hours) on direct or indirect participation or intervention in any political campaign on behalf of (or in opposition to) any candidate for public office." (*Id.* at PageID 8124.)

---

[7]The requests for information did not contain any of the "Unnecesssary Requests" which form the basis for the Unnecessary Requests Subclass in regards to Count III of the Second Amended Class Action Complaint.

TPTP was not a named plaintiff in this lawsuit when it received the optional expedited review program letter.  Rather, TPTP joined this lawsuit when Plaintiffs filed the [First] Amended Class Action Complaint on August 5, 2013.  (Doc. 14.)  TPTP implicitly declined to participate in the expedited review program in a September 12, 2013 letter from Plaintiffs' counsel to the Department of Justice.  (Doc. 233-2 at PageID 8621–22.)  Plaintiffs' counsel explained why its clients would not make the "representations" required for approval under the expedited review process:

> These "representations" would have exacted a stiff price from the groups in exchange for the expedited determination.  For example, in at least some respects, they would have required groups to silence their core political speech and expressive activity by following guidelines that are even more restrictive than some of the limitations previously endorsed by the IRS (including, for example, the limitations discussed in Revenue Ruling 2007-041).  Groups would then have been subject to audit to ensure their compliance with the more restrictive standards of conduct demanded by the representations.  Further, many groups would have been required to self-report changes in their activities that caused the representations to be untrue, even in cases where the organization's new mix of activities would nonetheless have allowed the entities to retain their recognition.
>
> In short, the letters would have had the effect of requiring applicants to surrender a portion of their legal claims in exchange for a benefit—an expedited determination with many strings attached—of dubious value.

(*Id.*)

## D.    IRS Stops Processing TPTP's Application During this Litigation

TPTP's application remains pending.  Casey Lothamer, an IRS branch chief, stated in an affidavit that the IRS "does not ordinarily issue a determination on exempt status when an issue involving an organization's tax exempt status under § 501 or § 521 is pending in litigation."  (Doc. 212-12 at PageID 8146–47; *see also* IRS Revenue Procedure 2014-9 § 4.04.)    Lothamer further stated that the IRS suspended the

processing of applications from this case when the processing would have required the IRS to interact with the plaintiff group.  (Doc. 212-12 at PageID 8147.)

The Government also contends that it stopped processing TPTP's application to protect its agents.  On May 14, 2013, while the IRS actively was processing TPTP's application, it received a letter from the treasurer of TPTP.  The letter stated as follows:

> It appears you are in trouble, according to the news reports, so I urge you to approve our application for 501(c)(4) status immediately, while you are still employed and have the power to do so.
>
> We have not received any communication from you since your letter of February 12, 2013.  You have had plenty of time to make your decision.  I have added our concerns to the Tea Party Patriots for additional input for their pending lawsuit on behalf of all tea party groups around the nation.

(Doc. 244-4 at PageID 8846.)  The Government argues that requiring IRS employees to process TPTP's application might result in the employees being targeted as individual-capacity defendants in this litigation.

Finally, the Government contends that it was complying with a "cease and desist" instruction in the September 12, 2013 letter from Plaintiffs' counsel to the Department of Justice.  Plaintiffs' counsel alleged in the so-called cease and desist letter that the IRS's follow-up communications with a represented party, the Tea Party Patriots, "could be viewed as additional discrimination of the very type that underlies the lawsuit itself." (Doc. 230-2 at PageID 8554.)  Plaintiffs' counsel requested in the letter, in part, as follows:

> [W]e request that the IRS cease and desist from any further communications with putative class members who are awaiting recognition of their exempt status, where such communications: (1) offer groups complete or limited relief in exchange for "representations," disclosures, or promises about groups' past, present, or future political speech or expressive conduct; or (2) demand additional or updated data

or information, purportedly to enable the IRS to extend, prolong, or conclude its scrutiny of groups' political speech and expressive conduct.

(*Id.*)  The Government understood Plaintiffs to be asking the IRS to stop processing TPTP's application and it communicated its understanding to Plaintiffs' counsel in a September 16, 2013 letter.  (Doc. 245-3 at PageID 8955.)

Nineteen months later, the Government was told that its purported understanding was incorrect.  The Government took the Rule 30(b)(6) deposition of TPTP on April 15, 2015.  TPTP requested during the deposition that the IRS process its application despite the fact that the lawsuit was pending.  (TPTP Dep., Doc. 197-15 at PageID 7392.)  The IRS continued to delay the processing after this explicit request.

Five months after the deposition, during a September 24, 2015 court conference, the Government reiterated its position that Plaintiffs' counsel had instructed them to stop processing TPTP's application.  (Tr., Doc. 210 at PageID 7744).  Plaintiffs' counsel responded that the purpose of the cease and desist letter was to have the Government direct all communications with TPTP through counsel, not to stop the processing of tax-exempt applications.  (*Id.* at PageID 7748–49.)  Plaintiffs' counsel requested at the conference that the IRS process TPTP's application.  (*Id.* at PageID 7749.)  However, the IRS continued to delay processing the application after the conference.

**E.    IRS Decision to Process TPTP's Application**

By letter dated August 16, 2016, the Government notified Plaintiffs that the IRS decided it will process TPTP's application.  (Doc. 288-2.)  On September 12, 2016, the Government explained that the decision was in response to criticism of the "litigation hold" policy by the Court of Appeals for the District of Columbia in *True the Vote, Inc. v. Internal Revenue Serv.*, 831 F.3d 551 (D.C. Cir. 2016).  (Doc. 294-1.)  The Government

also clarified that "TPTP's application will be processed in the ordinary course and TPTP will be treated like any other entity that appl[ies] for tax exempt status, except that correspondence will be sent through counsel as a result of the ongoing litigation." (Id.)

## III. ANALYSIS

The Motion for Partial Summary Judgment and the Motion for Preliminary Injunction raise overlapping issues. Did the IRS subject TPTP to viewpoint discrimination in the manner in which it has processed TPTP's § 501(c)(4) application for tax-exempt status and is that discrimination still ongoing? The Court concludes in the following analysis that TPTP has established at least a likelihood of success on the merits on those questions. The Court first will explain why granting TPTP preliminary injunctive relief to remedy the ongoing harm against TPTP is appropriate. It then will follow from that analysis why the Government is not entitled to summary judgment.

## A. Motion for Preliminary Injunction

Plaintiffs seek a preliminary injunction requiring the IRS to process TPTP's § 501(c)(4) application in the ordinary course of business. The Government responds that a preliminary injunction is neither justified nor appropriate.

### 1. Preliminary Injunction Standards

The decision whether or not to grant injunctive relief falls within the sound discretion of a district court. *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982). A preliminary injunction is an extraordinary remedy that should be granted only after consideration of the following four factors: (1) whether the movant has demonstrated a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of preliminary

injunctive relief would cause substantial harm to others; and (4) whether the public interest would be served by issuance of preliminary injunctive relief. *See Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000); *Devicor Med. Products, Inc. v. Reed*, No. 1:11CV645, 2013 WL 1315037, at *12 (S.D. Ohio Mar. 29, 2013).

A party must show more than a mere possibility of success to obtain a preliminary injunction. *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991). In general, the extent to which a party must demonstrate a substantial likelihood of success varies inversely with the degree of harm that party will suffer absent an injunction. *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 538 (6th Cir. 1978) (citation omitted). No single factor is determinative of the availability of a preliminary injunction. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985) (citation omitted). However, the failure to demonstrate the existence of an irreparable injury absent a preliminary injunction can be fatal to a motion for preliminary injunction. *See So. Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991).

### 2. Likelihood of Success on the Merits

TPTP has made a strong showing of a likelihood of success on the merits on Count II of the Second Amended Class Action Complaint. TPTP alleges that the IRS discriminated against it on the basis of its political viewpoint in the processing of its § 501(c)(4) application. TPTP has put forward evidence demonstrating that the IRS targeted TPTP's application for special scrutiny and delayed processing because it met the political advocacy criteria found to be inappropriate in the 2013 TIGTA Report. Although the IRS had changed the political advocacy criteria language in May 2012 to

focus more on political activities than on party names, an EO screener identified TPTP as a "TEA PARTY" case on the screening checklist in September 2012.  Additionally, the IRS Rule 30(b)(6) deponent admitted TPTP's application was segregated as a Tea Party case.  The IRS has held TPTP's application without further processing since June 2013 after requesting and receiving additional information from TPTP.  Processing applications "pursuant to different standards and at different rates depending upon the viewpoint of the applicants [is] a blatant violation of the First Amendment."  *Z Street v. Koskinen*, 791 F.3d 24, 32 (D.C. Cir. 2015).

The Government responds that the 2015 TIGTA Report proves that the IRS ceased using the inappropriate political advocacy criteria to target dissenting groups at the screening stage based on their political viewpoint no later than June 2013.  The Government argues that the Court should not issue an injunction to enjoin behavior which the IRS already has stopped.  However, the IRS's argument misses the mark.

Regardless of the fact the IRS purports to have stopped applying the inappropriate political advocacy criteria in 2013, the evidence is undisputed that the IRS continued to delay processing TPTP's until August of 2016.  The Government appears not to see the forest through the trees when it uses the existence of this lawsuit as grounds to continue the delay that is the subject of this lawsuit.  The evidence strongly suggests that the IRS initiated the delay because TPTP's application was perceived at the screening stage to be a Tea Party case.  The Court is not persuaded that the discriminatory animus that motivated the initial decision to segregate and delay TPTP's application can be neatly separated from the delay that now has continued for three years.  *Accord True the Vote, Inc. v. Internal Revenue Serv.*, 831 F.3d 551, 562 (D.C.

21

Cir. 2016) ("It is not at all clear why the IRS proposes that not ceasing [discriminatory conduct] becomes cessation if the victim of the conduct is litigating against it.").

Moreover, the Court is not convinced that the IRS's general litigation hold policy justifies the delay in processing TPTP's application. The Government admitted that it has discretion whether to apply the general litigation hold policy in specific cases during oral arguments in the case of *Z Street v. Koskinen*, No. 15-5010 (D.C. Cir. May 4, 2015), another case in which a tax-exemption applicant alleged viewpoint discrimination by the IRS.[8] Moreover, the litigation hold policy should arise only when an applicant's tax exemption status is at issue in the litigation. (Doc. 212-12 at PageID 8146–47; *see also* IRS Revenue Procedure 2014-9 § 4.04.) TPTP is not challenging in this suit whether it is entitled to § 501(c)(4) tax-exempt status. There is no disputed issue in this litigation which will affect the IRS's determination of whether TPTP qualifies for § 501(c)(4) status. Thus, there is no basis to stay determination of the application pending the outcome of this lawsuit.

Additionally, the Government has not proven that the so-called cease and desist letter justifies the purported litigation hold. TPTP asked the IRS to process its application during its Rule 30(b)(6) deposition, well after Plaintiffs' counsel issued the cease and desist letter. Plaintiffs' counsel later explained at a Court conference that the sole purpose of the cease and desist letter was for the IRS to direct communications regarding the processing of TPTP's application through its counsel. Yet the IRS has persisted to delay processing the application. Given these facts, TPTP has established

---

[8]A transcript of the oral argument before the Court of Appeals for the D.C. Circuit can be found on the D.C. Circuit's website.
https://www.cadc.uscourts.gov/recordings/recordings.nsf/DocsByRDate?SearchView&Query=z+street&Start=1&Count=10&SearchOrder=1&SearchWV=TRUE.

a least a likelihood of success on the merits of proving that the IRS's refusal to finish processing TPTP's § 501(c)(4) application is a continuation of the discriminatory treatment that appears to have begun when the IRS segregated the application as a Tea Party case.

Likewise, the Government has not proven that a litigation hold was necessary to protect its agents from being named as defendants in this suit.  Plaintiffs originally asserted multiple claims against IRS managerial and line-level employees in the Second Amended Class Action Complaint.  (Doc. 71.)  The Court dismissed the claims against the employees in their individual capacities in its July 17, 2014 Order.  (Doc. 102.)  It is unclear on what reasonable grounds the agents who process TPTP's application could be sued given the law of the case doctrine.  Also, the evidence that the IRS ceased using the political advocacy criteria to segregate Tea Party-type applications by June 2013 undercuts the Government's argument.  IRS agents who process an application in the ordinary course are not likely to be accused of viewpoint discrimination.  The Government's August 16, 2016 letter explaining that the IRS has decided to process TPTP's application does not alter this conclusion.  To date, the IRS has not issued a decision on the application.

Finally, the Government has not established that a preliminary injunction is inappropriate because such relief is different in kind from the relief sought in Count II of the Second Amended Class Action Complaint.  Plaintiffs state in Count II that "[t]his Court may grant declaratory and injunctive relief against the IRS and the Treasury Department . . . declaring that the Defendants' discriminatory conduct is unlawful and enjoining them from using tax exemption applicants' political viewpoints to target them

and *subject them to delay* . . . ."  (Doc. 71 at PageID 1044–45 (emphasis added).)  The injunctive relief sought in the Motion for Preliminary Injunction is not materially different. TPTP asks the Court for an ordering compelling the IRS to process TPTP's application in the ordinary course.  Such an order would require the IRS to end the three-year delay in processing.

For all these reasons, the Court concludes that Plaintiffs have established TPTP's likelihood of success on the merits on Count II of the Second Amended Class Action Complaint.

### 3.    Irreparable Harm and the Public Interest

Next, the Government argues that Plaintiffs cannot prove irreparable harm.  The Court disagrees.  The loss of First Amendment freedoms causes irreparable injury. *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014).  Additionally, the public interest lies with the protection of constitutional rights.  *Id.*

Nonetheless, the Government argues that no irreparable harm exists in this case because TPTP has an alternative statutory remedy available.  In 2015, Congress amended 26 U.S.C. § 7428 to provide a remedy for § 501(c)(4) applicants whose applications have been pending before the IRS for more than 270 days without a determination.  Previously, the remedy was available only to § 501(c)(3) applicants. Now § 501(c)(3) and § 501(c)(4) applicants can file suit in the U.S. Tax Court, the Court of Federal Claims, or the District Court for the District of Columbia for a judicial determination of their tax exemption applications if the IRS has not made a determination in 270 days.  26 U.S.C. § 7428(a)&(b).  The Government argues that

TPTP will not suffer irreparable harm absent an injunction because it can file a § 7428 suit for judicial determination of its application.

The Government made a substantially similar argument in the *Z Street* case and it was rejected by the D.C. Circuit Court of Appeals.  The D.C. Circuit Court of Appeals stated as follows:

> According to the [IRS] Commissioner, if Z Street had just waited an additional 32 days it could have filed suit under this [§ 7428] provision and obtained an "adequate remedy."  But as the Commissioner concedes, section 7428 authorizes a court to issue only "a declaration with respect to [an organization's] qualification" for a section 501(c)(3) exemption, 26 U.S.C. § 7428, and Z Street is not seeking to establish its eligibility for a tax exemption.  Instead, it seeks an order prohibiting the IRS from delaying consideration of Z Street's section 501(c)(3) application because of the organization's views on Israel.  The "only thing we're suing about," Z Street's counsel told us at oral argument, "is delay."  In other words, although section 7428 provides a remedy, that remedy cannot address Z Street's alleged injury.

*Z Street*, 791 F.3d at 31 (citations to case record omitted).  The Court agrees with the *Z Street* analysis.  TPTP is not asking the Court to declare its eligibility for a § 501(c)(4) tax exemption.  (Doc. 102 at PageID 1673.)  Instead, TPTP seeks an order prohibiting the IRS from delaying its consideration of its § 501(c)(4) application because of its political viewpoint in opposition to the current presidential administration.  It seeks for the IRS to process its application in the ordinary course of business as it would any other § 501(c)(4) applicant.  Section 7428 does not provide an adequate alternative remedy for the alleged constitutional wrongdoing.

### 4.      Preliminary Injunctive Relief

The Court concludes for the reasons stated above that Plaintiffs have established that TPTP is entitled to injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.  The Court orders the IRS to process TPTP's § 501(c)(4) application in the

ordinary course of business. The IRS shall direct all necessary communications with TPTP through Plaintiffs' counsel.

## B.    Motion for Partial Summary Judgment

Turning to the Motion for Partial Summary Judgment, the Government argues that TPTP's claim fails as a matter of law on the grounds of mootness or lack of standing. It follows from the foregoing analysis of the preliminary injunction issue that the Court does not agree.

Mootness is a jurisdictional question because the exercise of judicial power under Article III of the Constitution depends upon the existence of a live case or controversy. *Demis v. Sniezek*, 558 F.3d 508, 512 (6th Cir. 2009). "If events occur during the pendency of a litigation which render the court unable to grant the requested relief, the case becomes moot and thus falls outside our jurisdiction." *Id.* (internal quotation and citation omitted). A case is not moot so long as the parties continue to have a concrete interest in the outcome of the litigation. *Knox v. Serv. Employees Int'l Union, Loc. 1000*, 132 S. Ct. 2277, 2287 (2012) (internal quotation and citation omitted).

Standing is a related jurisdictional concept. It requires a plaintiff to satisfy three elements. "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992) (internal citations and quotation marks omitted). Second, a causal connection must exist between the injury and the conduct complained of. *Id.* In other words, the injury must be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the

26

court." *Id.* (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42 (1976)).  Third, it must be likely that the injury will be redressed by a favorable decision. *Id.*

The Government argues that the case is moot and that TPTP lacks standing because the IRS has ceased the allegedly wrongful conduct which is the basis of the Count II claim.  TIGTA concluded that the IRS discontinued using the inappropriate political advocacy criteria and the BOLO listings to screen cases by June 2013.  Plaintiffs do not offer evidence at this point to refute the TIGTA conclusion.  The cessation of wrongful conduct by a government entity can moot a case if the cessation appears genuine.  *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 981 (6th Cir. 2012).  However, in *True the Vote, Inc. v. Internal Revenue Serv.*, the D.C. Circuit Court of Appeals was not convinced that statements made by the IRS regarding the suspension of the use of the BOLO listings established that the case was moot.  831 F.3d 551, 563 (D.C. Cir. 2016).  The court explained: "A violation of right that is 'suspended until further notice' has not become the subject of voluntary cessation, with no reasonable expectation of resumption, so as to moot litigation against the violation of rights."  *Id.*  This Court agrees.  While the cessation of the use of the political advocacy criteria to screen applications did not remedy the alleged ongoing discrimination against TPTP, a preliminary injunction ordering the IRS to process TPTP's § 501(c)(4) application in the ordinary course will.  The Court concludes, therefore, that TPTP has a concrete interest in the outcome of the case, and Count II is not moot.  The Court will deny summary judgment to the Government on Count II.

IV.    **CONCLUSION**

For the foregoing reasons, the Government's Motion to Strike, or in the Alternative Response to, Plaintiff's Notice of Intention to Supplement Motion for Preliminary Injunction (Doc. 293) is **GRANTED** to the extent that it seeks to respond to Plaintiff's Notice of Intention to Supplement Motion for Preliminary Injunction; the Government's Motion for Partial Summary Judgment (Doc. 212) is **DENIED**; and the Texas Patriots Tea Party's Motion for Preliminary Injunction (Doc. 237) is **GRANTED**.

The Court orders the IRS to process TPTP's § 501(c)(4) application in the ordinary course of business, directing all necessary communications and requests for additional information to TPTP's legal counsel.  The risk of harm to the IRS if this injunction is overturned is minimal so the Court will require Plaintiffs to submit only a nominal security deposit of $1.00.

The Court is issuing this Order under seal because the parties filed briefs and exhibits under seal.

The Court **ORDERS** the parties to confer and jointly submit to the Court within two weeks of the date of this Order a single, redacted version of the Order Denying Defendants' Motion for Summary Judgment and Granting Plaintiffs' Motion for Preliminary Injunction which can be filed publicly.  If the Court has cited to a sealed exhibit, the parties may substitute a citation to a publicly available exhibit.

If the parties jointly agree that the Order Denying Defendants' Motion for Partial Summary Judgment and Granting Plaintiffs' Motion for Preliminary Injunction does not need to be redacted, then the parties shall so inform the Court within two weeks of the

date of this Order.  The Court intends to issue a publicly available version of this Order

within three weeks.

**IT IS SO ORDERED.**


_____/s/ Michael R. Barrett_____
Michael R. Barrett
United States District Judge