1          UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF OHIO
2                WESTERN DIVISION

3                   - - -

4   NORCAL TEA PARTY PATRIOTS,.  CASE NO. 1:13-CV-341
    et al.,                   .
5          Plaintiffs,        .
                              . *Discovery Conference via Telephone*
6        - vs -               .
                              .
7   INTERNAL REVENUE SERVICE, .  Tuesday, March 28, 2017
    et al.,                   .  1:30 p.m.
8          Defendants.        .  Cincinnati, Ohio
    . . . . . . . . . . . . . .
9

10              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE MICHAEL R. BARRETT, DISTRICT JUDGE
11

12  For the Plaintiffs:

13      EDWARD D. GREIM, ESQ.
        DANE C. MARTIN, ESQ.
14      Graves Garrett, LLC
        1100 Main Street, Suite 2700
15      Kansas City, Missouri  64105

16      DAVID R. LANGDON, ESQ.
        Langdon Law, LLC
17      8913 Cincinnati-Dayton Road
        West Chester, Ohio  45069
18

        CARLY F. GAMMILL, ESQ.
19      188 Front Street
        Suite 116-19
20      Franklin, Tennessee  37064

21  For the Defendants Internal Revenue Service and Department of
    the Treasury:
22

        LAURA C. BECKERMAN, ESQ.
23      JEREMY N. HENDON, ESQ.
        U.S. Department of Justice, Tax Division
24      Post Office Box 55, Ben Franklin Station
        Washington, D.C.  20044
25

```
 1   APPEARANCES, continued:

 2        GERALD A. ROLE, ESQ.
          U.S. Department of Justice
 3        P.O. Box 683
          Washington, D.C.  20044

 4
          JOSEPH A. SERGI, ESQ.
 5        LAURA M. CONNER, ESQ.
          JOSEPH R. GANAHL, ESQ.
 6        U.S. Department of Justice, Tax Division
          555 Fourth Street, NW
 7        Washington, D.C.  20001

 8
     For the Defendants Individual Line-Level Employees:
 9
          ERIC R. NITZ, ESQ.
10        JAMES BARTA, ESQ.
          MoloLamken, LLP
11        The Watergate
          600 New Hampshire Avenue, NW
12        Suite 660
          Washington, D.C.  20037
13
     For the Individual Management Defendants:
14
          BRIGIDA BENITEZ, ESQ.
15        CATHERINE COCKERHAM, ESQ.
          Steptoe & Johnson LLP
16        1330 Connecticut Avenue NW
          Washington, D.C.  20036
17

18   Law Clerk:          Grace M. Royalty, Esq.

19
     Courtroom Deputy:   Barbara Crum
20

21   Court Reporter:     Maryann T. Maffia, RDR
                         (513) 564-7677
22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2        (In chambers.  All counsel appearing by phone.)
 3            COURTROOM DEPUTY:  Counsel?  Hello.  Hi.  Thanks for
 4    waiting.  Here's Judge Barrett.
 5            THE COURT:  Hey, good afternoon, everybody.  How you
 6    doing?
 7            MR. GREIM:  Afternoon, Judge.
 8            MS. BECKERMAN:  Good afternoon.
 9            THE COURT:  Laura, how are you?
10            MS. BECKERMAN:  I'm doing well, thank you, Your
11    Honor.  How are you doing?
12            THE COURT:  I'm fine.
13        Eddie, how are you?
14            MR. GREIM:  We're very good here in Kansas City.
15            THE COURT:  All right.  Let me run through a couple
16    of observations, and then we can pick up the conversation
17    anywhere you guys want to.
18        And, Laura, I'm just using plaintiffs' list, not for any
19    particular reason, but just because I'm using it.  Okay?
20            MS. BECKERMAN:  Okay.
21            THE COURT:  So here's my thoughts.
22        "IRS treatment of class members."  Okay.  My thought is
23    the document request where Eddie says whether in the class or
24    not, my feeling is they're entitled to class-wide production
25    and discovery but not beyond the class itself.
```

 1    Then in terms of "the relevant time period," Eddie wants

 2  to go back to, like, two thousand, whatever it was, five or

 3  six.  I think we should limit discovery to the class period

 4  itself.

 5    As to the "IRS metrics," I think that Eddie's point is

 6  fairly well-taken that if, in fact, the IRS's general ordinary

 7  practices are not going to be served up, then I think it's

 8  tough to argue that what happened was within the general

 9  ordinary practices; because if you're going to argue that as a

10  defense, then you have to tell them what the general and

11  ordinary practices are.

12    In terms of "other governmental agencies," no discovery on

13  that unless somewhere in your e-mail production they find

14  something that is a request or a response to a request or

15  something and it looks like it's incomplete, and then perhaps

16  we could have a targeted look into the other agencies.  So not

17  blanket subpoenas, none of that stuff.  But if there is a

18  targeted reason to explore something that came in or went out

19  to another agency and it doesn't look like what the IRS has in

20  their files would be a complete, for example, a complete

21  e-mail chain, then we'll talk about going farther.

22    So those are some general observations.  So let me hear

23  your complaints.

24    And the other thing is, in terms of a general observation,

25  when I go through Laura's Interrogatory Number 7 --

1    I mean, I'm just throwing out some things there.

2    -- in there, they discuss the EO Determination Group; they

3    discuss BOLOs; they discuss screening, check sheets; they

4    discuss case assignment guides; they discuss flags for files;

5    they discuss the EO specs and counsel's discussion of

6    developing educational materials; they talk about the tag

7    spreadsheets; they talk about group meetings in April and a

8    workshop in July; they talk about July 2011 rulings and the

9    director changed some of the BOLO stuff; they talk about

10   buckets; they talk about training sessions which should have

11   notes and materials.

12   I mean, it seems to me, Eddie, that they pretty much told

13   you where to look if -- and I don't know whether you guys have

14   looked there or not, but it seems fairly complete to me as

15   long as Laura is willing to say that you've got all the

16   responsive documents.

17   So those are my observations.  Who wants to dig in and

18   complain first?

19        MS. BECKERMAN:  Sure --

20        MR. GREIM:  Your Honor, I won't complain.  This is

21   Eddie for the plaintiffs.  But I could start with that issue

22   because, you know -- and I think I've got just a short little

23   idea for how to handle 12 and 13.

24   We recognize everything you said on Rog 7.  But, you know,

25   basically Interrogatory 7 is an amended response that they

1    filed after we deposed Ron Bell to get that information out of

2    him, so we're well aware of all that.  I mean, we're

3    investigating all those angles.  It's not that we kind of

4    forgot that we deposed Ron Bell and learned all that

5    information or anything like that.  I know -- no one is saying

6    that.  But we're well aware of it.

7        But here, to us, is the final step for 12 and 13.  You

8    know, there is a system that could be reviewed.  There is

9    something that they could do to be sure that what Ron Bell

10    told us at our deposition that we took of him and that made

11    its way into the amended Rog 7 response is basically it.  And

12    we think it's this:

13        There was a system that's called Web ETS.  Now, they've

14    referenced a related system called EDS, like my name, Eds,

15    that is -- that they've already used to respond to 12.  But if

16    they were to look at this Web ETS and they were to take your

17    Ron Bell, take your Stephen Seok, take your heads of that

18    advocacy group, you could run -- you could go through their

19    time entries, Your Honor, and you could see if there were any

20    other time spent on a broad-based review.

21        That's an idea.  I mean, I -- unfortunately, we thought of

22    it over the last week.

23           THE COURT:  So you got who, like Hofacre, Bell and

24    Seok, whatever the person's name is?

25           MR. GREIM:  Yeah, Seok.  So you could look at those

1    people, and you could say, you know, "Okay.  Well, do you see

2    stuff in there?"  Like for Ron Bell, what that might show,

3    like that could show us what we later learned, I think through

4    these calls, that his secondary Secondary Screening went all

5    the way from January to May.  So we -- you know, they could do

6    that.  And, in fact, we've gotten an e-mail that -- you know,

7    it lists -- it's from Cindy Thomas to several other people

8    from April of 2012, and it mentions yet another review of

9    advocacy cases of more than twenty --

10           THE COURT:  Well, tell me what Web ETS is.  Is that a

11   program?  I'm not very good at computer stuff.  What is that?

12           MS. BECKERMAN:  Your Honor, it's a time-keeping

13   software.  So Web ETS is the way that IRS employees keep track

14   of what cases they've charged time to.  So, for example, if

15   you're assigned to review San Angelo Tea Party, you would use

16   Web ETS to log the facts that you were assigned to do

17   something with respect to that case.

18       It does not provide bigger-picture information about a

19   purpose of your work on the case.  That is found in the Case

20   Chronology sheets in the case files, the documents we've been

21   talking about the past couple of times here.

22       We used Web ETS queries to answer the Rog 1 response to

23   plaintiffs.  So we have, in fact, engaged in looking at Web

24   ETS, and we've given that type of information to the

25   plaintiffs already.

1          MR. GREIM:  So, Your Honor, that's -- let me just

2    pick up where I left off.  You know, whether it's Web ETS,

3    whether it's going through, you know, like this e-mail that we

4    found where, you know, probably no one is entering time on

5    this, but you can see an e-mail where 20 groups are going to

6    be reviewed to prepare for the bucketing process just to

7    circle back through and make sure that they have, you know,

8    what the main inspections were.  Do they want to stick with

9    the five that we gave them, or do they realize that there

10   really should be two more?  And they might stick with the

11   five.

12        Then, Your Honor, they -- remember, there is the issue of

13   whether they do it just for the class reps or for all class

14   members.  So we think they ought to continue the chart out for

15   the class members, one of the other issues --

16          THE COURT:  No.  I already mentioned on that, I

17   thought -- one of the interrogatories was, you know,

18   information whether or not a class member, and I've already

19   said I think it's not limited to class reps, it should be

20   class-wide, all 423, whatever it is.

21        So go ahead.

22          MR. GREIM:  Okay.  So then, after they've done that,

23   they could confirm that they've produced everything, and they

24   could name what it is that they're relying upon.  So if they

25   are relying on the tracking spreadsheets or if they would

1  direct us there, then they could put that in their response.

2  It's not in there right now.  And if it turns out that there

3  are a few other e-mails or spreadsheets, give them a chance,

4  that they would rely upon, then they can produce those to us

5  and just identify them in the response as the other thing that

6  we need to look at.

7       But what they would have to do, Your Honor, is go back --

8  I mean, right now the responses 12 and 13 still have the

9  objections to everything.  They basically say, "Hey, to

10  resolve this, we'll answer it for the five people, the five

11  class reps, using the inspections you've told us about."

12       So what they need to do is take away the objection, say,

13  "Look, this is really the best we have," and give it for

14  everybody, and then we move on.  They do that by the first

15  date.  We would move that back.  I remember Laura and some

16  others were going to be gone on April 14th.  Move that back --

17            THE COURT:  Hang on.  Hang on a second.  Let me ask

18  you a question.  So this ETS thing, I mean, what -- Laura says

19  all that's going to show is IRS Employee X had time entries --

20       I mean, Laura, let me just ask you this.  Is it possible

21  to serve up a screen shot on the class rep, see what that

22  shows and then see if Eddie wants to go further, or is that --

23       Give me your thoughts on that.

24            MS. BECKERMAN:  Your Honor, I believe that it is

25  possible to query this for the people who charged time to the

1    five class reps.  I believe that is possible.  I personally

2    have never used Web ETS because I don't work at the IRS; but

3    from sitting in on the 30(b)6 where we talked about these

4    things, that's my understanding.

5           THE COURT:  Well, Eddie could you just do an

6    exploratory on this if Laura can get that, take a look at it

7    and see if it has the kind of stuff you're looking for, or is

8    that not helpful?

9           MR. GREIM:  Well, Your Honor, that's pretty close.

10   What we would say, though, is rather than stick with the five

11   class reps, I think maybe doing it with the advocacy leaders

12   and just -- I mean, heck, just produce their -- produce the

13   results of that query.  Because then we can go through and we

14   can see, okay, Stephen Seok was a busy beaver in, you know,

15   November of 2012, going through and list inspections in there.

16      Well, maybe there was never an e-mail where they talked

17   about it.  That maybe isn't in the Case Chronology, but now,

18   finally, through Web ETS, we see it.

19      So we'd rather go with the people that were holding the

20   cases.

21      Now, the one thing I'd say that we'd miss would be

22   something like the e-mail I talked about where Cindy Thomas is

23   e-mailing other people about a review of these cases.  I don't

24   know that that shows up in ETS.  So I wonder if some sort of a

25   broader e-mail search for, like, "Tea Party within X words of

1   'review'" wouldn't be a bad idea.

2           THE COURT:  Well, have you seen one of these of what

3   an ETS screen shot looks like?  I mean, does it have any

4   detail or is it just --

5           MS. BECKERMAN:  Yes, I have seen it.  It does not.

6   All it does is list the name of the individual employee who

7   was assigned.

8       And as I think Mr. Greim -- or as Eddie is aware, early on

9   when we answered Rog 1, that is exactly what we did.  We went

10  to the named plaintiffs and we pulled up the names of people

11  that appear on Web ETS, and we gave him that information.

12  Then later on, after the class certification I believe it was,

13  we expanded it to the 298 that were in the TIGTA list because

14  this was before the class notice went out.  We gave them all

15  the people that had charged time to all of those cases as

16  well.

17      Your Honor, I do not know for sure, but I don't believe

18  that we can pull up a person and see all the cases they worked

19  on to do it the way that Eddie is suggesting.  Also, that

20  would implicate 6103 issues because there would be cases that

21  had absolutely nothing to do with this case that aren't class

22  members.

23      Also, what Eddie is asking us to do is really, once again,

24  to backtrack.  I mean, Your Honor, with respect to the fact

25  that our Answer to Interrogatory 7 is very thorough, and it

1     really lays out all the information, they've had this Rog

2     answer for two years now.  It's from March of 2015.

3          And, Your Honor, with respect to what Eddie was saying

4     about the difference between us responding as to the named

5     plaintiffs versus class, we completely agree that plaintiffs

6     are entitled to documents about the entire class; and, in

7     fact, that is what we've been doing from the very beginning of

8     merits discovery.

9          So with every document request, like Eddie just mentioned,

10    "Why don't we do a search of 'Tea Party' and 'review,'" well,

11    we've done searches like that.  We've done dozens and dozens

12    of searches agreed upon by both parties.  What we're saying is

13    they have all the documents from all the class members and

14    also the files.

15         And so Rule 33(d) says that, you know, to answer the

16    interrogatory, we've given them all of this information.   The

17    fact that they were able to identify an e-mail from Cindy

18    Thomas about the bucketing review --

19         Which is, in fact, one of the reviews that is in our

20    Interrogatory 12 answer, so this is not some new review.

21         -- it shows that the documents reveal all of the

22    information that is to be had and that plaintiffs currently

23    have access to all of that information.

24              THE COURT:  So are you willing to state, Laura, that

25    they've not only got all the claim file information but all

1    the e-mails relative to those particular files and those

2    advocacy groups?

3         MS. BECKERMAN:  I certainly believe so, Your Honor.

4    I mean, the searches we came up with were very broad.  We gave

5    them everything.  We did -- so if an e-mail came up and it was

6    about a class member, we gave it to them.  If an e-mail came

7    up and it was about a nonclass member, a total third party,

8    then we marked that as "Don't Produce," and we had a tag for

9    that.

10        But they have every -- all the e-mails, everything that

11   came up as to all the dozens and dozens of searches that we

12   ran and that we ran after they started working with us, and we

13   gave them documentation about each search.  So, you know, I

14   could pull up a spreadsheet and tell you that we agreed to

15   search "'Tea Party' within 50 words of 'Advocacy' within 20

16   words of this."  You know, they were very in-depth and broad

17   searches.  They have everything that have to do with the case

18   and that came up in these very broad searches and everything

19   that has to do with the class members at large.

20        THE COURT:  Would you be willing to give Eddie some

21   kind of an exemplar on the ETS thing just so he can take a

22   look and see what's on there and whether or not he thinks he

23   needs more?

24        MS. BECKERMAN:  Yes.  Well, I'm looking at my

25   colleagues because I thought we produced this --

1          MR. GANAHL:  Your Honor, this is Joe.  I think we

2    produced that earlier in the case where, at the time, it was

3    ten class members.  We produced one for each of the class -- I

4    mean the plaintiffs.

5          MS. BECKERMAN:  We can certainly send that over if

6    there is some confusion on the issue and --

7          MR. GREIM:  Your Honor, this is Eddie.  You know,

8    rather than build in another back and forth, it seems to me

9    that if they could just try to look at ETS, Web ETS, and if

10   the response is that you can't actually look under somebody's

11   name and see what they worked on, then that's the response.

12   Then Web ETS won't allow it.  And, you know, then that was a

13   dead end, and they can just tell us that.

14       But, no matter what, there's got to be an amended response

15   anyway.  So I don't really need, I don't think, Your Honor, to

16   see an example.  If they tell us that they can't do it, then

17   they can't do it.

18       Now, maybe the report has other groups on there.  That

19   could just be redacted.  Remember, we're only running reports

20   on a couple of the employees anyway.  So if it's listing other

21   people, then they can just redact that.  We don't need to see

22   that.

23          THE COURT:  But I thought that Laura said you can't

24   run a report on an individual IRS employee, it's got to be

25   done by the group, or did I mishear that?

```
 1              MS. BECKERMAN:  No, Your Honor.  That's my
 2    understanding of the -- I'm not a hundred percent, but that's
 3    my understanding --
 4              THE COURT:  Okay.  Can you guys dig into that, Laura,
 5    and just clarify that, talk to Eddie offline and see if you
 6    guys can come to some kind of an understanding?
 7              MS. BECKERMAN:  Sure.
 8              THE COURT:  Okay.
 9              MR. GREIM:  Your Honor, we --
10              MS. BECKERMAN:  So just one other issue that you
11    mentioned in the introduction discussion that I wanted to seek
12    clarification on.
13              MR. GREIM:  Your Honor?  I'm sorry.  Before we do
14    that, though, I wanted to -- before we move on to new issues,
15    I had one more thing on this.
16              THE COURT:  Okay.
17              MR. GREIM:  I just want to clarify.  I mean, there
18    are many e-mails that we see that relate to our case that are
19    attached to the Congressional reports and things that do not,
20    you know, that weren't produced to us.  Now, we're still going
21    through the very final production, and we still got some
22    documents on something else even yesterday, I think a limited
23    amount.  But there are some other things that the search
24    results, the search terms did not pull up, because those were
25    largely crafted for lots of other requests.
```

1      So I just don't want to let go of the idea that the IRS

2   make one more shot at -- whether it's through Web ETS or

3   whether it's some short query of "review within three of 'Tea

4   Party'" or something.  You know, if they're willing to then

5   say that they're all done, then they're all done.  But I think

6   the amendment has to go in there and they've got to actually

7   name the documents and not just the Case Chronologies.  So

8   that's all I wanted to --

9        THE COURT:  I thought a few phone calls ago I was

10   told, and I can't remember by whom, that you guys agreed on

11   the search terms and the scope of the e-inquiry.  Is that not

12   accurate?

13        MS. BECKERMAN:  That is true.  We did.  We agreed on

14   the searches and the search terms.

15        MR. GREIM:  Yeah.  But for the other -- Your Honor,

16   for the other ones, I mean, for this one we've been saying

17   that, you know, it shouldn't take search terms to just know

18   what the waves of review were.  I mean, for some of the other

19   requests, it turns out that you really -- search terms is the

20   way to go.  But here, I don't know.  I sort of never thought

21   we'd be in this position, and that's why I am actually

22   throwing that out there as a last-ditch effort.

23        THE COURT:  Well, I mean, couldn't Bell and Seok or

24   Soke, whatever his name is, I mean, wouldn't these people be

25   able to tell you what the waves of review were?

```
1            MR. GREIM:  Well, we hoped that -- I mean, I think

2    Bell is -- if you had to just choose one person with the

3    limited amount of time left, we would hope that Bell would be

4    able to.  But, then again, if EOT had the files, you know,

5    that they -- once they got the paper files, there could have

6    been a review that Bell was out of the loop on.  But, even

7    then, somebody in charge of EOT would know that.

8         Our other point, Your Honor, is we'd like to avoid

9    deposing all these people.  If they have the same people

10   working there who can just tell us, then we can focus on the

11   other stuff.

12           THE COURT:  Well, so what you're telling me is that

13   you have found e-mails that you think are relevant and it

14   would normally be responsive to the request, but the e-mails

15   were not produced by the IRS, they were obtained in some other

16   manner; is that right?

17           MR. GREIM:  Yes.  You know, e-mails that are attached

18   to the Congressional reports, like the Senate or the House,

19   that's mainly what we relied upon for class certification.

20           MS. BECKERMAN:  Your Honor, this is the first we've

21   heard of it.  I've never heard mention of any e-mails that

22   they think they're missing and --

23           THE COURT:  Well, that's why I raised the question,

24   Laura.

25        I guess my question to Eddie would be:  If you looked at
```

1    those e-mails, would they have fit in within the search terms

2    that were agreed upon by you guys, or are they outside of that

3    scope?

4              MR. GREIM:  Your Honor, I want to make clear:  I'm

5    not saying that those would have fallen under the search

6    terms.  My point is that the search terms were, you know,

7    relatively narrow, and they were what we could do on certain

8    topics.  But to suggest that because we had the search terms

9    we have all the relevant documents -- I mean, those

10   workarounds came at a cost precisely because we can see these

11   other documents attached to the Congressional reports.  But we

12   wouldn't --

13      I mean, Your Honor, we would not raise for the first time

14   on our third call with the judge if we, for some reason,

15   thought that there was a search term malfunction or something.

16   I don't make that argument.

17             THE COURT:  Well, how would Laura expand the search

18   such that the kind of e-mails you're talking about would be

19   caught up in her net?

20             MR. GREIM:  Well, frankly, I think we're sort of past

21   that point.  Now that we're getting to the end of the search

22   term production and we see what it did and did not yield and,

23   you know, we can see that, my gosh, it did not even yield this

24   or that e-mail --

25      And I can't give you an example right here.

1        THE COURT:  That's okay.

2        MR. GREIM:  To me, I'd rather just -- rather than go

3 on forever and do search terms, I'd rather just move forward

4 with the good documents we have.  But it's on something like

5 this where we're identifying the inspections that I make the

6 bold move of suggesting, you know, a search that might tell us

7 reviews that we're missing.

8        THE COURT:  But, I mean, describe that search.  What

9 are they -- because Laura's point, as I understood in the last

10 conversation, was that she would be searching the same

11 information that's already been produced, so you guys should

12 do it if you think there is items that exist.  But maybe I

13 misheard that as well.

14        MR. GREIM:  Somebody smarter is going to answer that.

15   Go ahead, Dane.

16        MR. MARTIN:  Well, I don't know about that, but

17 hopefully this will help clarify.

18   I think in the IRS's briefing they said that they've

19 produced approximately 15,000 documents of 2.1 million total

20 that exist.  And, really, that's a reflection that these

21 search terms have been, really, snapshots on any given topic.

22   So if a request says "Please produce timelines," we then

23 worked with the IRS to develop criteria that they can search

24 for that would produce timelines.

25   But the biggest question we have here on the topic of

 1   inspections is whether there are documents that have fallen

 2   through the holes, would not be captured by some other topic,

 3   and that a search or series of searches might pick up reviews

 4   that occurred.

 5       And so, really, on top of these overall information

 6   systems like Web ETS and EDS and things like that, could there

 7   be a search that says for the e-mail that we just uncovered

 8   from this rolling production we've seen.  It's a good example

 9   because it says, "Here are a list of organizations we would

10   like to start reviewing," and then it lists 20 organizations.

11   And so we just found this in our review, and a search term

12   that might pick up that type of language would ensure that it

13   was a discrete search made on this topic of inspections.

14           THE COURT:  Well, that's kind of what I'm asking.

15   How would you define the search that you would ask Laura to

16   undertake?

17           MR. GREIM:  I'd say "Tea Party" or the word "Tea

18   Party," the phrase "Tea Party" or the word "advocacy" within,

19   say, you know, five words of "review."  I mean, I -- that's an

20   idea that occurs from just getting this e-mail here.

21           MR. MARTIN:  Or, Your Honor, a list of organizations,

22   things like that.  Maybe we can just work with the IRS.  If

23   we're clear about what needs to occur, we can do our same

24   process and work with the IRS to develop a set of search

25   terms.

```
 1           THE COURT:  Okay.  So let me hear what Laura says
 2    about that.
 3           MS. BECKERMAN:  Your Honor, back on November 14th we
 4    had a two-and-a-half-hour call with the plaintiffs where we
 5    developed numerous searches.  This was after we produced about
 6    30,000 documents and after the first five months of discovery
 7    where plaintiffs refused to engage in any discussion to
 8    collaborate.
 9        And, you know, I'm not -- we are not opposed to the idea
10    of running one more search, but a search as broad -- and some
11    of the searches they're suggesting could potentially be broad.
12    We could be talking, like, 20,000 or 30,000 documents to
13    review, which is time intensive, especially when plaintiffs
14    are having us schedule so many depositions in the next couple
15    of months.
16        Also, when Dane mentions that he wants a list of
17    organizations, we have given them every single list we can
18    find in the database.  So the documents I e-mailed to you, the
19    second one was our updated Supplemental Response to Request
20    for Production Number 56.  These are the lists of -- any time
21    there is an advocacy organization on the list, it's in that
22    production that we gave them about a year ago.  We've produced
23    that information.
24        And what I'm hearing, really, from Eddie and Dane here is
25    that they want to engage in one last fishing expedition, that
```

1  they have no evidence that there is anything else out there,

2  but they want us to run a few more searches just to see what

3  they can mop up. We have really been through this, and we've

4  done dozens and dozens of searches that they have asked us to

5  do. So it does seem a little bit ridiculous at this late date

6  that they want us to add yet more searches.

7        THE COURT: Well, but I think I hear him saying that

8  they -- some documents that they have found --

9    And you guys found them from where, the Congressional

10  Record, or where?

11       MR. GREIM: No. The one we are talking about just

12  now is RFP 21-226. But that's the one that actually has a

13  list of people that they want to review.

14       MS. BECKERMAN: So that means we produced that

15  document, Your Honor. So they have --

16       THE COURT: That was --

17       MS. BECKERMAN: They have the document from us, our

18  --

19       THE COURT: I was going to make that point for you,

20  Laura, but you made it for me.

21    So what's your response to that, guys?

22       MR. GREIM: Yeah. I mean, I was making two different

23  points. This is -- I was not using this as one of the

24  documents that Congress had that we didn't.

25    But, I mean, Your Honor, I guess my point is this. This

1    is an example -- you know, there has been no search term run

2    on the question of groups of reviews that they did.  There

3    have been search terms run on other discrete requests, like on

4    timelines and things like that, and then we actually did some

5    search terms that ended up covering several requests.  We kind

6    of stepped back and made them more general to cover more

7    things, but we don't have one on this.

8         Frankly, our thought was always that this, among all of

9    our requests, would be inappropriate for search terms.

10        Now, I changed my mind now that I, you know, in the last,

11   probably, three weeks before the IRS say, you know, there

12   truly is no one we can talk to who can tell us whether there

13   were these broad-based reviews.  Now I'm falling back on the

14   search term point, and I'm just --

15             THE COURT:  Well --

16             MR. GREIM:  I mean, we are fortunate that it happened

17   to be responsive to a different search.  I mean, we're lucky.

18   It's not that they --

19             THE COURT:  Well, let me ask you this.  Are you guys

20   willing to offline discuss this and figure out if, in fact,

21   you can get a search that would be narrow enough, that it's

22   not overburdensome, but it is focused enough that it gets

23   relevant material?  Is that something you're willing to take a

24   shot at working at?

25             MR. GREIM:  Yes, Your Honor.

1        THE COURT:  Laura?

2        MR. GANAHL:  I'm sorry, Your Honor.  This is Joe.  I

3   don't mean to step on Laura's toes.  She is looking for

4   something.

5      We're not willing to agree to that, Your Honor.  Mr. Greim

6   has no proof that he has a Congressional document.  I mean,

7   that's a very serious allegation that he's making, that we

8   haven't produced things that are attached to Congressional

9   reports.  And there is no -- and I haven't heard what document

10  it is.  And, if it was, I would certainly like to look to see

11  if we have handed it over.

12     We have in the past where we've been told that we haven't

13  given things or we haven't included people, where we did then

14  a simple search and realized they're on the list.

15     I will point out what Laura is looking for is -- and I'm

16  stalling.  One of the early interrogatories asked for "Tea

17  Party" or "Republican" or "Conservative" or a whole bunch of

18  --

19        MS. BECKERMAN:  Document request.

20        MR. GANAHL:  I'm sorry.  It was one of the early

21  document requests.  I put a team of, like -- what? -- 10 or 12

22  to 15 attorneys that had to review tens of thousands, if not

23  hundreds of thousands of documents because that was the search

24  term we did that was so broad that got all these.  But we've

25  outlined in our discovery response to them how many documents

1   we got, how the hits worked, what search terms we used.  So

2   what Eddie is saying now about running this search, we've

3   actually run a broader search than this.

4       It just seems like, Your Honor, that we're moving back to

5   where we were two weeks ago, and I'm just concerned that -- I

6   don't know.  I guess, that's my concern, is that it just feels

7   like we're going back two weeks.

8       And I feel like we were making such progress.  The Court

9   is aware of everything we've done.  When we didn't have access

10  to search terms, we made our own search terms.  And because we

11  didn't have the benefit of speaking to counsel, we made them

12  broader than we were.

13      Now let me hand it back to Laura.  I apologize.

14          THE COURT:  All right.  Well, let's do this.  Why

15  don't you guys have a conversation about this without me on

16  the call.  Eddie can tell you what he thinks he's found, why

17  it possibly, if, in fact, it was missed and not produced,

18  whatever.  Can you guys --

19      You don't have to agree to an ultimate production or

20  non-production, but can you try to work through that

21  yourselves offline?

22          MS. BECKERMAN:  Certainly.

23          THE COURT:  Okay.  What's next then, guys?

24          MS. BECKERMAN:  Your Honor.  I'd like to --

25          MR. GREIM:  How about if Laura goes?  She had

1   something else.

2          MS. BECKERMAN:  Sure.  At the beginning of the call,

3   Your Honor mentioned that with respect to the plaintiffs' list

4   --

5       This is Number 6 on their list about IRS metrics.

6       -- that the Court was basically saying that if the IRS

7   can't produce metrics on something, then we shouldn't be able

8   to argue about that.  I just want to take it from the big

9   picture down to the specific.

10      So, Your Honor, the one discovery request that plaintiffs

11  list here is Interrogatory Number 11.  Interrogatory Number 11

12  asks:  "For each year from 2006 to the present, please

13  identify the number of Applicants (whether a class member or

14  not) that had their Applications subject to development on the

15  basis of political activity, private benefit or private

16  inurement, lobbying activities."  And for each entity it asks

17  for "the number of entities that received a development

18  letter; the number of these entities that received multiple

19  development letters; the number of these entities that

20  received an Unnecessary Request; and the number of these that

21  were denied tax-exemption."

22      So, Your Honor, it is true that the IRS does not keep the

23  statistics asked for in Interrogatory 11, and that is what we

24  said in our response.

25      I also understand from Your Honor's ruling that you, you

1  know, are saying that discovery is going to be limited to the

2  class.  Here, they are asking for all applicants for

3  tax-exempt status --

4           THE COURT:  We've moved past that, Laura.

5           MS. BECKERMAN:  Yeah.  So we don't have metrics on

6  that issue, and we are not going to be making an argument

7  based on any metrics on that issue because we don't have them.

8      However, with respect to different types of metrics that

9  they've asked for -- for example, in Interrogatory Number 9,

10  which can be found at 318-11 towards the end, they ask for

11  specifics about the ages of case closure of entities, both on

12  the tracking list and then entities in general, and we

13  produced -- we fully responded to that.  We produced, I think,

14  ten different charts showing each year, the number of cases,

15  the average days, the median days.  So there are many types of

16  metrics where we were able to answer, and we provided the

17  answers and we had them.

18      So I just wanted to clarify with respect to the Court's

19  ruling on the IRS metrics issue that it's only with respect to

20  the metrics that we do not keep.  We, you know, obviously

21  can't provide an answer if they don't exist, and we obviously

22  won't be making an argument based on metrics that don't exist.

23      For the metrics that the IRS has produced, you know, many

24  other types of metrics plaintiffs have asked for, that we

25  produced them and that this ruling doesn't apply to the other

1  metrics that are not Rog 11 but Rog 9, Rog 8, other aspects of

2  the case.

3          THE COURT:  Maybe I missed the point.  I thought what

4  Eddie was getting at in his request was that they want to

5  know, kind of, what your broad approach is so that -- you

6  know, I think what he's trying to -- maybe I missed the point,

7  but I think he's trying to get past the situation where you

8  guys say:  Well, we do this with all kinds of select groups.

9  We do this with zoos.  We do this with churches.  We do this

10  with institutions of higher learning.  So the request we made

11  on these folks is not outside of our usual pattern in dealing

12  with cases.

13      That's kind of what I thought he was trying to figure out,

14  but maybe I'm totally wrong on that.

15          MR. GREIM:  Your Honor, this is what we're trying to

16  figure out.

17          MS. BECKERMAN:  Except, Your Honor, that is

18  Interrogatory Number 17.  We did, in fact, respond to that.

19  So that's -- you know, the plaintiffs, they only reference

20  Interrogatory 11, which was the one I just talked about a few

21  moments ago where we don't keep those metrics.

22      But with respect to 17, it asks for every instance.  This

23  is in the document I e-mailed to you, and it's also at

24  Document 318-10, page 18.

25          THE COURT:  Laura, you'll have to accept my apology

1  for not memorizing all the info you've sent me.  Okay.

2          MS. BECKERMAN:  Oh, of course not.  I just -- didn't

3  know if it would be easier to look at the stuff on the e-mail

4  or the stuff on the docket.

5          THE COURT:  Well, which document are you talking

6  about now?

7          MS. BECKERMAN:  So this is 318-10.  It was attached

8  to the government's filing from our original Motion to Compel.

9          THE COURT:  Oh, hang on a second.  Give me a second.

10          MS. BECKERMAN:  It's Page ID 10506.

11          THE COURT:  Hang on.

12          (Pause in proceedings.)

13          THE COURT:  Okay.  10506.  All right.  What am I

14  looking at?

15          MS. BECKERMAN:  Sure.  So Interrogatory Number 17

16  asks "for every instance in which the IRS designated a group

17  of at least five Applicants for centralization."

18      What we said in response to this is that it's overbroad

19  because anytime you designate five, that's going to be

20  hundreds of cases, but we agreed with plaintiff to limit it to

21  just the ones listed in our answer.  We answered by pointing

22  to four examples.  You can see that in the next couple of

23  pages:  10507, 10508, 10509.

24          THE COURT:  Right.  Yeah.  I got it.

25          MS. BECKERMAN:  So we've agreed already with

1   plaintiffs that we will not be bringing up any other

2   centralizations with respect to anything not described in

3   response to Interrogatory 17.  And so here we really lay out

4   all the information that they asked for about these other

5   examples where the IRS centralized cases.

6       So, Your Honor, what you were getting at in terms of, you

7   know, is this something you normally do, well, I would --

8   think that we have, in fact, answered that.  We agree to be

9   bound to just our Answer to Interrogatory 17 and not talk

10  about some other example not listed there.

11          THE COURT:  Okay.  So if you got into an ordinary

12  practice defense, you would be limited to what's on those

13  pages?

14          MS. BECKERMAN:  Yes, to those examples.  I mean, we

15  just talk about credit counseling, foreclosure assistance,

16  et cetera, right.

17          THE COURT:  Ed?

18          MR. GREIM:  Your Honor, I agree with that as well,

19  but we've got apples and oranges here.  We shifted from

20  Interrogatory 11 to 17.  I think we just heard, 17 talks about

21  centralization, which is something they did here.  But that's

22  not -- but 11 talks about the specific types of inquiries they

23  made of people and whether those are ordinary, and 17 talks

24  about whether centralization is ordinary.

25      So I agree with you -- I mean, we cut a deal on 17, we've

1  got their responses here, they're limited to that, but that's

2  a different issue than Interrogatory Number 11 that we were

3  just discussing.

4     I mean, this is all -- I mean, frankly, I think maybe this

5  clarifies things a little bit, but don't be -- you know, 17 is

6  just a different issue.  It's centralization, it's not the

7  processing of applications by asking questions on private

8  inurement, private benefit and the things that we have in

9  Interrogatory 11.  So I just say that by way of clarification.

10        THE COURT:  Isn't that something you can handle in a

11  deposition of IRS people, or not?

12        MR. GREIM:  I'm sorry, Your Honor.  What would we

13  handle?

14        THE COURT:  Well, okay.  All right.  So you've got

15  the issue of centralization, so you take -- what was one of

16  them?  You take asset foreclose.  So you got somebody from

17  asset foreclosure.  Run through the kind of questions you

18  have here.  "Did you ask these people this, that and the other

19  thing?"

20     Actually, there is one that might fit better.  Let's see.

21  Where is it?  10506.  Let's see.  Well, give me a second.

22  What was the last -- "support organizations" --

23     I was looking for one that might have, you know, where --

24  a question about donor base and stuff like that.  It might be

25  relevant, but I'm not sure these examples fit that unless

1    you've got a healthcare organization that's raising money.  I

2    don't know.

3        Laura, what do you think?

4            MS. BECKERMAN:  Your Honor, I'm not entirely sure

5    that I completely follow.  I think --

6            THE COURT:  Okay.  What Eddie is saying is, you've

7    given him a list of, whatever it is, four or five groups that

8    the issue is centralized.  What he wants to know is, you know,

9    what other groups have you asked the kinds of questions that

10   you asked his class members.  I think that's what he's saying.

11           MS. BECKERMAN:  I'm not entirely sure, Your Honor,

12   that Eddie is interested in the questions with respect to

13   these other types of groups.  I think that we generally agree

14   that when you're looking at (c)(3) and (c)(4) organizations

15   that are -- issue as (c) organizations, that they might merit

16   different -- like, than credit counseling --

17       (Phone connection interrupted.)

18       I think that with Rog 17, what I'm trying to get is how

19   Your Honor has said that, you know, Eddie might be interested

20   --

21       (Phone connection interrupted.)

22       -- in the ordinary practice of the IRS in terms of

23   handling applications.  One of the aspects of handling is

24   centralization, treating things that are on a similar topic

25   similarly to each other, and that's what Rog 17 gets to.

1      Rog 11, which is the one that is listed under the IRS

2  metrics in plaintiffs' filing, that one is asking about, if

3  you're looking at issues of private benefit, private

4  inurement, what type of questions did you ask.  And I think

5  that -- my point there is simply that the IRS doesn't have

6  available statistics on that.  However, because Your Honor has

7  already basically ruled on the issue that, you know, we're

8  going to keep to the timeline of a class and we're going to

9  keep to the class members, well, then that narrows Rog 11 to

10  just the class members.

11      Here again, Eddie has the files, just like we do, and you

12  can go through the files and see what questions were asked.

13  The unnecessary questions, those are the seven that are in the

14  definition of the subclass.  And so you can, quite easily,

15  just look at the questions and see are any of these the same

16  as the seven unnecessary questions.  So in there --

17          THE COURT:  Well, I would assume that the questions

18  of the class members would be fairly consistent.  I guess the

19  question is, is that practice consistent with other IRS

20  inquiries.

21          MS. BECKERMAN:  And we are not making a factual

22  argument, Your Honor, that because we asked this question to a

23  class member and to a nonclass member, that it's okay.  With

24  that respect -- I think that might be Interrogatory 16 that we

25  answered on this issue.  We're making a legal argument that

1   there are certain cases where the Court said that the type of

2   information that -- for example, asking whether someone on

3   your board is going to run for public office, that we believe

4   that in the *American Campaign Academy* case out of the tax

5   court, that the Court found that that type of information

6   might be relevant to determining tax-exempt status; and,

7   therefore, if a Court found a question could be relevant,

8   then, you know, we don't think it could be illegal for the IRS

9   to ask that question.

10     So we've given them these case cites.  I think they're

11   familiar with our position on this issue.  So we are not going

12   to be making any argument that because, you know, that

13   Question Number 1 was asked to a class member and to some --

14   and it was also asked a totally different type organization,

15   that makes it okay.  We're definitely not going to be making

16   that argument at all.  That's not our argument.  We would just

17   be making an argument that Question Number 1 is okay because a

18   Court has said that type of information is relevant in the

19   situation.  That's the difference there.

20        THE COURT:  Eddie?

21        MR. GREIM:  Your Honor, we're familiar with that

22   position.  I mean it, you know -- I think this will make more

23   sense when it comes up at the hearing or at trial or in

24   summary judgment.  The cases are not going to say that these

25   questions are okay in this, you know, in this situation or

 1    that they're always okay or it's okay to do what the IRS did

 2    here.

 3        But they'll go as far as they go.  We'll argue it at that

 4    time.  Our only point is, I think what you said several

 5    minutes ago, which is that you can't say that it's typical to

 6    ask all these private inurement and private benefit

 7    development questions of groups like this, that that's what

 8    they're precluded from doing.  If they want to say that a

 9    case, that it's always okay legally, then we'll argue about

10    whether the case said that.

11            THE COURT:  Okay.  I think that's where we are;

12    right?

13            MR. GREIM:  I think so.

14            MS. BECKERMAN:  We agree.  I mean, we are not going

15    to be saying that these questions are okay because they're

16    always done; we're going to be saying they're okay because

17    case law says it's okay.

18            THE COURT:  Okay.  All right.  So what's next?  I

19    mean, I painted sort of a broad brush at the outset.  Does

20    anybody have any specifics?

21            MR. GREIM:  Your Honor, plaintiffs, we do.  We'd just

22    take two of the other issues, and then I think we're kind of

23    -- I think that's all we would say.

24        On the relevant time period --

25            THE COURT:  Yes, sir.

1          MR. GREIM:  -- you know, the targeting -- there is a

2   class period, but that class period defines when the IRS used

3   these common targeting criteria to pull somebody into the

4   class.  But that class period doesn't define when they were

5   actually going through the unauthorized inspections.

6       Now, you know, even if we were to limit our discovery to

7   just tell us what the unauthorized inspections were and we had

8   no other relevant questions, I mean, we're going to find

9   unauthorized inspections that happened to the, you know, class

10  that had been assembled by mid-2013.  Later on in 2013 when

11  they stopped adding people to the class -- so we're outside

12  the quote, "class period" for purposes of deciding who's in it

13  -- but there's still bad things happening to those people in

14  the form of unauthorized inspections.

15      And so our only point is we can't just use the artificial

16  construct of when they started building membership of the

17  class and they stopped building the membership of the class to

18  apply to everything else.  I mean, there's all kinds of other

19  conduct, you know, that is relevant here, like, for example,

20  being worried about Tea Party groups and e-mailing about that.

21  Well, that was before they first pulled somebody out

22  specifically to be in the class.

23          THE COURT:  But Eddie, how much before, all the way

24  to 2006, which I think was what you were asking for?

25          MR. GREIM:  Well, you know, on different requests we

1   asked back for different time periods.  And so, I -- frankly,

2   I am embarrassed to say, I'm not sure which of our requests.

3   I could probably pull it up here.  It goes back to '06.

4      But our point is simply:  as far back as there are

5   responsive documents, they should produce them, and it can't

6   just be limited to the relevant time period.

7        THE COURT:  Okay.  I'm willing to show some

8   flexibility, but I'd like to pick some bookend dates on either

9   end so that it's not completely open-ended.  How do we do

10  that?

11       MS. BECKERMAN:  Sure.  Your Honor, if I may address

12  that.  So plaintiffs picked the class time period when they

13  did the class definition, and that time period starts with

14  when the first class member's application was received by the

15  IRS.  And so the Complaint focuses on unlawful inspections of

16  the class member's tax return information, and so no unlawful

17  inspection could occur before that taxpayer submitted their

18  application to the IRS.  And that date begins in January of

19  2010, which is, you know, extremely early.  All the timelines,

20  that's actually -- usually the timelines pick up in mid-2010.

21     On the later date, the class time period goes through June

22  of 2013, which is actually about five weeks after the

23  Complaint was filed.  The Complaint, I believe, was filed May

24  20th, 2013, and the class time period goes through the end of

25  June.  And so, you know, if -- to the extent Eddie thinks that

1   there is something after his Complaint was filed, well, he

2   can't seek relief for something that didn't happen.  You know,

3   it's not in the Complaint if it didn't happen until after he

4   filed the Complaint.

5       So, you know, I do think that we're talking about the

6   right time period.  If you look at the timeline and the TIGTA

7   report, if you look at all the timelines we produced, the

8   Congressional report, this really is the time period that

9   everybody who looked at this agrees is the key time period at

10   issue.

11       And so, I mean, we think that that is -- that plaintiffs

12   picked this time period for a reason, because it's the time

13   period in the TIGTA report and the Congressional report, it is

14   the time period when these things happened that are at issue

15   in this case.  So we think that when plaintiffs picked this

16   time period it made sense because of the facts of the case,

17   and it still makes sense today for purposes of discovery.

18          THE COURT:  Anything else, Eddie?

19          MR. GREIM:  Okay.  Your Honor, first of all,

20   Mr. Martin --

21       Dane, help me out here.

22       The earlier dates were for the metrics-related questions,

23   which we've addressed elsewhere.  But in terms of actual

24   e-mails about the Tea Party groups or about the targeting, we

25   would not -- I mean, there is no way there would even be

1    responsive documents back then.  So I would be willing to go

2    to, say, June 30th of 2009 when Tea Party groups were starting

3    to form.  So I would be willing to go back that far.  There

4    may be nothing back there.  I would do that.

5         The other thing is, there is -- you know, we saw, with the

6    Preliminary Injunction motion, there were many things

7    happening, I mean, with TPTP, for example, after the Complaint

8    was filed.  The issue, again -- it's not just identifying what

9    the unlawful inspections were.  I mean, I gave that as sort of

10   the, you know, sort of the extreme example; that, you know,

11   even if discovery were just limited to the inspections

12   themselves and not people's motivations for them and not the

13   tax administrative purpose for them, that we would at least

14   have to cover the period of the unauthorized inspections.  But

15   there is no --

16        You know, we asked for injunctive relief in our Complaint.

17   We by no means have said that we think all the wrongful

18   conduct against the groups stopped when we filed our first

19   Amended Complaint.  Of course, you know -- our initial

20   Complaint.  We filed an Amended Complaint after that.  Then we

21   saw, in the case of TPTP, what they were doing to people even

22   while the litigation was going on.

23             THE COURT:  Well, how far beyond June 30th, 2013, do

24   you want to go?

25             MR. GREIM:  Well, Your Honor, for TPTP we just got up

1  until September of last year.  I mean, I would say if they

2  have responsive documents even today about, you know,

3  inspections of these groups for unauthorized purposes, we

4  should get those documents.  Now, it may be that there are

5  none because they've stopped.  That might be the answer.  But

6  I just can't imagine that if Lois Lerner is e-mailing somebody

7  about, you know, why they targeted the Tea Party groups two

8  weeks after we filed our lawsuit, that that is not responsive

9  because it's post the date of filing.

10          MS. BECKERMAN:  Your Honor, may I just address a

11  couple of things?

12          THE COURT:  Yeah, please do.  I'm with Joe.  I think

13  we're going backwards.  Go ahead.

14          MS. BECKERMAN:  Sure.  I think that Eddie is

15  conflating two different issues.  There is the class claim,

16  and then there is a different claim that only pertains to

17  Texas Patriots Tea Party.

18      When plaintiffs have sent us a request for information

19  about Texas Patriots Tea Party that goes beyond the class time

20  period, because TPTP is by itself in the injunctive relief

21  claim, we've answered and we've given them stuff up to the

22  present about TPTP.

23      The class action claim is not for injunctive relief.  It

24  is only for unlawful inspection.  And so with regard to

25  documents about the class members, you know, we do believe

1    that the time period that is the class definition that

2    plaintiffs put forth and that the Court adopted is the correct

3    time period.

4        First of all, Lois Lerner was gone from the IRS by the end

5    of the class time period.  So, absolutely, any documents that

6    she would have generated are within the class time period.  Or

7    she was no longer working there.  And we have given -- we

8    didn't just stop with the date of Complaint.  We went through

9    the class time period, which is the end of June, 2013.  So,

10   you know, there really has to be kind of a reasonable limit.

11       And to just take this also to the practical end, we have

12   reviewed an awful lot of documents in this case.  When

13   plaintiff told us their objection about the timeline, which

14   was later on in the review, we did start tagging some

15   documents as being outside the timeline, but we did the vast

16   majority of our review, probably 75 percent of it, before we

17   knew that they wanted us to do that, and so we don't have it

18   tagged.

19       So what plaintiffs are asking requires us to do an awful

20   lot of work over, and especially -- I mean, Eddie just said

21   that he doesn't know whether there is anything before January

22   of 2010.  He said maybe June, he doesn't know.  So what we're

23   really talking about is having the government to do an awful

24   lot of work over for what is, at best, a fishing expedition.

25            THE COURT:  All right.  Let me chew on that one,

```
 1   guys.  What's next?

 2          MR. GREIM:  The other governmental agencies, Your

 3   Honor -- you know, we listed three in here based on specific

 4   communications.  I'm going to let Mr. Martin quickly run

 5   through that one.

 6          THE COURT:  Great.  Thanks.

 7          MR. MARTIN:  Your Honor, so what made us -- and I

 8   think our requests have gone to this as well.  What we are

 9   certainly interested on as far as specificity was that there

10   were some conversations between Miss Lerner and members of the

11   FEC and the DOJ regarding the use of sworn representations

12   made by Tea Party groups in applying for tax-exempt status

13   against them in enforcement proceedings.  And the reason that

14   we're very interested in that is that there's other

15   indications that we've seen that the -- some of the reasons

16   that some of the unnecessary requests were asked and some of

17   the development occurred was specifically to get

18   representations by these groups.

19       We also have this expedited processing that was sent out

20   to class members.  I think that's after the class period, so

21   after they were formed as part of the class, they then

22   received this expedited processing.

23       And one argument that we have made and intend to make is

24   that that actually requested entities to swear under oath that

25   they would engage in certain activities that were more onerous
```

1  -- or that they would comply to standards that were more

2  onerous than required by the exemption standards.

3      So, for us, the effort to acquire sworn statements and the

4  communications with members of the FEC and DOJ about these

5  sworn statements is a good indicator of what the purpose was

6  for these requests and, thereafter, the purpose for the

7  ultimate inspection of that information.

8          THE COURT:  Well, I guess I would ask:  How do you

9  know this if you haven't seen the e-mails?

10      It sounds like you've already got the info, don't you?

11          MR. MARTIN:  We do because -- well, we do -- for the

12  e-mails we know about, we do.  But -- so we have the e-mails

13  from Miss Lerner to, I think, a member of the FEC.  I think

14  Miss Lerner referenced something about DOJ officials.  I think

15  that that e-mail was produced to, I'm going to say, Judicial

16  Watch in a FOIA request.  The challenge is that that e-mail is

17  redacted in part.  Also, I think that we want to know the full

18  story on that.  And the fact that we encountered a single

19  e-mail on that topic, it doesn't really give us any

20  information about how far the IRS went to actually, you know,

21  fulfill that plan, if it was a plan, did that -- did they

22  actually take steps to complete it.

23      Those are some of the base questions that we wanted to get

24  to when asking if the IRS and the DOJ or the FEC talked about

25  the Tea Party cases.

1          THE COURT:  Okay.  A couple of quick observations.

2     Okay.  One of the things I said was, if you had a specific

3     item which looks like it bore further inquiry, I would

4     certainly consider whether or not to permit that.  But I

5     thought in our last phone conversation we talked about this.

6     I thought Laura said there's no reason to go to the other

7     agencies because if there was communication, it would have

8     been in our files which we've already produced.

9        So I'm kind of wondering if I'm missing something here.

10    At least I think she said that.  I haven't read the

11    transcript, but I thought I heard that.

12          MR. MARTIN:  Your Honor --

13          MS. BECKERMAN:  Your Honor, that is what we said.

14    And I just want to reiterate that we -- the government is not

15    withholding any documents in response to any of the searches

16    where they asked for communication, for example, between the

17    IRS and Treasury.  We produced all the documents, and we

18    believe that, really, the bottom line is that if there is a

19    communication between the IRS and another agency, then it will

20    necessarily also be housed at the IRS.

21       I do want to address some of the examples that they used

22    --

23          THE COURT:  Well, hang on one second.  Let me ask you

24    a question.  From what I understand they just said was, is

25    they didn't get this document from you guys, it was obtained

1  by somebody else through a FOIA request and was not produced.

2       MS. BECKERMAN:  I don't believe that they said that.

3  I mean, we don't know what -- if they've asked us for a copy

4  of this document, then we will give them a copy of this

5  document.

6       THE COURT:  I mean, I'd kind of like to see the

7  document itself so I can figure out what the situation is

8  exactly.  But go ahead, Laura.  I interrupted.  I'm sorry.

9       MS. BECKERMAN:  My colleagues are telling me that

10  this document is attached to the plaintiffs' motion as Exhibit

11  H.

12       THE COURT:  Hang on.

13       MS. BECKERMAN:  So that would be Docket 319-8.

14       THE COURT:  Hang on a second.  My pile is ever

15  growing here.

16       MS. BECKERMAN:  Sure.

17       THE COURT:  What's the page number?

18       MS. ROYALTY:  It's a docket entry.

19       MS. BECKERMAN:  It's Page ID 10660.

20       THE COURT:  106 -- wait a minute.  It's attached to

21  theirs; right?

22       COURTROOM DEPUTY:  319.

23       THE COURT:  Let me find 319.  Sorry.

24    (Pause in proceedings.)

25       THE COURT:  What page on 319?

```
1              MS. BECKERMAN:  It's Page ID 10660.

2              THE COURT:  106.

3              MS. ROYALTY:  It would be attached to that.  You

4    might not have that.

5              THE COURT:  I may not have that.

6              MS. ROYALTY:  Let me grab it.

7              THE COURT:  We didn't print the attachment.  Just

8    tell me what we're talking about.

9              MS. BECKERMAN:  Sure.  Well, Your Honor, in this

10   section of their brief, plaintiffs cite the two exhibits,

11   Exhibits G and H.  Exhibit G is a page from the House

12   Oversight and Government Reform Report about the Tea Party

13   advocacy cases.  In there, they cite to an interview and to an

14   e-mail.  The e-mail that they are citing to is in support of

15   their argument that they need discovery outside of the IRS.

16        Well, I was able to find that e-mail.  We produced it.

17   It's Bates number 41928, if plaintiffs want to look for it.

18   So we produced that e-mail.

19        Exhibit H is an actual copy of an e-mail.  And I don't

20   know if this is the e-mail that Dane was talking about, but it

21   is not an e-mail to the FEC.  It's an internal IRS e-mail

22   where Lois Lerner says, quote, "As I mentioned yesterday,

23   there are several groups of folks from the FEC world that are

24   pushing tax fraud prosecution for c4s who they report are not

25   conducting political activity when they are (or these folks
```

think they are).  One is my ex-boss, Larry Noble, former

General Counsel at the FEC, who is now president of Americans

for Campaign Reform.  This is their latest push to shut these

down.  One IRS prosecution would make an impact and they

wouldn't feel so comfortable doing the stuff."

So, you know, we produced all the e-mails to and from an

FEC e-mail address.  That was one of their requests for

production that we have already produced all the documents.

Here is an example of a document that is internal.

So we still don't have any examples of any documents that

would give us any evidence that there are documents -- there's

reason to look at agencies outside the IRS.  They, once again

--

THE COURT:  I mean, not that I would expect you to

know, but do you know if -- were there any e-mails between her

and Larry Noble that were produced or discovered or anything

like that?

MS. BECKERMAN:  We -- I know that one of the

discovery requests asked for a very broad request of all

e-mails to and from Lois Lerner, work and personal accounts,

and we produced those.  I don't know if there were any e-mails

to this particular person.

THE COURT:  Okay.

MS. BECKERMAN:  But this e-mail here, it's not

referencing it in other e-mails, but I think it's talking

 1    about --

 2           THE COURT:  Oh, no, no.  I get it.  I understand that

 3    part, but it does sound like there was some communication.

 4    I'm just wondering if there's any way to know what the form of

 5    the communication was.

 6        Let me switch back to Eddie and Dane.  So, I mean, what do

 7    you think, fellas?

 8           MR. GREIM:  Your Honor, I would just -- you know, if

 9    they're saying they've really produced all of it, then, you

10    know, again, we can't -- it's kind of hard to disagree with

11    them without knowing more.  The Bates number they've mentioned

12    is a later one in the 41,000.  So if that was in the last

13    tranche, or even a month or so ago, we may still be getting to

14    that as we -- you know, we're doing our own kind of review to

15    get ready for depositions that are happening as we're going

16    here.

17        I would say this also, Your Honor.  Earlier in that same

18    exhibit there is an e-mail from Lois Lerner to Nikole Flax

19    saying about a call she got from Richard Pilger, Director of

20    Election Crimes Branch at DOJ, talking about some of the same

21    idea of going after these people.

22        And so I don't -- I'm not here to say that I know of

23    documents, e-mails between Lois Lerner and DOJ or FEC or Larry

24    Noble, even, that have not been produced.  I just want to know

25    that if they exist, they will be produced.

1      MS. BECKERMAN:  Your Honor, we do disagree with the

2   characterization of the documents that Eddie made about that

3   these -- talking about going after groups.  But I think that

4   the larger point is that we have -- there is no evidence that

5   there's documents out there that are relevant that aren't also

6   housed at the IRS.  In fact, we are seeing evidence of the

7   fact that these are IRS e-mails on this issue.  And if someone

8   at the IRS is going to e-mail someone outside the IRS --

9      THE COURT:  Time out, Laura.  I'm just going to let

10  the issue sit.  It seems to me that the IRS has done what the

11  IRS is supposed to do.  If you guys take some of these e-mails

12  and say -- I forget the guy's name you just mentioned at DOJ.

13  But if you want to drop a subpoena on this person to find out

14  about their contacts and stuff like that, then we'll talk

15  about whether or not that effort gets supported.

16     So you guys figure out -- you guys put together what you

17  want to do with this stuff and what information you want to

18  try to gather, and we'll figure out what the best way to do it

19  is.

20     MR. GREIM:  Your Honor, we'll do that.  I mean, at

21  the end of the day it may be that they say they've produced it

22  all, and that's it.  And, I'm sorry, I hate to use precious

23  time, but I've got to say -- I'm looking at this e-mail more

24  closely, and I agree with Laura.  This is not about Pilger

25  going after the groups; it's about getting testimony before a

1    senator who wanted to know about crimes of these folks.  So I

2    did mischaracterize it, and I don't want it to sit in the

3    transcript like I said it before.

4         THE COURT:  No, that's okay.  And part of the issue

5    is you're still getting recent production, so we're not quite

6    there yet.  So let's move on to something else while there's

7    still daylight outside.

8         MR. GREIM:  Okay.  Your Honor, we have some other

9    things on the agenda that weren't part of your first

10   run-through, but some of these we can -- I tell you what,

11   here's one thing we should do.

12        THE COURT:  Yes.

13        MR. GREIM:  *Bivens* deposition issue.  I'm pleased to

14   tell you it is all -- with two exceptions, it is probably

15   going to be done.

16        THE COURT:  All right.

17        MR. GREIM:  We have spoken with counsel for the

18   line-level folks.  I think Eric Nitz is on the call from them.

19   In exchange for being able to take these without the

20   confidentiality designation and getting rid of the old

21   confidentiality designations on the old class discovery

22   depositions, we are going to release our *Bivens* claims against

23   them.  So that --

24        THE COURT:  Okay.  Well, if you guys tell me you've

25   got something under control, that's fine.  If the under

1  control falls apart, just bring it to my attention.  So that's

2  good.  All right.

3  MR. GREIM:  Okay.  One more forecast for you.  I

4  mentioned there were two exceptions with the management level

5  folks, and here's what we may -- we probably will, I should be

6  bringing to you.  We may have a similar deal there with the

7  exception that two of the higher-ups -- and I guess I won't

8  name them until we have to --

9  THE COURT:  All right.

10  MR. GREIM:  -- do not agree -- that -- they want to

11  raise an additional issue with making these public.  They, I

12  think, will argue harassment, that there is a possibility of

13  harassment by private individuals if the contents of their

14  testimony becomes known.

15  And so our hope, Your Honor, will be to tee that issue up

16  for you as quickly as possible and then have a decision so

17  that by the time we take their depositions, which might well

18  be later on in May, we will know whether they are to be under

19  seal or not, you know --

20  THE COURT:  Okay.

21  MR. GREIM:  -- based on whether the harassment

22  concern is just cause for keeping them under seal.

23  THE COURT:  Right.

24  MS. BENITEZ:  And, Your Honor, this is Brigida

25  Benitez.  And I don't want to take up more time in this

1    hearing, but I represent the management level defendants.

2        As Eddie just represented, I mean, we've reached agreement

3    with all of them. I have 11 clients, and all but two -- but

4    these are the -- and I'm happy to name them because I think

5    that's important. The highest profile, Lois Lerner and Holly

6    Paz, are two individuals who were subjected to pretty extreme

7    harassment, you know, following a lot of the press accounts.

8    A lot of the statements and things were put on *Fox News* and

9    every press outlet. They've received death threats. They had

10    to get protection from the IRS. Ms. Paz's son was harassed

11    and was chased from the school bus. I mean, there were really

12    some nasty things that happened, and they are very concerned

13    about having this testimony be public and having this all

14    start.

15        So we are happy to, as I've told Eddie, make them

16    available for deposition, work with him to schedule them --

17        That's not at all an issue.

18        -- and, certainly, on my other clients to do the same.

19    But for the two of them, we will be submitting a Motion for

20    Protective Order and provide Your Honor with that evidence so

21    that you could see for yourself the level of harassment

22    they've endured and, I think, does not deprive Eddie of having

23    the testimony for, you know, his purposes in this litigation.

24        THE COURT: Okay. Well, I think we're just teeing up

25    the argument now and not making it; right?

1          MS. BENITEZ:  Yes, that's correct.

2          THE COURT:  Okay.  Good.

3     So what else then, guys?

4          MS. BECKERMAN:  Your Honor, the government has the

5     issue that it brought to the Court on its Motion to Compel,

6     which is identifying the documents responsive to the specific

7     requests.  So in Document Request Numbers 2, 3, 4 and 5, in

8     response to each of these, the plaintiffs responded by citing

9     the entire production to date, which is, I think, about 13,000

10    pages of documents.  I mean, we believe that the rules require

11    them to cite with a bit more specificity much in the way we

12    did.  When a request asked for timeline, we cited a timeline

13    section.  Likewise, we believe that they should be doing the

14    same and that that will better enable us to understand what

15    documents are responsive to his request.

16         THE COURT:  I thought we kind of touched on that a

17    couple of phone calls ago, and Eddie said that he was working

18    on a target date by what time he would, you know, give you

19    damages, give you what are the alleged improper inspections

20    and all that kind of stuff.  I mean, if you needed more time

21    to follow up, we would do that, but maybe I'm wrong again.

22         MR. GREIM:  Your Honor, our -- that's right.  The

23    only thing I'd say is, there is a slightly different issue

24    here.  There's really two parts of it.  One is, when we

25    identify -- you know, we answered their inspections issue as

1    part of the roadmap, but there is a separate document request

2    where they want us to -- because they've asked us to produce

3    all documents showing that, for example, that their

4    inspections were unauthorized.  And, of course, we don't have

5    any documents of our own about this.  It's the IRS documents.

6       But we did -- like, our production, for example, in this

7    case, Your Honor, was surfing the internet, pulling the TIGTA

8    report, pulling the Congressional reports, and pulling the

9    things that we thought were most important out of the great,

10   much larger mass that's out there publicly available and

11   producing that to them.  So the IRS wants us --

12           THE COURT:  No, I -- time out.  I thought we had

13   already had this conversation, and I said I understand that,

14   and you said but once you get through your discovery and

15   you're able to identify what you're talking about from the

16   documents the IRS is producing, you'll let them know what

17   you're going to use; right?  Am I --

18           MS. BECKERMAN:  That would be fine with --

19           MR. GREIM:  Yes, Your Honor, we can do that.  I just

20   would say, it's going to be a little -- it's going to be in

21   the nature of more of an exhibit list at that point, but we

22   can do that.  I mean, we will.  I just -- I -- we may still

23   have a rather large range of documents.  If they want to know,

24   you know, all documents that show that the inspections were

25   enough for a lawful tax administration purpose, it's going to

1  be much of the TIGTA report because it's going to outline the

2  motivation.  But we'll do that.  I mean, I still think there

3  will be large chunks.

4      Now, on identifying the inspections, Your Honor, that will

5  be very targeted because that will be specific for each group.

6  It will point to each wave that they were subjected to.

7          THE COURT:  Well, all I care about is the government

8  having adequate time to prepare for what's coming at them

9  depending on what you've got lined up to fire their way.

10  That's all.

11          MR. GREIM:  And, Your Honor, I think we'll be able to

12  do that.  My thought was -- not to circle back to the roadmap,

13  but if they've got their stuff to us --

14          THE COURT:  I love the roadmap, Eddie.

15          MR. GREIM:  Okay.  Thank you.  I'll have to start

16  using that more often in other --

17          THE COURT:  Yeah.

18          MR. GREIM:  But if we have a very quick meeting,

19  confer -- and, you know, some amendment will have to occur on

20  their inspection stuff back to us.  If that happens by April

21  21 -- before we said the 14th, and I moved it to the 21st

22  now -- we would get back to them by May 8th.  Before we said

23  May 1, and now I'd say May 8th.  And then we'll go into our

24  final gasp of D.C. depositions.  Those will be done by May

25  25th.  We would give them our update based on those

1    depositions still, I think, on June 1, maybe the end of that

2    week, June 5.

3           MS. BECKERMAN:  Your Honor, Eddie seems to have taken

4    us back to the idea that the government hasn't produced enough

5    information for them.  I mean, of course we're going to get

6    together with them and see if there is any other small

7    targeted searches that we could reasonably do, and quickly.

8    But, other than that, I didn't understand that the Court had

9    ordered us to produce anything more.  In fact, I thought the

10   Court had reflected that our interrogatory responses were very

11   thorough.

12          THE COURT:  Well, I did.  I've got a couple of issues

13   hanging.  One is that we have to talk about the period of

14   production on the one issue, and I haven't finally decided

15   that.  I want to chew on that a little bit.  Other than that,

16   what I've said was I thought your production stuff was

17   thorough, but I've also understood from this conversation that

18   not everything has been reviewed.  But there is a difference

19   between thorough and complete, so I just want to make sure we

20   close the loop and get that squared away.  Okay?

21          MS. BECKERMAN:  Of course.  That makes sense.  Thank

22   you.

23          THE COURT:  Yeah.  Another thing, one issue which has

24   been hanging is the concept of -- and, like I said, I'm not

25   holding anybody's feet to the fire on this.  There was the

1   concept of not having a dual process of summary judgment

2   potentially followed by a bench trial, but putting the whole

3   ball of wax together, legal arguments, factual arguments and

4   all that stuff and moving towards completion in that manner.

5   I think Eddie said his group was generally on board with that,

6   and I think, Laura, you said you had to check.  I don't have

7   to have an answer on that, but I'm just kind of curious if

8   there's any discussion on that.

9        MS. BECKERMAN:  Your Honor, we did discuss it.  We

10   ran it up our supervisorial chain, and we can't waive the

11   right to file summary judgment.  And also, really on a

12   practical level, many of the issues that we would be

13   addressing in summary judgment are primarily legal issues,

14   which we would be happy to discuss and -- for example, you

15   know, whether applications for tax-exempt status are return

16   information given the Sixth Circuit's ruling on Mandamus, what

17   the meaning of tax administration purpose is --

18        THE COURT:  Don't forget.  Kethledge's quote, I

19   think, was something like those regulations are to protect the

20   taxpayer and not the IRS, if I remember right.  So just

21   remember that.  Didn't he say that?

22        MS. BECKERMAN:  Well, he said --

23        THE COURT:  He said a lot, he said a lot, but he did

24   throw that in there.  Okay.  I'm just saying, you guys have

25   your legal issues, and we'll look at it as we come down the

```
 1  road.  Okay?  All right.  But, you know, if you can't do it,
 2  you can't do it.  That's fine.
 3          MS. BECKERMAN:  Yeah.
 4          THE COURT:  Yeah.
 5          MS. BECKERMAN:  Unfortunately, we can't forego the
 6  summary judgment.
 7          THE COURT:  Okay.
 8          MR. GREIM:  Your Honor, my only point would be that I
 9  know what these legal issues are going to be and, frankly,
10  they could go in a trial brief.  I mean, they -- but I'm
11  afraid what's going to happen is, with summary judgment we'd
12  get a race to the bottom because, you know, the legal issues
13  get teed up, then there's lots -- even if you tried it, you
14  start off with the idea of a very streamlined, you know, that
15  it's either return information or it's not.  You do that, and
16  pretty soon you're raising a few other issues too, and now
17  we're trying our case --
18          THE COURT:  Oh, no, Eddie, I'm totally with you on
19  that.  I understand it.  That's why I made the suggestion.
20  Because in Proposed Findings of Facts and Conclusions of Law,
21  you can flesh out every legal issue you would have fleshed out
22  in a summary judgment motion.  But if the boss says don't do
23  it, there's not much Laura can do.
24          MR. GREIM:  Fair enough.  Far be it from me to
25  question Laura's boss.  But I would -- while we're on this,
```

1  there is the TPTP issue.  We think that is fully briefed.  The

2  question there was once Your Honor ordered injunctive relief

3  in the fall, what exactly did that mean in practice for

4  finishing the processing of TPTP and --

5          THE COURT:  Boy, you got me.

6      Come on, lighten up, guys.  Lighten up.  I'm getting a

7  little punch drunk.  It's the end of the day here.

8          MR. GREIM:  Oh, we had a barbecue for lunch, and

9  we're getting kind of dizzy on our end.

10          THE COURT:  I am looking so forward to seeing you

11  guys in trial.  I'm going to predict right now the sidebars

12  last as long as the presentation --

13          MS. ROYALTY:  No, it's a bench trial.

14          THE COURT:  Oh, it's a bench trial, that's right.

15  Still -- well, so there really shouldn't be a sidebar, should

16  there.

17          MS. ROYALTY:  You could still have them if you want

18  them.

19          THE COURT:  Let's have an advisory jury watch the

20  case and see what they say.  Wow.

21      I'm sorry.  Go ahead.  I digressed.

22          MR. GREIM:  Your Honor, there is one other -- so I

23  just raised TPTP.  I mean, we can talk about this with Joe and

24  Laura --

25          THE COURT:  Eddie, Finney will tell you I go off on

1   tangents all the time.

2           MR. GREIM:  He's never told us that.

3           THE COURT:  Okay.

4           MR. GREIM:  He has never told us that.  He should

5   have, though.

6       But on TPTP, Your Honor, we just -- that is an issue

7   that's been briefed.  You know, everyone has attached their

8   exhibits.  Even though it's preliminary injunction, I think

9   you could -- you know, I think it is ready to be decided,

10  especially, you know, if there was any thought that if we had

11  an early bench trial, we could just take it up then.  If that

12  doesn't happen, then it would seem -- you know, we'd like to

13  get that rolling just in case Your Honor decides that TPTP has

14  to produce documents up to the minute, you know.  Then all

15  this time they need to be still submitting documents for the

16  processing, and so it does matter to them.

17          THE COURT:  Laura, there is another talking point to

18  discuss with the boss.

19          MR. GANAHL:  Your Honor, this is Joe.  I think I

20  could maybe, hopefully, fix this right now.  So TPTP, the

21  issue with TPTP is, where we last left it, to remind the

22  Court, there was an injunction granted for them to be

23  processed in the ordinary course.

24          THE COURT:  Right.

25          MR. GANAHL:  The ordinary course, they were looking

1   at the entire existence of the organization, and then they had

2   sent some questions to TPTP that covered the entire time

3   period.  So time has passed.  At the time, the Service wanted

4   us to adamantly fight that, you know, it's -- they should be

5   processed like everyone else.  Essentially, plaintiffs came

6   back, we're asking for special treatment.  In the course of

7   this, briefing and in discovery, we've given them all of the

8   files that taxpayers normally don't have access to.  So

9   plaintiffs have access to everything the Service was looking

10  at, all of their concerns they were looking at.  We even

11  waived -- they called into question attorney-client, so they

12  have all of our attorney-client work product.

13      I have confirmed with the Service that they are willing to

14  withdraw the questions and only look at the early years of

15  TPTP to make a determination.  If that resolves the issue,

16  that gives us special treatment.  And, to go even further,

17  TPTP, we can set the time here, can submit anything they want

18  to the IRS to make a determination, and now they have the --

19  to use the word, they have the roadmap of what the Service was

20  looking at, what concerns they have, they had the draft

21  denial, they have the questions of what the Service was

22  examining.  So TPTP could be in a very good position to submit

23  information that the Service would need to process their

24  application.

25      And then, once the Service rules on that -- and it's a

1  little complicated, but Judge Dlott's ruling on the Motion for

2  Summary Judgment -- I'm sorry, Motion to Dismiss, made clear

3  that anyone with, you know, Count 2 only was for people with a

4  pending application.  So then rather than have a trial, Count

5  2 could would go completely away, and it would help my client

6  because TPTP is the only person left that hasn't been acted on

7  in any way.

8      As the Court may be aware, there is a little publicity

9  surrounding this and a little bit of Congressional inquiry, so

10  it would be very good that they resolve all of the outstanding

11  applications.

12          THE COURT:  Joe, I instructed myself at the outset of

13  this case not to watch media reports, tweets, blogs, stories,

14  news reports or anything like that, so I'm in the dark.

15      But Joe, what do you say --

16      Or Eddie, what do you say to what Joe just said?

17          MR. GREIM:  Well, I -- it's not a lot different from

18  different things we've heard from the IRS.  We talked about

19  this the other day, and I don't know if what he said here is

20  anything different.  I --

21      But here's the problem, Your Honor.  We think there should

22  be a clear decision that if TPTP answers what the IRS had

23  identified in 2013 as what was still necessary before they got

24  caught up in all this, then that ought to be enough.  And what

25  worries me a little bit is this idea that --

1      And I'd really love to get into details here.  This call

2  may not be the time for it.

3      -- but this idea that we can look through and we can try

4  to guess what the IRS thought was important.  Because,

5  remember, in succeeding years they kept looking back at the

6  file again and kept thinking of new things.

7      So I'm not sure which standard -- we want the Court to

8  make a clear decision, and I'm afraid that if we leave it wide

9  open and just say, "Taxpayer, you give us what you think we

10 need," that's a game that we're not going to win.

11          THE COURT:  I thought Joe said he was willing to cut

12 it off at 2013, or not?

13          MR. GANAHL:  That's what I said, Your Honor.  We've

14 given plaintiffs everything they've asked for.  We just want

15 it to go away.  This Count 2 will go away once they get a

16 ruling, and now it's, you know -- for the Court and for us.

17          MR. GREIM:  Okay.  The only good thing I'd say is

18 that the IRS previously said that they would deny us based on

19 2013, and so I hope it's -- you know, I guess I'll just say

20 this.  I would like to talk to Joe and Laura offline about

21 this going back to 2013 idea.  Because, if I'm hearing them

22 right, this might be something brand new, but it would have to

23 be what we asked for in this case.  I just want to be very

24 sure that it is.

25          THE COURT:  Okay.  Well, you guys talk about that

1   offline, but it does --

2         MR. GANAHL:  Your Honor, can I just address

3   something?

4         THE COURT:  Sure.

5         MR. GANAHL:  I don't know if it would be a denial

6   because I don't know what they would submit.  I do know, and

7   it's clear from where we stand right now, that there was a

8   proposed denial drafted and there's a bunch of other things.

9   But the point is, if Mr. Greim is -- if Eddie is asking for

10   the Court to order an approval, that's clearly the

11   anti-injunction -- there is no jurisdiction here.  That would

12   be a different cause of action.

13     I thought it was the process, and he said -- one of the

14   arguments was you need to look at the earlier years, which we

15   agreed to do.

16         THE COURT:  Okay.

17         MR. GANAHL:  I said he could answer anything he

18   wanted.  So if he wanted to answer those early questions

19   tendered, he could answer those early questions.

20         THE COURT:  Why don't you guys kick that around?

21   We'll talk about that in the next phone call, because I'm sure

22   we're going to have several.  But it does bring up an

23   interesting question.  Has anybody ever discussed that evil

24   word "settlement" at any point in this process?  Is there any

25   --

1          MS. BECKERMAN:  Your Honor, we have mentioned to

2    Mr. Greim that we're very happy to listen to any reasonable

3    settlement offers.  We'd be happy to sit down and have a

4    settlement conference.  I had mentioned that a couple of

5    times.  Any time -- the one problem we have is that Eddie

6    hasn't given us an actual number for damages.  He's given us a

7    range, anywhere from 1,000 to 10,000 per plaintiff.  But if

8    Eddie was able to give us a number, we would be very happy to

9    sit down and talk settlement.

10         MR. GANAHL:  And, Your Honor, there is a practical

11   concern of us bringing up settlement and a number, and that is

12   we're not allowed to make settlement offers.  I mean, it's

13   just -- it's our rulings.  But, as Laura mentioned, we are

14   more than willing to discuss it and are willing to discuss it.

15         MR. GREIM:  Well, Your Honor --

16         THE COURT:  Hang on.

17         MR. GREIM:  -- I'm glad to hear that.

18         THE COURT:  Hang on.

19      So Joe, you're telling me what the rule is, is you guys

20   can't throw something out but you can respond to whatever

21   Eddie puts on the table?

22         MR. GANAHL:  Right.  We can have a full -- what we

23   put in a million letters, because usually what happens is when

24   you're a normal trial attorney, someone makes an offer, and

25   you say, "No, but I could recommend this," and then they come

1  back and go, "Counterclaim.  Counteroffer accepted."

2      What we are allowed to have is a full and frank

3  discussion.  And then what happens from us is, the trial team

4  makes a recommendation to the chief of the section.  Then,

5  depending on the number, it could go to the Office of Review,

6  which is, I think, over two million -- or over a million.  And

7  then if it's over a certain amount, the Joint Committee has to

8  be --

9          THE COURT:  All right.  So we deal with this every

10  day in cases where the County Prosecutor's Office is -- we

11  have a settlement discussion, but they're bound by saying, "At

12  the end of the day, we've got to take this to the County

13  Commissioners and they can up or down it."  Right?  Same deal?

14          MR. GANAHL:  Yes, very similar.

15          THE COURT:  Okay.  All right.

16          MR. GANAHL:  But whatever discussions we would have,

17  we would certainly have everyone involved in the discussion on

18  our side.

19          THE COURT:  How do we get that conversation teed up?

20  That's the kind of thing I love doing, but if it's a bench

21  trial, that might be problematic and might have to pawn that

22  off to somebody else.  How do we get this teed up, Joe?

23          MR. GANAHL:  I actually think if Eddie had -- I mean,

24  he could start the ball rolling if he had an amount in -- I

25  mean, to be fair, we can't even figure out, really, what he is

1   asking for in this case.  That partly comes from the fact that

2   the damages are per inspection and we don't have --

3           THE COURT:  Well, maybe I have to ask the question of

4   Eddie then.

5       Eddie, how do we get this teed up?

6           MR. GREIM:  Well, Your Honor, frankly, this is the

7   first time that we've heard from the IRS about the idea that

8   they are not able to give us a number, that we must start.

9   But we'll start.  We're happy to do that.  You know, it is

10  true -- in fact, it kind of caught us off guard a little bit.

11  Maybe three or four weeks ago in a discussion on discovery, I

12  think it was Laura that kind of mentioned offhand "We're happy

13  to take any reasonable settlement offer," and it struck me

14  that -- I believe I had not heard that until then.  It was

15  sort of not exactly on topic --

16          THE COURT:  Oh, that's --

17          MR. GREIM:  -- but when you're a plaintiff, you file

18  that away and you want to return to that.

19          THE COURT:  Yeah.  You know, I don't care about the

20  history of discussions.  I guess my question is:  Moving

21  forward, how do we get it teed up, from your perspective?

22          MR. GREIM:  Your Honor, what we'd like to do is -- I

23  mean, I badly would like to get to what I think we must be

24  missing here in discovery.  I mean, there are some key people

25  that we did not take for class discovery.  I mean, I think

1   their testimony, when they are finally confronted with some of

2   these documents, will inform us.  It will make a difference in

3   what we do.

4           THE COURT:  Okay.

5           MR. GREIM:  We're very close to being done.  We are

6   scheduling depositions.

7           THE COURT:  All right.  So we're not ready yet, but

8   at some point we can reengage possibly on that topic; right?

9           MR. GREIM:  Yes.  Yeah, we definitely can.

10          THE COURT:  Okay.

11          MR. GANAHL:  I'm sorry, Your Honor.  I was passed a

12  note which said "He is asking about mediation, you moron,"

13  which is not you, Your Honor, it's me.  If that is the

14  question of whether the government would be open to settlement

15  mediation or a settlement discussion in front of a magistrate,

16  the government is not -- a settlement conference, the

17  government is not opposed to that, Your Honor.

18          THE COURT:  Okay.

19          MR. GANAHL:  I think that, in hindsight, I think

20  that's what you were asking me.

21          THE COURT:  Yeah.  I mean, unless -- when there is a

22  bench trial, unless both parties say, "No, Judge, we want you

23  to do it," I usually ask one of my colleagues to handle the

24  settlement discussion, whether it's another DJ or one of the

25  two MJs, or even drag in a DJ from Columbus or Dayton that

1  would be willing to do it, because I know everybody wants to

2  spend time with you all.

3      But if you guys -- you know, if you guys think in the

4  settlement discussions we can broach topics that will not

5  affect, you know, my decision if I ultimately have to decide

6  the case, I'm happy to do it.  But if you think that's really

7  problematic, I hundred percent get that.  So is that something

8  internally both sides can kick around and talk about?

9          MS. BECKERMAN:  Your Honor, I can tell you, it is

10 just a policy of our office that if it's a bench trial, we're

11 required to ask for a different judge or a magistrate judge to

12 be a mediator.

13          THE COURT:  But, Laura, policy is more like

14 guidelines, isn't it?

15     (Laughter.)

16          MS. BECKERMAN:  Well, you know.  I know that if I

17 asked my supervisor, that is what he will tell me.  But yes,

18 we would be very happy to schedule a mediation conference with

19 a judge.

20          THE COURT:  Okay.  All right.  Well, let's -- we'll

21 visit that when Eddie thinks he is ready.  Is that okay?  Is

22 that fair enough?

23          MR. GREIM:  That's fair, Your Honor.

24          THE COURT:  Okay.  What else do we have on this call?

25          MR. GREIM:  "IRS audits of class members during or

1    after the application process," item number 7.

2            MS. BECKERMAN:  Well, Your Honor, it's -- I kind of

3    thought that that was taken care of when we were talking about

4    the time period because --

5            THE COURT:  Yeah.  I haven't finally decided on that.

6    Can we leave that one alone temporarily, or not?

7            MR. GREIM:  Your Honor, we're fine leaving it alone.

8    I think we've made our point in our filings.

9            THE COURT:  Okay.

10           MS. BECKERMAN:  Yeah.  I mean, our only point would

11   be that we have not actually heard of any suggestion or any

12   evidence that there are any audits at all.  I have no reason

13   to believe that there were any audits of the class members.

14   These people are Eddie's clients, so presumably he could

15   contact them or send them a questionnaire and ask, "Have you

16   been audited?"

17       And without any suggestions of any audits, I mean, we just

18   really think it's very far afield because the Complaint is

19   about the application process which is separate and distinct

20   from the audit process.  So there is nothing about audits at

21   all in the Complaint.

22           THE COURT:  Eddie, that's a good point.  Can you

23   query your folks to see if there is a dog to chase on that

24   one?

25           MR. GREIM:  Your Honor, let me be clear, though.

1    We're not suing for damages for people that experienced

2    audits.  Our issue is were they -- in their review as they

3    were going through the process, were they --

4              THE COURT:  Were they -- was that a targeting

5    technique.  I get it.

6              MR. GREIM:  Right.  And so let's say they never did

7    end up auditing somebody.  It's still extremely relevant if

8    they were saying, "Well, we can get these people on

9    audit."  We might actually see that an audit occurred during

10   that time, which would show, you know, further inspection.

11   But, frankly, they're inspecting the file to decide whether to

12   do an audit.

13     I agree, we're not suing for wrongful audit or something.

14   We've said that from the very start.  So a query of all the

15   class members of whether they were audited doesn't get us very

16   far.  I mean, there could be some people who were just audited

17   just because, randomly.  We don't care about that.  We care

18   about their discussions, their plans to audit or to refer them

19   for other examinations that fell short of an audit.  That is

20   our key, and that's all we want to know about.

21             THE COURT:  All right.  That was interrogatory, what,

22   seven?

23             MR. GREIM:  Seven, Your Honor.

24             MS. BECKERMAN:  Your Honor, just to clarify?  So when

25   Eddie talks about being referred for an audit, I think what

1    he's talking about is a referral to the Review of Operations

2    Unit, which ceased existing a couple of years ago.  But all of

3    those referral papers are in the file.  There was a specific

4    document request about that, and so we answered with respect

5    to that.  We've pointed them to the files and showed them the

6    type of documents that they did.

7        So, once again, if there is any discussion about referring

8    an entity to Review of Operations, which is not a referral for

9    audit, but I think that's what he's talking about, then that

10    is in the file.

11        Audits are not a secret process.  If an entity is audited

12    or selected for audit, they get a letter notifying them.  So

13    there wouldn't be some secret audit of any entity.  The entity

14    would be able to tell you if they got a notice that they were

15    being audited.

16          MR. GREIM:  Your Honor, everything she said is right.

17    Our issue, though, still is that people are discussing it,

18    making plans to do it.  We want to know about it.  I mean, it

19    may not lead to the letter.  And I used the word "referral."

20    I was trying to refer to several things at once.  Review of

21    Operations is something they used to have.  They don't call it

22    that anymore.  I don't know that we've been told that they

23    don't do anything short of an audit.  You know, they no longer

24    have something called a Review of Operations and no longer

25    have a separate group that does it.

1        Look, we would just like to have the documents if they're

2   talking about doing it and making plans to do it.  That

3   wouldn't be just it slipped into their file.

4             MS. BECKERMAN:  Your Honor, Interrogatory 7 is an

5   interrogatory, not a document request.  It asks for

6   identification of the orgs that were flagged for audit using

7   the targeting criteria.  So, again -- and, you know, documents

8   generated relating to the audit.  Audits -- if there was an

9   audit, it would be in a separate audit file, and we have no

10  reason to believe there were any audits.

11       The Review of Operations referral sheets are in the case

12  files.  Eddie is familiar with those.  The rest of

13  Interrogatory 7 isn't about searching for e-mails or document

14  requests.  It's about identifying organizations.  Well, we

15  have no reason to believe any organizations were audited.

16       The issue of audits is not in the Complaint.  It's not

17  part of the class action claim.  We really don't think that

18  it's relevant and that it is also a fishing expedition because

19  Eddie could easily poll his people and see if anyone was

20  audited.  Then, well, we could look and see that audit file at

21  that time.

22             THE COURT:  I think what he's saying, though, Laura,

23  is he wants to know if a discussion of audits was kicked

24  around as a tool to put pressure on these groups, but I don't

25  know if that's exactly paraphrasing it correctly.

1         MR. GREIM:  I'll take that, Your Honor.  That is what
2  we're asking.  If the answer is no --
3     I think I'm starting to actually hear an answer on this
4  call.
5     -- then that can be their interrogatory response, is that
6  no, there's not.  But if they say they don't want to look
7  because they don't think they'll find anything, that's
8  different.
9     So I think we're entitled to an answer.  Were plans made
10  or weren't they?
11         THE COURT:  Well, let me --
12         MS. BECKERMAN:  Your Honor, that is not what the
13  interrogatory asked.
14         THE COURT:  Okay.  Well --
15         MS. BECKERMAN:  The interrogatory asked --
16         THE COURT:  Okay.  Let me take a look at the
17  interrogatory and circle back.  Okay, Laura?
18         MS. BECKERMAN:  Sure.  It's page ID 105 --
19         THE COURT:  I'm not going to look at it this second.
20         MS. BECKERMAN:  Okay.
21         THE COURT:  Okay?  All right.  What's next then,
22  guys?
23         MR. GREIM:  Well, Your Honor, I think everything else
24  -- there is the question of whether they have to respond to
25  our last set of discovery, was it timely or not.  We just want

1    a -- I guess we're asking for an answer on that because I

2    think it's still open.  We did talk about this briefly on an

3    earlier call.  The IRS said that they had tried in vain to get

4    us to talk to them about narrowing the request and that we

5    wouldn't talk to them.

6        You know, Your Honor, we're happy to deal with objections

7    that they have, but we want to do it outside the context of

8    the idea that we served them too late and that this is all,

9    sort of, just to accommodate us.  We'd just like the Court to

10   tell us whether we sent them out too late or not to meet our

11   old deadline of March the 30th or twenty -- whatever our old

12   deadline was, March the 30th.

13           THE COURT:  Laura and Joe aren't going to like this

14   answer, but it's never too late for discovery.

15           MR. GREIM:  Well, Your Honor, if that is the answer,

16   then we'll -- I mean, then we'll work on the objections as

17   objections, and maybe we'll whittle things down in the context

18   of, you know, it's timely.  And if there's other issues, we'll

19   work on those.

20           THE COURT:  Okay.

21           MR. GANAHL:  Your Honor, given that there's no --

22   that it's never too late for discovery, given that we weren't

23   answering these, could we start our response time as of today?

24           THE COURT:  Oh, yeah.  I don't have a problem with

25   that.

1          MR. GANAHL:  Okay.

2          MR. GREIM:  Well, Your Honor, the only problem with

3    that is, I mean, we've been talking about the timeliness issue

4    for weeks now, and I'm afraid we're going to get them after

5    the, you know, the -- at least the April depos at this point.

6    I mean, our --

7          THE COURT:  Okay.

8          MR. GANAHL:  Your Honor, we will endeavor to get them

9    out as quickly as we can.

10          THE COURT:  Yeah.  Joe, will you take a look at

11    what's been requested and kind of get a timeframe for what

12    you're going to need and we can circle back to that one as

13    well?

14          MR. GANAHL:  We can do that, Your Honor.  I will say,

15    a lot of them will lead to objections.  For example, they want

16    every high-level IRS employee of an FES grade or a GS-15

17    that's ever had any contact with the White House.  That's a

18    little silly.  There is request for a FOIA request that has

19    nothing to do with this lawsuit, and they want information

20    withheld on literally a grand jury -- not grand jury, the

21    criminal investigation.  They want the names that have been

22    redacted.

23       So I think there will be a lot of objections, but we can

24    look at it, Your Honor.

25          THE COURT:  Yeah.  It would seem --

```
 1              MS. BECKERMAN:  Not redacted by us.

 2              MR. GANAHL:  Oh, yeah.  Not redacted by us, redacted

 3    by the F.B.I.

 4              THE COURT:  Yeah.  It would seem to me that

 5    organizing the objections is probably more readily

 6    accomplished than getting all the responses out, so why don't

 7    you do your best on that.  Okay?

 8              MR. GANAHL:  We can do that, Your Honor.

 9              THE COURT:  Okay.  I hate to do this, but do we need

10    to set a follow-up call at this juncture or should we let it

11    sit for a little bit and then circle back?

12              MR. GREIM:  Your Honor, if we have a follow-up call,

13    it will make us all get our stuff done, and maybe we can tell

14    you we don't need the follow-up call other than -- or what we

15    could do is, we could have a date to report back to you.

16              THE COURT:  Okay.  Anybody got any thoughts on how

17    much time we need for that?

18              MS. BECKERMAN:  So we would be reporting back on the

19    issue of collaborating with regard to the search and also when

20    plaintiffs think it's time to schedule a settlement?

21              THE COURT:  That, and I'll try to --

22         How do you guys want me to inform you of my decision on

23    the relevant dates?

24              MS. BECKERMAN:  An order would be fine with us, a

25    minute order.
```

```
 1            THE COURT:  Yeah.  Okay.  Let me --
 2      When do you guys want to come back together?
 3            MR. GREIM:  Well, Your Honor, if we give you a report
 4   -- I mean, we can probably talk very quickly about the other
 5   issues.  If we give you a report by Monday of this coming
 6   week?  You know, we're going to be in D.C. taking depositions
 7   later in the week.  We could just call you together -- oh,
 8   wait.  No.  They've got an argument on the 6th.
 9            THE COURT:  And Laura is gone, isn't she?
10            MR. GREIM:  Not yet.  But they've got to argue the
11   other cases, Your Honor.
12            MS. BECKERMAN:  We have depositions tomorrow,
13   Thursday and Friday in this case.  So perhaps maybe Friday the
14   7th?  We have a deposition in this case on the 7th, I believe,
15   scheduled, but we could take a break and do a report-in if
16   that date would work.
17            THE COURT:  What are we doing on the 7th, Barb,
18   anything?
19            COURTROOM DEPUTY:  We do have the naturalization at
20   Cincinnati State, though, and that starts at one o'clock.
21            THE COURT:  Can we do it in the morning of the 7th,
22   guys?
23            MS. BECKERMAN:  Sure.
24            MR. GREIM:  Well, Your Honor, we were trying to hold
25   that day for a deposition.  If we can move that deposition to
```

 1  April 18th or 19th, then the 7th will be open.

 2          THE COURT:  I think what Laura was saying was you

 3  guys would all be together and you'd just call in from the

 4  depo, but maybe I'm wrong.

 5          MS. BECKERMAN:  That was my thought.  It sounded like

 6  we just needed a short report to the Court, you know, maybe a

 7  half-hour or something.

 8          THE COURT:  Right.  Right.  We don't need another

 9  marathon session.  I hate to even ask you --

10          MS. BECKERMAN:  If we can call the Court for a

11  half-hour, then do the deposition?

12          THE COURT:  I hate to even ask this question, but are

13  you guys anticipating needing us during the course of

14  depositions, or do you think they're going to go along

15  smoothly?

16          MR. GREIM:  We've never needed anybody yet, Your

17  Honor.

18          THE COURT:  Okay.  All right.  Let's just pick a time

19  sometime the morning of the 7th just for a quick touch-base.

20          COURTROOM DEPUTY:  Okay.  At ten o'clock, we have a

21  criminal final pretrial, but I don't think it's going to go.

22  We could use that time, but we also, at 10:30, have a

23  discovery hearing in another case.  Then the Cincinnati State

24  naturalization is at one.

25          THE COURT:  What time are you guys starting the depo

1    on the 7th; do you know?

2          MS. BECKERMAN:  I believe 9:30.  We also have a

3    deposition on the 5th where the same -- also here in D.C.  If

4    that's a better date for Your Honor, we could probably take

5    time from that deposition to call in for a short update.

6          THE COURT:  You want to just do nine o'clock on the

7    7th before you guys start?

8          MS. BECKERMAN:  Sure.

9          MR. GREIM:  That's fine.

10         THE COURT:  Okay.  If anybody wants to send me

11   anything to help me along on the timeline stuff, would next

12   Monday be okay for that, or by Friday of this week if you guys

13   just want to, you know, circle back on your arguments?

14         MR. GREIM:  Yes, Your Honor.  I think Monday, just to

15   be safe, if that's okay.

16         THE COURT:  Sure.

17         MS. BECKERMAN:  Is there anything particular that

18   would be helpful that the Court is looking for?

19         THE COURT:  Yeah.  I'm looking for a settlement now.

20      (Laughter.)

21         MR. GREIM:  Your Honor, we'll probably give you some

22   documents that show, you know, things that are relevant to the

23   issue of whether the inspections were unauthorized that are

24   before the date in which people started to be segregated and

25   after the date when they were segregated to show that, you

1    know, the unauthorized inspections were not limited to that

2    period, and that evidence about, you know, what the motive of

3    the people doing it was are not limited to the, kind of,

4    coincidental dates when people were being segregated.

5            THE COURT:  Could we do it this way then?  Could you

6    get something to me by the close of business on Monday, and

7    then Laura could respond by the close of business --

8        I don't know, Laura.  You tell me.

9        -- Wednesday, Thursday, something like that?

10           MS. BECKERMAN:  Wednesday would be fine.

11           THE COURT:  Okay.

12           MR. GREIM:  Your Honor, one quick thing.  It does

13   relate to the depositions.  There have been some -- there is

14   something called an authorization that the IRS gives us under

15   -- it's a long story, but you may already know about this.

16   Basically, those are the topics that we're limited to in our

17   questioning.  One concern has been the date range in these.

18   You know, we will be taking, I think, Nan Marks on the 5th and

19   Judith Kindell on the 6th.  Those are kind of important

20   people.  We would just --

21       You know, even if it turns out that the Court says it's

22   inadmissible, we would like to be able to know that we can ask

23   questions that are outside the targeted date ranges for those

24   depositions just so we don't lose that.

25           THE COURT:  Laura?

1          MS. BECKERMAN:  Your Honor, there is -- so they have

2    a broader date range, and we've never had an instruction not

3    to answer based on date range.

4          MR. GANAHL:  Limited in class.

5          MS. BECKERMAN:  Yeah.  So I don't think that this is

6    a problem.

7          THE COURT:  Okay.

8          MR. GREIM:  Mr. Martin has had it recently.  He

9    pinged me on it.

10          THE COURT:  Well --

11          MR. MARTIN:  With that clarification, Your Honor,

12    then we should be good.

13          THE COURT:  Yeah.  I'm going to go with what Laura

14    just said.

15          MR. GANAHL:  I'm sorry, Your Honor.  I'm looking at

16    the one for Elizabeth Kastenberg, and it says, "The processing

17    of applications of tax exemptions are in the period January

18    1st, 2010, to the present."

19        I'm not sure that's a date limitation.  So it does cover

20    the current period.  I think maybe they're confusing class

21    discovery where there was a time limit.

22          THE COURT:  Okay.

23          MR. MARTIN:  Well, I think there was only a concern,

24    Your Honor, just about making sure that as an issue is still

25    being resolved, that it doesn't create an impediment in the

1    depositions that we've already scheduled, the testimony on

2    authorizations that we've already put together.  And it seems,

3    based on what Laura said, that we don't anticipate to

4    encounter that.  So it seems like we're all okay.

5            THE COURT:  Yeah.  That's what I heard from Laura.

6    Okay.  All right.  Okay, guys.  That's where we are.  I'll

7    start shopping for another judge to handle the settlement

8    conference.

9            MS. BECKERMAN:  Thank you, Your Honor.

10           THE COURT:  Cool.  All right.  Okay.  I guess we're

11   finished now; right?

12           MR. GREIM:  Yes.  Thanks, Your Honor.

13           THE COURT:  Thanks, everybody.

14           MR. GENAHL:  Thank you, Your Honor.

15           THE COURT:  All right.  Thank you.  Bye.

16

17       (The proceedings concluded at 3:37 p.m.)

18

19                    C E R T I F I C A T E

20

21       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

22   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

23   S/MARYANN T. MAFFIA, RDR

24   OFFICIAL COURT REPORTER

25