**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| NORCAL TEA PARTY PATRIOTS, et al., | ) | |
| ON BEHALF OF THEMSELVES, | ) | |
| THEIR MEMBERS, and THE CLASS | ) | |
| THEY REPRESENT, | ) | |
| | ) | Case No. 1:13-cv-00341 |
| Plaintiffs, | ) | |
| | ) | Judge Michael R. Barrett |
| v. | ) | |
| | ) | |
| THE INTERNAL REVENUE SERVICE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**UNITED STATES' STATEMENT OF PROPOSED UNDISPUTED MATERIAL FACTS IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT ON CLASS ACTION CLAIM**

Pursuant to Court Order (Dkt. 352), the United States submits the following Proposed

Undisputed Facts in support of its Motion for Summary Judgment on Class Action Claim under

seal.

**TABLE OF CONTENTS**

I. IRS Exempt Organizations Division Is Responsible for Processing Applications for Tax Exempt Status. ................................................................................................................ 3

II. In An Effort to Ensure Consistency in Processing Applications, EO Determinations Developed a Screening Process, TAG Spreadsheet, and Eventually, a BOLO List. .............. 6

III. EO Determinations Regularly Coordinated Cases to Ensure Organizations Presenting Similar Issues Were Treated Consistently. .......................................................................... 9

IV. After an EO Screener Identified a "Tea Party" Case with Indications of Political Campaign Intervention, EO Determinations Sought Guidance from EO Technical and Labeled Subsequent Cases as an "Emerging Issue." ........................................................ 11

V. EO Incorrectly Began Using the Label "Tea Party" to Describe the Coordination of Cases Presenting Issues of Political Campaign Intervention. ........................................... 15

VI. To Provide EO Determinations With Guidance, EO Technical Began to Develop "Test Cases" and Advise EO Determinations on Case Development. ........................................... 16

VII. While EO Technical Works the "Test Cases," EO Determinations Begins to Coordinate Advocacy Applications Using Inappropriate Criteria. ......................................................... 23

VIII. When EO Director Lois Lerner Learned of BOLO List Criteria, She Ordered the Criteria be Changed to Focus on Issue of Political Campaign Intervention. ........................................... 27

IX. Unfortunately, the Changes Ordered by Lerner Were Misinterpreted by EO Determinations Personnel, and the Advocacy Cases Continued to Pile Up. ................................................... 29

X. Faced with a Significant Backlog of Applicants, EO Technical Undertook, Ultimately Unsuccessfully, a Three-Pronged Approach to Resolve Cases and Provide Guidance to EO Determinations. ................................................................................................................... 31

*First Prong: Test Cases* ...................................................................................................... 31

*Second Prong: Triage Review* ........................................................................................... 32

*Third Prong: Guidesheet* .................................................................................................. 34

XI. As the Backlog Increased, EO Determinations Began to Use the Draft Guidesheet to Process Cases. In Its Rush to Resolve Advocacy Cases, EO Determinations Sent Boilerplate Questions That, While Generally Applicable to Determinations of Tax Exempt Status, Were Unnecessary to Resolve the Recipient's Application. ....................................................... 35

XII. Concerned by the Backlog and Complaints About Burdensome Questions, Deputy Commissioner Steve Miller Ordered an Independent Review in an Effort to Get Back on the Right Track and Resolve the Advocacy Cases. ................................................................... 39

XIII. At Miller's Instruction, IRS Senior Technical Advisor Nancy Marks Implemented the Bucketing Process, a Successful Triage Effort to Resolve Cases. ....................................... 44

XIV. As a Result of the Delay in Processing Advocacy Cases, TIGTA, Congress, and the DOJ Opened Investigations. While these Investigations Uncovered Mismanagement, There Were No Findings of Bias or Intent to Discriminate. ................................................................... 49

XV. In Response to TIGTA's Report and After Plaintiffs Filed Their Complaint, the IRS Initiated an Optional Expedited Process That Resolved All Still-Pending Applications Eligible for Processing. ........................................................................................................ 52

XVI. Consistent With the Findings to Date, There Is No Evidence of Animus or Political Bias Against Taxpayer Entities, and the IRS Employees Acted in Good Faith. ......................... 54

## I. IRS Exempt Organizations Division Is Responsible for Processing Applications for Tax Exempt Status.

1.      From 2010 to 2013, the IRS received over 290,000 applications from entities seeking tax exempt status under 26 U.S.C. § 501(c), almost 262,000 of which were from entities seeking exempt status under § 501(c)(3) and (c)(4). Processing applications for tax exempt status is one of many tax administration functions performed by the Internal Revenue Service. The Exempt Organizations Unit (EO) of the Internal Revenue Service Tax Exempt/Government Entities Division (TE/GE) is responsible for processing these applications and determining whether entities qualify for tax exempt status under the law. (Gov't Ex. 1, Declaration of Stephen A. Martin, ¶¶ 3-5; Gov't Ex. 7, United States' Response to Plaintiffs' Class Discovery Interrogatories Nos. 1-2, p. 5.)[1]

2.      Under § 501(c)(3) of the Internal Revenue Code, entities "organized and operated exclusively for" religious and charitable purposes, among others, are exempt from taxation, and taxpayers may deduct donations made to § 501(c)(3) entities from their income. Along with this benefit come certain restrictions. In order to qualify for § 501(c)(3) status, the statute provides that "no part of the net earnings" of the entity may "inure[] to the benefit of any private shareholder or individual" and that the entity may not attempt to influence legislation or participate in any political campaign on behalf of or in opposition to any candidate for public office. 26 U.S.C. § 501(c)(3).

3.      Under § 501(c)(4), entities "not organized for profit but operated exclusively for the promotion of social welfare . . . the net earnings of which are devoted exclusively to

_____

[1] *See* Appendix A for an organizational chart of relevant IRS offices and Appendix B for the job titles of all relevant IRS employees during the relevant time period.

charitable, educational, or recreation purposes" are exempt from tax. As is the case with § 501(c)(3) entities, the earnings of § 501(c)(4) entities cannot "inure[]" to the benefit of private individuals. 26 U.S.C. § 501(c)(4). Unlike § 501(c)(3) entities, however, donations to § 501(c)(4) entities are not tax deductible.

4. Although the statute defines a § 501(c)(4) entity as operated *exclusively* for the promotion of social welfare, the applicable Treasury Regulations provide that this requirement is met if the entity "is *primarily* engaged in promoting in some way the common good and general welfare of the people of the community." 26 C.F.R. § 1.501(c)(4)-1(a)(ii)(2) (emphasis added). The regulation further states that "the promotion of social welfare does not include direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office." *Id.*

5. Thus, in practice, § 501(c)(3) organizations are statutorily prohibited from engaging in any political campaign intervention, while § 501(c)(4) organizations may engage in political campaign intervention so long as those activities are not the organization's "primary" activity. In addition, neither type of entity may have its earnings inure to the benefit of an individual.

6. Within IRS, Exempt Organizations, the office of Rulings & Agreements is responsible for applying § 501(c) and the accompanying Treasury Regulations to the entities applying for tax exempt status to determine whether they meet the legal requirements for tax exemption. This work includes processing applications for tax exempt status, providing technical interpretations of laws and procedures relating to exempt organizations, and participating in the development and issuance of regulations and other published guidance of general applicability. (Gov't Ex. 1, Declaration of Stephen A. Martin, ¶ 6.)

7.      A component of Rulings & Agreements, the Exempt Organizations Determinations Unit (EO Determinations), processes and reviews applications for tax exempt status and issues determination letters to applicants once a decision on their application is made. (Gov't Ex. 1 ¶¶ 6-7.)

8.      During the relevant time period, employees in EO Determinations were organized into several work groups. Each of these work groups had topical specialties and were responsible for processing applications that fell within those specialties. For example, the Emerging Issues work group focused on applications for which there is no established case law, issues arising from significant current events, and issues arising from changes to tax law or other significant world events. The Touch and Go (TAG) group focused on abusive tax avoidance transactions. Management believed that the work group approach promoted consistency in results and fostered greater efficiency, since no agent was required to be an expert in all issues. (Gov't Ex. 1 ¶ 12.a; Gov't Ex. 42, Bipartisan Senate Finance Committee Report, pp. 67, 69.)

9.      The work groups were staffed by EO Determinations Revenue Agents and supervised by managers. Managers were responsible for supervising around 12 EO Determinations Agents. Manager responsibilities typically included ensuring applications are timely and accurately processed as well as addressing related personnel issues. EO Determinations managers are required to review application files being worked by the employees of that manager when consulting with the employees or reviewing their determinations. (Gov't Ex. 1 ¶ 12.b.)

10.      The Exempt Organizations Technical Unit (EO Technical) was also a component of Rulings and Agreements. EO Technical provided assistance to other IRS offices, including

EO Determinations, on issues involving exempt organizations. It also processed exempt-organization applications that were referred by EO Determinations. (Gov't Ex. 1 ¶¶ 6, 10.)

11. During the relevant time period, when an organization mailed its application for tax exempt status and user fee payment to the IRS, the application would be delivered to the IRS's Covington, Kentucky office where IRS employees registered receipt of the application in a computer system and processed the user fee payment. Then, the applications were forwarded to the IRS's Cincinnati office. (Gov't Ex. 47, Merits Discovery Deposition of Cindy Thomas, Tr. 16:23-17:2.)

## II. In An Effort to Ensure Consistency in Processing Applications, EO Determinations Developed a Screening Process, TAG Spreadsheet, and Eventually, a BOLO List.

12. During the relevant time period, the front line IRS employees in Cincinnati who reviewed the bulk of applications for tax exempt status were EO Determinations Screeners. Screeners were responsible for the front-end review of newly received applications for tax exempt status. The review consisted of applying tax law to the facts represented in the application to determine if the application (1) could be approved, (2) required minor additional information, or (3) required further development before a determination could be made. In the last case, the screener forwarded the application to other specified work groups for future processing. (Gov't Ex. 1 ¶ 12.a.i.)

13. This initial review covered all applications seeking tax exempt status under § 501(c) and was not limited to just those applications seeking tax exempt status under § 501(c)(3) or § 501(c)(4). (Gov't Ex. 1 ¶ 12.a.i; Dkt. 212-8, PageID 8067, Excerpt from file of Plaintiff Americans Against Oppressive Laws, Inc. (AAOL).)

14. Cases requiring minor additional information or development were sent to an EO Determinations Revenue Agent for further work. Revenue Agents were responsible for

reviewing and processing applications for tax exemption. Through this review, the agent developed the facts and applied established tax law to those facts to reach a determination of whether the applicant is organized for a tax exempt purpose. The Revenue Agents processed applications submitted under Internal Revenue Code subsections § 501(c)(3), § 501(c)(4), and § 501(c)(6), among others. When the need arose, management would assign EO Revenue Agents to participate in projects or group efforts designed to facilitate the processing of applications and provide assistance to other agents in cases that required their expertise in a particular subject matter. In order to perform their duties, EO Revenue Agents were required to review the application files assigned to them or about which they were being consulted. (Gov't Ex. 1 ¶ 12.a.)

15.    When EO Determinations Screeners observed multiple applications that were either coming in from a single practitioner or had similar issues, EO Determinations would designate a work group within EO Determinations to consolidate those cases and, if needed, to seek guidance from EO Technical. To facilitate this process, an EO Revenue Agent could be designated as a coordinator. (Gov't Ex. 1 ¶ 12.a.ii;

16.    "Coordinator" was not an official position. Rather, it was a term used informally to refer to an EO Revenue Agent assigned to shepherd applications associated with a particular technical issue. Responsibilities included (1) performing secondary screening of cases from the initial screener to ensure technical accuracy of the initial assessment, (2) conducting meetings with designated agents assigned to the technical issue, and (3) assisting in tracking statistics associated with applications involving the particular issue—such as credit counseling, political campaign intervention, potentially abusive schemes, etc. (Gov't Ex. 1 ¶ 12.a.ii.)

17.     An issue coordinator reviewed the application files identified by screeners as presenting the issues that they were responsible for coordinating to ensure that the initial screener had correctly identified the application as being within their issue specialty. This process was referred to as "secondary screening." (Gov't Ex. 47, Thomas Merits Tr. 21:15-24 (describing how, "where the Washington office was involved in a group of cases and provided some guidance or direction," EO Determinations specialists who were subject-matter experts were "identified to do a secondary screening to make sure that the initial screener put the case in the right bucket").)

18.     Plaintiffs allege that the secondary screening conducted by the coordinators was an unauthorized inspection. (Gov't Ex. 8, Plaintiffs' Amended Response to Interrogatory No. 4, Inspection No. 1.)

19.

20.     To make the system less cumbersome, managers in Cincinnati created a spreadsheet to consolidate the information previously sent in email notices. The spreadsheet was originally referred to as the "TAG" list, as the TAG work group was the first to have its cases listed on the spreadsheet. The spreadsheet grew to have additional tabs for specialties covered by other EO Determinations work groups. (Gov't Ex. 42, pp. 67-70.)

(Use of the BOLO is detailed in paragraphs 87-89, below.)

22. From August 2010 until it was permanently discontinued on June 20, 2013, the BOLO was updated frequently and distributed to EO Determinations personnel. (Gov't Ex. 12; Dkt. 245-7, PageID 8965, 8971, Treasury Inspector General for Tax Administration (TIGTA) Report: Status of Action Taken to Improve the Processing of Tax exempt Applications Involving Political Campaign Intervention, May 27, 2015) ("What TIGTA Found: . . . First, the IRS eliminated the use of Be On the Look Out (BOLO) listings, which TIGTA determined had contained inappropriate criteria regarding political advocacy cases. TIGTA conducted interviews with a random sample of employees, who confirmed that BOLOs or similar listings were no longer being used.")

**III.** **EO Determinations Regularly Coordinated Cases to Ensure Organizations Presenting Similar Issues Were Treated Consistently.**

23. Where the coordinated cases presented new issues or uncertain legal questions, EO Determinations would ask EO Technical for assistance. (Gov't Ex. 1 ¶ 10.)

24. EO Technical was staffed by Tax Law Specialist (TLSs). TLSs were responsible for providing technical guidance to the field, processing private letter ruling requests, teaching technical workshops, and assuming review of applications for tax exemption from EO Determinations. When the need arises and as assigned by management, TLSs are permitted to participate in projects or group efforts designed to facilitate the processing of applications, to ensure consistency in approach and the correct application of law, and to provide guidance in areas of law that may be unclear. TLSs assigned to provide assistance will often need to see all or a part of an application file in order to provide the assistance, and a TLS assigned to make a

determination is required to review the application file in order to perform that duty. (Gov't Ex. 1 ¶ 12.d.)

25.     EO Determinations coordinated cases on a range of issues including Credit Counseling, Health Care, Foreclosure Assistance, and 26 U.S.C. § 509(a)(3) Supporting Organizations.

(Gov't Ex. 9, United States' Response to Plaintiffs' Interrogatory No. 17;

26.     For example, from 2002 to 2014, EO Determinations coordinated a group of over 4,000 applications as part of the IRS's Credit Counseling Compliance Project focused on abuse by tax exempt credit counseling organizations. EO Determinations sought guidance from EO Technical with respect to the issues presented by these applications, and several applications were transferred to EO Technical to be worked. Most, if not all, of these cases received additional development letters from the IRS seeking information not provided by the original application. Once coordinated, the applications waited, on average, over 435 days for a determination of tax exempt status. *Id.*

27.     Similarly, starting in the spring of 2008, EO Determinations noticed an increase in applications from organizations providing relief to homeowners in foreclosure. EO Determinations worked with EO Technical to coordinate over 1,300 cases. The applications were logged on a spreadsheet, and EO Technical along with the Guidance Unit assisted in creating a template development letter to be sent to applicants. Once identified for coordination, the applications waited, on average, 585 days for a determination of tax exempt status. *Id.*

29.     For example, from 2004 to 2008, the IRS processed and approved five

applications for § 501(c)(4) tax exemption from entities affiliated with Emerge, including the

main umbrella organization Emerge America.[2] (Gov't Ex. 42, SFC Report, p. 110-111.)

30.     In 2008, the IRS began to review the similarities of the Emerge cases and

determined that they should be subject to mandatory review by EO Technical due to their

partisan nature. (*Id.*)

31.     At this point, EO Determinations transferred open Emerge cases to EO Technical

where they were held until the IRS received a ruling in a related court proceeding. Following that

ruling, EO Technical determined that the Emerge organizations did not qualify for § 501(c)(4)

status, and the pending applications were denied. The IRS did not finalize the denials until 2011,

resulting in delays of over 3 years. (*Id.*)

32.     In addition, the IRS revoked the approvals from the previously granted Emerge

entities, as the applicants' activities showed that they did not qualify for tax exempt status. (*Id.*)

**IV.     After an EO Screener Identified a "Tea Party" Case with Indications of Political
         Campaign Intervention, EO Determinations Sought Guidance from EO Technical
         and Labeled Subsequent Cases as an "Emerging Issue."**

33.     In February 2010, EO Determinations agent John Koester brought the application

of Albuquerque Tea Party to the attention of his manager. Summarizing the conversation in an

---

[2] Emerge and its affiliated chapters are organizations that train Democratic women to run for political office. (Gov't Ex. 42, SFC Report, p. 107.)

email, Mr. Koester wrote: "[r]ecent media attention to this type of organization indicates to me that this is a 'high profile' case." He goes on to state that information on the entity's application "indicates possible future political candidate support." (Gov't Ex. 11, Email from John Koester to John Shafer, pp. 3-4.)

34.     At the time, the Internal Revenue Manual directed agents to bring to the attention of a manager applications presenting issues that were "newsworthy" or had the "potential to become newsworthy." (Gov't Ex. 39, Internal Revenue Manual 1.54.1.4(2)(p) (2006).)

35.     Koester's manager, John Shafer, discussed the issue with his manager, Cindy Thomas. Ms. Thomas discussed Albuquerque Tea Party's application with management in EO Technical. EO Technical's management decided that, because of "recent media attention" and because the application "indicates possible future political candidate support," the application might indicate an "emerging issue" and should be brought to the attention of EO Technical for guidance. (Gov't Ex. 11, pp. 2, 4.)

36.     As EO Determinations Program Manager Cindy Thomas explained, this followed the typical process for identifying potential emerging issues: "[w]hen the screening group starts seeing new type of cases that have similar issues, they meet and come up with criteria to identify 'emerging issues' and elevate information. 'Emerging issue' cases are sent to Group 7822 (Steve Bowling's group) and we start coordinating with EOT to seek guidance." (Gov't Ex. 12, Email from Cindy Thomas to Holly Paz, dated June 2, 2011, p. 2.)

43.     While EO Technical worked the test cases, EO Determinations would begin to identify and coordinate the cases presenting similar issues so that an agent assigned to the cases could work with the EO Technical Tax Law Specialist and receive guidance on how to correctly apply the law to the issues presented. (Gov't Ex. 11.)

45. EO Determinations Manager Cindy Thomas assigned Revenue Agent Elizabeth Hofacre to coordinate what EO Determinations started referring to as the "Tea Party" cases, because she was from a group that had experience coordinating emerging issues. (This group of cases was later referred to as the "advocacy cases.") As part of this job, Hofacre began keeping a list of the coordinated advocacy cases. (Gov't Ex. 47, Merits Discovery Deposition of Cindy Thomas, Tr. 94:19-95:6.)

46. Plaintiffs allege that review of the list of advocacy cases, later referred to as "tracking sheets," by IRS employees, was unauthorized. (Gov't Ex. 8, Inspection No. 17.)

**V.   EO Incorrectly Began Using the Label "Tea Party" to Describe the Coordination of Cases Presenting Issues of Political Campaign Intervention.**

47. When Koester brought the application of Albuquerque Tea Party to the attention of his manager, he did so for two reasons. First, he believed the case might be "high profile" due to media stories he had seen. Second, the application indicated that the entity planned to spend 20% of its resources on supporting political candidates. (Gov't Ex. 11.)

49. EO then began to use the term "tea party" to refer to cases presenting issues similar to those of the test cases, which were originally transferred to EO Technical because the applications showed plans to engage in political campaign intervention.     Gov't Ex. 11.)

## VI. To Provide EO Determinations With Guidance, EO Technical Began to Develop "Test Cases" and Advise EO Determinations on Case Development.

53. EO Technical began the work of creating guidance for EO Determinations by assigning two "Tea Party" test cases, Prescott Tea Party LLC and Albuquerque Tea Party, Inc., to Tax Law Specialist Carter Hull on April 5, 2010.[3] (Gov't Ex. 31, Email from Carter Hull to Holly Paz, Subject: Procedures, dated July 24, 2012.)

---

[3] On May 26, 2010, Prescott Tea Party, a § 501(c)(3) applicant, was closed as FTE (failure to establish) after not responding to Mr. Hull's development letters. (Gov't Ex. 31.) Public records reveal that Prescott Tea Party filed (continued...)

54.     In April 2010, EO Technical began including the test cases on Sensitive Case Reports (SCRs). The Exempt Organizations unit used Sensitive Case Reports (SCRs) to keep upper-level management appraised of noteworthy cases and issues. (Gov't Ex. 42, p. 33.)

55.     The Internal Revenue Manual (IRM) instructed EO Technical that cases "likely to attract media or Congressional attention" should be considered for inclusion on SCRs. (IRM 7.29.3.2(c), available at https://www.irs.gov/irm/part7/irm_07-029-003.html.)

56.     In the first such SCR entry for the test cases, dated April 28, 2010, Mr. Hull noted: "Currently there are 13 Tea Party cases out in EO Determinations and we are coordinating with them to provide direction as to how to develop those cases based on our development of the ones in DC." (Gov't Ex. 14, April 28, 2010 Email Attaching SCR.)

57.     The relevant entry in the April 28, 2010 SCR is as follows:

| Name of Org/Group | Group #/Manager | EIN | Received | Issue | Tax Law Specialist | Estimated Completion Date | Status/Next action |
|---|---|---|---|---|---|---|---|
| Prescott Tea Party, LLC and Albuquerque Tea Party, Inc. | 2/Ron Shoemaker | 27-0484865 and 90-0513502 | 4/2/2010 | Whether a tea party organization meets the requirements under 501(c)(3) and is not involved in political intervention. | Chip Hull | 9/30/2010 | One development letter sent, and working on sending development letter for the second case. Also, will coordinate with Cincy as to helping to develop their cases. |

(Gov't Ex. 15, April 28, 2010 SCR.)

58.     The April 28, 2010 SCR contained information on 17 categories of "sensitive" cases, including, for example, entries for "Emerge Maine," "EPM Civil Rights Funds," and "Tennessee Pooled Assets." (Gov't Ex. 15, April 28, 2010 SCR.)

59.     Initially, EO Determinations continued to work on the "Tea Party" cases with guidance from EO Technical. As part of this process, Ms. Hofacre, the coordinator for the cases

---

(… continued)

Articles of Termination with Arizona Secretary of State on January 26, 2010. (Gov't Ex. 13, Arizona Corp. Comm. History Inquiry, Prescott Tea Party.) Following Prescott's dissolution, Hull requested that another § 501(c)(3) applicant be assigned to him as a replacement test case. He was assigned American Junto on June 30, 2010. (Gov't Ex. 31.)

at that time, consulted with Mr. Hull before sending out development letters. (Dkt. 212-5, PageID 7878-80, Excerpts, NorCal Application file; Gov't Ex. 52, Class Discovery Deposition of Elizabeth Hofacre Tr. 99:4-23.)

60.     For example, after Plaintiff NorCal Tea Party Patriots submitted its application to the IRS in late April 2010, the application was assigned to Ms. Hofacre for development. Ms. Hofacre reviewed the file and worked with Mr. Hull to draft a letter requesting that NorCal submit additional information in support of its application. (Gov't Ex. 52, Hofacre Tr. 221:8-222:6.)

61.     Plaintiffs identify Carter Hull's review of NorCal's development letter in his role providing guidance to EO Determinations as an "unauthorized inspection." (Gov't Ex. 8, Inspection No. 4.)

62.     On July 6, 2010, Hofacre sent an initial development letter to NorCal Tea Party Patriots seeking 16 specific requests for information. The requests included, for example, "Provide a copy of your bylaws," "Provide a list of your board members and provide resumes," and "You list amounts in item three (gross amounts derived from activities related to your exempt activities) on your income statement. Please indicate what composes this." (Dkt. 212-5, PageID 7880, Excerpts, NorCal Application file.)

63.     Plaintiffs have identified the review of NorCal's file that Hofacre conducted prior to sending the July 6, 2010 development letter, any review conducted by Hull as part of his assistance to Hofacre in drafting the letter, and Hofacre's review of NorCal's responses to the letter as unauthorized inspections. (Gov't Ex. 8, Inspections Nos. 3-4.)

64.     Hofacre followed this procedure with other entities, including Plaintiff San Angelo Tea Party. Hofacre was assigned San Angelo's application in June 2010. She conducted

internet research and drafted a development letter in July 2010, which she faxed to Chip Hull for review. Mr. Hull responded to her in September 2010, and her notes reflect that she discussed the letter "in detail with Chip" and "made changes to the letter." Hofacre also responded to a call from the taxpayer to "explain the process." Hofacre mailed the development letter to San Angelo on September 28, 2010. (Gov't Ex. 74, Excerpts, San Angelo Application file, IRS_Norcal_0000085297.)

65.     San Angelo did not respond to the letter, and it later informed the IRS that its Board decided in January 2011 to withdraw its application and "go with a simple corporation format" instead. (Gov't Ex. 74, at IRS_Norcal_0000085294-95.)

66.     During this time period, as a backlog of cases began to pile-up, EO Determinations Program Manager Cindy Thomas requested multiple status updates from EO Technical. (Gov't Ex. 36, Email string from Cindy Thomas, "Re: Political Cases—Status?")

67.     Long waits for guidance from EO Technical were, unfortunately, not unusual. Ms. Thomas testified that, when EO Determinations was waiting for guidance from EO's DC offices, it was not unusual to have to request multiple status updates. She recalls a similar process occurring for credit counseling cases and charter schools. (Gov't Ex. 47, Thomas Merits Tr. 128:20-129:20.)

70.     The January 31, 2011 SCR chart contained entries for twenty-three different case

Categories, including the following entry:

| | Name of Org/Group | Group #/Manager | EIN | Received | Issue | Tax Law Specialist | Estimated Completion Date | Status/Next action | Elevated to TEGE Commissioner? |
|---|---|---|---|---|---|---|---|---|---|
| 1. | American Junto and Albuquerque Tea Party, Inc. | T2/Ron Shoemaker | 27-0484865 and 90-0513502 | 4/2/2010 | Whether a tea party organization meets the requirements under 501(c)(3) and is not involved in political intervention. | Chip Hull | 3/31/2011 | Developing both a (c)(3) and (c)(4) cases. Proposed favorable being drafted on (c)(4). Proposed denial being drafted on (c)(3). Coordinating with Cincy as to helping to develop their cases. | No |

(Gov't Ex. 21, January 31, 2011 SCR Chart.)

71.     After reviewing this SCR Chart, Lerner wrote an email to EO managers

commenting on nine of the categories of cases listed in the chart. Regarding the test cases, she

wrote: "Tea Party Matter very dangerous. This could be the vehicle to go to court on the issue of

whether Citizen's United[5] overturning the ban on corporate spending applies to tax exempt rules.

Counsel and Judy Kindell need to be in on this one please needs to be in this [sic]. Cincy should

probably NOT have these cases—Holly please see what exactly they have please." (Gov't Ex.

20, Email from Lois Lerner, dated February 1, 2011.)[6]

---

[4] As described in footnote 3, above, American Junto replaced Prescott Tea Party as the § 501(c)(3) test case following the January 2010 dissolution of Prescott.

[5] On January 21, 2010, the United States Supreme Court issued its opinion in *Citizens United v. Federal Election Commission*, which held that the First Amendment prohibits restrictions on independent political expenditures by nonprofit corporations and other entities. 558 U.S. 301 (2010). The next day, EO Director, Lois Lerner, told her supervisors that the *Citizens United* decision was likely to elicit questions and confusion from tax practitioners and suggested that the IRS issue a press release, be prepared to respond to inquiries, and be prepared for an increase in applications. (Gov't Ex. 10, Email string from Lois Lerner to Sarah Ingram, p. 3.)

   Despite this background, discovery has not revealed any evidence that EO Determinations Screeners were aware of the decision in *Citizens United* or that EO Determinations took any steps in anticipation of an increase of applicants for § 501(c)(4) status with indications of political activity.

[6] Judith Kindell was a Senior Technical Advisor responsible for providing legal advice and assistance to the EO Director and the EO program overall. In 2012 and 2013, one of the assignments of the Senior Technical Advisor was (continued...)

74.     In an April 7, 2011 email, Lerner followed up regarding her concern that: "these [cases] could blow up like crazy if the Determ[ination]s folks let one out incorrectly—think MN firefighters."[7] (Gov't Ex. 15, Email String Holly Paz and Lois Lerner, dated July 7, 2011.)

---

(… continued)
to review applications for tax-exempt status and, based on that review, to advise and assist EO Determinations Revenue Agents and Tax Law Specialists in the classification and analysis of cases involving indications of potential political campaign intervention. (Gov't Ex. 1 ¶ 12.e.)

76.     In October 2010, Ms. Hofacre transferred to EO Quality Assurance, and EO Determinations Agent Ronald Bell took over her work as coordinator. Mr. Bell understood his role to be to wait for guidance from EO Technical, and accordingly, he only developed one of the pending cases from October 2010 to November 2011. (Gov't Ex. 55, Class Discovery Deposition of Ronald Bell, Tr. 53:14-54:15, 64:21-66:20.)

77.     The "test case" approach ultimately dragged on for nearly two years and was not successful in providing guidance to help EO Determinations address the growing backlog of coordinated advocacy cases. (Gov't Ex. 42, SFC Report, pp. 39-40, 92.)

78.     During the time that EO Determinations was holding coordinated cases and awaiting guidance from EO Technical, several Plaintiffs submitted their applications for tax exempt status: San Angelo Tea Party (San Angelo) in March 2010, South Dakota Citizens for Liberty (SD Citizens) in August 2010, and Americans Against Oppressive Laws, Inc. (AAOL) in October 2011. (Gov't Ex. 74, IRS_SanAngelo000019; Dkt. 212-10, PageID 8088, Excerpts from SD Citizens Application file; Dkt. 212-8, PageID 8066, Excerpts from AAOL Application file.)

79.     Plaintiffs submitted their applications for tax exempt status voluntarily, and Plaintiffs understood that IRS employees would review the materials they submitted. (Gov't Ex. 68, NorCal Rule 30(b)(6) Deposition, Merits Discovery Tr. 14:19-15:9; Gov't Ex. 69, San Angelo Rule 30(b)(6) Deposition, Merits Discovery Tr. 38:15-19; Gov't Ex. 70, SD Citizens Rule 30(b)(6) Deposition, Merits Discovery Tr. 15:10-18; Gov't Ex. 71, AAOL Rule 30(b)(6)

Deposition, Merits Discovery Tr. 38:16-39:12; Gov't Ex. 72, TPTP Rule 30(b)(6) Deposition, Merits Discovery Tr. 37:2-9.)[8]

## VII. While EO Technical Works the "Test Cases," EO Determinations Begins to Coordinate Advocacy Applications Using Inappropriate Criteria.

80. In July 2010, EO Determinations provided Continuing Professional Education training to EO agents. At this training, agents were advised that they would soon receive an expanded TAG spreadsheet to enable them to identify and route cases to the appropriate groups. (Gov't Ex. 16, EO Determinations CPE, Instructor Guide: *Heightened Awareness Issues*.)

81. EO Determinations informed agents that the new spreadsheet would contain the following tabs: "Emerging Issues," "Watch List," "TAG [touch-and-go] (or "Potential Abusive"), "TAG Historical (or "Potential Abusive Historical"), and "Coordinated Processing." This spreadsheet was later named the be-on-the-look-out (BOLO) list. (*Id.*; Gov't Ex. 17, CPE PowerPoint Presentation.)

82. During the training, agents were shown a PowerPoint presentation that contained the following slides:

What Are Emerging Issues?

- Groups of Cases where No Established Tax Law or Precedent has been Established.
- Issues Arising from Significant Current Events (Doesn't Include Disaster Relief)
- Issues Arising from Changes to Tax Law
- Other Significant World Events

Emerging Issue Examples

- Tea Party Cases:
  1. High Profile Applicants
  2. Relevant Subject in Today's Media
  3. Inconsistent Requests for 501(c)(3) and 501(c)(4).
  4. Potential for Political/Legislative Activity
  5. Rulings Could be Impactful

---

[8] While a § 501(c)(3) organization must have prior approval of its status to function, the same is not true of § 501(c)(4) entities. *See* 26 U.S.C. § 508 (providing for application procedure to be recognized as a § 501(c)(3) group.) Rather, § 501(c)(4) entities *may* apply for express recognition of their status, but they are not required to do so before operating with all of the advantages of that status.

<table>
<tr><td>

**Emerging Issue Examples Continued:**

- Pension Trust 501(c )(2):
  1. Cases Involved the Same Law Firm
  2. High Dollar Amounts
  3. Presence of an Unusual Note Receivable



</td><td>

**Emerging Issues Examples Continued**

- Historical Examples:
  1. Foreclosure Assistance
  2. Carbon Credits
  3. Pension Protection Act
  4. Credit Counseling
  5. Partnership/Tax Credits
  6. Hedge Funds

</td></tr>
</table>

(Gov't Ex. 17, PowerPoint Presentation from CPE Training, at USA_NorCAL_RFP_0002619-22.)

83.     The training also covered coordinated processing of cases involving similar issues. Here, agents were taught:

<table>
<tr><td>

**What Are Coordinated Processing Issues?**

- Cases with Issues Organized for Uniform Handling
- Involves Multiple Cases
- Existing Precedent or Guidance Does Exist



</td><td>

**Coordinated Examples**

- Break-up of a Large Group Ruling Where Subordinates are Seeking Individual Exemption.
- Multiple Entities Related Through a Complex Business Structure (e.g. Housing and Management Companies)
- Current Specialized Inventories

</td></tr>
</table>

(Gov't Ex. 17, at USA_NorCAL_RFP_0002623-24.)

84.     From the beginning there was confusion regarding what to look for when coordinating the cases. As the notes from the July 28, 2010 training reflect, IRS employees gave conflicting accounts of the types of entities that should be coordinated under the "Tea Party" entry on the Emerging Issues tab. (Gov't Ex. 18, Minutes from July 28, 2010 Training.)

85.     Screener Gary Muthert explained that entities with "the following names and/or titles were of interest and should be flagged for review: 9/12 Project, Emerge, Progressive, We The People, Rally Patriots, and Pink-Slip Program." (*Id.*)

86.     After Muthert's discussion, the Meeting Minutes reflect that Hofacre informed agents that "applications with Key Names and/or Subjects should be transferred to [group] 7822 for Secondary Screening. Activities must be primary. 'Progressive' applications are not considered 'Tea Parties.'" (*Id*.)

87.     Shortly after the July 2010 training, EO Determinations distributed the newly-named BOLO list, containing the five tabs discussed during the training, to EO personnel. The BOLO list was implemented to help EO Determinations personnel stay up-to-date on what to look for when reviewing applications and on where to route cases presenting specialty issues. (Gov't Ex. 47, Thomas Merits Tr. 35:3-15.)

88.     For example, one entry on the November 23, 2010 version read: "Medical Marijuana. Email dated 7/5/10. Look for cases involving Medical Marijuana. Forward cases to processing who will forward the cases to Denise Tamayo, group 7888." (Gov't Ex. 19, November 23, 2010 BOLO List, "TAG" tab.)

89.     The entry regarding the "Tea Party" cases was listed on the emerging issues tab of the BOLO list. From August 12, 2010 to February 1, 2011, this tab appeared as follows[9]:

| Issue Name | Issue Description | Issue Number | Alerts (Year and number) | Disposition of Emerging Issue | Current Status (Opened or closed) | |
|---|---|---|---|---|---|---|
| 501(c)(2) | These cases involve a commingled pension trust holding title to a high dollar note receivable secured by real estate. The application appear to be prepared from a template. The fund manager is usually JP Morgan Chase bank. | x | x | Any future cases may be closed on merit if applicable. EOT determined these applications qualify under 501(c)(2). A referral was completed to address any EP concerns. | Closed | |
| Tea Party | These case involve various local organizations in the Tea Party movement are applying for exemption under 501(c)(3) or 501(c)(4). | EI-1 | x | Any cases should be sent to Group 7822. Ron Bell is coordinating. These cases are currently being coordinated with EOT. | Open | |

---

[9] From August 12, 2010 to November 15, 2010, the fifth column referred to coordinator Elizabeth Hofacre, rather than Ronald Bell.

(Gov't Ex. 19, "Emerging Issues" tab.)[10]

90.    On June 1, 2011, EO Technical Manager Holly Paz asked EO Determinations: "What criteria are being used to label a case a 'Tea Party case'? We want to think about whether those criteria are resulting in over-inclusion." (Gov't Ex. 12, Email String, p. 3.)

91.    In order to answer Paz's questions, screening group manager John Shafer polled the screeners to ask what criteria they have been using when looking for the cases identified by the "Tea Party" entry on the "Emerging Issues" tab of the BOLO list. He responded: "The following are issues that could indicate a case to be considered a potential 'tea party' case and sent to Group 822 for secondary screening. (1) 'Tea Party, Patriots or '9/12 Project' is referenced in the case file. (2) Issues include government spending, government debt and taxes. (3) Educate the public through advocacy/legislative activities to make American a better place to live. (4) Statement in the case file that are critical of the how the country is being run." (Gov't Ex. 12, p. 2.)

92.    Forwarding Shafer's email to Paz, EO Determinations Program Manager Cindy Thomas wrote: "I guess what I am trying to say is that it doesn't matter what the cases are called or how they are grouped, EOD needs guidance to ensure consistency." (Gov't Ex. 12, Email string from Holly Paz to Nancy Marks, et. al., "Fw: Coordination Question – For meeting tentatively scheduled for 6/13.")

---

[10] This was not the only entry on the BOLO list that concerned political activity. The BOLO list also contained an entry on the "TAG Historical" tab that read: "Progressive. Common thread is the word 'Progressive.' Activities appear to lean towards a new political party. Activities are partisan and appear as anti-Republican. You see references to 'blue.'" In addition the "Watch List" contained an entry for "ACORN Successors" that instructed such cases to be forwarded to the TAG group. (Gov't Ex. 19.)

**VIII.  When EO Director Lois Lerner Learned of BOLO List Criteria, She Ordered the Criteria be Changed to Focus on Issue of Political Campaign Intervention.**

93.     On July 5, 2011, Lois Lerner convened a meeting with EO employees to discuss the Tea Party applications and options for processing those applications

Gov't Ex. 24, Email from Cindy Thomas to EO Determinations Managers, dated July 5, 2011.)

94.     In advance of the meeting, EO Technical employee Justin Lowe prepared a briefing paper for Lerner that stated: "EOD Screening has identified an increase in the number of (c)(3) and (c)(4) applications where organizations are advocating on issues related to government spending, taxes and similar matters. Often there is possible political intervention or excessive lobbying." The briefing went on to cover the criteria gathered by Shafer, state that over 100 cases were identified as part of this emerging issue, and mention the test cases pending in EOT. (Gov't Ex. 23, Email from Justin Lowe to Holly Paz, et. al., dated June 27, 2011 and attached Briefing Paper; *see also* Gov't Ex. 49, Merits Discovery Deposition of Nancy Marks Tr. 95:6-10 ("You know, what the [EO Determinations] folks we interviewed said was that they were starting to see a lot of cases with this issue, and that was new to them. Whether that meant they had never seen another case, I can't tell you.").



100.     During the relevant time period, the ROO was authorized to review an

organization's activities to determine whether those activities were consistent with its stated tax

exempt purpose and whether the organization was adhering to applicable reporting requirements.

The ROO did not contact entities; rather, it would look at an application file and conduct internet

research.[12] (Dkt. 309-6, Declaration of Tamera Ripperda ¶ 18.)

101.     At that time, the Internal Revenue Manual provided that a "Review of Operations

(ROO) follow-up referral is prepared when a determination specialist has concerns about the

past, present, or future activities of the organization but does not have sufficient cause to deny

exemption."

(Gov't Ex. 37, IRM 7.20.1.5(2)(b) (2011);

## IX.     Unfortunately, the Changes Ordered by Lerner Were Misinterpreted by EO Determinations Personnel, and the Advocacy Cases Continued to Pile Up.

102.     Days after the July 5, 2011 meeting, EO Determinations changed the BOLO list

entry to eliminate the reference to "Tea Party" and replaced it with the term "Advocacy Orgs."

---

[12] The ROO no longer preforms this function. On September 10, 2013, the ROO ceased accepting referrals from EO Determinations. As of October 4, 2015, the ROO's only responsibility is to review hospital organizations' compliance with the Affordable Care Act. (Dkt. 309-6 ¶ 18.)

This entry read: "Organization involved with political, lobbying, or advocacy for exemption under 501(c)(3) or 501(c)(4)." (Gov't Ex. 32, Email from Holly Paz, BOLO Descriptions, dated May 13, 2013.)

103.    Although the BOLO list entry changed, EO management did not effectively communicate the extent and purpose of the change to EO Determinations agents, nor did they follow-up to ensure effective communication. (Gov't Ex. 42, SFC Report, pp. 58-59.)

104.    Rather, EO Determination Program Manager Cindy Thomas's email to the EO Determinations group managers soft-pedaled Lerner's criticism. Thomas's email focused on changing the label used to refer to cases rather than the need to change the criteria to focus on an organization's activities rather than its name or policy positions. (Gov't Ex. 24) ("Lois expressed concern with the 'label' we assigned to these cases. Her concern was centered around the fact that these type things can get us into trouble down the road when outsiders request information and accuse us of 'picking on' certain types of organizations even though we all know that isn't what is taking place. . . . Lois did want everyone to know that we are handling the cases as we should, i.e., the Screening Group starts seeing a pattern of cases and is elevating the issue.")

105.    Accordingly, despite the change to the BOLO list, EO Determinations' coordination of the advocacy cases did not substantively change at this time.

106.    Further, EO Determinations screeners found the "Advocacy Orgs." BOLO entry too vague and general to be helpful to their task. So, on January 2012, EO Agents changed the BOLO entry again to the label "Current Political Issues" with the description:

> Political action type organizations involved in limiting/expanding government, education on the constitution and bill of rights $ocial economic reform/movement. Note: typical advocacy type issues that are currently listed on

the Case Assignment Guide (CAG)[13] do not meet these criteria unless they are also involved in the activities described above.

(Gov't Ex. 32.)

107.     When EO management learned of this change, which included references to policy positions rather than to activities, management again ordered the entry changed and ordered that no further changes be made without management approval. (Gov't Ex. 42, SFC Report, p. 84.)

108.     The new, EO management-sanctioned BOLO entry read:

501(c)(3), 501(c)(4), 501(c)(5), and 501(c)(6) organizations with indicators of significant amounts of political campaign intervention (raising questions as to exempt purpose and/or excess private benefit). Note: advocacy action type issues (e.g., lobbying) that are currently listed on the Case Assignment Guide (CAG) do not meet this criteria.

(Gov't Ex. 32.)

109.     No further changes were made to this entry of the BOLO list. The BOLO list was permanently discontinued on June 20, 2013. (*See* ¶ 22.)

## X.     Faced with a Significant Backlog of Applicants, EO Technical Undertook, Ultimately Unsuccessfully, a Three-Pronged Approach to Resolve Cases and Provide Guidance to EO Determinations.

110.     Following the July 5, 2011 meeting with EO Director Lerner, EO Technical began its multi-pronged approach to provide guidance to EO Determinations while trying to speed cases to resolution. Each prong ultimately proved unsuccessful.

*First Prong: Test Cases*

111.     After Goehausen replaced Hull, work on the test cases proceeded more quickly. One case was closed after a representative of the entity informed Goehausen that it would not be

---

[13] The Case Assignment Guide was a chart that EO managers used to assist in determining how to assign applications to agents based on their grades (and experience levels).

responding to the IRS's information request. For the other entity, Goehausen reviewed its responses to information requests and wrote a proposed denial of its application. (Gov't Ex. 42, SFC Report, p. 91.) (The second entity is neither a Plaintiff nor class member in this case.)

*Second Prong: Triage Review*

113.    Paz assigned EO Technical Tax Law Specialist Hilary Goehausen to review the pending 501(c)(3) and (c)(4) advocacy applications to see whether, after reviewing the file, she could recommend the application for approval, possible denial, or whether it needed more development. (Gov't Ex. 2, Deposition of Hilary Goehausen Tr. 100:11-23.)

115.    Goehausen testified that her "understanding of the purpose [reviewing the applications] was to help move some of these outstanding applications." She was to see if a favorable determination letter could be issued based on the information already in the application file, or, if not, whether the organization likely did not qualify for 501(c) status or more information was needed to determine whether it qualified. (Gov't Ex. 45, Goehausen Tr. 101:4-14.)

116.    As part of this assignment, Goehausen reviewed the applicants' electronic application files (housed in the IRS's TEDS software system) and input notes regarding her recommendations on a spreadsheet. (Gov't Ex. 26, Goehausen Triage Review Spreadsheet; Gov't Ex. 45, Goehausen Tr. 118:8-21.)

117.    Plaintiffs NorCal Tea Party Patriots and San Angelo Tea Party were reviewed by Ms. Goehausen as part of this effort. (Gov't Ex. 26, Lines 12 and 20.)

118.    Plaintiffs have identified Goehausen's review of San Angelo's electronic application file as an "unlawful inspection." (Gov't Ex. 8, Inspection No. 5.)

119.    Ultimately, Goehausen's work did not achieve the desired result of helping EO Determinations resolve pending cases. (Gov't Ex. 46, Thomas Class Tr. 153:24-154:21.)

120.    EO Determinations Program Manager, Cindy Thomas, described Goehausen's comments as less than definitive. This was due, in part, to the fact that Goehausen only had access to the electronic version of the application file housed on the IRS' TEDS electronic file system. At this time, the TEDS system did not always contain the entity's full application file because responses to development letters were kept in the paper file and not always imaged into the TEDS system. In addition, Ms. Goehausen lacked experience in the area of political campaign intervention and some of her review reflected that inexperience. (Gov't Ex. 26; Gov't Ex. 46, Thomas Class Tr. 154:14-21.)

121.    For example, with regard to Plaintiff San Angelo, Ms. Goehausen notes: "Appears to be mostly engaging in primarily political campaign activity; no apparent educational or legislative activities." But, the notes do not contain a clear recommendation for what action EO Determinations should take on this application. (Gov't Ex. 26, Line 12) (emphasis in original.)

*Third Prong: Guidesheet*

123.    Guidesheets were regularly used by EO personnel to assist in review of an application and to create relevant questions to develop the case. Attorneys in the IRS Office of Chief Counsel, whose role is to provide legal advice to the IRS, regularly review draft guidesheets. (Gov't Ex. 6, Declaration of Janine Cook ¶ 2; Gov't Ex. 52, Hofacre Tr. 205:6-206:12.)

126.    In November 2011, EO Technical provided a draft guidesheet to EO Determinations. However, a final guidesheet was never created. Despite much work and several revisions, work on the guidesheet ultimately stalled because EO Technical was unable to come to

an agreement with attorneys from the IRS Office of Chief Counsel, Tax exempt/Government Entities Division (TE/GE Counsel) on the language of the document. It was not unusual for EO Technical to consult with TEGE Counsel on such matters, especially matters involving legal guidance in areas with little precedent. (Gov't Ex. 6, Cook Dec. ¶ 2; Gov't Ex. 27, Draft Guidesheet; Gov't Ex. 57, Deposition of Janine Cook, Merits Discovery Tr. 50:9-19, 55:1-12, 57:5-19, 90:18-91:3, 132:13-22, describing discussions on draft guidesheet between TE/GE Counsel and EO Technical.)

## XI. As the Backlog Increased, EO Determinations Began to Use the Draft Guidesheet to Process Cases. In Its Rush to Resolve Advocacy Cases, EO Determinations Sent Boilerplate Questions That, While Generally Applicable to Determinations of Tax Exempt Status, Were Unnecessary to Resolve the Recipient's Application.

127.    In November of 2011, EO Determinations Program Manager Cindy Thomas continued to be concerned about the growing backlog of advocacy cases. Responding to a November 3, 2011 email from Lerner asking for input on how to prioritize work, Thomas emphasized the backlogged advocacy cases: "We've been waiting for EO in D.C. to get us a guidance/reference document with lessons learned from the c4 and c3 cases they worked and coordinated with Judy Kindell and Counsel." (Gov't Ex. 25, Email from Cindy Thomas to Lois Lerner, "Re: R&A Priorities.")

128.    On November 22, 2011, EO Technical Manager Michael Seto sent Thomas a spreadsheet containing the results of Goehausen's "triage" and asked Thomas to use Goehausen's work product along with the draft version of the guidesheet to begin developing the backlogged advocacy cases. (Gov't Ex. 26, Email from Steven Bowling to Cindy Thomas, "Fw: Advocacy Orgs" and Attachments.)

129.    The day after she received Seto's email with the draft guidesheet and Goehausen spreadsheet, Thomas contacted EO Determinations Group Manager Steve Bowling to "come up

with a game plan for working these cases." Thomas asked Bowling to identify an EO

Determinations Agent to coordinate the effort. (*Id.*)

130.    Thomas wanted to put together a team to develop the cases similar to what the

IRS had done with credit counseling and health care cases. Her idea was to:

> Put[] somebody in charge of having an action plan put together, putting someone
> in charge to coordinate all of these cases similar to what we did with credit
> counseling cases and what we were doing or at some point in time did with
> healthcare cases. In those situations, we had individuals from EO Technical along
> with EO Determinations and EO Quality Assurance. We formed a team, and we
> had individuals reviewing cases. Ultimately, template letters were prepared, and
> when responses came in, those responses would be shared with the other
> individuals on the team, so that everyone would be on the same page and then to
> bring the cases to closure."

(Gov't Ex. 47, Thomas Merits Tr. 131:9-23.)

131.    Thomas instructed Bowling to form a team with "a representative from each

group . . . in the Determination program along with a Quality Assurance individual and

individuals from the Washington office to provide some technical guidance similar to the process

that we handled in the past with credit counseling cases and healthcare-type cases." (Gov't Ex.

47, Thomas Merits Tr. 189:22-190:3.)

132.    While no official title was given to members of the team, the EO Revenue Agents

and Tax Law Specialists that participated in this effort were informally referred to as the

"Advocacy Team Members." In this role, Advocacy Team Members were responsible for

reviewing applications for tax exemption that involved potential political campaign intervention

activities. They developed and processed cases with potential political campaign intervention

activities, attended technical meetings, and worked with designated EO Technical or EO

Determinations employees when the need arose. (Gov't Ex. 1 ¶ 12.a.iii.)

133.    Bowling chose Revenue Agent Stephen Seok to head up the effort to develop the

cases by setting up and heading the Advocacy Team. Bowling met with Seok and told him to

"set up a team" to "review questions that could be used in additional information letters." The team was comprised of senior agents, because they were "experience[d], seasoned." (Gov't Ex. 50, Bowling Tr. 120:20-21, 121:22-123:10.)

134.    Bowling chose Seok for this role because Seok "did a really good job" with a project involving credit counseling cases. So, Bowling believed that Seok's "approach, his thinking, you know, being reasonable, go-getter" would help him "keep [the] team focused, keep the team on point." (Gov't Ex. 50, Bowling Tr. 122:13-123:6.)

135.    Seok met with the members of the Advocacy Team and started assigning cases to the agents. Seok prepared template development letters, which the team issued to their assigned advocacy cases, with the goal of issuing determinations and closing the pending cases. (Gov't Ex. 47, Thomas Merits Tr. 190:17-21.)

136.    Plaintiffs NorCal and SD Citizens were among the applications assigned to Advocacy Team members for review and development as part of the process instituted by Thomas and overseen by Seok. Development questions were sent to both NorCal and SD Citizens. (Dkt. 212-6, PageID 8003-10, Except, NorCal's Application File; Dkt. 212-10, PageID 8082-86, Excerpt, SD Citizens Application File.)

137.    Plaintiffs allege that the review of the file prior to sending development questions and the review of the responses the entities submitted to those questions were both unauthorized inspections. (Gov't Ex. 8, Inspection No. 6-7.)

138.    As part of the Advocacy Team's work, NorCal received a letter requesting additional information sent by EO Agent Carly Young on January 27, 2012. The letter contained nineteen requests, some with several sub-parts. (Dkt. 212-6, PageID 8003-9.)

139.    Because NorCal had received no contact from the IRS about its application for nearly two years, it was understandably frustrated to receive a lengthy request for additional information with the standard turn-around time of three weeks. (Dkt. 212-6, PageID 8003-9; Gov't Ex. 68, NorCal Merits Tr. 44:8-17.)

140.    NorCal received two of the information requests later identified to be unnecessary: Question 16(c) and Question 18. (Dkt. 212-6, PageID 8003-9; *see* Dkt. 228, PageID 8478-79, list of questions in definition of Unnecessary Requests Subclass.)

141.    Question 16(c) asked: "If you have a board member or officer who has run or will run for a public office, please describe fully. If none, please confirm by answering 'None' to this question." In response, NorCal wrote: "None." (Dkt. 212-6, PageID 8008.)

142.    Question 18 requested, among other things, the names of NorCal's donors. NorCal did not provide donor names to the IRS, as NorCal's Rule 30(b)(6) representative, Ginny Rapini, has repeatedly and adamantly maintained, both in public statements and in her sworn deposition testimony. Rather, NorCal provided a printout from its Paypal.com account, which listed donation amounts. This print out did not contain donor names or other identifying information, and no names or identifying information was provided in responses to Question 18. (Dkt. 212-6, PageID 8008 (no handwritten response); Dkt. 197-11, PageID 7216, NorCal Rule 30(b)(6) Deposition, Class Discovery Tr. 36:16-37:4; Dkt. 197-11, PageID 7230-31, NorCal Class Tr. 93:21-94:5) (Ms. Rapini testifying that she provided paypal.com information but refused to provide donor names); Dkt. 208 (electronic media submitted with notice of filing.)

143.    Plaintiffs allege that the review of the information that NorCal provided in response to Question 16(c)—consisting of the word "none"—constituted an "unauthorized inspection." (Gov't Ex. 8, Inspection No. 7.)

144.    Starting in February 2012, IRS managers began to hear complaints from the media and Congress regarding delays and burdensome information requests. (Gov't Ex. 42, SFC Report, p. 99.)

145.    On March 5, 2012, due to concerns raised about lengthy and intrusive requests for information, Paz instructed EO Determinations to stop sending out development letters. (Gov't Ex. 28, Email string from Steven Bowling to Cindy Thomas, "Re: Congressional Follow Up – updated instructions and need for info.")

**XII.    Concerned by the Backlog and Complaints About Burdensome Questions, Deputy Commissioner Steve Miller Ordered an Independent Review in an Effort to Get Back on the Right Track and Resolve the Advocacy Cases.**

146.    By March of 2012, Steve Miller, then the Deputy Commissioner for Services and Enforcement, became aware of concerns about the backlog of advocacy applications and the congressional inquiries regarding delays and burdensome information requests. (Gov't Ex. 48, Nicole Flax Deposition Tr. 35:14-18; Gov't Ex. 49, Nancy Marks Deposition Tr. 27:14-19.)

147.    Miller's Deputy Chief of Staff, Nikole Flax, testified that Miller sent Senior Technical Advisor Nancy Marks to Cincinnati to conduct an "independent review so that Steve Miller had a clear sense of what was happening on the cases." (Gov't Ex. 48, Flax Tr. 36:13-17.)

148.    As a Senior Technical Advisor, Marks had primary responsibility for policy-level analysis and coordination of tax law issues with other functions within the IRS, as well as at other federal agencies. During the relevant time periods, Senior Technical Advisors were assigned to review applications for tax exempt status and, based on that review, to advise and assist EO Determinations Revenue Agents and Tax Law Specialists in the classification and analysis of cases involving indications of potential political campaign intervention. (Gov't Ex. 1 ¶ 12.f.)

149.     Marks was chosen for this task because of her many years of experience and because she did not work in EO and would therefore be independent. (Gov't Ex. 48, Flax Tr. 52:7-11.)

150.     Marks understood her assignment to be to "get to the root" of what is going on with the backlog of advocacy applications in Cincinnati and "if there was a problem, let's get it on the right track." (Gov't Ex. 49, Marks Tr. 29:7, 16-17, 35:7-11.)

151.     Marks put together a team consisting of Technical Advisor Joseph Urban, Senior Technical Advisor Sharon Light, and Tax Law Specialist Rob Malone, assisted by Paz, to help her investigate. (Gov't Ex. 49, Marks Tr. 59:9-11.)

153.     Marks and her team reviewed some of the relevant files using the TEDS electronic system and then travelled to Cincinnati to review complete files and speak with the EO Determinations employees who had been involved in screening and coordinating the cases. (Gov't Ex. 49, Marks Tr. 59:13-61:2.)

154.     In order to better understand the types of questions being asked of applicants and the number of questions in development letters, Sharon Light[14] and Judith Kindell reviewed the development letters sent to advocacy organizations with pending applications for tax exempt status. (Gov't Ex. 53, Merits Discovery Deposition of Judith Kindell, Tr. 136:19-137:5.)

_____

[14] Sharon Light's name is now Sharon Want.

155.     Plaintiffs identify this review as an unlawful inspection. (Gov't Ex. 8, Inspection No. 8.)[15]

156.     Based on this review, Marks' team concluded that EO Determinations had been issuing some questions that were burdensome or not well tailored to the facts presented by the individual applications. (Gov't Ex. 28.)

158.     In short, the IRS was concerned that donor names, which § 501(c)(4) entities are not required to disclose, would become subject to public disclosure due to § 6104.[16]

159.     In order to address this concern, the IRS determined that donor names submitted by organizations seeking tax exempt status were not considered part of the determination of tax exempt status for these entities. As such, the information could be expunged from the file and therefore not subject to public disclosure. (Gov't Ex. 29, Email from Margo Stevens to Lois Lerner.)

---

[15] Plaintiffs assert that IRS employees "J. Kindell" and "S. Brown" conducted unauthorized inspections as part of Inspection No. 8: Review for Unnecessary Questions. While Judith Kindell was part of Ms. Marks team and did review files to determine whether complaints about burdensome questions were founded, there is no record of any "S. Brown" participating in this review.

[16] Tax-exempt entities are required to disclose their donors to the IRS as part of their yearly tax return filing, and that information is listed on the Form 990, Schedule B. While Form 990s are subject to public disclosure, the donor information found on Schedule B is not. (*See* Instructions, IRS Form 990, p. 5, available at https://www.irs.gov/pub/irs-pdf/f990ezb.pdf.) However, pursuant to § 6104, information that is submitted as part of the tax-exempt application process and that the IRS considers in making the determination, is made public if the application is approved. Thus, if an entity submitted donor names and the IRS considered that information in approving the entity, the donor names would be part of the file subject to public disclosure under § 6104. As detailed in paragraphs 159-163, once EO managers realized this problem existed, they took steps to quickly cure the issue.

160.	IRS employees reviewed the files in order to expunge any donor information.[17] The IRS sent letters to the organizations notifying them that any donor information had been expunged and would not be publicly available, and inserted a memorandum into the files from which information had been expunged—memorializing the process. (Gov't Ex. 54, Merits Discovery Deposition of Meghan Biss, Tr. 404:12-405:1; *see, e.g.*, Gov't Ex. 73, IRS_NorCalTeaParty000172.)

161.	As part of their effort to ensure that the files were scrubbed of any donor information, the IRS interpreted this to cover "a much broader group of people" than just lists of donors. (Gov't Ex. 54, Biss Tr. 406:19-407:3.)

162.	For example, Plaintiff TPTP was not asked for a list of donor names and did not submit any such list as part of its application for tax exempt status. But, the IRS redacted the Facebook page printouts found in TPTP's application file as part of the IRS's effort to expunge donor information. As EO employee, Meghan Biss, explained:

> TPTP had Facebook information contained in their application and we had made the decision that if an individual cared enough about an organization, was interested enough in an organization to be participating on their Facebook page, to be commenting on their information in their Facebook page, that it was entirely possible that, that individual was also a donor to the organization, and so without any information to the contrary we would go ahead and treat them as such and redact their information so that their Facebook, their names and their profile photos, that information was not publicly disclosed of who it was that was commenting on their Facebook page.

(Gov't Ex. 54, Biss Tr. 406:4-18.)

---

[17] Due to preservation orders, the IRS could not permanently destroy this information. Rather, it was "expunged" from the entity files and sent to a secure holding facility in West Virginia where it could not be accessed by Services and Enforcement employees and could not be disclosed in response to a request for public disclosure under § 6104. (Gov't Ex. 54, Biss, Tr. 404:12-405:1.)

163.    Similarly, although the IRS sent NorCal a letter notifying it that "donor information" had been expunged, Rapini, NorCal's Rule 30(b)(6) deponent, confirmed that there are no lists of donor names in the materials expunged from its file. (Gov't Ex. 68, NorCal Merits Tr. 77:12-79:3.)[18]

164.    Plaintiffs identified the review of application files by Marks and her team as part of their work to determine what had gone wrong and get the process on the right track to be an unlawful inspection. (Gov't Ex. 8, Inspection No. 9.)

165.    On May 3, 2012, Marks presented her team's finding to Miller at a meeting. (Gov't Ex. 48, Flax Tr. 47:6-14.)

166.    Marks reported to Miller that EO Determinations was flagging cases for coordination based on name and ideology and that there were 250-300 cases awaiting determination. Miller was very upset by this information and "made it clear that he wanted the inventory to get on the right track, and get the cases looked [at] properly" and get applications the "rulings that they requested." Miller "wanted that accomplished as quickly as possible, consistent with doing it right." (Gov't Ex. 49, Marks Tr. 86:19-87:13.)

---

[18] In discovery, Plaintiffs identified documents Bates Nos. NorCal_011353-13416 as "fundraising donor information submitted by Ginny Rapini." (Gov't Ex. 41, Plaintiff NorCal's Response to Document Request No. 8.) But, at Ms. Rapini's deposition, she confirmed that the list of donor names contained in Bates Nos. NorCal_011353-13416, consisting of a print-out from NorCal's PayPal account was a different document from the PayPal print out she submitted to the IRS. She confirmed that the date the PayPal list found in NorCal_011353-13416 (which does list donor names) was downloaded did not match the date she recalls downloading the PayPal list sent to the IRS (which contained only donation amounts, not names of donors). (Dkt. 197-11, PageID 7232-33, NorCal Class Tr. 101:15-103:11.)

**XIII. At Miller's Instruction, IRS Senior Technical Advisor Nancy Marks Implemented the Bucketing Process, a Successful Triage Effort to Resolve Cases.**

167.    In order to resolve the mounting backlog of cases, Marks recommended to Miller that EO Technical staff provide in-person assistance to EO Determinations by reviewing and "bucketing" each pending advocacy application. (Gov't Ex. 42, SFC Report, p. 102.)

168.    As part of the bucketing triage, Marks assembled a team of EO Technical agents to go to Cincinnati and work alongside EO Determinations agents to review the cases (the "bucketing team"). The object of this review was to determine which "bucket" the case fell into:

   a.   Bucket 1: Information in case file is sufficient to conclude that entity should receive a favorable determination,

   b.   Bucket 2: Some information is lacking from case file but only a small number of questions need to be addressed to resolve application.

   c.   Bucket 3: Information in case file is lacking and case needs significant work to develop and determine whether it qualifies for status.

   d.   Bucket 4: Based on information in case file, entity likely does not qualify for tax exempt status.

(Gov't Ex. 49, Marks Tr. 148:17-149:20.)

169.    From mid-May to early June 2012, Mark's team worked in Cincinnati to bucket all the pending advocacy cases. As part of this process, each pending case was reviewed by two members of the bucketing team. They used a "Bucketing Worksheet" to record their notes and make a recommendation regarding which "bucket" the entity fell into. If the two reviewers disagreed, then the case would be reviewed a third time to break the tie. (Gov't Ex. 30, Email string, "Advocacy Cases – next steps – revised.")

170. Plaintiffs have identified the bucketing review as an unauthorized inspection. (Gov't Ex. 8, Inspection No. 10.)

171. Following the bucketing process, and according to EO's normal procedures, the advocacy cases were to be reviewed by EO Quality Assurance. At the time, the Internal Revenue Manual directed that "[a]pplications that present sensitive political issues, including . . . activities that may appear to support or oppose candidates for public office" were subject to mandatory review by EO Quality Assurance. The EO Determinations Quality Assurance Office was staffed by revenue agents who were responsible for reviewing applications after EO Determinations had completed their work on the application. (Gov't Ex. 38, IRM 7.20.5.4(3)(x) (2008); Gov't Ex. 1, ¶ 9.)

173. Plaintiffs identify the Quality Assurance mandatory review as an unauthorized inspection. (Gov't Ex. 8, Inspection No. 12.)

174. The bucketing team worked from mid-May through early June to review each of the 282 pending advocacy cases. In her June 8, 2012 email, Paz summarized the results as follows:[19]

---

[19] In a separate email, Kindell noted that, "Of the 84 (c)(3) cases, slightly over half appear to be conservative leaning groups based solely on the name. The remainder do not obviously lean to either side of the political spectrum" and that, "Of the 199 (c)(4) cases, approximately 3/4 appear to be conservative leaning while fewer than 10 appear to be liberal/progressive leaning groups based solely on the name. The remainder do not obviously lean to either side of the political spectrum." (Gov't Ex. 33, Email from Judith Kindell to Lois Lerner, "Bucketed cases.")

|  | § 501(c)(3) entities | § 501(c)(4) entities |
|---|---|---|
| Approval (Bucket 1) | 16 | 65 |
| Limited Development (Bucket 2) | 16 | 48 |
| General Development (Bucket 3) | 23 | 56 |
| Likely Denial (Bucket 4) | 28 | 30 |
| **Total** | **83** | **199** |

(Gov't Ex. 30, Email from Holly Paz to Cindy Thomas, June 8, 2012.)

176.    Plaintiffs NorCal, AAOL, and SD Citizens were reviewed as part of the bucketing process. On May 17, 2012, EO Agent Matthew Giuliano reviewed NorCal's file and completed a bucketing worksheet indicating that NorCal fell into bucket 1. EO Agent Andrew Megosh concurred with this recommendation. On May 31, 2012, EO Quality Assurance reviewed NorCal's file and also concurred with the recommendation that the application be approved. (Dkt. 212-6, PageID 8039-48.)[20]

177.    As a bucket 1 entity, NorCal was among the first group of files assigned to an EO Agent after bucketing. On June 8, 2012, NorCal was assigned to EO Agent Faye Ng, who reviewed the case file, responded to a pending inquiry from the Taxpayer Advocate Office,[21] expunged "donor information" found in the file, and finished sorting and organizing the case file

---

[20] As detailed above, NorCal did not submit a list of donor names in response to the relevant information request. (*See* ¶ 163.)

[21] NorCal had contacted the Taxpayer Advocate Office regarding the delay in its application. Thus, Ms. Ng had to respond to the inquiry from the Taxpayer Advocate's Office prior to closing NorCal's file.  Congress created the Taxpayer Advocate Office to assist taxpayers in resolving their problems with the IRS.

to ready it for closure. On August 12, 2012, the IRS issued a letter to NorCal approving its application for tax exempt status. (Dkt. 212-6, PageID 8011, 8038.)

178.    Plaintiffs identify Ng's final review to ready the file for approval and closing as an unauthorized inspection. (Gov't Ex. 8, Inspection No. 2.)

179.    South Dakota Citizens for Liberty was reviewed by Daniel Dragoo, Sharon Light, and Hilary Goehausen, who agreed that it fell into bucket 1. (Gov't Ex. 75, IRS_SDCitizens000281-82, 294.)

180.    The bucketing worksheet, completed on May 31, 2012, further recommends that, for SD Citizens, the "ROO [Review of Operations Unit] should look at activities at end of 2012 to see whether political activities became primary for the year because of the election." (Gov't Ex. 75, IRS_SDCitizens000285.)

181.    Janine Estes filled out a Referral to Review of Operations Unit form on June 18, 2012 marking the box next to "political/legislative activities." (Gov't Ex. 75, IRS_SDCitizens000280.)

182.    Plaintiffs identify the ROO referral form completed by Estes as an unauthorized inspection.[22] (Gov't Ex. 8, Inspection No. 16.)

183.    While several Plaintiffs have a ROO referral form in their files, the ROO did not act on those referrals, so the ROO unit did not work on the Plaintiffs' files.[23]

---

[22] The purpose of the ROO and the rationale behind these referrals is discussed at ¶¶ 100-102.

[23] While many of the 428 class members have a ROO referral form in their file, the ROO unit did not act on the vast majority of these referrals. In fact, only seven of the class members, and none of the Plaintiffs, had their files reviewed by the ROO unit following a referral. (Gov't Ex. 9, Response to Interrogatory No. 6.)

184.     On June 20, 2012 SD Citizens received a letter notifying it of approval of its tax exempt status. (Gov't Ex. 75, IRS_SDCitizens000227.)

185.     AAOL was reviewed by bucketing team members Justin Lowe and Andrew Megosh, both of whom identified it as a bucket 3 case. The review revealed that more information was needed to consider AAOL's application due to lack of information and inconsistencies in the available information. As Megosh wrote on the bucketing worksheet, "Organization's description of activities appears to promote social welfare" but "description of the organization contained on the trademark sites [for the trademarked organization name] includes the following: 'promoting the interests of a political organization. . . .'" (Dkt. 212-8, PageID 8068-71, Excerpts, AAOL's Application File.)

186.     As a bucket 3 case, AAOL was assigned to an EO Agent for further development in September of 2012. EO Agent Faye Ng reviewed the file and prepared a development letter, which she sent to EO Technical for review and approval.

187.     Plaintiffs identified the development letter review by EO Technical as an unauthorized inspection. (Gov't Ex. 8, Inspection No. 11.)

188.     On May 22, 2013, Ng issued the development letter to AAOL. This letter contained two questions, which were focused on concerns raised by AAOL's application. For example, one question reads:

> The description associated with the trademark [of the AAOL name] describes the purpose of your organization as "Promoting the interests of a political organization; Promoting public awareness of the interests of a non-profit political activist organization; Promoting public awareness of oppressive laws and the need to curtain them." . . . "Please explain how you are a political organization or a political activist organization."

(Gov't Ex. 76, IRS_AAOL000077-80.)

189.    AAOL responded to Ng's development letter and received an approval of its tax exempt status on July 16, 2014. (Dkt. 212-9, PageID 8075-79.)[24]

190.    During the bucketing process, EO management worked to expedite normal post-review procedures so that organizations bucketed as deserving of a favorable determination would receive notice of their determination as quickly as possible and that they would be notified that they did not need to respond to any outstanding development requests. (Gov't Ex. 34, Email from Holly Paz to Lois Lerner, "Re: Next Steps.")

191.    By December 17, 2012, EO had issued approvals to 108 of the backlogged entities. (Dkt 197-4, PageID 7046, 2013 TIGTA Report.)

## XIV.    As a Result of the Delay in Processing Advocacy Cases, TIGTA, Congress, and the DOJ Opened Investigations. While these Investigations Uncovered Mismanagement, There Were No Findings of Bias or Intent to Discriminate.

192.    In June 2012, the Treasury Inspector General for Tax Administration (TIGTA) notified EO that it was commencing an audit regarding "Consistency in Identifying and Reviewing Applications for Tax exempt Status Involving Political Advocacy Issues." (Gov't Ex. 35, Email from Lois Lerner to Richard Daly, et al., "Re: 201210022 Engagement Letter," p. 2.)

193.    After receiving notice of the upcoming TIGTA audit, Lois Lerner wrote: "It is what it is. Although the original story isn't as pretty as we'd like, once we learned thi[ng]s were off track, we have done what we can to change the process, better educate our staff and move the

---

[24] The delay in issuance of AAOL's determination letter occurred because, in accordance with the IRS's longstanding policy, entities who initiated litigation regarding their applications were placed in a litigation hold. Accordingly, AAOL's application was placed in a litigation hold in June 2013. However, in order to speed as many applications as possible to resolution while avoiding contact with represented parties, in 2014, the IRS commenced processing the applications of litigants where that processing did not require contact with the taxpayer. Further contact with AAOL was not necessary, so the IRS finished processing the application and issued a determination letter in June 2014. (*See* Dkt. 309, PageID 10254-55 for discussion of litigation hold policy and application to this litigation.)

cases. So, we will get dinged, but we took steps before the 'dinging' to make things better and we have written procedures. So, it is what what [sic] it is." (Gov't Ex. 35, p. 1.)

194.    On May 14, 2013, TIGTA released its report entitled: *Inappropriate Criteria Were Used to Identify Tax exempt Applications for Review*. In this report, TIGTA concluded:

> The IRS used inappropriate criteria that identified for review Tea Party and other organizations applying for tax exempt status based upon their names or policy positions instead of indications of potential political campaign intervention. Ineffective management 1) allowed inappropriate criteria to be developed and stay in place for more than 18 months, 2) resulted in substantial delays in processing certain applications, and 3) allowed unnecessary information requests to be issued.

(Dkt. 14-1, PageID 123, Exhibit A to First Amended Complaint, 2013 TIGTA Report.)

195.    TIGTA further found the use of the criteria gave the impression that the IRS was not impartial, and that ineffective management and lack of procedures for tracking requests for guidance contributed to unwarranted delay in processing these applications. (*Id*. at PageID 133.)

196.    The TIGTA report also determined that ineffective management and a lack of training resulted in IRS agents sending the affected organizations requests for additional information. Some of these requests were later determined to have not been necessary to process the applications. (*Id.* at PageID 145.)

197.    Based on the findings in its report, TIGTA issued nine recommendations to the IRS aimed at reforming the screening and review processes to ensure that proper criteria were being used, ensuring the delivery of timely and appropriate guidance to the IRS employees doing the reviewing, developing additional training for the reviewers on identifying applications where political campaign intervention activities may require additional scrutiny, and ending the backlog of unprocessed applications and ensuring that future applications would be processed in a timely manner. (*Id.* at PageID 137-148.)

198.     The TIGTA report on which Plaintiffs rely in their complaint did not characterize the IRS's conduct as "targeting." In fact, Michael McCarthy, TIGTA's Chief Counsel, specifically expressed concern over the use of the word "targeting" because, "[T]argeted has a connotation of improper motivation that does not seem to be supported by the information presented in the audit report." (Dkt. 197-3, PageID 7043, Senate PSI Report, *IRS and TIGTA Management Failure Related to 501(c)(4) Applicants Engaged in Campaign Activity.*)

199.     Following issuance of the TIGTA report, various Congressional committees and subcommittees began their own investigations into the IRS.  For example, on September 5, 2014, the United States Senate, Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs, issued a report entitled, "IRS and TIGTA Management Failures Related to 501(c)(4) Applicants Engaged in Campaign Activity," S. Rpt. 113-26, available at https://www.gpo.gov/fdsys/granule/CPRT-13SPRT89800/CPRT-113SPRT89800/content-detail.html. *See also* S. Rep. No. 114-119, at 77 (2015).  Similarly, on August 5, 2015, the Senate Finance Committee released Senate Report 114-119, The Internal Revenue Service's Processing of 501(c)(3) and 501(c)(4) Applications for Tax exempt Status Submitted by "Political Advocacy" Organizations From 2010-2013 (Gov't Ex. 42.) The bipartisan investigative reports did not find that the mismanagement and delays were due to political animus or bias.

200.     On May 14, 2013, Attorney General Eric Holder announced that the Department of Justice's Criminal and Civil Rights Division, in collaboration with the FBI and TIGTA, was pursuing an investigation into the matters described in the TIGTA report. On October 23, 2015, Assistant Attorney General Peter Kadzik advised Congress that it was closing its investigation and confirmed it would not recommend criminal charges against Lois Lerner or any IRS official.

He stated that the joint investigation, "found no evidence that any IRS official acted based on political, discriminatory, corrupt, or other inappropriate motives that would support a criminal prosecution." Instead, the investigation found "substantial evidence of mismanagement, poor judgment, and institutional inertia, leading to the belief by many tax exempt applicants that the IRS targeted them based on their political viewpoints" but concluded that "poor management is not a crime." (Letter from Peter J. Kadzik, Assistant Attorney General, to Hon. Bob Goodlatte, Chairman, Committee on the Judiciary, U.S. House of Representatives and Hon. John Conyers, Jr., Ranking Member, Committee on the Judiciary, U.S. House of Representatives, dated Oct. 23, 2015, available at http://online.wsj.com/public/resources/documents/IRS1023.pdf.)

201.    On May 20, 2013, Plaintiffs filed their Complaint in this case, citing liberally to the findings of the 2013 TIGTA Report and attaching the Report to their First and Second Amended Complaints. (Dkt. 1; Dkt. 14-1; Dkt. 63-1.)

**XV.    In Response to TIGTA's Report and After Plaintiffs Filed Their Complaint, the IRS Initiated an Optional Expedited Process That Resolved All Still-Pending Applications Eligible for Processing.**

202.    On June 25, 2013, EO Director Kenneth Corbin instituted an Optional Expedited Process[25] for organizations who submitted § 501(c)(4) applications that had been pending for more than 120 days as of May 28, 2013 and that indicate the organization may be involved in political campaign intervention or issue advocacy. (Gov't Ex. 40, Interim Guidance on Optional Expedited Process, June 25, 2013.)

---

[25] The alleged unauthorized review as part of the Optional Expedited Process took place after Plaintiffs filed their complaint. Plaintiffs have not amended their complaint to include these allegations, nor have they sought leave to do so. Thus, the United States maintains that these facts are not relevant as they were not pled in the complaint. However, because Plaintiffs included them in their allegations of unauthorized inspections in response to Interrogatory No. 4, the United States will briefly address them.

203.    By this point, many of the bucketed cases had been resolved, but the IRS wanted to resolve the remaining pending cases as quickly as possible.

204.    The Optional Expedited Process offered pending § 501(c)(4) applicants the option to represent that their past, current, and anticipated future political campaign intervention would not exceed 40% of their organization's activities. For organizations who opted to make this representation, the IRS would issue a favorable determination letter within two weeks. (Gov't Ex. 40, at Step 2.)

205.    Starting on June 25, 2013, the IRS began reviewing entities to determine whether they were eligible for the Optional Expedited Process and notifying eligible entities of this new option via letter. TE/GE Counsel attorneys worked with EO Technical employees to execute this process. (Gov't Ex. 6, Cook Dec. ¶¶ 4-8; Gov't Ex. 40, at Step 1.)

206.     In order to be eligible for the Optional Expedited Process, the organization could not present issues of potential private inurement, as that may disqualify the organization from tax exempt status. Thus, the IRS first had to review the applications to determine whether each organization had issues concerning improper inurement before notifying it that it was eligible for the Optional Expedited Process. (Gov't Ex. 40, at Step 1.)

207.    As part of the Optional Expedited Process and the simultaneous processing of applications, all of the pending advocacy applications were resolved except for two. However, court orders requested by those two applicants enjoin IRS from processing the pending applications. (Dkt. 303, PageID 10021, staying processing of Plaintiff TPTP); (Order Granting Plaintiffs' Motion for Preliminary Injunction, *Freedom Path, Inc. v. Lois G. Lerner, et al.*, Case No. 3:14-cv-1537, Dt. 79, Sept. 7. 2016 (N.D. Tex.).)

208.     Plaintiffs identify the review of applications provided for by the Interim Guidance instituting the Optional Expedited Process as unauthorized inspections. (Gov't Ex. 8, Inspection Nos. 13-15.)

**XVI.  Consistent With the Findings to Date, There Is No Evidence of Animus or Political Bias Against Taxpayer Entities, and the IRS Employees Acted in Good Faith.**

209.     Many of the IRS employees whose actions are at issue in this case were unaware of the political leanings of the "Tea Party" groups or of the political context of the "Tea Party movement." For example, EO Tax Law Specialist Elizabeth Kastenberg testified:

> Q: Is the name "Tea Party" a reflection of ideology in itself?
>
> A: When I first was looking at the cases, it did not flag in my mind, because that's not how I reviewed cases, but it does for other folks; but, for me, it was just a concentration on the activities that the organization did.

(Gov't Ex. 51, Merits Discovery Deposition of Elizabeth Kastenberg Tr. 66:13-19)

210.     Similarly EO Technical Tax Law Specialist Carter Hull testified that he did not remember any coverage in the media about the positions that the Tea Party was taking. Nor was he aware of any political party alignment:

> Q: Was your understanding from the media coverage that [the Tea Party movement] was aligned with the democratic party?
>
> A: I don't remember any particular alignment, either democratic or republican.
>
> Q: Do you remember it being aligned with calling for limiting government?
>
> A: I think that may have been a recollection from later years but not at that point.
>
> Q: Do you have any recollection of it -- the Tea Party talking about taxes?
>
> A: No.  I have no — no memories in that regard.
>
> Q: The Constitution or the Bill of Rights?
>
> A: No, sir.
>
> Q: Do you have any recollection that the Tea Party espoused general political ideology?
>
> A: No, I do not.

(Gov't Ex. 67, Class Discovery Deposition of Carter Hull Tr. 50:10-25) (*see also* Gov't Ex. 60, Merits Discovery Deposition of Gary Muthert Tr. 39:17-25, 63:20-65:24.)

211. Throughout class and merits discovery, Plaintiffs took depositions of twenty-two current and former IRS employees, some of whom were deposed multiple times.[26] Each of these employees who viewed Plaintiffs' tax return information confirmed that they: (1) were familiar with the rules regarding § 6103 and authorized access of tax return information; (2) received training each year to help prevent unauthorized access of return information;[27] and (3) believed that they were authorized to view the Plaintiffs' return information at the time they viewed the information because they believed that doing so was part of their job:

    a. Ronald Bell (Gov't Ex. 56, Bell Merits Tr. 198:20-201:18.)

    b. Meghan Biss (Gov't Ex. 54, Biss Tr. 414:11-419:6.)

    c. Steven Bowling (Gov't Ex. 50, Bowling Tr. 259:22-261:24.)

    d. Janine Cook (Gov't Ex. 57, Cook Tr. 310:3-313:15.)

    e. David Fish (Gov't Ex. 64, Fish Tr. 238:9-242:1.)

    f. Nikole Flax (Gov't Ex. 48, Flax Tr. 246:3-10.)[28]

    g. Hilary Goehausen (Gov't Ex. 3, Goehausen Declaration ¶¶ 3-7.)[29]

---

[26] Plaintiffs deposed the following individuals during both class and merits discovery: Ronald Bell, Judith Kindell, Holly Paz, and Cindy Thomas.

[27] Former IRS Tax Law Specialist Carter Hull, now retired, knew that he was not to review taxpayer information outside his job duties. (Gov't Ex. 5, Declaration of Carter Hull, ¶ 3.)

[28] Ms. Flax testified that she never reviewed any applications for tax-exempt status nor did she review any part of an individual entity's application file. (Gov't Ex. 48, Flax Tr. 246:3-10.)

[29] Plaintiffs took the depositions of IRS employees Hilary Goehausen, Carter Hull, Stephen Seok, and Elizabeth Hofacre during class discovery but not during merits discovery. As this topic of inquiry was not relevant until merits discovery, their testimony has been supplemented by declaration.

h.  Joseph Herr (Gov't Ex. 58, Herr Tr. 151:22-154:12.)

i.  Elizabeth Hofacre (Gov't Ex. 4, Hofacre Declaration ¶¶ 3-7.)

j.  Carter Hull (Gov't Ex. 5, Hull Declaration ¶¶ 3-5.)

k.  Elizabeth Kastenberg (Gov't Ex. 51, Kastenberg Tr. 108:19-111:5.)

l.  Judith Kindell (Gov't Ex. 53, Kindell Merits Tr. 151:10-155:11.)

m.  

n.  Casey Lothamer (Gov't Ex. 59, Lothamer Tr. 268:5-276:12.)

o.  Justin Lowe, (Gov't Ex. 66, Lowe Tr. 186:7-193:10.)

p.  Nancy Marks (Gov't Ex. 49, Marks Tr. 217:14-224:5.)

q.  Gary Muthert (Gov't Ex. 60, Muthert Tr. 175:4-178:22.)

r.  

s.  Stephen Seok (Gov't Ex. 2, Seok Declaration ¶¶ 2-7.)

t.  Michael Seto (Gov't Ex. 65, Seto Tr. 288:19-291:21.)

u.  Mitchell Steele (Gov't Ex. 61, Steele Tr. 157:5-161:11.)

v.  Lucinda (Cindy) Thomas (Gov't Ex. 47, Thomas Merits Tr. 219:23-222:1.)

w.  Jon Waddell (Gov't Ex. 62, Waddell Tr. 203:7-206:23.)

x.  Sharon (Light) Want (Gov't Ex. 63, Want Tr. 162:22-164:9.)

Dated: July 21, 2017                    Respectfully submitted,

DAVID A. HUBBERT
Acting Assistant Attorney General
Tax Division

*s/ Joseph A. Sergi*
JOSEPH A. SERGI (DC 480837)
Senior Litigation Counsel
U.S. Department of Justice, Tax Division
555 4th Street, N.W., JCB 7207
Washington, D.C.  20001
(202) 305-0868; (202) 307-2504 (FAX)
Joseph.A.Sergi@usdoj.gov

LAURA C. BECKERMAN (CA 278490)
LAURA M. CONNER (VA 40388)
STEVEN M. DEAN (DC 1020497)
JOSEPH R. GANAHL (MD)
JEREMY N. HENDON (OR 982490)
Trial Attorneys
U.S. Department of Justice, Tax Division
555 4th Street, N.W.
Washington, D.C.  20001
(202) 514-2000

Of Counsel:

BENJAMIN C. GLASSMAN
United States Attorney
MATTHEW J. HORWITZ (OH 0082381)
Assistant United States Attorney
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
(513) 684-3711
Matthew.Horwitz@usdoj.gov

ATTORNEYS FOR THE UNITED STATES