<pre>
 1                      UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF OHIO
 2                           WESTERN DIVISION


 3                              - - -

 4  NORCAL TEA PARTY PATRIOTS,.  CASE NO. 1:13-CV-341
    et al.,                    .
 5            Plaintiffs,       .
                               .  Motions Hearing
 6         - vs -               .
                               .  Thursday, August 9, 2018
 7  INTERNAL REVENUE SERVICE,  .  1:05 p.m.
    et al.,                    .
 8            Defendants.   .  Cincinnati, Ohio
    . . . . . . . . . . . . .

 9

10                   TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE MICHAEL R. BARRETT, DISTRICT JUDGE

11

12  For Plaintiffs:

13  EDWARD D. GREIM, ESQ.            DAVID R. LANGDON, ESQ.
    Graves Garrett, LLC              Langdon Law, LLC
14  1100 Main Street, Suite 2700     8913 Cincinnati-Dayton Road
    Kansas City, Missouri  64105     West Chester, Ohio  45069
15
    CHRISTOPHER P. FINNEY, ESQ.
16  Finney Law Firm, LLC
    4270 Ivy Pointe Boulevard, Suite 225
17  Cincinnati, Ohio  45245

18  For Defendants Internal Revenue Service and Department of the
    Treasury:
19
    JOSEPH A. SERGI, ESQ.
20  U.S. Department of Justice, Tax Division
    555 Fourth Street, NW
21  Washington, D.C.  20001

22  For Individual Management Defendants:

23  BRIGIDA BENITEZ, ESQ.            MARK T. HAYDEN, ESQ.
    CATHERINE COCKERHAM, ESQ.        Taft Stettinius & Hollister LLP
24  Steptoe & Johnson LLP            425 Walnut Street
    1330 Connecticut Avenue NW       Suite 1800
25  Washington, D.C.  20036          Cincinnati, Ohio  45202
</pre>

```
 1   APPEARANCES, Continued:

 2
     For Interested Party The Cincinnati Enquirer:
 3
     JOHN C. GREINER, ESQ.
 4   Graydon Head & Ritchey, LLP
     312 Walnut Street
 5   Suite 1800  Cincinnati, Ohio  45202

 6
     For Amicus Curiae State of Ohio:
 7
     FREDERICK D. NELSON, ESQ.
 8   Ohio Attorney General's Office Administration
     30 East Broad Street, 17th Floor
 9   Columbus, Ohio  43215

10   For Amicus Judicial Watch, Inc.:

11   RAMONA R. COTCA, ESQ.
     425 Third Street, NW
12   Suite 800
     Washington, D.C.  20024
13

14
     Law Clerk:          Grace Royalty, Esq.
15
     Courtroom Deputy:   Barbara Crum
16
     Court Reporter:     Maryann T. Maffia, RDR
17                       Potter Stewart U.S. Courthouse
                         Room 239
18                       100 East Fifth Street
                         Cincinnati, Ohio  45202
19                       (513) 564-7677

20

21

22

23

24

25
```

```
 1                   P R O C E E D I N G S

 2           THE COURT:  On the docket is District Court Case

 3    Number 1:13-CV-341:  NorCal Tea Party Patriots, et al., versus

 4    the IRS, et al.

 5        We're here this afternoon for a motions hearing.

 6           THE COURT:  Okay.  You over there with all your

 7    friends, Joe?

 8           MR. SERGI:  Yes.  I'm all by myself.

 9    (Laughter.)

10           THE COURT:  I've got the seating chart, but just for

11    the record will everybody identify themselves.

12           MR. GREIM:  For the plaintiff class, Your Honor,

13    Eddie Greim.

14           MR. LANGDON:  David Langdon.

15           MR. FINNEY:  Chris Finney.

16           THE COURT:  Okay.  Start over here.

17           MS. BENITEZ:  For Lois Lerner and Holly Paz, Brigida

18    Benitez.

19           THE COURT:  Okay.

20           MS. COCKERHAM:  Catherine Cockerham.

21           MR. HAYDEN:  Mark Hayden.

22           THE COURT:  All right.  Let's go in the back.

23           MR. GREINER:  For The Cincinnati Enquirer, Jack

24    Greiner.

25           MR. NELSON:  For Amicus The State of Ohio and
```

1    Attorney General Mike DeWine, Fred Nelson.

2            THE COURT:  Okay.

3            MS. COTCA:  For *Amicus* Judicial Watch, Ramona Cotca.

4            THE COURT:  All right.  So basically we have motions

5    --

6        Oh, I'm sorry.  I forgot Joe.

7            MR. SERGI:  It happens a lot.

8            THE COURT:  I'm looking through the screen, okay?

9    Come on.

10   (Laughter.)

11           MR. SERGI:  Joe Sergi from the Department of Justice

12   on behalf of the United States.  That's okay, Your Honor.  I

13   don't plan on saying anything.

14           THE COURT:  We couldn't have gotten it done without

15   you, Joe.  It's okay.

16       All right.  And I really don't care which order people

17   speak in as long as everybody has the chance to speak and

18   keeps it fairly contained, but basically I guess there's,

19   what, three possible outcomes, right?  Either it all gets

20   disclosed, none of it gets disclosed, or some combination

21   thereof where things that were actually contained in the

22   motions themselves possibly can get disclosed, not disclosed,

23   things like that.

24       So I've got a couple of questions that people can talk

25   about:  What's the standard as Brigida is going to call it, or

1   is it more akin to *Shane Group*.  We can all talk about that.

2       Who wants to start?  It makes no difference to me.

3           MR. GREIM:  Your Honor, we think Lerner and Paz are

4   the movants, so they should probably go first.

5           THE COURT:  That's fine.

6           MS. BENITEZ:  We're happy to do that, Your Honor.

7           THE COURT:  Sure.

8           MS. BENITEZ:  Your Honor, would you like me to come

9   up to the podium?

10          THE COURT:  It's wherever you're comfortable.  If

11  you're going to stay there, Brigida, then you might as well

12  sit and make yourself comfortable, but just use the

13  microphone.  If you want to stand -- I know when I speak I'm

14  nervous, so I like to stand.  So it might be easier to work

15  from the podium.

16          MS. BENITEZ:  I'm used to standing Your Honor, so

17  I'll come up.

18          THE COURT:  Yeah, sure.  Just ballpark how long

19  you're going to speak for us.

20          MS. BENITEZ:  I'm sorry?

21          THE COURT:  How much time do you think?  I'm not

22  putting you on a leash; I just want to kind of know.

23          MS. BENITEZ:  Five or ten minutes?

24          THE COURT:  Perfect.  Go ahead.

25          MS. BENITEZ:  So, Your Honor, we're here today on

1  cross motions regarding the sealing of the depositions of Lois

2  Lerner and Holly Paz, two individuals who were originally sued

3  by plaintiffs but dismissed by this Court.  Both cooperated,

4  submitted to depositions.  In fact, Ms. Paz was deposed twice,

5  once during class certification and once during discovery.

6      Their depositions were attached to the government's Motion

7  for Summary Judgment filed about a year ago and to the

8  plaintiffs' opposition to the U.S. Motion for Summary Judgment

9  which was filed September of last year.  Now, before the

10  government filed its reply brief, the parties settled all

11  claims in October of 2017.

12      Your Honor, while there is a presumption of public access

13  to judicial records under the common law and the First

14  Amendment, we maintain that these deposition transcripts are

15  not judicial records.

16        THE COURT:  Can I ask a question before you go any

17  further?

18        MS. BENITEZ:  Yes.

19        THE COURT:  In one of our -- we didn't have many

20  phone conferences about discovery on this case, so, you know,

21  I should remember all of them word for word.  But in one of

22  them I thought there was a discussion about, due to a pending

23  lawsuit, that your clients didn't have to testify unless they

24  had an agreement, so some form or --

25      Does that ring a bell or am I just making that up?  I

1   thought that was discussed at some point, or somebody can

2   correct me.

3            MS. BENITEZ:  No, that's correct.  And, in fact, that

4   was -- those were the circumstances under which Ms. Paz was

5   deposed during class certification.  Because there was

6   qualified immunity, that deposition was actually covered by an

7   earlier protective order that was agreed to by the parties.

8            THE COURT:  Okay.  And that was just Miss Paz?

9            MS. BENITEZ:  That was just Ms. Paz.  She was deposed

10  at that point, and then both Ms. Paz and Mrs. Lerner were

11  deposed during discovery; but, at that point, both had been

12  dismissed from this lawsuit.

13           THE COURT:  And that occurred before I was on the

14  case, right?

15           MS. BENITEZ:  Correct.

16           THE COURT:  Okay.  All right.  I'm sorry.  Go ahead.

17           MS. BENITEZ:  No.  Please.

18      We maintain that these deposition transcripts are not

19  judicial records.  They were filed with the Court only in

20  connection with a motion that was not fully briefed and that

21  was not and will never be adjudicated.  And that makes all the

22  difference because there is no public right of access to those

23  depositions.

24      Now, even if they were judicial records, we believe we

25  need the *compelling reason* standard to overcome that

1    presumption, as I'll discuss in a little bit.  But if they're

2    not judicial records, then this Court can seal the depositions

3    upon a showing of good cause, and we believe we've made such a

4    showing.

5         We've demonstrated in the voluminous records the

6    harassment and physical threats to Ms. Lerner and Ms. Paz and

7    their families during the pendency of this litigation.  These

8    two women and their families have received repeated and

9    explicit threats of bodily harm in person, by phone, by mail,

10   by e-mail containing graphic and profane language that I will

11   not repeat in this courtroom but that the Court is well aware

12   of.

13              THE COURT:  Right.

14              MS. BENITEZ:  And as we have detailed in our material

15   supporting our motion, harassment and death threats were so

16   serious and credible that the authorities became involved.  I

17   can't imagine that anyone in this courtroom wouldn't be

18   horrified if themselves or their families be the subject of

19   such threats and repeated harassment, especially,

20   unfortunately, in the current environment in which people

21   often use violence to take out their frustrations on public

22   matters.

23        I wanted to also set the context of what it is we're

24   seeking.  We are asking this Court to keep three, three of 233

25   summary judgment exhibits sealed and to keep the unredacted

1    versions of three summary judgment submissions sealed.  Now,

2    that's in terms of the issues relating to the case.  I'm not

3    addressing the affidavits and the briefs relating to the

4    Motion to Seal.  So that's three exhibits sealed, three

5    redacted documents out of almost a thousand documents, both

6    entries and attachments, in this Court's docket over five

7    years of litigation.

8         So starting with the point that the documents are not

9    judicial records.

10        Courts have held that what makes a document a judicial

11   record and subjects it to the common law right of access is

12   the role that it plays in the adjudicatory process.  Now, the

13   D.C. Circuit said in the *El-Sayegh* case that we cited that

14   "documents that are preliminary, advisory, or, for one reason

15   or another, do not eventuate in any official action or

16   decision being taken" are not judicial records and the

17   presumption of public access does not attach.

18        As the Court put it in that this case, if there's no

19   judicial decision, then "documents are just documents; with

20   nothing judicial to record."  There are no judicial records.

21        Now, the Sixth Circuit has approvingly cited the *El-Sayegh*

22   case in the context of student disciplinary records and has

23   said, "There is no First Amendment or common law right of

24   access to documents which played no role in a judicial

25   decision."

1    Other Courts have been fairly consistent on this

2    principle.  The *Flagg* case out of the Eastern District of

3    Michigan, referring to Sixth Circuit precedent and the

4    precedent of other Circuits, said "the Courts of Appeals have

5    uniformly recognized the distinct and more lenient standards

6    that govern restrictions upon discovery materials, as opposed

7    to materials submitted to and relied upon by the courts in

8    making substantive rulings."

9       While the Courts said that the rights of the public kick

10   in when the discovery materials are filed with the court, the

11   Court also said, and I quote, "the extent of these rights

12   depends upon the purpose for which the materials are filed and

13   the use made of these materials by the court."

14          THE COURT:  Can I interrupt you for a second,

15   Brigida?

16          MS. BENITEZ:  Of course.

17          THE COURT:  Because I'm sure it's going to come up.

18      So I'm sure the other side is going to argue that in order

19   to approve the settlement I had to review and make use of the

20   documents that were filed.  What's your thought on that?

21          MS. BENITEZ:  Well, Your Honor -- that's perfect.  I

22   was going to get to that.  Not only did the Court never

23   adjudicate the Summary Judgment Motion, but the Court here

24   only had to determine whether the settlement is fair and

25   adequate.  The likelihood of success factor that the

1    plaintiffs mentioned in their briefs that is part of the

2    larger inquiry into whether, as the Sixth Circuit has said,

3    "the parties are using settlement to resolve a legitimate

4    legal and factual disagreement," and the Sixth Circuit

5    distinctly focuses on the parties' legal arguments.

6         The summary judgment papers are publicly available.  The

7    legal arguments therein are not redacted.  So reference to the

8    depositions of Ms. Lerner and Ms. Paz were not necessary to

9    determine whether the settlement resolves a legitimate

10   dispute.

11        And, in fact, the plaintiffs' brief in support of their

12   motion for settlement approval didn't mention the Lerner and

13   Paz transcripts in the discussion of the merits of their

14   claims and instead discuss the merits of the claim only

15   briefly and at a high level with the focus on the legal issue.

16        And certainly, you know, in reviewing the Court's order

17   approving the settlement, which was just entered yesterday,

18   the Court mentions reviewing the record but makes no mention

19   of any review of the Lerner and Paz transcripts or, frankly,

20   transcripts any of the witnesses.

21        Your Honor, I also wanted to address and started with the

22   standard.  We believe the *Shane Group* case from the Sixth

23   Circuit is distinguishable and ultimately does not support an

24   unsealing.  And, in fact, we think that the result we seek

25   here is consistent with *Shane Group*.

1      *Shane Group* discusses the same presumption for judicial

2  records in the adjudication stage.  And while the Court says

3  that the line between discovery and adjudication is crossed

4  when the materials are put in the court record, it says

5  nothing further on that point.  It assumes those records are

6  for purposes of adjudication, a point that cases like

7  *El-Sayegh* elaborate on and explain that they are.

8      And, in fact, the Sixth Circuit case *In re Morning Song*

9  *Bird Food Litigation* confirmed that the simple act of just

10  filing a document with the Court does not transform that

11  document into a judicial record.

12      So here the deposition transcripts were not part of any

13  adjudication even if they were, in fact, filed with the Court.

14      More importantly perhaps, this case is a world away from

15  the *Shane Group*.  As we said in our briefs, the wealth of

16  publicly available materials here easily distinguishes this

17  case from *Shane Group*.  There the Sixth Circuit vacated the

18  District Court's sealing decision that went so far as to seal

19  the Amended Complaint, the Plaintiffs' Motion for Class

20  Certification, the Response thereto, and nearly 200 exhibits

21  to the parties' filings, including an expert report that

22  served as the keystone to the settlement and under which the

23  expert would be compensated about $2 million.  So without

24  access to the Complaint, the class members could not even know

25  what their legal claims were.

1    So to compare *Shane Group* where almost everything was

2  sealed to this case where almost everything is public just

3  makes no real sense.

4    We think, Your Honor, that because these are not judicial

5  documents the Court may seal upon a showing of good cause, and

6  we've made such a showing here.  The Court can properly seal

7  the documents, you know, weighing the private interests

8  against the public's interests and the information contained

9  in the documents.

10    And the private interests here are significant.  Courts

11  have recognized that individuals have a right to physical

12  safety that must be protected.  We've shown through the

13  affidavits that Ms. Lerner and Ms. Paz have been victims of a

14  campaign of harassment since the initiation of this lawsuit

15  and that they and their family members have received death

16  threats and threats of physical harm.

17    Now, I mentioned earlier and we believe that, even

18  assuming that these are judicial records, the credible death

19  threats and other harassment provide compelling reasons to

20  keep these transcripts sealed.  Courts have ruled that safety

21  concerns are overriding interests that outweigh the

22  presumption of public access to judicial records.

23    So the Sixth Circuit in the *In re Knoxville* case, for

24  example, said that privacy interests can outweigh the public's

25  right of access, that "common law right of inspection has

1   bowed before the power of a court to insure that its records

2   are not 'used to gratify private spite or promote public

3   scandal' through the publication of 'the painful and sometimes

4   disgusting details of a divorce case.'"

5      Here we're not talking just about promoting scandal,

6   though, I think, unfortunately, that may be part of the

7   motivation, but it's about protecting the lives of nonparties,

8   including children, who have been the subject of threats.

9      There are cases both in and outside the Sixth Circuit on

10   point holding that threats of physical violence overcome the

11   public's right to access documents.  Now, in many of those

12   cases the threats were potential; they were ones that the

13   parties thought would come.  They had not been actually made.

14   Here the threats are very real, repeated, and quite

15   disturbing.

16      All of these cases stand for the proposition that Courts

17   can take whatever steps are necessary to prevent individuals

18   from receiving public exposure when that exposure would

19   threaten them, and the Court can still conform to the

20   narrow-tailoring requirement.

21      Now, none of the cases, frankly, that have been cited by

22   anyone, but by, you know, plaintiffs in any of the briefs

23   mirror the facts here.  Now, many of these cases involve plea

24   agreements where the right to public access is particularly

25   important because they contain the entire case, essentially a

1    substitute for trial.  Some of the cases involve

2    business-sensitive information and trade secrets; certainly

3    important and valuable, but not as valuable as a human life.

4        Here this is a very different case.  It's important to

5    examine the context of the documents because there has been

6    some mention in the plaintiffs' briefs and the *amicus* briefs,

7    *amici*, that the public needs to understand "the conduct giving

8    rise to the case," a phrase we've seen again and again.

9        Well, there are 430 entries in the docket.  There are 525

10   attachments.  So that's almost a thousand documents, virtually

11   all of which are publicly available.  So there's a 228-page

12   Second Amended Complaint.  There's the IRS's Answer.  There

13   are Motions to Dismiss.  There's a -- you know, the plaintiffs

14   filed a 103-page consolidated response to those motions.

15   There's Court's opinion.  There are just thousands of pages of

16   briefing that are available to anyone in the public to

17   understand the conduct giving rise to this case.  All of this

18   is public.  The government produced more than 16,000 documents

19   to plaintiffs, none of which were sealed or produced under any

20   protective order.

21       Other than Ms. Lerner and Ms. Paz, plaintiffs deposed 21

22   former and current IRS employees.  None of those depositions

23   are sealed or otherwise under a protective order.

24       Again, we seek to keep three of 233 exhibits sealed and to

25   keep unredacted versions of three summary judgment submissions

1    sealed, all of which have, by the way, lightly-redacted public

2    versions.

3        So the public certainly has sufficient information to

4    understand the conduct giving rise to this case.  There are

5    thousands of documents in the Court's docket, thousands of

6    pages produced in discovery, thousands more in the greater

7    public record that discusses, in excruciating detail, the

8    conduct giving rise to this case.

9        I would point the Court's attention to the *Dish Network*

10   case that we cited out of California.  In sealing the names of

11   confidential informants because disclosure would put their

12   lives and safety at risk, the Court ruled that "disclosure

13   serves no important public purpose because the other

14   declarations and briefs related to the merit of plaintiff's

15   motion for preliminary injunction are sufficient to put the

16   motion and the Court's ruling in context to serve the public

17   interest in understanding the judicial process."

18       Disclosure here serves no important public purpose.  The

19   public can satisfy its need for information when all the many,

20   many documents are already available to them without putting

21   the lives of nonparties at risk.

22       We also contend that the sealing of these deposition

23   transcripts is narrowly tailored, especially viewed in the

24   light of this enormous public record.  It's true that this

25   isn't a case about sealing the names or addresses or phone

1    numbers or other private information.  See, that information

2    is already out there, and it has been used by the public to

3    harass and threaten these women and their families.  Every

4    time there is more publicity there are more threats.

5         In fact, I can represent to the Court that Ms. Lerner

6    recently, in the first spate of articles, received a death

7    threat mailed to her home when there were articles, and TIGTA

8    is currently investigating.

9         It's fair to say that those threats will escalate with the

10   release of the deposition transcripts.

11        Now, there's been a lot of bluster on the other side, but

12   ultimately there is no real prejudice to the parties or to the

13   public.  The parties have litigated their case.  It's done.

14   No member of the class even objected to the multi-million-

15   dollar settlement despite the transcripts being sealed.  There

16   is no prejudice to the public.  As I just went over, the

17   public has an extensive record that it can pour over to

18   understand this case.

19        Now, I understand that they want publicity, and newspapers

20   want to sell newspapers, and perhaps politicians running for

21   office want to side with wealthy backers of this case, but

22   under the law that should not override the legitimate concerns

23   and fears for safety of two non-Ohio residents, nonparties and

24   their families, including children.

25        So, at the end of the day, what we're trying to do is to

1  prevent an avoidable tragedy when there is no corresponding

2  public benefit.

3          THE COURT:  Okay.  Thanks.

4          MS. BENITEZ:  Thank you.

5          MR. GREIM:  Your Honor, I'll probably take those

6  issues in reverse order for you here, but I'll cover both of

7  the key points.

8      The plaintiffs show from discovery that Lerner and Paz

9  were sort of the masterminds of the misconduct that we've

10  alleged here.  We showed that they targeted the conservative

11  applicants based on their names and their viewpoints.

12      Contrary to everything that we've just heard from Lerner

13  and Paz, the content of their testimony does matter.  It

14  actually has to matter.

15      So in their briefing they said it doesn't matter what we

16  said in our transcript, it's just the mere fact that people

17  learn that our transcript has been released that will generate

18  publicity, that will then fire up certain individuals, whoever

19  they are out in the country, that -- that's actually their

20  causal chain.  So under their theory the content doesn't

21  matter.

22      But actually, Your Honor, the content has to matter under

23  both the two main issues today.  I want to start off with that

24  one.

25      I do want to address the fact that last night the Court

1    approved the settlement and granted final approval.  It did

2    state that it had made a thorough examination of the record.

3    It said that there were complex factual and legal issues.

4    And, in fact, the standard in this Circuit out of the

5    six-factor test, the *International Union* case talks about not

6    just legal issues, it talks about factual issues.

7         The Court noted the substantial discovery depositions and

8    other things the parties had conducted in discovery, and it

9    said the parties had the information they needed to resolve

10   the case.

11        These were all arguments that we made in our motion.  In

12   fact, if you go back to our motion both for preliminary and

13   final approval, on page 1 the very first thing we said was

14   that an important part of this settlement is that we are now,

15   the public is now going to be able to get all the facts about

16   this scandal that otherwise had not come out.

17        We mention the fact that we had been able to depose Lerner

18   and Paz.  Then at page 11 we point to the depositions of

19   Lerner and Paz as informing the settlement, as informing the

20   class.

21        Now, it is true that in our motions for approval, Your

22   Honor, we did not go back and reargue the case, cite the

23   entire record.  That's not what you do in that kind of a

24   motion.  We directed the Court to the record.  It was our hope

25   and expectation -- and, in fact, the Court did look at our

1 summary judgment papers not for purposes of deciding the

2 summary judgment but to see what the actual issues were as

3 part of the Court's findings.

4     The Court noted the many factual intricacies of the case;

5 and, of course, the place you would find that would be in

6 summary judgment briefing.

7     But, Your Honor, here's the key point.

8     At the heart of the intricacies that you talked about in

9 your order last night is what Lerner and Paz did.  These are

10 not just two witnesses.  Their transcripts are not just three

11 out of, whatever it was, 400 documents.  This is the

12 explanation of the people, the two individuals who we allege

13 orchestrated the targeting.  That was our theory in this case.

14 It was not that the White House did it or something like that.

15 It was that Lerner and Paz did it.  What we showed was, in our

16 summary judgment papers, the animus that these individuals had

17 against the groups.  We showed that they then had the

18 knowledge of how the groups were being targeted and that they

19 ratified it.

20     I won't go through all the fact here.  But with respect to

21 Paz, for example, we argued that she had knowledge in the

22 spring of 2010 that what were then being called Tea Party

23 groups were being targeted, not because they had advocacy in

24 their files but because they were members of the Tea Party

25 movement.

We showed that Lerner was informed only a month or two later with documents showing the Tea Party was being looked at as its own issue, that there were going to be test cases and there was going to be delay. Then we showed what Lerner did in 2011 in June when she was undeniably informed of what was going on. And, you know, what did she do? Well, Lerner had said publicly that she tried to fix it. But, in fact, we showed that no, she did try to fix it; she changed the label for what was going on, and she ratified the old conduct and kept the process of delay going and, in fact, told the Cincinnati people that you're doing a good job.

So, look, Your Honor, we understand Lerner and Paz, despite the settlement and the Attorney General's apology, might adamantly disagree with everything I just said. They certainly provided testimony on all these points and more. That is what we're looking at.

At the end of the day when the American people, when the people that care about this case want to know --

"All right. Well, we've seen the e-mails. What did the people who sent these e-mails say about it? Did they mean what they said? Is this really what it appears to be?"

-- well, those are the questions that were asked and answered.

And I will not go into the content of it, obviously, but that is what the transcripts give, the capstone to all of

1   this.  They tell us what was really motivating these two

2   people.

3           THE COURT:  Let me interject something then.  So when

4   you're referencing what I reviewed, what I did look at were

5   the motions.  I didn't look at the depositions in their

6   entirety.  Any distinction there?

7           MR. GREIM:  Well, Your Honor, we certainly invited

8   you to do it.  I think that the motions --

9           THE COURT:  Well, I didn't need to because I assumed

10  you accurately quoted the depositions.  Right?

11          MR. GREIM:  And I believe and hope we did, Your

12  Honor.  But the other thing is, this Court has a local rule.

13      I guess we should -- let's go and skip that point and I'll

14  go back in.

15      This Court has a rule that when you cite from a

16  transcript, that you don't just put that page and then the

17  signature page.  You file the entire thing because the context

18  --

19          THE COURT:  That is so that myself and my law clerks

20  can test the accuracy of quotations, which was not necessary

21  because no reply was filed and no -- because of the

22  settlement, we didn't have to get that far.

23          MR. GREIM:  Well, Your Honor, there is no case,

24  certainly in this Circuit -- now, I understand that we've got

25  a difference of what the Sixth Circuit holds, but in the *Shane*

1     *Group* and *Rudd* cases this Court does not say that we're going

2     to go in and look and see which individual parts of one

3     transcript were actually cited in an opinion or even cited by

4     the parties.

5        I mean, frankly, I know we filed lengthy papers. But we

6     did have to worry about repetition and we were under some time

7     limitation. We can't possibly cite every part that is

8     relevant to the determination. We have to assume that the

9     Court might go and say, "On the following page, did that

10     witness say the opposite?" That's why we filed the whole

11     thing. We can't know what exactly you did, but --

12          THE COURT: Well, it didn't come to that, Eddie. You

13     know that.

14          MR. GREIM: Right. But you had to look at it for

15     purposes of class certification. So even, Your Honor, in the

16     Circuits that have adopted the relevance and the use standard,

17     which are clearly some of the other Circuits, we don't see

18     them going into a deposition transcript -- we don't have a

19     single case where they go through and they redact parts of a

20     transcript that weren't cited by the parties. Because,

21     frankly, with even more time and more space we could have gone

22     through.

23        I mean, you know, did we have an inquiry about whether

24     that testimony had to be cited? Were there other parts where

25     the person said the same thing? I mean, that would have to be

1   relevant, Your Honor, because at that point why would we

2   unredact part of the transcript that mentioned the fact

3   because it was cited when the person said the same thing two

4   days later.  At what point is -- how is that narrowly

5   tailored?  There's nothing new.

6       So I want to circle back to this content issue because

7   this is the key.  I think these are judicial records.  We've

8   briefed it so much, there's enough authority that I think

9   everything we wanted to say is there.  I want to go to this

10  point.

11      Lerner and Paz, under their theory the content doesn't

12  matter.  And this is a key point.  If you look at all of the

13  cases, what do they say is the burden of the party trying to

14  overcome a strong presumption?  They say they've got to go

15  document by document, page by page.  And why do they do that?

16  It's because whatever the interest is, whether it's privacy,

17  whether it's a privilege, whatever they're relying on,

18  physical threats, it's got to tie to something that's being

19  said.

20      And, you know, now you might say at first, well, there

21  might be an exception in these confidential informant/

22  undercover police cases.  But there, what's the issue?  The

23  issue is the information that's their identity.  It's their

24  name.  So that's the thing that puts them in danger.  If they

25  are going to be in the same prison as the person who, you

1    know, are the compadres of the person who committed the crime,

2    there is all kinds of testimony that they're in trouble.  They

3    get beat up.  They get picked on in prison.  Those are all

4    unique cases.

5         But the point is, Your Honor, in all of them, here's what

6    they have in common.  They have something that's private.

7    They have some private information, not public official acts.

8    They have private information, and then they've got a showing

9    of what about that private information is going to injure

10   them.  And sometimes it's just their name.

11        And so what have they done in this case, Your Honor?

12   They've departed from that.  They've openly said in their

13   brief:  We're not going to take on that burden because that's

14   not our theory.

15        It's enough for them that the media report on the idea

16   that this is being released.  And so --

17        In fact, they've even -- they've characterized the

18   transcripts as having nothing new.  They've said:  Oh, people

19   can read the actual e-mails and, you know, they can see enough

20   of this that we don't really need it.

21        Well, you have to ask yourself:  What's the problem then?

22   What's the harm?

23        Again, under their theory, it's the, quote, "media

24   spotlight."  That is their theory.  And there is no other

25   case, there is no other case that relies on that theory.

1    Now, there are two reasons why, Your Honor, that has to

2  fail.  First of all, it's tied to a prediction about what

3  people will do when they read media coverage about public

4  official acts.  And so if the theory just stopped at media

5  coverage -- they -- they've got two bumps in their causal

6  chain.  If they just stopped at media coverage and that was

7  the harm --

8    So, for example, if *The Washington Post* covers this and

9  says "Lerner and Paz tried to keep their testimony secret" and

10  then 500 people write comments and they write terrible things

11  in there -- I guess I won't give any suggestions or examples,

12  but if they write all kinds of things in the comments, that by

13  itself is not enough.  We know that.

14    In fact, we know that that public interest that doesn't

15  constitute actual threats against Lerner and Paz actually

16  raises the bar even higher for sealing.  I mean, if that were

17  all, we'd be done.

18    And so what the defendants want the Court to do, what

19  Lerner and Paz want the Court to do -- excuse me -- is to go a

20  step beyond that and basically say:  In America today, when

21  there's intense media coverage, there are just some people who

22  come to a boil and they can't control themselves and they send

23  off letters.  They send off threats.

24    How many of those are true threats?  I guess we shouldn't

25  get into that in a public debate.  But the point is they are

1  asking the Court to speculate in a way that the other cases

2  don't.

3      Let me -- let's also look at the case and see where the

4  reasoning breaks down, because what they needed to do here was

5  show you a little bit more about the content.  Now, their

6  incidents --

7       Although we just learned about something new at oral

8  argument.  I'd be very curious to see exactly that this is

9  involving Miss Lerner.

10      But the incidents are clustered in May of 2013 when the

11  scandal emerged.  Now, we have heard counsel say it's

12  coterminous or it coincided with the onset of the litigation.

13  I mean, frankly, I think we can take judicial notice that the

14  scandal itself and the Congressional hearings have gotten far

15  more discussion than the case itself.  But May of 2013, and

16  then there were some outliers that went as late as October of

17  2014.

18      Now, the key moments in this case, Your Honor, all

19  postdate that.

20      The 2015 Motion for Class Certification, which contained

21  all of that discovery, and the early 2016 granting of class

22  certification, that was the most media coverage that this case

23  has had.  There were no more threats at that time.

24      The 2016 argument at the Sixth Circuit over the list of

25  targeted groups, that was a major media moment.  There was

1     nothing.  There were no threats at that time.

2        The 2016 injunction against TPTP that Your Honor entered

3     based on likelihood of success on the First Amendment

4     violation, nothing there.

5        And then, finally, the 2017 Motion for Protective Order

6     that Lerner and Paz filed, other than what I've just heard

7     about here in the courtroom, there was nothing.  There was

8     nothing from that time forward other than the comments and the

9     newspaper articles, which can't serve as the basis.

10       So, Your Honor, there is not even a match between

11    publicity about Lerner and Paz and about the key facts in this

12    case and the timing of the death threats, or whatever else you

13    want to categorize these unpleasant messages as, that came in.

14    They don't line up factually.

15       And, frankly, the far more likely explanation is that when

16    the scandal first broke or when someone came before Congress,

17    that that seemed to reach deeper in the public and perhaps

18    motivated these individuals.

19       The point is that the Court, given the showing that they

20    have to make, the Court should not be in the business of

21    speculating about that.  There should actually be proof that

22    links the content to the harms.

23       But let me go further.  There is actually even greater

24    issue.  When they don't tie their harms to content, that means

25    they are not tying it to actually private information.  And

1  that private information, Your Honor, undergirds every other

2  case:  undercover agent identity; their spouse's name or phone

3  number; or the testimony of that agent or confidential

4  informant that's going to tell the bad guys who is testifying.

5  We've got a long, you know, hundred-year history of agents and

6  undercover police being killed violently.  That was talked

7  about in one of the cases.

8      So here's what their argument really means.  Their

9  argument is purely based on threats.  It's purely based on

10  threats.  They've skipped the point about private information.

11  Because, again, this testimony is about their official conduct

12  as agents of the United States Government.  It's not about

13  their private lives.

14      So, Your Honor, a showing of threat, if it were real, if

15  any litigant did this -- and Lerner and Paz could have done

16  this -- it could and should actually have required Lerner and

17  Paz to seek the seal of many other things, for example:  other

18  witnesses' testimony about their conduct; their e-mails, in

19  our view, damming e-mails disclosing their motivation behind

20  what they did.  All of those things are in the record.  Those

21  actual exhibits are in the record.

22      Now, Your Honor, why did those things not lead to death

23  threats or to the other things, the other harms that are

24  alleged here?  Because those were all filed in all these years

25  when nothing was happening until this thing we just heard

1    about a few minutes ago.

2        So, Your Honor, the point is they really would need to

3    have -- if their theory is correct, they should have tried to

4    seal all those materials.

5        In fact, why not go further than that?  Why not parties'

6    statements and briefs that are deemed to be too incendiary

7    and that get quoted in the paper and then fire up someone

8    sitting at home reading that?  What about my argument today?

9    It could be quoted somewhere.  And, again, if this background

10   of threat is there, it's enough, because it's not private

11   information.

12       So, Your Honor, at the end of the day when you skip over

13   this initial element of privacy and you allow official acts,

14   official testimony about their official acts --

15       They are not private acts, by the way.  It's not

16   intelligence-gathering on terrorism or anything like that.

17   This is their work at the IRS.

18       -- if you allow threat to be enough, then we can muzzle

19   far more filings, far more court proceedings than is done

20   today.

21       In fact -- and I won't go through the cases again.  That's

22   why we don't see a case like this.  We don't see a case based

23   purely on threat.  The *Dish Network* case was an *ex parte*

24   proceeding.  There wasn't even opposing counsel to argue.  The

25   law is probably not correctly cited there.  It's an unreported

1   decision.  But even there, they actually -- it was an

2   undercover agent scenario who was still out in the field and

3   still working.

4       Your Honor, this case would be an outlier if this were to

5   be the first Court to say that it's threat alone, threat alone

6   will be enough, it doesn't have to be a private activity,

7   private information, someone's identity.

8       Your Honor, I think with that I've covered in reverse

9   order.  Unless you have other questions, I have nothing else.

10              THE COURT:  No, I'm good.  Thanks.

11      Let's head to the back.  Jack, do you want to be next?

12              MR. GREINER:  Thank you, Your Honor.

13              THE COURT:  Sure.

14              MR. GREINER:  Just a couple of points.  Your Honor, I

15  would just like to talk about the consequences of what I think

16  it would mean if this Court adopted Lerner and Paz's standards

17  in two areas.

18      One, this judicial document theory.  They basically are

19  taking the position that if the Court -- really, they are

20  taking the position that if the case settles while there is a

21  pending motion that is unresolved, then that pending motion is

22  not a judicial document.  I mean, that is their argument.

23      That's not supported by *Shane*.  In fact, *Shane* goes the

24  complete opposite way.  Bear in mind that in *Shane,* one of the

25  documents at issue was an expert's report that was in front of

1    the Court only because it was attached to a *Daubert* motion

2    which was unresolved at the time of the settlement in *Shane.*

3    *Shane* involved settlement as well.  Had *Shane* adopted Lerner

4    and Paz's theory, it would have found that report to not be a

5    judicial document.

6        So *Shane* certainly doesn't advance their cause and, in

7    fact, by its operation, flatly contravenes their argument.

8        But let's just talk about for one minute the --

9        Besides the consequence that a settlement can essentially

10   wipe out the history of any unresolved motion, which is

11   absurd, let's just talk about the further consequence of their

12   argument, which is if the Court doesn't look at this specific

13   line in this specific record, then it is not a judicial

14   document.

15       Just think about the consequence of that for a minute.

16   Who's going to make that determination?  You're going to have

17   to take the record at issue, and then you're going to have to

18   take the Court's determination, and then you're going to have

19   to -- somebody, I guess the Court, will have to parse out,

20   "Well, yeah, but I'm reading this decision, and the Court

21   didn't really reference, you know, page 5 of the motion, so

22   page 5 isn't a judicial record.  Or it didn't really

23   explicitly talk about Exhibit A, so Exhibit A is not a

24   judicial record."

25       That is a completely unworkable system, and it's not a

1  surprise that there's no cases to support it.

2      The *Sayegh* case is completely not on point for a couple of

3  reasons.  Number one, it involved a plea agreement.  In the

4  Circuits, there's a specific way that plea agreements are

5  dealt with.  It was talked about in the *Sayegh* case.  It was

6  talked about in the *Robinson* case, which is cited in *Sayegh*.

7  It's very limited to that specific process, number one.

8      Number two, the plea agreement was part of a motion that

9  said to the Court basically:  If there is a plea agreement, we

10  don't have one yet, the defendant has never agreed to this,

11  the defendant has not answered a plea, but if the defendant

12  does, we want that to be under seal.

13      So it was really kind of a conditional filing.  That's not

14  the case with this Motion for Summary Judgment.  It's not as

15  if the Motion for Summary Judgment was presented to the Court

16  and said, "Hey, Judge, if we file this, we're going to want it

17  under seal."

18      So it's completely not on point, and I for the life of me

19  can't figure out why it was cited other than they have nothing

20  else so they may as well give it a shot.  But the standard

21  that they are proposing is completely unworkable.

22      With respect to whether it's a judicial document, of

23  course it's a judicial document.  I mean, it's kind of absurd

24  to think otherwise.

25      Your Honor, with respect to their view of the compelling

1   need -- and I don't want to be repetitive.  Again, the idea is

2   we can't have publicity because publicity causes crazy people

3   to make threats.  So, therefore, we've been accused of this

4   controversial behavior; and if our explanation of our role in

5   that controversial behavior becomes public, that will fire the

6   public up.

7         We're not pointing to any trade secret, confidential

8   source information or information that needs to be statutorily

9   remain confidential, which are the only three things that

10  *Shane* said.  That's what *Shane* is limited to by its express

11  holding, by the way, so they can't point to any of that.

12        As Mr. Greim said, what they're saying is:  There's going

13  to be publicity, and when there's publicity, you know, people

14  send us angry messages.

15        Okay.  If that's the standard, again, let's think about

16  the consequences of that.

17        That means every Ponzi scheme operator who is tried in

18  this court is entitled to their deposition testimony being

19  sealed because it's the same thing and probably worse.  People

20  who have lost millions of dollars, you know, might have an

21  interest in taking some physical, you know, retribution

22  against that Ponzi scheme operator, so we got to seal that

23  Ponzi scheme operator's deposition.

24        Accused pedophile priests.  I mean, that's going to cause

25  some strong emotions.  So that means, under this theory, that

1  the accused pedophile priest deposition testimony has to be

2  sealed because, my goodness, the publicity is going to cause

3  all kinds of problems.

4       A cop killer.  I mean, I can go on and on.

5       It, again, is a standard that if adopted in this case is

6  going to lead to that argument in every case, and I don't know

7  for the life of me how you make a principled distinction.

8       So that's the can of worms that Lerner and Paz are asking

9  you to open, Judge.  There is no basis for it, and the

10 implications of it are extraordinary and would lead to just an

11 unworkable situation.

12      That's all I have.

13          THE COURT:  Okay, thanks.

14      Fred, do you want to say something?

15          MR. NELSON:  Yes, Your Honor, if that's all right.

16          THE COURT:  Sure.

17          MR. NELSON:  Thank you, Your Honor.  So the question

18 here is whether the public is entitled to know what the

19 depositions of public officials as filed in this case

20 involving the federal government, what the federal government

21 has now admitted was an abuse of public governmental power,

22 where the public is entitled to know that.  And on behalf of

23 the State of Ohio, which I believe is the only public entity

24 to have briefed the issue in this case, the Ohio Attorney

25 General submits that the answer is yes, the public is entitled

1   to know that under the case law.

2      The Sixth Circuit has made clear again and again that it's

3   the vital public interest that's at stake here saying, for

4   example, that the public interest, where the public interest

5   relates to the conduct giving rise to the case, secrecy could,

6   quote, "insulate the participants, masking impropriety,

7   obscuring incompetence and concealing corruption."

8      And that's why the standard is so high.  That's why it's a

9   strict standard involving compelling interest, narrow

10   tailoring and the rest.

11      Here the request by Ms. Lerner and Ms. Paz is to seal all

12   of their deposition testimony for all time.  And they say,

13   well, the public can get an understanding as to what went on

14   here by reading the Amended Complaint and other documents,

15   presumably, the admissions of the federal authorities and so

16   forth.

17      But what they're asking to shield is not simply three out

18   of however many documents that are on the docket.  It's a

19   hundred percent of their deposition testimony.  All the

20   deposition testimony by the central actors in this scandal

21   they say should be concealed, and that's totally contrary to

22   what the Sixth Circuit at any rate has said that the law is in

23   these considerations.

24      There are all sorts of public interests at play here.  It

25   seems to me we, as a public, have a right to try to make sure

1  that the IRS is not used as a political tool.  Decade after

2  decade we've tried to implement reforms to ensure that, but

3  we are again in a taxpayer-targeting case where the government

4  is paying out millions of dollars apparently in settlement.

5      As our brief noted, Ms. Lerner and Ms. Paz have said

6  elsewhere, they've argued to other Courts that a reasonable

7  person would not have known it was wrong to target groups on

8  the basis of their philosophical predispositions.

9      The public has a right to know how folks could have

10  thought that if the answer to that question is in the

11  deposition transcripts that have been filed on the public

12  record.

13      The publication of the depositions as filed also serves a

14  useful purpose, it seems to me, in acting as a check on the

15  process in that the depositions will be available to

16  journalists and co-workers and the knowledgeable public that

17  can check them against the facts as those individuals find

18  them to be.

19      And as the Sixth Circuit has emphasized too, and this

20  goes, I think, directly to the arguments that Miss Benitez was

21  making on the other side, openness and public access can

22  reduce public pressures and suspicions and to serve as

23  something of a steam valve.

24      To quote the Sixth Circuit from the *Brown & Williamson*

25  case, quote, "When the legal system is moving to vindicate

1    societal wrongs, members of the community are less likely to

2    act as self-appointed law enforcers or vigilantes," which

3    people should never do, whose conduct is disgusting and is

4    wrong as it is illegal.

5        To continue to quote the Sixth Circuit, "The crucial

6    prophylactic aspects of the administration of justice cannot

7    function in the dark; no community catharsis can occur if

8    justice is done in a corner."

9        Now, Ms. Lerner and Ms. Paz argue that no legitimate

10   public function is served by open access here, but that's

11   wrong.  As I say, they are seeking to shield a hundred percent

12   of their testimony.  The Sixth Circuit has been very clear

13   that the line is crossed when deposition transcripts are filed

14   with the Court.

15       *Shane* says, as Your Honor knows, that discovery is one

16   thing, but at the adjudication stage very different

17   considerations apply.  The line between these two stages,

18   discovery and adjudication, "is crossed when the parties place

19   material in the public record."  And the quote goes on to say

20   that "the public has a strong interest in obtaining the

21   information contained in the court record."

22       That's the law in the Sixth Circuit today -- right? --

23   and the law in a great many other Circuits.  It may or may not

24   be the law in the D.C. Circuit.  The D.C. Circuit acknowledged

25   that there are other -- in the *Sayegh* case that's cited in

1   here, and in other Circuits, and they said, for example, the

2   *Pansy*, P-A-N-S-Y, case out of the Third Circuit that says the

3   existence of the right depends on, quote, "whether a document

4   is physically on file with the court."

5       This issue came up just three weeks ago in the Sixth

6   Circuit again in a case called *Woods,* a one-page decision by

7   Judge Kethledge from July '18 which involved dismissal of a

8   protest of administrative rule.  One party, apparently

9   contrary to the agreement with the government, filed with the

10  Sixth Circuit a notice that attached the settlement agreement.

11  This was not a class certification case.  The Sixth Circuit

12  didn't need to review the settlement agreement.

13      The government protested and said:  We want this removed

14  from the record.

15      And Judge Kethledge and his colleagues on the panel said:

16  No.  Settlement is already part of the public record because

17  it was filed, and any agreements between the parties "would

18  not overcome the public's strong interest in access to court

19  records."

20      The court hadn't reviewed it.  They hadn't used it to

21  decide anything.  The case was being dismissed, but it was a

22  court record and the Sixth Circuit insisted that it remain as

23  much.

24      Miss Benitez cites to the *Flagg* case, a District Court

25  opinion that preceded *Shane* and *Rudd* and so forth.  As we

1    noted in our brief, in that case the District Court say,

2    quote, "As the Court explained in its May 26 decision, the

3    Attorney General's deposition is not a judicial document,

4    because neither it nor any other sealed materials have been

5    filed for the purpose of securing this Court's ruling on the

6    merits of any substantive issue."

7        *Flagg* cuts, I think, in favor of disclosure, not the other

8    way.

9        The public's interest in this matter is of great

10   significance.  The Sixth Circuit in the *Signature Management*

11   case from last year emphasized again that that's the central

12   question that needs to be addressed.

13       I would note that we would deplore, of course as everyone

14   in this courtroom would, any threats or indications of private

15   retaliation.  That, as has been said, is not the issue here.

16   We would certainly have no objection to the Court redacting

17   aliases, if people used them, or addresses or Social Security

18   numbers or information regarding personal routines and that

19   sort of thing.

20       The question is should the substance of the rationales and

21   rationalizations and actions of public actors be available for

22   public inspection having been filed with the Court in this

23   public adjudication.

24       With that said, I very much appreciate the courtesy of the

25   Court and allowing me to appear here today.

1          THE COURT:  Thank you.

2          MR. NELSON:  Thank you.

3          THE COURT:  Ramona, do you want to add anything?

4          MS. COTCA:  Very briefly, Your Honor.

5          THE COURT:  Okay.

6          MS. COTCA:  Good afternoon.  Just to introduce to the

7  Court Judicial Watch, because it's an *amicus* party, Judicial

8  Watch is a nonprofit organization --

9          THE COURT:  I read your filing.

10          MS. COTCA:  Okay.  All right.  So you know the

11  importance and the mission of the organization with respect to

12  promoting transparency, accountability, fidelity, and

13  integrity in government.

14     So I think the common theme here, at least with respect to

15  where Judicial Watch's position is, there is a grave interest,

16  public interest, with respect to these two depositions, or

17  three, the depositions of Mrs. Lerner and Miss Paz.

18     And just to update the Court on the brief that had been

19  filed, because we did mention a case that Judicial Watch -- it

20  still is pending, actually, against the IRS in the District

21  Court in the District of Columbia.  Shortly after we did file

22  the brief, we noted that part of the reason we'd like to see

23  the depositions is to be able to put forth the argument that

24  government misconduct is an exception to the B5, the

25  deliberative process exemption under the Freedom of

1    Information Act.

2        Since that brief has been filed, and I don't know if there

3    is any coincidence as to the timing, the IRS did agree to

4    provide all of the withholdings that we were challenging.

5        Now, those withholdings are just a minimal portion with

6    respect to the vast volume of records we've received in that

7    case, and there are a lot of other withholdings from e-mail

8    communications with Miss Paz and Miss Lerner.

9        That being said, I don't think our position changes in any

10   way here because, contrary to what the attorney for Miss Paz

11   and Miss Lerner had said, that there is no prejudice to the

12   public, there is prejudice to the public.

13       Based on the litigation that we have had and still have

14   against the IRS, we still do not have a complete record of all

15   the e-mail records of Miss Lerner and Miss Paz.  Part of our

16   litigation on the lawsuit, there was an investigation with

17   respect to their, Miss Lerner's anyway, missing e-mails.  More

18   than 400 backup tapes had been destroyed during our litigation

19   when it was pending.

20       The deposition testimony, the words of Miss Lerner and

21   Miss Paz with respect to their thinking and their conduct

22   during this time that the IRS was targeting these groups, is

23   essential and is part of that public record that the public

24   deserves to have.

25       So I would argue that the public would be prejudiced if

1    these depositions would be sealed in perpetuity as their

2    position is here today.

3        Thank you very much for your time

4            THE COURT:  Brigida?

5            MS. BENITEZ:  Thank you.

6            MR. SERGI:  Actually, Your Honor, could I be heard

7    for one second?

8            THE COURT:  Oh, I thought you said you weren't going

9    to say anything?

10           MR. SERGI:  I really thought I wasn't.

11           THE COURT:  I kind of zoned you out.

12           MR. SERGI:  I feel I needed to correct something.

13           THE COURT:  All right.  Come on up, Joe.

14           MR. SERGI:  Your Honor, the government, as you know,

15   takes no position on whether it should be sealed.  We didn't

16   oppose the sealing.  We didn't oppose the unsealing.

17       But we do believe an accurate record should be relied upon

18   by this Court.

19       Both Mr. Greim and Mr. Nelson made a lot of claims that

20   I'm not going to go into about what the case is about and what

21   the Court held and what the parties agreed to.  I will -- I

22   know the Court should just look at the Second Amended

23   Complaint and the settlement agreement to see what was

24   actually agreed to in the case.

25       But with regard to Judicial Watch, while I do agree that

1    the government has waived the deliberative process --

2        I'm not involved in those cases.  I was tangentially

3    involved in one because I'm actually the ESI coordinator and I

4    actually know how the computers systems work in the

5    government, so I was an advisor in one case.

6        But I asked the counsel before I came out, and they

7    informed that the government has indeed waived deliberative

8    process on those documents.  However, what made me stand up

9    was the insinuation that somehow it had something to do with

10   these motions because the -- I asked them for a pleading that

11   I could give to the Court, if necessary, and it was filed on

12   January 31st, 2018, was when the government said that it would

13   waive reliance on deliberative process with regards to the

14   first case cited.

15       So I just wanted the timing to be clear, that it was not

16   in reaction to this motion, it was not -- that is a separate

17   case.  That case is not being handled by the attorneys who are

18   handling this case.  They are working their own case out, and

19   I just wanted that to be clear.

20       Thank you, Your Honor.

21           THE COURT:  Okay.  Thank you.

22       Final thoughts, Brigida?

23           MS. BENITEZ:  Yes, Your Honor.  Thank you.

24       One thing that the other parties said have an impact as to

25   whether or not these are judicial records.  The content is not

1   what makes it a judicial record.  We're not here to debate the

2   merits or relevance or substance or the importance of the

3   testimony of Ms. Lerner or Ms. Paz.  We don't take any

4   position on that.

5       And to the extent that plaintiffs want everyone and the

6   public to know, you know, about their knowledge in 2010 or

7   whatnot, there are thousands of documents, including e-mails

8   of both Ms. Lerner and Ms. Paz, none of which have been sealed

9   in this case.

10      The key is that these deposition transcripts were not used

11  for an adjudication.

12      We have shown good cause, and we have shown that the

13  privacy interest is in safety.  That's at the core of the

14  cases where testimony has been sealed or a courtroom has been

15  sealed.  It's those privacy interests that outweigh any public

16  interest here.

17      And it's not just intense media coverage.  It's not that

18  there are articles.  It's that these two women and their

19  families have actually received threats, people at their

20  homes, and other things that we've detailed in the affidavit.

21  And contrary to what the plaintiffs have said, those threats

22  are not stale.  We have detailed that they've been ongoing and

23  have occurred throughout this litigation, and the affidavits

24  say as recently as this year.  So those threats have been

25  ongoing.

1    This is -- it's not our argument, as counsel for *The*

2    *Enquirer* said in trotting out the parade of horribles, that,

3    you know, we're wiping out the history of any unresolved

4    motion?  No.  What about the 230 summary judgment exhibits

5    that are publicly available?  Those stay on the record.  The

6    summary judgment pleadings, all of that is still on the

7    record.  We are not asking about that, and we're not trying to

8    hide any kind of role that Ms. Paz or Ms. Lerner had in these

9    cases.  That's all already publicly available.

10    We're here because the publicity matters, and Ohio has

11    recognized that.  I point the Court to the *Fears* case where

12    the concern about publicity to the manufacturers of

13    lethal-injection drugs, concern about potential negative

14    publicity and threats that would emerge were sufficient.  Here

15    we have concrete threats, not just people writing comments

16    to a *Washington Post* article, though there are certainly

17    plenty of those.

18    I'd like to address for just a moment the *Woods* case that

19    counsel mentioned.  It makes no difference.  In that case, I

20    mean, easily distinguishable.  There was a settlement

21    agreement that was attached to a Motion to Dismiss for review.

22    That motion was actually adjudicated by the Court and, more

23    importantly, there was no justification given in that case for

24    sealing.  In fact, the Court said the government does not even

25    attempt to do that.  It's very different because we have

1    provided arguments for sealing.

2        The plaintiffs address the threats and call them stale, I

3    suppose, and no one else even addressed the threats.  But

4    that's why we're here because those are significant threats

5    and those outweigh any interest that there may be in the

6    public knowing just a tiny bit more about this case, because

7    there are thousands of documents out there.

8        And I guess I would end by saying:  At the end of the day

9    here, will it be worth it if *The Enquirer* gets to write a

10   story if Lois Lerner is assaulted?  I certainly don't think

11   so, and we hope the Court will agree with us that it wouldn't

12   be.

13       And I'd like to just make one final point that we included

14   in the footnote, but I'd like to make sure that it's clear.

15   We've been talking about the deposition transcripts.  There

16   are also videos of these depositions that have not been filed

17   with the Court.  Those videos, I just want to make clear our

18   position, are not judicial records, have not been, I would

19   assume, viewed by the Court since they've not been filed with

20   the Court, and are not and should remain sealed regardless of

21   the Court's decision on the actual transcripts.

22       Thank you, Your Honor.

23           THE COURT:  Okay.  Thanks.

24       All right, guys.  Thanks for your attention.  Appreciate

25   it.

1           MS. BENITEZ:  Thank you, Your Honor.

2           THE COURT:  What's the matter?

3           MR. GREIM:  I don't --

4           THE COURT:  You said she was the movant.  She goes

5  last.

6           MR. GREIM:  Fair enough, Your Honor.

7           THE COURT:  All right.  Thanks.  Guys.

8           COURTROOM DEPUTY:  This court is now in recess.

9

10

11

12      (The proceedings concluded at 2:10 p.m.)

13

14

15

16               C E R T I F I C A T E

17

18  I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

19  RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

20

21  S/MARYANN T. MAFFIA, RDR                    _____

22  Official Court Reporter

23

24

25